John C. Longmire (*pro hac vice* admission pending)     Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (*pro hac vice* admission pending)   David W. Gaffey (VSB# 85088)
James H. Burbage (*pro hac vice* admission pending)     Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**                        **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue                                      Two James Center
New York, NY 10019                                      1021 E. Cary Street, Suite 1700
                                                        Richmond, VA 23219
Telephone:        (212) 728-8000                        Telephone:        (804) 977-3300
Facsimile:        (212) 728-8111                        Facsimile:        (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF RONALD KRUCZYNSKI,
## CHIEF FINANCIAL OFFICER OF PAPER SOURCE, INC.,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Ronald Kruczynski, hereby declare under penalty of perjury:

1.      I am the Chief Financial Officer of Paper Source, Inc. (together with the other above-captioned debtor and debtor in possession, the "Debtors," the "Company," or "Paper Source").  I have served as Chief Financial Officer of Paper Source since joining the Company in March 2014.

2.      I have more than two decades of experience as a senior financial executive for a number of companies in the retail, media and technology sectors.  Prior to joining the management team of Paper Source, from 2011 to 2014, I served as Chief Financial Officer – Radio Stations of

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

Clear Channel Media and Entertainment, now known as iHeartMedia, Inc., the largest radio broadcasting company in the United States. Before that, I worked for three years as the Chief Financial Officer of Highway Technologies, Inc., a leading provider of traffic safety services and equipment. Prior to these roles, I served as Vice President of Finance for Sears Holding Corporation, the owner of a large chain of department stores, and as Director of Accounting of GE Capital, the financial services division of General Electric. I have a bachelor's degree in accounting and finance from Augustana College and a master's degree in business administration from DePaul University. I am also a Certified Public Accountant.

3.     On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced with this court (the "<u>Court</u>") voluntary cases under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated in this Declaration, all facts set forth in this Declaration are based upon my personal knowledge, input by the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.     I submit this declaration to assist the Court and other parties in interest in understanding the circumstances and events that led to the commencement of the chapter 11 cases ("<u>Chapter 11 Cases</u>") and in support of the motions and applications that the Debtors have filed with the Court, including the "first-day" pleadings (the "<u>First Day Pleadings</u>"). The First Day Pleadings seek relief intended to preserve the value of the Debtors and maintain continuity of the

Debtors' operations which, as discussed more fully below, is critical in these Chapter 11 Cases as the Debtors seek to maximize value for the benefit of their stakeholders.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

## Background

5.      The Debtors operate a leading lifestyle brand and retailer of premium paper products, crafting supplies and related gifts, including custom invitations, greeting cards and personalized stationery and stamps.  Through their 158 domestic stores and e-commerce website, the Debtors are an omnichannel provider of fine and artisanal papers, wedding paper goods, books and gift wrap.  The Debtors also provide wedding consultation, crafting supplies and instructions, and subscription services.  The Debtors' administrative headquarters is in Chicago, Illinois.

6.      As described in detail below, prior to the outbreak of the COVID-19 pandemic, the Debtors had been enjoying rapid expansion and sustained sales growth, and had recently undertaken a significant acquisition.  However, as with many other retail brands, the Debtors have sustained deep damage to their finances and operations as a result of the ongoing COVID-19 pandemic.  The Debtors have commenced these Chapter 11 Cases to implement a comprehensive restructuring that will allow the Debtors to achieve certain objectives that are critical to their survival: (a) conduct a marketing process whereby the Debtors will seek to sell all or substantially all of their assets to MidCap Funding Investment XI LLC, an affiliate of MidCap Financial Trust—which is both the DIP Agent and Prepetition First Lien Agent—or another buyer; (b) evaluate and rationalize the Debtors' real estate portfolio, including renegotiating lease terms to align the Debtors' rent expenditures with prevailing market rates; and (c) continue operations without interruption, including minimizing any potential adverse effects to the Debtors' businesses, customers, employees, trade partners and other key stakeholders.

7.     The Debtors believe that pursuing these three goals simultaneously—a robust marketing process, real estate portfolio rationalization, and continued business operations—is essential to the success of these Chapter 11 Cases.  Notably, the Debtors are not the only key stakeholder that believes pursuit of these three goals is vital to the Debtors' long term success. Prior to the Petition Date, the Debtors and their advisors negotiated extensively with their Prepetition First Lien Lenders to develop a strategy that maximized recoveries for creditors and otherwise protected the interests of the Company's other key stakeholders.  The cornerstones of this strategy are twofold.

8.     *First*, the Debtors will conduct a postpetiton marketing process lasting approximately 50 days which will provide sufficient time for the Debtors and its advisors to obtain substantial lease concessions.  This process will supplement the thorough and extensive pre-petition marketing process that the Debtors launched in December 2020 whereby by the Debtors contacted nearly 140 potential acquirers.

9.     *Second*, the Debtors have entered into a "stalking horse" agreement (the "Stalking Horse Agreement") with MidCap Funding Investments XI LLC (the "Stalking Horse Purchaser"). The Stalking Horse Purchaser is an acquisition entity designated by (a) MidCap Financial Trust ("MidCap") in its capacity as administrative agent and collateral agent for the DIP Lenders[2] (in such capacities, the "DIP Agent") and (b) MidCap in its capacity as administrative agent and collateral agent for the Prepetition First Lien Lenders (in such capacities, the "Prepetition First Lien Agent").  Under the terms of the "stalking horse" asset purchase agreement (the "Stalking Horse Agreement"), MidCap has agreed to credit bid an amount equal to (a) the full amount of

---

[2]     "DIP Lenders" refer to the lenders that are parties to that certain Secured Superpriority Debtor-in-Possession Credit Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Facility") with the Debtors.

obligations under the DIP Facility (the "DIP Obligations") in the expected aggregate principal amount of $16.0 million and (b) up to the full amount of the obligations under the Prepetition First Lien Facility (the "Prepetition First Lien Obligations") in the aggregate principal amount of approximately $72.8 million as of the Petition Date (together, the "Credit Bid").

10.      The Bidding Procedures (as defined below) and the Stalking Horse Agreement are designed to maximize the likelihood of generating value for the benefit of enterprise-wide stakeholders as expeditiously as possible, in several ways.  *First*, the Bidding Procedures are intended to provide the Debtors with sufficient time to attempt to rationalize their real estate expenditures, in an effort to increase market interest in the Debtors. *Second*, the Bidding Procedures are intentionally designed to generate the interest of third party buyers, as evidenced by the lack of bid protections for the Stalking Horse Purchaser and the Stalking Horse Purchaser's willingness to consider bids for less than the full amount of the Credit Bid.  *Third*, the Bidding Procedures provide flexibility to maximize value by allowing for the possibility of Qualified Bids (as defined in the Bidding Procedures) to be financed by MidCap.  *Finally*, the Stalking Horse Agreement will help preserve estate value during the sale process by providing assurance to employees, contract counterparties, and other stakeholders that there will be a going concern business that emerges from these Chapter 11 Cases.  The Debtors believe that commencing these proceedings with a Stalking Horse Agreement in hand will help facilitate the accomplishment of the goals set forth above, and best position the Company to maximize creditor recoveries, and continue as a going concern.

11.      To familiarize the Court with the Debtors, their business, the circumstances leading to these Chapter 11 Cases, and the relief the Debtors are seeking in the first day motions, I have organized this declaration as follows:

- **Part I** describes the Debtors' corporate history and current operations;

- **Part II** describes the Debtors' prepetition corporate and capital structure;[3]

- **Part III** describes the circumstances leading to the filing of these Chapter 11 Cases and the Debtors' current restructuring efforts;

- **Part IV** describes the proposed debtor-in-possession financing; and

- **Part V** sets forth the evidentiary basis for the relief requested in each of the first day pleadings.

<u>Discussion</u>

I.    **Company History and Current Operations.**

A.    **History.**

12.    Susan Lindstrom founded Paper Source in 1983, opening a single store in Chicago, Illinois to showcase the beauty of handcrafted papers from around the world.  Between 1983 and 2007, Ms. Lindstrom grew Paper Source into a 27 store business before selling a majority stake in the Company to Brentwood Associates, a Los Angeles-based private equity firm.

13.    The Company expanded more rapidly after being acquired by Brentwood Associates.  By 2011, Paper Source operated 51 retail locations.  In 2013, funds affiliated with Investcorp International Inc. ("<u>Investcorp</u>") acquired Paper Source from Brentwood Associates and began extensive investment initiatives in the Company, including its facilities, management team, and end-to-end information technology systems.  Under Investcorp's stewardship, Paper Source focused on recruiting talented personnel from leading consumer brands, many of whom remain with the Company today.  I joined Paper Source in 2014 and in 2015, Paper Source hired its current Chief Executive Officer, Winnie Park.  Employees working in the Company's Chicago headquarters have been with the Company approximately 4 years on average.

---

[3]    Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their business.  The Debtors reserve all rights to revise and supplement the figures presented herein.

14.     During my tenure, the Company has continued to focus on growth and increasing its brand exposure.  Following the acquisition of 27 leases out of the chapter 11 cases of our former competitor Papyrus in March 2020, our footprint expanded to 161 Paper Source locations.  In effect, the Company quadrupled its headcount in less than a decade and had increased the amount of retail locations over 120% since Investcorp purchased the Company—a tremendous feat at a time when many brick and mortar retailers saw their physical presence shrinking dramatically.

15.     In addition to expanding the number of physical retail locations, the Company has also made significant, complementary investments into its business operations over the past several years.  Beginning in 2015, the Company began evolving from a multi-channel retailer into an omnichannel lifestyle brand, and developed a redesigned e-commerce platform that focused on mobile customers.  The Company also implemented a new customer relationship management system, which allowed the Company to complete a detailed customer segmentation that helped to dramatically improve their marketing capabilities.  Paper Source can now interact with it customers across many platforms, including on social media (*e.g.* Facebook, Instagram, Pinterest), through YouTube videos, via email distribution lists, or through our electronic catalogue.  Moreover, also in 2015, the Company opened its 150,000 square foot distribution center in Forest Park, Illinois.  With the outbreak of the COVID-19 pandemic in March 2020, these forward-leaning investments allowed the Company to quickly pivot and successfully fulfill historically unprecedented volumes of online sales.

### B.      Geographical and Digital Footprint.

16.     As of the Petition Date, the Company operates 158 stores, all within the United States, in addition to its e-commerce website, www.papersource.com.  Concurrently with the filing of this declaration, the Debtors are filing a motion to reject 11 unexpired leases and immediately exit from those underperforming store locations.

17.    During the outset of these Chapter 11 Cases, the Debtors intend to work with their real estate advisor, A&G Real Estate Partners ("**A&G**"), to achieve concessions from the Debtors' landlords, in an effort to rationalize their real estate expenditures in light of current market conditions.  Prior to the Petition Date, the Debtors' incurred approximately $3 million in rent per month and estimate landlords collectively have in excess of $15.8 million in deferred rent claims.

18.    The Debtors' store locations are typically located in in-line positions in urban and suburban areas of retail concentration, with relatively fewer locations in traditional shopping malls. The Company currently operates in 29 states and the District of Columbia, with a significant presence in Virginia, California, Illinois, Massachusetts, New York and Texas.[4]  As mentioned above, the Company's corporate headquarters is located in Chicago, Illinois and the Company operates a 150,000 square foot distribution center facility in Forest Park, Illinois.

### C.    Employees

19.    As of the Petition Date, the Company employs approximately 1,700 employees in the United States (the "Employees").  Approximately 1,500 Employees are paid on an hourly basis, and approximately 190 Employees earn a salary.  The majority of the Debtors' employee work in the 158 retail locations, with smaller numbers working in the Company's Chicago headquarters and distribution center.  The Company is not party to any collective bargaining agreements.  As set forth more fully in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, (II) Continue Employee Benefits Programs, and (III) Pay Prepetition Withholdings and Payroll-Related Taxes, and (B) Granting Related Relief* filed contemporaneously herewith, the

---

[4]    Paper Source also has stores in Alabama, Arizona, Colorado, Connecticut, Florida, Georgia, Indiana, Kansas, Kentucky, Maine, Michigan, Minnesota, Missouri, Nebraska, Nevada, New Jersey, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Vermont, Washington, and Wisconsin.

Debtors offer a standard suite of benefits to their employees, including medical, dental and vision insurance, short and long term disability insurance, a 401(k) plan, and discounts for purchases made at Paper Source locations.

### D.    Product Mix and Sales.

20.    Paper Source's merchandise includes a mixture of in-house designs and curated third party products that provide a wide variety of goods and experiences that are relevant for customers' special moments in life.  The Company's mixture of products and experience-based offerings reflects the Company's goal of having its customers "Do Something Creative Every Day."  Inspiring its customers is an extension of the Company's mission to Give, Live, Create, Celebrate.  This mission is reflected in the Company's wide array of highly curated products, including:

- *Giving*—books and journals, bath and beauty, care packages, toys and games, home décor, candles, confections, and subscriptions;

- *Living*—calendars, personal accessories, home décor, kitchen essentials, journals, desk items, art prints, and cookbooks;

- *Creating*—art supplies, specialty paper, custom stamps, crafting classes, DIY craft kits, journals, and how-to projects; and

- *Celebrating*—wedding invitations, special event announcements, party supplies, balloon bouquets, and rental space for private parties.

21.    Paper Source's stores offer a unique experience that is a defining asset and hallmark of the Company.  This in-store experience has been a key differentiator for Paper Source and one of its greatest strengths.  For example, Paper Source has run children's art camps and skill-based workshops at its store locations, and provides one-on-one design consultations to help couples create wedding invitations.

22.    The Company generally has its highest sales volumes between October and January as a result of the holiday selling season.  In 2020, the Company had gross sales of approximately

$104 million, compared to $153.2 million in 2019.  This decline is a direct result of government mandated shut downs, capacity restrictions  and the general decline of store traffic and purchasing brought on by the ongoing COVID-19 pandemic.  The Debtors closed 100% of their stores on March 16, 2020 in response to the pandemic, and were only able to slowly reopen locations between late May and early September 2020.  These extended closures caused the Debtors to lose out on sales from important holidays—including Easter and Mother's Day—that are critical to the Company's operations.  These depressed sales figures were further harmed by the wave of canceled weddings, which have traditionally been a key revenue driver for the Company, throughout the Spring and Summer of 2020.

#### E.    Business Lines.

23.    Paper Source operates three main business lines: (i) brick and mortar retail stores; (ii) e-commerce; and (iii) wholesale.  Retail sales historically comprise the overwhelming majority of the Debtors' business, accounting for approximately 83% of sales in 2019.  However, the ongoing COVID-19 pandemic has had a material impact on the Company's in-store sales performance, which declined to an estimated 72% of sales in 2020.  At the same time, the Debtors' e-commerce business segment has experienced tremendous growth, going from approximately 10% of sales in 2019 to 24% in 2020.  Growth in e-commerce sales is expected to continue due to certain strategies the Company has implemented, such as adding curbside pickup, expanding custom print offerings, and a growing subscription program.

24.    Finally, the Debtors' wholesale business accounted for approximately 4% of sales in 2020, and consists of Paper Source selling products to other retailers, which in turn are sold in their retail locations.  Historically, the Debtors' wholesale business had been focused mostly on smaller "mom and pop" shops, which accounted for approximately 92% of the Debtors' wholesale business in 2014.  In recent years, the Debtors' wholesale business has shifted toward sales through

national retailers such as Kohl's, Nordstrom and Crate & Barrel, which are businesses with larger footprints that help drive brand awareness for Paper Source. These national accounts have grown in recent years to account for nearly half of the Debtors' total wholesale business in 2020.

   **F.    Supply Chain and Vendor Relationships.**

   25.    The Debtors' supply chain and vendor relationships are some of the most important components of their business. The Company maintains a vertically-integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to the Company's distribution center, which then supplies the Debtors' brick-and-mortar locations and fulfills online orders. In order to meet the changing demands and preferences of customers and adapt to trends within the market, the Company designs approximately 40% of its product in-house and works closely with various international and domestic vendors to ensure merchandise is up to the standards the Company's customers demand, and delivered on time. For example, the Debtors leverage their scale and strong relationships with vendors to secure volume discounts and custom colors for their products.

   26.    The Company also utilizes brokers in overseas markets to assist with product development and sampling, order management, product inspection, and quality control. The Company, utilizing their brokers and third party logistics firms, coordinates with overseas vendors to ship the merchandise to a destination port. From there, the goods are transported to the Debtors' distribution center in Illinois.

**II.    The Debtors' Prepetition Corporate and Capital Structure.**

   27.    The below chart depicts the Debtors' current corporate structure:



28.     The Company's current capital structure is largely the result of certain refinancing transactions that took place in May 2019.  Debtor Pine Holdings, Inc.'s only asset is the 100% equity interest it holds in debtor Paper Source, Inc.  As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $103,188,208.08.  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date (collectively, the "Prepetition Credit Facilities"):

| Funded Debt | Maturity | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| **Revolving Credit Facility** | May 22, 2024 | Libor + 7.00% | $15,000,000.00 |
| **First Lien Term Loan Facility** | May 22, 2024 | Libor + 7.00% | $55,100,000.00 |
| **First Lien Fourth Amendment Delayed Draw Term Loan** | February 26, 2021 | Libor + 12.00% | $2,706,000.00 |
| **Second Lien Term Loan Facility** | November 22, 2024 | 5.00% (cash) 11.50% (PIK) | $30,382,208.08 |
| **Total** | | | **$103,188,208.08** |

**B.      Prepetition First Lien Facility.**

29.      Paper Source, Inc., as borrower, Pine Holdings, Inc. as guarantor, MidCap Financial Trust, as Prepetition First Lien Agent, the term loan lenders party thereto from time to time (the "Prepetition First Lien Lenders" and, together with the Prepetition First Lien Agent, collectively, the "Prepetition First Lien Secured Parties"), are party to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as amended, restated, amend and restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement"), which provides for a first lien secured credit facility consisting of (a) a term loan A commitment, which is scheduled to mature on May 22, 2024 (the "Prepetition First Lien Term Loan"), (b) a delayed draw term loan commitment, which matured on February 26, 2021 (the "Fourth Amendment Delayed Draw Term Loan"), and (c) a revolving credit commitment, which is scheduled to mature on May 22, 2024 (the "Prepetition First Lien Revolving Credit Facility").

30.      The obligations under the Prepetition First Lien Credit Agreement are secured, subject to certain exceptions, by a first priority lien on substantially all personal property of Pine Holdings, Inc. and Paper Source, Inc.  As of the Petition Date, approximately $55.1 million in Prepetition First Lien Term Loan borrowings, $2.7 million in Fourth Amendment Delayed Draw

Term Loan borrowings, and $15.0 million in Prepetition First Lien Revolving Credit Facility
borrowings are outstanding under the First Lien Credit Agreement.

### C.     Prepetition Second Lien Term Loan Facility.

31.     Paper Source, Inc., as borrower, Pine Holdings, Inc. as guarantor, Victory Park
Management, LLC, as administrative agent (the "Prepetition Second Lien Term Agent"), and
certain financial institutions as lenders (the "Prepetition Second Lien Lenders" and, together with
the Prepetition Second Lien Term Agent, collectively, the "Prepetition Second Lien Secured
Parties"), are party to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as
amended, restated, amend and restated, supplemented or otherwise modified from time to time,
the "Prepetition Second Lien Term Loan Agreement"), which provides for a second lien secured
term credit facility consisting of a term commitment of $25.0 million, which is scheduled to mature
on November 22, 2024.

32.     The obligations under the Prepetition Second Lien Term Loan Agreement are
secured, subject to certain exceptions, by a second priority lien on substantially all personal
property of Pine Holdings, Inc. and Paper Source, Inc..  As of the Petition Date, as a result of paid-
in-kind interest that has accrued and capitalized since the closing of the Prepetition Second Lien
Term Loan Agreement, approximately $30,382,208.08 aggregate principal amount is outstanding
under the Prepetition Second Lien Term Loan Agreement.

### D.     Prepetition Subordination and Intercreditor Agreement.

33.     The Prepetition First Lien Agent, Prepetition Second Lien Term Agent and Debtors
are parties to a subordination and intercreditor agreement, dated May 22, 2019, (the "Prepetition
Intercreditor Agreement"), which governs: (1) the relative lien priorities of the secured parties with
respect to the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Term Loan
Agreement; (2) the rights of the respective secured parties to take enforcement actions against

collateral; and (3) waivers of certain rights of certain of the secured parties with respect to, among other things: (a) the provision of debtor-in-possession financing to the Debtors and the Debtors' use of cash collateral; (b) the ability to seek adequate protection under the Bankruptcy Code; and (c) the ability to contest certain asset sales in a bankruptcy case.

### E.    Leases.

34.    The Debtors are party to 163 leases, comprised of 158 active retail locations, 3 non-active retail locations, the Company's headquarters, and distribution center.  These leases create fixed costs for the Debtors of approximately $36 million per year.  Due to the loss of revenue from store closures in 2020 as a result of the COVID-19 pandemic, the Debtors sought rent waivers and deferrals for the majority of the leases.  While the Company was able to successfully negotiate a number of rent deferrals and rent abatements with its landlords, each of those arrangements expired in December 2020.  As a result of these deferrals and other unpaid rent obligations, the Debtors have outstanding rent obligations of approximately $15.8 million as of the Petition Date.

### F.    Equity Interests and Outstanding Warrants.

35.    Funds affiliated with, or managed by, Investcorp International Inc. (collectively "Investcorp") constitute the majority owners of the Company through its equity holdings of debtor Pine Holdings, Inc.  Debtor Pine Holdings, Inc. has three classes of equity—Series A Common, Series D Common, and Series A Convertible Preferred.  MidCap Financial Trust and certain affiliated funds own both nonvoting preferred equity and nonvoting common equity in Pine Holdings, Inc. as a result of a capital infusion transaction that took place on October 16, 2020,

described in Section III.B below.[5]  A summary of the approximate ownership interests in Pine

Holdings, Inc. is provided below:

| Party | % Ownership of Convertible Preferred Stock | % Ownership of Common Stock |
|---|---|---|
| Investcorp | 60.00% | 80.0% |
| Lenders | 40.00% | 10.0% |
| Former Management[6] | 0.00% | 3.0% |
| Other Investors | 0.00% | 7.0% |

36.    Current and former Company management own options to purchase common

equity in Pine Holdings, Inc.  Moreover, the largest of the Company's Prepetition Second Lien

Lenders, VPC Special Opportunities Fund III Onshore, L.P. ("Victory Park"), owns unexercised

warrants, which, if exercised, would give Victory Park the right to purchase common equity in

Pine Holdings, Inc.

**G.    Board of Directors**

37.    The Debtors are privately held.  As of the Petition Date, the board of directors of

both Pine Holdings, Inc. and Paper Source, Inc. consist of the same six members, including the

current CEO Winnie Park.  Of the remaining directors, two are affiliated with Investcorp, and three

are independent directors.

---

[5]    On October 16, 2020, Paper Source, Inc., Pine Holdings, Inc., the Prepetition First Lien Lenders and the
Prepetition First Lien Agent entered into an amendment to the Prepetition First Lien Credit Agreement,
pursuant to which the Prepetition First Lien Lenders agreed to extend an additional $5.0 million to Paper
Source, Inc. in the form of the "Term Loan C" and the commitments to provide the "Fourth Amendment
Delayed Draw Term Loans" (each defined below).  As consideration for the Prepetition First Lien Lenders
extending the Fourth Amendment Delayed Draw Term Loans, certain equity owners of Pine Holdings, Inc.
agreed to transfer 1,200 shares of Series A Convertible Preferred and 100,000 shares Series A Common to
the Prepetition First Lien Lenders pro rata based on each Prepetition First Lien Lender's commitment to
provide additional financing.

[6]    This group includes two current members of the Debtors' management, both of whom were employed by the
Debtors in 2013.

III.    **Circumstances Leading Up to the Petition Date and Restructuring Efforts.**

A.    **Papyrus Sale and Impact of the COVID-19 Pandemic on the Debtors' Business**

38.    Before the COVID-19 pandemic began—which required Paper Source to close 100% of its retail operations for over one month in the Spring of 2020—the Debtors' business had been strong.  On March 2, 2020, the Debtors acquired 27 leases out of the chapter 11 proceedings of Papyrus, historically one of the Company's biggest competitors in the high-quality paper product space.  The logic of the acquisition was simple:  Paper Source acquired the best leases out of Papyrus' portfolio and was uniquely positioned to leverage its existing supply chain, vendor network and distribution capabilities to add bottom line growth to the Company's balance sheet. The sale represented a 22% expansion of the Debtors' retail footprint at a time when many retailers were continuing to close their stores.  Investcorp helped the Company finance the acquisition by purchasing $8,000,000 of Series A Convertible Preferred stock—a significant vote of confidence in the long term equity value of the Company.

39.    Unfortunately, the Company never realized the benefits of the Papyrus acquisition. Less than three weeks later, on March 16, 2020, the Company decided to shut down all of its retail locations in the face of the unprecedented global COVID-19 pandemic.  At the time of this decision, approximately 83% of the Debtors' sales were generated through in-store sales. Unsurprisingly, impact of the pandemic was felt by all of the Debtors' key stakeholders:

- *Landlords*—in April 2020, following the decision to close all of its retail locations, the Company held a call with its landlords to ask for rent concessions in light of the ongoing public health emergency.  Specifically, the Debtors asked landlords to (i) waive the Company's rent obligations for April, May, and in some cases June, and (ii) enter into "like for like" rent arrangements for the remainder of 2020 whereby the Company would pay landlords a percentage of its original rent obligations, based on the relative strength

of its sales in a given month as compared to the same month in 2019, with a minimum rent requirement of 50% of its original rent obligation.  For example, if a store's sales were 80% of the prior year's sales for that month then the Debtors would pay 80% of their original rent obligation that month for that lease, but if the store's sales were only 10% of the prior year's sales then the Debtors would pay the minimum 50% of the original rent obligation that month.  The Debtors believed these requested concessions were reasonable given the Company's reduced sales and the fact that many of the Debtors' leases included "escalator" provisions whereby rent continued to increase annually.  Responses within the landlord community varied.  Many landlords made no concessions.  Some landlords agreed to the Company's request, while others negotiated bespoke rent relief arrangements.  These negotiated rent concessions helped the Company navigate an increasingly tight liquidity profile for the remainder of 2020.  However, each of these agreements expired prior to January 2021.  Since then, the onslaught of landlords threatening to terminate lease agreements has increased to the point where the Company was left no other option but file these Chapter 11 Cases.

- *Vendors*—as a general matter, the Debtors order merchandise through purchase orders rather than long term supply contracts.  Historically, the Debtors have negotiated payment terms with their vendors whereby the Debtors pay for goods received within 30-60 days of receipt.  Much like the Company's efforts with its landlords, the Company began extending payment on its trade payables with its vendors to preserve its cash position.  As a result, the Company has faced increasing pressure from both its merchant suppliers, and suppliers of non-merchant services (*e.g.* software providers, providers of shipping and delivery services).  Many vendors have threatened to stop doing business with the

Company unless they are made whole, which has further distracted management and complicated the Debtors' already tight liquidity profile.

- ***Employees***—as the height of the pandemic, the Debtors furloughed approximately 95% of their in store employees, as well as employees in their distribution center and Chicago headquarters. Senior management agreed to individualized salary reductions, each of approximately 30% of their original salary. In addition, some employees were permanently terminated in an effort to further sure up the Company's cash position.

40.    Despite these and other efforts to preserve cash, and in spite of support from various economic stakeholders, the economic impact of the global COVID-19 pandemic irreparably harmed the Debtors' prepetition business operations. Following the government mandated lockdowns of last Spring, the Debtors worked tirelessly to open their retail locations as quickly as possible once such restrictions were lifted, which took approximately one week on average. While the initial stage of the pandemic has ended, its continued drag on the Debtors' business operations cannot be overstated:

- ***Occupancy Limitations***—as of mid-February 2021, approximately 84% of the Company's retail locations are subject to store occupancy limitations. Of those, 27.5% of the Company's retail locations stores have a 25% occupancy limit, 11.25% have an occupancy limit of 30-40%, and 40% of the Company's retail locations are subject to a 50% occupancy limitation. Several states—most notably California, where the Debtors have 37 stores, representing approximately 23% of the entire store fleet—are continuing to impose partial commercial business lockdowns. In addition to generating less revenue, the reduced occupancy stores now have COVID related expenses. When reopening stores, the Debtors have emphasized health, and maintained extensive safety and distancing protocols to

protect associates and customers.  Although the outright government mandated lockdowns of last Spring have ended, the Company is still very much operating its retail locations with one arm tied behind its back.

- ***Ongoing Public Health Backdrop***—according to the *The Atlantic's* "Covid Tracking Project," the United States routinely endured over 3500 deaths per day in February 2021 as a result of COVID-19.[7]  Moreover, over 75,000 Americans—roughly one third of the population of Richmond, Virginia—are still routinely being diagnosed with COVID-19 *every day*.  There remains great uncertainty as to when COVID-19 vaccines will be available to Americans, especially those under the age of 45 (who make up the majority of the Company's customer base).  Even assuming a sufficient vaccine supply, there remain dual public health threats posed by Americans simply declining to accept the vaccine,[8] and three troubling coronavirus variants that have emerged in the United Kingdom, South Africa, and Brazil,[9] some of which are already present in the United States.[10]  Put simply, robust in-store retail operations remain incompatible against the current public health backdrop.  Accordingly, many former and potential customers are continuing to abstain from shopping at the Company's stores.  The Company estimates that approximately 30%

---

[7]     The COVID Tracking Project, https://covidtracking.com/data/charts/us-daily-deaths (last visited March 1, 2021)

[8]     Madeline Holcombe, *Nearly a third of US adults are undecided about the Covid-19 vaccine.  Some say friends and family could sway them*, https://www.cnn.com/2021/02/13/health/us-coronavirus-saturday/index.html (Feb. 13, 2021, 7:05 PM)

[9]     Brian Resnick, *4 reasons we're seeing these worrying coronavirus variants now,* https://www.vox.com/science-and-health/22247525/covid-19-variants-uk-south-africa-brazil-b117-why-now (Jan. 27, 2021, 12:10 PM)

[10]    Centers for Diseases Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant-cases.html (last visited March 1, 2021).

of formerly loyal customers have not visited a Paper Source retail location or purchased anything through the Company's website since the pandemic began.

**B.    Liquidity Difficulties**

41.    As described above, the significant drop in in-store retail sales immediately began straining the Company's liquidity profile.  Prior to the COVID-19 pandemic, the Debtors, although overall financially healthy, were highly leveraged, with approximately $100 million in funded debt against 2019 earnings before interest, taxes, depreciation and amortization ("EBITDA") of approximately $13 million.  When combined, the funded debt and lease obligations created high fixed costs for the Debtors.

42.    By June 2020, the Company's liquidity profile had decreased to the point where the Company actively began looking for a lifeline.  Investcorp—which had provided the Company with $8,000,000 of equity financing in February 2020 to fund the Papyrus deal—determined not to make any additional investments.  The Company began conversations with its largest Prepetition Second Lien Lender, Victory Park, about a potential capital infusion transaction in excess of $10 million that would allow the Company to survive through 2021.  The Company negotiated with Victory Park from June through August, until it became clear to the Company that Victory Park would be unable to provide the capital infusion required.

43.    Having devoted a significant amount of time negotiating with Victory Park—all as the Company's liquidity profile continued to decline—the Company then focused on its Prepetition First Lien Lenders and asked for a capital infusion transaction that would allow the Company to make it through the 2020 holiday season.  The Prepetition First Lien Lenders, with the help of their professionals Proskauer Rose LLP and Carl Marks Advisory Group LLC, confirmed the Company's dire circumstances and provided the Company with funding through a series of transactions:

- On September 3, 2020, the Prepetition First Lien Lenders provided the Company with $1,500,000 in additional borrowings ("Term Loan B").

- On September 11, 2020, the Prepetition First Lien Lenders provided the Company $3,500,000 pursuant to the Fourth Amendment Delayed Draw Term Loan.

- On October 16, 2020, the Prepetition First Lien Lenders again provided the Company with additional liquidity, this time $5,000,0000, of which approximately $1.0 million was in the form of a term loan ("Term Loan C"), and $4.0 million was Fourth Amendment Delayed Draw Term Loans.[11]

During this time, the Company, the Prepetition First Lien Lenders, and the Prepetition Second Lien Term Loan Lenders entered into multiple forbearance agreements in order for the Debtors to be able to continue to operate notwithstanding defaults under the Prepetition Credit Facilities.

44.    Although the Company's financial performance through December 31 was better than expected under the circumstances, by February 2021, the Company again found itself in an untenable position with minimum liquidity, and significant lease liabilities that continued to mount each month.

## C.    Strategic Alternatives and Sale Process.

45.    Starting in the summer of 2020, the Company began engaging professionals to help advise on potential solutions to address the Company's liquidity and capital structure concerns.  In June 2020, the Company and its board of directors (the "Board") began to review strategic alternatives, including the potential capital infusion from Victory Park that fell apart in August.  In August, the Company retained Willkie Farr & Gallagher LLP ("Willkie")—who had been working

---

[11]    As of the Petition Date, both the "Term Loan B" and "Term Loan C" have been repaid.

with the Company throughout 2020—as legal counsel to assist in the company's restructuring efforts.  In September 2020 (and then again in late January 2021), the Company hired M-III Advisory Partners, LP ("M3") to further assist in its operational restructuring efforts, including assisting with a store rationalization strategy.

46.    Beginning in November 2020, the Company began working with its investment banker to explore a sale of all or substantially all of the Debtors' assets.  The investment banker distributed teasers to potential acquirers starting on December 11 and began distributing more substantive materials starting on December 20.  As part of that sale process, the investment banker reached out to approximately 138 potential buyers—10 strategic buyers and investors, who were selected based on their business model, historical acquisition activity, and financial capabilities, and 128 financial buyers and investors, who were selected based on their historical interest in retail, consumer and branding opportunities, existing and past investment and financial capabilities.  Approximately 65 of those institutions executed non-disclosure agreements and received a "confidential information memorandum" and other information containing business and brand overviews, product positioning, management team information, channel overviews, customer demographics, strategic plans, growth opportunities, and historical and projected financial information.  At the same time, the existing Prepetition First Lien Lenders and Prepetition Second Lien Term Loan Lenders began discussing potential transactions to provide a longer term solution to address the Company's liquidity and capital structure concerns.

47.    Despite a robust marketing process, by late January 2021 it was clear that the sales process would not be generating any bids in excess of the Prepetition First Lien Lenders' secured debt position.  While out-of-court options were discussed with potential buyers, most potential acquirers contemplated effectuating any transaction through a chapter 11 proceeding due to the

Company's significant lease liabilities.  Around the same time, the Company was informed that a comprehensive out-of-court solution involving the Prepetition First Lien Lenders and Prepetition Second Lien Lenders was no longer viable.

48.    Left with no viable out-of-court options, in early February 2021 the Company began preparing for a chapter 11 filing.  After considering its alternatives, the Debtors, in consultation with their advisors, have determined that pursuing a going concern section 363 sale in chapter 11 represents the best path forward to preserve and maximize value for the benefit of their stakeholders.  To that end, the Debtors and their advisors, including proposed investment banker SSG Capital Advisors, LLC ("SSG"), have started preparing a teaser and confidential information memorandum, and will be launching a thorough postpetition marketing and sale process.  The Debtors have concurrently filed a motion seeking the approval of sale and bid procedures to facilitate the Debtors' sale efforts (the "Bidding Procedures Motion").

49.    Additionally, through arm's-length negotiations, the Debtors and the Prepetition First Lien Secured Parties negotiated the Stalking Horse Agreement.  Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser, an affiliate of the DIP Agent and the Prepetition First Lien Agent, will serve as stalking horse bidder for the Debtors' sale process, as discussed in more detail above.  The Stalking Horse APA provides for a credit bid of up to (a) the full amount of the obligations under the DIP Facility in the expected aggregate principal amount of $16.0 million and (b) up to the full amount of the obligations under the Prepetition First Lien Facility (in the aggregate principal of roughly $72.8 million.  Importantly, the Stalking Horse Purchaser has expressed a willingness to consider bids for less than the full amount of the Credit Bid and the Bidding Procedures provide for the flexibility to maximize value by allowing for the possibility of Qualified Bids (as defined in the Bidding Procedures), to be financed by MidCap.  Moreover, the

terms of the Stalking Horse APA do not require the Debtors to pay any break-up fee, expense reimbursement, or other forms of protections benefiting the Stalking Horse Purchaser.  The Debtors believe that this important concession will help foster increased interest in the Debtors' business and aid the Debtors in maximizing value.

50.     Pursuant to the Bidding Procedures Motion, the Debtors anticipate a marketing and sales process that will last approximately 85 days following the Petition Date, with a bid deadline of April 16, 2021 and an anticipated sale closing by May 26, 2021.  After consulting their real estate advisor A&G, the Debtors believe that a marketing process of this length will give the Company sufficient time to rationalize their lease portfolio, which will accrue to the benefit of a third party buyer pursuant to the contemplated sales transaction.  In addition, I understand through conversations with the Company's advisors that these and other milestones contemplated in the Bidding Procedures Motion are customary and appropriate for a marketing and sales process of this nature.  The Debtors' and their advisors believe that this process will allow the Debtors to generate more interest than the prepetition sales process generated.  Further, based on these discussions with the Company's advisors, I believe the Bidding Procedures are appropriately designed to provide a method by which the Debtors will be able to maximize the value received for their Assets.

**IV.     Proposed Debtor-In-Possession Financing.**

51.     Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* ("DIP Motion") filed contemporaneously herewith, the Debtors seek authorization from the Court to enter into the

*Senior Secured Super-Priority Debtor-in-Possession Credit Facility Term Sheet* ("DIP Term Sheet" and the facility provided for thereunder "DIP Facility").  The Debtors require immediate access to additional liquidity to both ensure that they are able to continue to meet their working capital needs, and cover the administrative costs of these Chapter 11 Cases.  Based on the Debtors' projected cash flow forecast, the Debtors anticipate that they will be unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover working capital needs and the projected restructuring costs of these Chapter 11 Cases without access to postpetition financing, and that the liquidity provided by the DIP Facility is necessary to provide the Debtors' customers, landlords, vendors, and employees with comfort that the Debtors will continue to operate in the ordinary course of business during these Chapter 11 Cases.

52.    As set forth in greater detail in the DIP Motion and the Adams Declaration,[12] the Debtors, with the assistance of their advisors, undertook a marketing process to solicit proposals for debtor-in-possession financing.  Prior to the start of that marketing process, the Prepetition First Lien Lenders informed the Debtors' professionals that they would not consent to having their prepetition liens primed.  The Debtors concluded that the Prepetition First Lien Lenders' unwillingness to consent to the priming of their liens meant that, if the Debtors wanted to avoid a protracted, uncertain and expensive priming fight, the Debtors would need to locate a third-party lender willing to provide debtor-in-possession financing on an unsecured or junior lien basis.  Ultimately, none of the parties that were contacted by the Debtors' professionals expressed a

---

[12]    As used herein, the "Adams Declaration" shall mean the *Declaration of Colin M. Adams in Support of Motion of the Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing; (B) Authorizing the Debtors to Use Cash Collateral; (C) Granting Liens and Providing Superpriority Administrative Expense Status; (D) Granting Adequate Protection; (E) Modifying the Automatic Stay, (F) Scheduling A Final Hearing, and (G) Granting Related Relief*, filed contemporaneously herewith.

willingness to provide debtor-in-possession financing secured by liens junior to the liens of the Debtors' Prepetition First Lien Lenders.

53.     As a result of the foregoing, the Company is looking to move forward with the Prepetition First Lien Lenders and for authorization to enter in to the DIP Facility.  The DIP Facility is a commitment by and between Paper Source, Inc. as borrower, and Midcap Financial Trust as DIP Agent.  The DIP Term Sheet contemplates the DIP Agent, and the other lenders party to the DIP Term Sheet, providing the Debtors with a senior secured, superpriority debtor-in-possession loans to the Debtors consisting of new money delayed-draw term loans in an aggregate amount not to exceed $16.0 million, of which $7.75 million will be available upon entry of an interim order approving the DIP Facility and $8.25 million will be available upon entry of a final order approving the DIP Facility.

**V.      Evidentiary Basis for Requested First Day Relief.**

54.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these Chapter 11 Cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  I believe that the relief requested in the first day motions is necessary to allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases.  I have reviewed each of the first day motions discussed below and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit A** attached hereto and incorporated herein by reference.

*[Remainder of page left intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 2, 2021

*/s/ Ronald Kruczynski*
Ronald Kruczynski
Chief Financial Officer of Paper Source, Inc.

## Exhibit A

**Evidentiary Support for First Day Motions**

## <u>Evidentiary Support for First Day Motions</u>[1]

I.    **Debtors' Motion for Entry of an Order (A) Directing Joint Administration of Chapter 11 Cases and (B) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.    Pursuant to the Joint Administration Motion, the Debtors seek entry of an order (a) directing procedural consolidation and joint administration of these related Chapter 11 Cases; and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these Chapter 11 Cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.    Many of the motions, hearings, and orders in these Chapter 11 Cases will affect each Debtor entity, and jointly administering these Chapter 11 Cases will avoid unnecessary expenses by eliminating the need for duplicative filings, objections, notices, and hearings.  Additionally, joint administration will reduce the administrative burdens imposed on the Court, as the Clerk of the Court will be permitted to utilize a single docket for the Chapter 11 Cases and to combine notices to creditors and other parties in interest in the Debtors' respective cases.  Jointly administering the cases will also enable the U.S. Trustee and all parties in interest to monitor these Chapter 11 Cases with greater ease and efficiency.  The Debtors' respective constituencies will not be prejudiced by joint administration because the relief sought is procedural only and will not affect the substantive rights of any party in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable first day motion.

II.    **Debtors' Motion for Entry of Interim and Final Orders (A) Extending Time to File Schedules and Statements of Financial Affairs, (B) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (C) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (D) Authorizing the Debtors to Redact Certain Personal Identification Information, and (E) Granting Related Relief (the "<u>Creditor Matrix Motion</u>").**

3.      Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order: (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "<u>Schedules and Statements</u>") by 20 days, for a total of 34 days from the Petition Date; (b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (c) authorizing the Debtors to file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor; (d) authorizing the Debtors to redact certain personal identification information; and (e) granting related relief.

4.      Although I understand that that Schedules and Statements are typically filed within 14 days of the Petition Date, in a complex chapter 11 case the Court may extend the time "for cause."   Collecting the necessary information for the Schedules and Statements requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, which resources would be best used to stabilize the Debtors' business operations.  Prior to the filing of these Chapter 11 Cases, the Debtors focused on preparing for the chapter 11 filing, preparing the business to transition into chapter 11, and negotiating with the Debtors' first lien secured lender to enter in the Stalking Horse Agreement and secure access to the DIP Facility.  Such efforts made it difficult for the Debtors to prepare the Schedules and Statements.

5.      I am also aware that a list of creditors usually is filed on a debtor-by-debtor basis, but in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.[2]

6.      Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix home address information of the Debtors' current employees, former employees, current officers and directors, and former officers and directors, and customers, because such information could be used to perpetrate identity theft or locate survivors of domestic violence or stalking.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the U.S. Trustee, any official committee of unsecured creditors appointed in these Chapter 11 Cases, and the Court.

7.      Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**III.    Debtors' Motion for Entry of an Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief (the "<u>Case Management Motion</u>").**

8.      Pursuant to the Case Management Motion, the Debtors seek entry of an order: (a) establishing certain notice, case management, and administrative procedures, which (i) direct that matters requiring notice under rule 2002(a)(2)–(6) of the Federal Rules of Bankruptcy Procedure will be served only to individuals and entities identified on a shortened mailing list and those creditors who, in accordance with rules 2002-1 and 9013-1(M) of the Local Rules of the

---

[2]      If any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

United States Bankruptcy Court for the Eastern District of Virginia, file with the Court a request that they receive such notice pursuant to Bankruptcy Rule 2002; (ii) allow electronic service of all documents (except complaints and summonses) for the Master Service List; and (iii) direct that all matters be heard at periodic omnibus hearings to be scheduled in advance by the Court; (b) approving the notice of commencement; and (c) granting related relief.

9.      Given the size and complexity of these Chapter 11 Cases, I believe implementing the Case Management Procedures will facilitate the fair and efficient administration of these cases and promote judicial economy.

10.     Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

**IV.  Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering or Discontinuing Services, (B) Providing Utility Companies with Adequate Assurance of Payment, (C) Establishing Procedures for Resolving Requests for Additional Assurance of Payment, and (D) Granting Related Relief (the "Utilities Motion").**

11.     Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) prohibiting the Utility Companies from altering or discontinuing services; (b) providing the Utility Companies with adequate assurance of payment; (c) establishing procedures for resolving requests for additional assurance of payment; and (d) granting related relief.

12.     Through the operation of 158 retail locations, a distribution center, and corporate offices, the Debtors obtain necessary electricity, telephone, internet, natural gas, water, waste management, and other similar services from a number of utility companies.  The Debtors pay the majority of their Utility Services costs directly to the Utility Companies that provide such services.

13.     On average, prior to the Petition Date, the Debtors paid approximately $285,000 per month for Utility Services in the aggregate.  Accordingly, the Debtors estimate that their cost for Utility Services during the 30 days after the Petition Date will be approximately $285,000.  The

Debtors estimate the aggregate amount currently held as deposits, prepayments, or surety bonds by the Utility Companies is approximately $30,000.

14.     The Debtors expect revenues from postpetition operations, the proposed debtor-in-possession financing facility, and cash otherwise available to the Debtors will be more than sufficient to pay the Debtors' postpetition Utility Services obligations.  However, to provide additional assurance of payment, the Debtors propose depositing $143,000 into a segregated account as additional assurance of payment (the "Adequate Assurance Deposit"), which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services.  The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any Adequate Assurance Deposit.

15.     The Debtors may close certain stores over the course of these Chapter 11 Cases. Once these stores are closed and their corresponding utilities accounts are settled, the Adequate Assurance Deposit will be reduced accordingly to reflect actual utility obligations in accordance with the Adequate Assurance Procedures.

16.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Companies to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

17.     Furthermore, the Debtors request that Utility Companies be prohibited from refusing or disrupting Utility Services, for any duration, including those that are indirectly obtained through nonresidential real property leases with Landlords associated with certain retail locations. Landlords must continue to honor their obligations and pay for Utility Services in accordance with

such leases unless and until an applicable lease is rejected pursuant to section 365 of the

Bankruptcy Code, notwithstanding any current or future nonpayment, deferral, waiver, or other

compromise of rent.  Without the Adequate Assurance Procedures, a Utility Company could delay

a request for adequate assurances until the last minute in an attempt to force the Debtors to agree

to its request or face cessation of essential services.  This would force the Debtors to address

numerous requests by Utility Companies in an unorganized manner at a critical period in their

Chapter 11 Cases when their efforts should be focused on managing key stakeholder relationships

and maximizing value for all of their stakeholders.  Therefore, it is critical that Utility Services

continue uninterrupted during these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I

respectfully submit that the Court should approve the Utilities Motion.

**V.      Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors
to (I) Continue to Operate Their Cash Management System, (II) Honor Certain
Prepetition Obligations Related Thereto, and (III) Maintain Existing Business Forms,
and (B) Granting Related Relief (the "<u>Cash Management Motion</u>").**

18.      Pursuant to the Cash Management Motion, the Debtors seek entry of interim and

final orders: (a) authorizing the Debtors to (i) continue use of their existing Cash Management

System and procedures, (ii) pay any prepetition or postpetition amounts outstanding on account of

the Bank Fees, and (iii) maintain existing Business Forms in the ordinary course of business; and

(b) granting related relief.

19.      The Debtors operate an intricate Cash Management System to facilitate the timely

and efficient collection, management, and disbursement of funds used in the Debtors business.

The Debtors use their Cash Management System in the ordinary course to transfer and distribute

funds and to facilitate cash oversight and management.  Additionally, the Debtors maintain daily

oversight of the Cash Management System and implements cash management controls for

entering, processing, and releasing funds.  In the twelve months prior to the Petition Date, the

Debtors estimate that cash collections from operations in the ordinary course of business average approximately $9.5 million per month. The Debtors estimate that total disbursements will average approximately $15.5 million per month during these Chapter 11 Cases. On a monthly basis the Debtors pay approximately $9,000 in Cash Management Service Fees in connection with the maintenance of the Cash Management System, and $190,000 in Cash Management Merchant Fees in connection with non-cash payment processing services (together, the Cash Management Service Fees and Cash Management Merchant Fees, the "Bank Fees"). The Debtors estimate that they owe approximately $259,000 on account of Bank Fees as of March 1, 2021, and request authority to pay outstanding Bank Fees in the ordinary course of business in order to ensure the uninterrupted operation of the Cash Management System.

20.     The Cash Management System includes twelve bank accounts owned by debtor Paper Source, Inc.:

- One main operating Bank Account maintained at Fifth Third Bank ("Fifth Third") (the "Main Operating Account").

- Nine store-level depository Bank Accounts that serve the Debtors' 158 retail locations (collectively, the "Store Accounts"). The Store Accounts are maintained at the following Banks: Bank of America, N.A. ("Bank of America"); BMO Harris Bank, N.A. ("BMO Harris Bank"); JPMorgan Chase Bank, N.A. ("Chase"), Comerica Bank ("Comerica"); First National Bank of the Lakes ("First National Bank of the Lakes"); Mechanics Bank ("Mechanics Bank"); PNC Bank, N.A. ("PNC – Alexandria"); Wells Fargo ("Wells Fargo"); and Fifth Third.

- One credit card deposit and lockbox deposit Bank Account maintained at Fifth Third (the "Deposit Account").

- One disbursement Bank Account maintained at Fifth Third (the "Disbursement Account").

21.     The Cash Management System is organized around the Main Operating Account which pools incoming funds from the Debtors' Store Accounts and Deposit Account. The Debtors fund their obligations either by making payments directly from the Main Operating Account, or through transfers made to the Disbursement Account.

22.    ***Cash Collections***.  The Debtors generate cash receipts from sales made in their 158 retail locations.  Store managers or assistant managers deposit those receipts into one of the nine Store Accounts multiple time per week, typically every Monday, Wednesday, and Friday.  The Store Account used by each location is typically a function of which Banks is closest to that store.  Each of the Store Accounts only receives non-credit card store-level cash sales with the exception of the Store Account maintained at Fifth Third Bank.  In addition to receiving deposits of some store-level cash sales, the Debtors deposit checks which are not related to the normal course of business (*e.g.* tax refunds) into that account.  Finally, the Debtors also accept non-credit card sales from wholesale customers via check or ACH.

23.    ***Credit Card Collections***.  The overwhelming majority of the Debtors' sales are made by customers via electronic payments such as credit and debit cards.  Credit card and other electronic payments are taken at the point of sale ("POS"), whether such transactions are online or in person.  The Debtors' POS system batches credit card sales together at a store level on a daily basis and transmits such sales information to a third-party service provider, Bank of America Merchant Services.  Bank of America Merchant Services then coordinates payment with Visa, MasterCard, Discover, American Express, Samsung Pay (for in-store transactions only), and PayPal (for online transactions only).  Credit card payments made using Visa, MasterCard, and Discover are deposited into the Deposit Account two business days after batch transmission, while purchases made using American Express are deposited into the Deposit Account four business days after batch transmission.  Online proceeds, payments using Samsung Pay, and credit card sales from wholesale customers are similarly deposited into the Deposit Account.  The Deposit Account is a zero balance account with the Main Operating Account, meaning funds are automatically swept into the Main Operating Account on a daily basis.

24.     The Debtors make cash disbursements to fund their daily operations either directly from the Main Operating Account or from the Disbursement Account.  The Disbursement Account is a zero balance account linked to the Main Operating Account, and funded by the Main Operating Account through daily automatic transfers.

25.     Moreover, as part of the Cash Management System, the Debtors utilize preprinted business forms in the ordinary course of their business, including letterhead, purchase orders, invoices, and preprinted checks (the "Business Forms").  As of the Petition Date, the Debtors have a significant unused stock of Business Forms.  To avoid the associated costs of printing new Business Forms and avoid potential confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number.

26.     Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close their existing bank accounts or stop using their Business Forms, I believe that it is critical that the existing Cash Management System remain in place on a postpetition basis.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**VI.** **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (II) Continue Employee Benefits Programs, and (III) Pay Prepetition Withholdings and Payroll-Related Taxes, and (B) Granting Related Relief (the "Wages Motion").**

27.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) pay all prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Employee Compensation and Benefits Programs in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs in the ordinary course of business, including paying third-party providers who process and administer the Employee Compensation and Benefits Programs; (b) pay all prepetition withholdings and payroll-related taxes; and (c) granting related relief.

28.      As of the Petition Date, the Debtors' Employees include over 400 full-time individuals and over 1,300 part-time individuals.  Approximately 1,500 Employees are paid on an hourly basis, and approximately 190 Employees earn a salary.  In addition to the Employees, the Debtors also periodically retain specialized individuals as Independent Contractors, as well as Temporary Staff to fulfill certain duties (including production, shipping, or customer service) when the Debtors are otherwise unable to fill required positions such as during seasonal business peaks.  The Debtors source the Temporary Staff from various staffing agencies and do not pay the individual worker directly.  The Independent Contractors and Temporary Staff are an important supplement to the efforts of the Debtors' Employees.  As of the Petition Date, the Debtors retain one Independent Contractor and approximately 110 Temporary Staff.

29.      Many of the Employees and Temporary Staff rely on the Employee Compensation and Benefits Programs to pay their daily living expenses.  Thus, Employees and Temporary Staff will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.  The Debtors

seek to minimize the personal hardship the Employees and Temporary Staff would suffer if employee obligations are not paid when due or as expected. Consequently, I believe the relief requested is necessary and appropriate.

30.    The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits Programs, including, among other things, wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable expenses, non-insider employee incentive programs, health insurance, life insurance, workers' compensation benefits, short- and long-term disability coverage, retirement plans, paid and unpaid leave, severance, and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion. The Debtors seek authority, but not direction, to pay the following good faith estimates of aggregate prepetition amounts on account of the Employee Compensation and Benefits Programs:

| Employee-Related Obligations | Interim Amount | Final Amount |
|---|---|---|
| Employee Compensation | $1,450,000 | $1,450,000 |
| Independent Contractor and Temporary Staff Compensation | $700,000 | $700,000 |
| Payroll Processing Fees | $28,000 | $28,000 |
| Withholding Obligations | $330,000 | $330,000 |
| Reimbursable Expenses | $102,000 | $105,000 |
| Employee Discount | $0 | $0 |
| Non-Insider Employee Incentive Programs | N/A | $0 |
| Health and Welfare Programs | $200,000 | $250,000 |
| Life Insurance and Disability Programs | $18,000 | $18,000 |
| Workers' Compensation Program and Workers' Compensation Funds | $120,000 | $120,000 |
| 401(k) Plan | $0 | $0 |
| Ethics Hotline Program | $0 | $0 |
| Commuter Programs | $300 | $300 |
| Paid and Unpaid Leave | $5,000 | $5,000 |
| Severance Program | $27,000 | $27,000 |

31.     Except as noted in the Wages Motion, the Debtors do not believe that prepetition amounts owed to any single Employee on account of the Employee Compensation and Benefits Programs will exceed the statutory cap of $13,650 under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  The Debtors believe that some employees may have prepetition claims in excess of the statutory caps arising from the Debtors' obligations under their self-insured medical plan.  The Debtors will seek authority to pay amounts in excess of $13,650 for such Employees, but only pursuant to a Final Order.

32.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the loss of valuable Employees, who are the lifeblood of the Debtors' operations, would deplete the Debtors' workforce and thereby hinder the Debtors' ability to meet customer demands.  I believe that, failure to satisfy these Employee Compensation and Benefits Programs obligations will exhaust Employees' morale and loyalty at a time of already perceived uncertainty.  Such an outcome would diminish stakeholder confidence in the Debtors' ability to successfully carry out their chapter 11 strategy and to continue operating as a going-concern.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these Chapter 11 Cases.

33.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**VII.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain, Renew, or Supplement Their Insurance Policies, (II) Continue Their Insurance Premium Financing Agreement, (III) Maintain, Renew, or Supplement Their Surety Bonds, and (B) Granting Related Relief  (the "<u>Insurance Motion</u>").**

34.    Pursuant to the Insurance Motion, the Debtors seek interim and final orders: (a) authorizing the Debtors to (i) maintain, renew, or supplement their insurance policies, including any self-insurance policies, (ii) continue their insurance premium financing agreement, (iii) maintain, renew, and supplement their surety bonds on an uninterrupted basis, and (b) granting related relief.

35.    In the ordinary course of business, the Debtors maintain approximately 10 Insurance Policies that are provided by various third-party insurance carriers (collectively, the "<u>Insurance Carriers</u>").  The Insurance Policies provide coverage for, among other things, the Debtors' personal property, commercial general liability, employment practices liability, directors' and officers' liability (including tail coverage), crime and cyber risk, and automobile accident liability.  The Debtors work with an Insurance Broker to obtain these Insurance Policies and may owe certain fees to the Insurance Broker.

36.    Certain of the Insurance Policies require the Debtors to prepay the full premium amount for the applicable coverage period.  To lessen the financial burden that would be imposed on the Debtors by prepaying the full amount of premiums, the Debtors have financed the premiums for all but one of the Insurance Policies in the ordinary course of business pursuant to the Premium Financing Agreement with AFCO Premium Credit LLC ("<u>Premium Financing Agreement</u>").  The Debtors make monthly payments on account of the Premium Financing Agreement of approximately $45,000 per month.  Additionally, the Debtors also maintain a Self-Insured Policy for employee healthcare policy for which BlueCross BlueShield of Illinois provides stop loss insurance coverage.

37.     All of the Insurance Policies are essential to the ongoing operation of the Debtors'

business.  The aggregate annual premium due on the Insurance Policies is approximately $670,000,

plus applicable taxes and surcharges.  Pursuant to the Insurance Motion, the Debtors seek authority

to maintain, renew, and/or supplement the Insurance Policies and to continue honoring any

amounts on account of the Insurance Obligations in the ordinary course of business to ensure

uninterrupted coverage during the course of these chapter 11 cases.

38.     In the ordinary course of business, the Debtors are required to maintain a surety

bond with the United States Customs and Border Protection Agency ("CBPA") to secure their

ability to pay any applicable duties, penalties, or obligations, including any anti-dumping duties it

may incur with respect to its imports (the "Import Bond Program").  The Import Bond Program

provides up to $60,000 in coverage for all imports into the United States and guarantees the

payment of import duties and taxes to the CBPA.  Continuing to pay the obligations arising under

the Import Bond Program necessary to maintain the Debtors' current business operations.  Failing

to provide, maintain, or timely replace any bonds will prevent the Debtors from complying with

their state and federal law obligations, and consequently prevent them from undertaking essential

functions related to their operations, such as importing goods.  A substantial portion of the Debtors'

merchandise is sourced from foreign suppliers and any disruption in payments under the Import

Bond Program could result in termination of the customs import bond, which would negatively

impact the Debtors' business.

39.     Continuing to honor the Debtors' obligations arising in connection with its

Insurance Policies, the Premium Financing Agreement, and Import Bond Program are essential to

the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in

many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.

40.    I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**VIII.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (B) Granting Related Relief (the "Customer Programs Motion").**

41.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to maintain and administer their customer-related programs and honor certain prepetition obligations related thereto, and (b) granting related relief.

42.    The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand, including a Returns Program, Sales Promotions, Gift Card Program, Charitable Donations Program, Happy Returns Program, Subscription Box Program, Waste Not Paper Program, and Workshops Program.  Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.  The Customer Programs include:

- ***Returns Program***—under the Debtors' Returns Program—which applies to both in store and online purchases—customers can return purchased merchandise and other services so long as certain conditions are satisfied.

- ***Sales Promotions***—in the ordinary course of business, the Debtors offer sales promotions across a wide variety of products, both online and in their brick and mortar locations.

- ***Gift Card Program***—in the ordinary course of business, the Debtors maintain a Gift Card Program pursuant to which their customers can purchase pre-paid, non-expiring Gift Cards in various denominations, above $25 and up to $250, or are issued a Gift Card in exchange for a merchandise return in various denominations. The Debtors estimate that as of the Petition Date, approximately $1.6 million in issued Gift Cards remain outstanding. The Debtors are seeking authority to pay $2,000 in outstanding fees to their Gift Card service provider.

- ***Charitable Donations Program***—in the ordinary course of business, the Debtors' provide donations of the net sale proceeds from certain merchandise to various charitable organizations, including the National Association for the Advancement of Colored People, the Human Rights Campaign, and the Lawyers' Committee for Civil Rights Under Law.

- ***Happy Returns Program***—the Debtors have an agreement with a third-party vendor HR Logistics, Inc., a wholly-owned subsidiary of Happy Returns, Inc. to integrate the Debtors' stores as part of a network of "Return Bars" for online shoppers of other retail companies (such as Everlane and other direct to consumer brands) to return qualifying merchandise at a retail location. When such online shoppers arrive to return the other merchant's merchandise at the Debtors' stores, the Debtors provide such shoppers a promotion of $10 off purchases within the Debtors' store to encourage additional sales. The Debtors do not pay any fees to Happy Returns in connection with the Happy Returns Program and Happy Returns is not owed anything as of the Petition Date.

- ***Subscription Box Program***—the Debtors maintain a subscription services program pursuant to which their customers may sign up to receive boxes of curated merchandise.

- ***Waste Not Paper***—the Debtors maintain a wholesale customer program through which the Debtors offer customers large-quantity custom ordering and various delivery options.

- ***Workshop Program***—the Debtors offer a variety of workshops and events which provide, among other things, instructional classes on crafting, lettering, and other do-it-yourself (DIY) projects, and which are typically led by the Debtors' employees

43.    Similar to many retail companies, the Debtors also accept Non-Cash Payments from customers. The Debtors pay a Payment Processing Company fees in exchange for processing these Non-Cash Payments. I believe that it is essential to continue to accept Non-Cash Payments because the overwhelming majority of the Debtors' in-store sales—and all online sales—are made using Non-Cash Payments. The Debtors cannot afford to cede their online presence, particularly

as many of their brick and mortar locations face COVID-19 pandemic-related occupancy restrictions.  In addition, the Debtors' cannot administer many of their Customer Programs without Non-Cash Payments.

44.    I also believe that continuing to administer the Customer Programs without interruption during the pendency of the Chapter 11 Cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition, the Debtors risk alienating certain customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

45.    I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

IX.    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Prepetition Common Carrier, Warehouse, and Lienholder Claims and Related Obligations and (B) Granting Related Relief (the "<u>Lienholders and Common Carriers Motion</u>").**

46.    Pursuant to the Lienholders and Common Carriers Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to pay certain prepetition common carrier, warehouse, and lienholder claims, and related obligations; and (b) granting related relief.

47.     The Debtors' rely on services provided by Shipping Service Providers, including third-party wholesalers, brokers, freight forwarders, common or contract carriers, shippers, logistics providers to source Merchandise from around the world.  Without the services of the Shipping Service Providers, the Debtors would not be able to fill their 158 retail locations, or satisfy online customer orders.  In addition, the Debtors occasionally keep raw materials that will eventually be turned into Merchandise at locations owned by third party Warehouse Service Providers.

48.     Moreover, the Debtors also rely on various general contractors and vendors to assist with remodels and on-site construction and repairs at their 158 retail store locations, the Debtors' Chicago headquarters, or the Distribution Center (the "Non-Merchant Lienholders," and together with the Shipping Service Providers and Warehouse Service Providers, the "Service Providers").

49.     Under certain nonbankruptcy laws, the Service Providers may be able to assert liens on the Debtors' Merchandise and other property in their possession to secure payment of the charges or expenses incurred in connection with the performance of prepetition services.  In particular, certain Service Providers may refuse to deliver or release the Debtors' Merchandise and other property for shipment to the Debtors' distribution center or retail locations or to fulfill online orders if they are not paid timely.  If any Service Providers possess or retain the Debtors' Merchandise or other property, the Debtors' operations would be disrupted and their ability to successfully administer these Chapter 11 Cases would be jeopardized.  In addition, pursuant to section 363(e) of the Bankruptcy Code, the Service Providers may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

50.     Collectively, the Debtors estimate that approximately $2.78 million is due and owing on the Service Claims as of the Petition Date.  The Debtors are requesting authority to pay the Service Claims in an amount not to exceed $400,000 during the interim period.

51.     I believe that payment of the Service Claims is a sound exercise of the Debtors' business judgement.  Furthermore, payment of such claims is necessary for the successful reorganization of the Debtors because any disruption in the services provided by the Service Providers—specifically, an interruption in or shutdown of the Debtors' distribution network—would cost the Debtors' estates significant lost revenues and would irreparably harm the Debtors' relationships with their customers.  The harm and economic disadvantage that would stem from the failure or refusal of any of the Service Providers to perform services for the Debtors is grossly disproportionate to the amount of the Service Claims that the Debtors are seeking authority to pay.  I believe that the relief requested in the Lienholders and Common Carriers Motion is necessary in order for the Debtors to operate their business in the ordinary course and to preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Lienholders and Common Carriers Motion.

**X.     Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Granting Related Relief (the "Critical Vendors Motion").**

52.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, the undisputed, liquidated, prepetition Critical Vendor Claims in an amount not to exceed $1.3 million on an interim basis, and a total of $2.0 million on a final basis, and (b) granting related relief.

53. The Debtors' efforts to provide their customers, both domestically and around the world, with a wide selection of highly-curated products have created significant customer loyalty and countless positive in-store customer experiences. Such success has been made possible by the Debtors' partnership with numerous critical product and service providers who ensure that Paper Source is *the* destination for premium paper products and related gifts and craft items (collectively, the "Critical Vendors"). The Critical Vendors support nearly every aspect of the Debtors' ongoing business operations.

54. Similar to many other comparably sized retailers, the Debtors do not enter into long term supply agreements with their Merchandise Vendors, and instead order the majority of their merchandise through purchase orders. The Debtors' reliance on purchase orders to fill their inventory needs makes them extremely vulnerable to the risk of Critical Vendors deciding either to cease doing business with the Debtors or to demand trade terms that are much less favorable to the Debtors.

55. Prior to the Petition Date, the Debtors worked tirelessly with their advisors to evaluate their vast vendor base of more than 1,200 suppliers and assess which relationships are critical to the Debtors' ongoing successful business operations. This task was particularly hard in light of the makeup of the Debtors' supplier base, many of which are small businesses who the Debtors believe to be inexperienced with the chapter 11 process and rely significantly (if not entirely) on the Debtors' significant purchases to continue their own business operations. The Debtors seek a total of $2.0 million on a final basis to satisfy Critical Vendor Claims, which is less than 20% of the Debtors' outstanding trade payables as of the Petition Date. In return for paying Critical Vendors, the Debtors seek authorization, but not direction, to condition payment of the Critical Vendor Claims, either in full or in part, on each vendor's agreement to continue to provide

favorable trade terms in line with historical practices and other terms covered by existing agreements and other programs, for the postpetition delivery of goods and services and otherwise continue supplying the Debtors with essential goods and services for the duration of these Chapter 11 Cases.

56.     The bulk of the Debtors' Critical Vendors are suppliers of the inventory and merchandise that the Debtors sell in their 158 retail locations and online (the "Merchandise Vendors").  Given the high-quality specialized nature of the merchandise sold in the Debtors' stores—with certain products having premium, specialized qualities that render them truly irreplaceable—the inventory and merchandise that the Debtors purchase from the Merchandise Vendors is not substitutable.  In addition, the Debtors do business with certain Critical Vendors that are suppliers of goods and equipment that are vital to the Debtors day-to-day operations, as well as vendors that provide critical marketing support products and services for their business operations (collectively, the "Non-Merchandise Vendors").  Essential goods and services provide by such vendors include transaction processing, maintenance and support of online operations, general supplies and packaging materials, customer relationship management capabilities, and digital marketing and brand creative services, among others.  In many instances, the Non-Merchandise Vendors are the only vendors able to produce or deliver the volume or quality of certain materials or products sufficient to meet the Debtors' operational needs.

57.     Without the goods and services provided by the Critical Vendors, the Debtors would be forced to cease or substantially curtail operations even more than they already have in response to the COVID-19 pandemic as they would not have products to sell in store or online.  If the Debtors do not pay the Critical Vendor Claims, the resulting harm to the Debtors' estates would far outweigh the cost associated with paying a portion of the Debtors' prepetition obligations to

the Critical Vendors.  I believe the relief sought in the Critical Vendors Motion will not burden the

Debtors, but will help maximize the value of their estates.  Accordingly, on behalf of the Debtors,

I respectfully submit that the Court should approve the Critical Vendors Motion.

**XI.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (B) Granting Related Relief (the "Taxes Motion").**

58.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders: (a) authorizing, but not directing, the Debtors to pay Taxes and Fees without regard to whether such obligations accrued or arose before or after the Petition Date, including any obligations subsequently determined pursuant to an audit or otherwise to be owed for periods prior to the Petition Date; and (b) granting related relief.

59.    The Debtors pay the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.  The Debtors' payment of the Taxes and Fees is necessary because failure to pay would have a material adverse impact on the Debtors' ability to operate and continue their business.  If certain Taxes and Fees remain unpaid, Taxing Authorities may take action to recover unpaid amounts directly from the Debtors' directors, officers, or employees.

60.    Pursuant to the Taxes Motion, the Debtors seek authorization to make the following payments on account of prepetition Taxes and Fees:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Sales and Use Taxes** | Taxes imposed on the sale and use of certain goods and/or services. | $800,000 | $658,000 |

| Income and Withholding Taxes | The Debtors incur various state, local and federal income and withholding taxes. The Debtors pay these taxes on a periodic basis. | $82,500 | $82,500 |
|---|---|---|---|
| Franchise Taxes | Taxes required to conduct business in the ordinary course. | $0 | $0 |
| Property Taxes | Taxes and obligations related to the Debtors' personal property holdings. | $265,000 | $186,000 |
| Import Taxes | Customs duties, excise taxes, detention and demurrage fees, tariffs, and associated taxes and charges related to the import of goods from foreign jurisdictions. | $100,000 | $30,000 |
| Other Taxes and Fees | Taxes and Fees related to licensing, permits, reporting requirements, commercial activity, and other related fees paid to state and local agencies. | $10,000 | $10,000 |
| Audits | Investigations by the Authorities with respect to the above categories, which may result in the imposition of Assessments (as defined herein), together with interest and possible fines and penalties to become payable. | $600,000 | $0 |
| | **Total** | $1,257,500[3] | $966,500 |

61.    I believe that the relief requested in the Taxes Motion is a sound exercise of the Debtors' business judgment and is critical to minimizing disruptions to the Debtors' operations. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**XII.    Debtors' Motion for Entry of an Order (A) Authorizing (I) the Rejection of Certain Unexpired Leases, (II) the Abandonment of Any Personal Property, Effective as of the Petition Date, and (B) Granting Related Relief (the "<u>Lease Rejection Motion</u>").**

62.    Pursuant to the Lease Rejection Motion, the Debtors seek entry of an order: (a) authorizing (i) the rejection of certain of the Debtors' Leases, a list of which is annexed as **<u>Schedule 1</u>** to **<u>Exhibit A</u>** of the Lease Rejection Motion, (ii) the abandonment of certain of the

---

[3]    This total approximation does not include any amounts in estimated additional Taxes and Fees that may be assessed against the Debtors pursuant to the Audits (as defined herein).

Debtors' Personal Property free and clear of all liens, claims, encumbrances, interests, and rights

of third parties that may be located at the premises and not otherwise transitioned to another store

location, with both rejection of the Leases and the abandonment of Personal Property to be

effective as of the Petition Date; and (b) granting related relief.

63.     The Debtors engaged real estate advisor A&G to help undertake a comprehensive

review of each of their retail locations, including the terms of each underlying Lease.  The Debtors

determined that 11 of their brick-and-mortar retail stores do not have a place in their go-forward

business.

64.     I believe the fixed liabilities associated with the Debtors' real estate portfolio are a

significant contributing factor to the Debtors' ongoing financial hardship.  Absent rejection, the

Debtors would be obligated to pay rent under the Leases even though they have ceased operations

at, and are no longer in possession of, such store locations.  Moreover, in addition to their

obligations to pay rent under the Leases, the Debtors may be obligated to pay certain real property

taxes, utilities, insurance, and other related charges associated with the Leases.  The costs of the

Leases exceed any marginal benefits that could potentially be achieved from assignments or

subleases of the Leases.  Absent rejection, I believe that the associated Leases will continue to

burden the Debtors' estates with substantial administrative expenses at a critical time when the

Debtors are making concerted efforts to maximize liquidity and preserve the going concern value

of their business.  By rejecting the Leases, I believe the Debtors will save approximately $114,526

per month in rent and associated costs.

65.     I believe that the relief requested in the Lease Rejection Motion is in the best

interest of the Debtors' estates, their creditors, and all other parties in interest and that the landlords

of the Closed Stores will not be unduly prejudiced.  Accordingly, on behalf of the Debtors, I respectfully submit that the Lease Rejection Motion should be approved.

**XIII.** **Debtors' Motion for Entry of an Order (A) Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases and the Abandonment of Related Personal Property, and (B) Granting Related Relief (the "Rejection Procedures Motion").**

66.     Pursuant to the Rejection Procedures Motion, the Debtors seek entry of interim and final orders: (a) establishing procedures for the rejection of executory contracts and unexpired leases and the abandonment of related personal property; and (b) granting related relief.

67.     In the course of operating their retail business, the Debtors are party to over 200 contracts, which include agreements with vendors for the supply of goods and services, and unexpired leases, of which 163 may be considered nonresidential real property leases.  The Debtors are currently evaluating all of their executory contracts and unexpired leases ("Contracts and Leases"), and may reject a substantial number of them over the course of these Chapter 11 Cases. Establishing the Rejection Procedures early in these Chapter 11 Cases will streamline the administration of the Debtors' estates and enhance the efficiency of the chapter 11 process by eliminating substantial legal expenses and delays that would otherwise be incurred if multiple hearings were held on separate motions with respect to every Contract and Lease that the Debtors seek to reject.  The Rejection Procedures are reasonable and fair to Contract and Lease counterparties because they afford all parties in interest with sufficient notice and the opportunity to be heard with respect to the rejection of the Contracts and Leases.

68.     I believe that the relief requested in the Rejection Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Rejection Procedures Motion should be approved.

**XIV.  Debtors' Motion for Entry of an Order (A) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases and (B) Granting Related Relief (the "<u>Rent Deferral Motion</u>").**

69.    Pursuant to the Rent Deferral Motion, the Debtors seek entry of interim and final orders: (a) extending for the duration of these cases the time for the Debtors to perform obligations that arise within 60 days after the Petition Date ("<u>Extension Period</u>") under unexpired leases of nonresidential real property; (b) automatically staying, for the duration of the Extension Period, all motions, applications, actions, or pleadings filed in these cases seeking to: lift the automatic stay as a result of the Debtors' failure to perform any obligations arising under any unexpired nonresidential real property lease; determine the validity, priority, or extent of a lien or other interest in any such lease; obtain a declaratory judgement in connection with the Debtors' failure to perform any obligation (including payment of rent) under any such lease; compel the Debtors' performance of any obligation (including payment of rent) under any such lease; or compel rejection, assumption, or assignment of any such lease with the Debtors; and (c) granting related relief.

70.    I believe it is not prudent or in the best interests of the Debtors' estates and creditors to require the Debtors to make approximately $3.0 million in non-residential lease payments each month during the first 60 days of these Chapter 11 Cases.  This conclusion is based on four distinct reasons:

- ***The Lasting Impact of COVID-19 on the Debtors' Retail Operations***—while the initial stage of the pandemic has ended—marked by government mandated lockdowns—COVID 19 continues to be a material drag on the Debtors' business operations.  The Debtors can only operate many of their 158 retail locations subject to substantial occupancy limitations.  Moreover, these chapter 11 cases are taking place against the backdrop of unprecedented public health crisis which has unsurprisingly and understandably led to a substantial decline in in-store customer traffic and revenues.

- ***The Benefit to the Debtors' Estates Constitutes Cause to Approve the Extension Period***—the Debtors commenced these Chapter 11 Cases to implement a comprehensive restructuring

that will allow the Debtors to both conduct a comprehensive post-petition marketing process, and evaluate and rationalize the Debtors' real estate portfolio, including renegotiating lease terms to align the Debtors' rent expenditures with prevailing market rates. These goals do not exist in isolation, and are inherently intertwined. The Extension Period will give the Debtors the time and reprieve necessary to thoughtfully engage in negotiations with Landlords regarding Lease Obligations and to determine whether assumption or rejection of the applicable Leases are appropriate. This process, in turn, will enhance the value of the Company to the benefit of the estates' creditors.

- ***Landlords Are Not Unduly Prejudiced by the Extension Period***—the Lease counterparties will not be prejudiced by the Extension Period. The Debtors are not seeking to waive or indefinitely defer Lease Obligations, and Lease counterparties will continue to have administrative expense claims to the extent of their Leases and the Bankruptcy Code, unless otherwise consensually agreed to with the Debtors. Importantly, the Debtors' postpetition financing provides for sufficient funding available to pay operating expenses through the Extension Period, including Lease Obligations to the extent not consensually modified with the Landlord.

- ***The Balance of Equities Favors Suspending Lease Obligations***—in the past year, nearly all of the Debtors' employees were either furloughed, terminated, or had endured salary reductions. Trade creditors have been operating under extended repayment terms, and several will be asked to continue providing favorable trade terms despite potentially reduced or delayed payments. Equity holders and holders of funded debt have seen tens of millions of dollars in value destruction. Under these circumstances, nearly every creditor and stakeholder has unfortunately borne the impacts of the pandemic. The interests of Landlords—while a significant consideration—cannot be elevated over the Debtors' obligations to maximize creditor recoveries in these Chapter 11 Cases.

71.    I believe that the relief requested in the Rent Deferral Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest. Because of the extraordinary circumstances resulting from COVID-19, the benefit to the Debtors' estate in granting the relief requested, and the lack of undue prejudice to the Landlords, and the balance of equities, I respectfully submit that the Rent Deferral Motion should be approved.

## XV.    Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) (A) Approving the Retention and Appointment of Epiq Corporate Restructuring, LLC as the Claims and Noticing Agent to the Debtors and (B) Granting Related Relief (the "<u>Claims and Noticing Agent Retention Application</u>").

72.    Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order: (a) approving the services agreement between the Debtors and Epiq Corporate

Restructuring, LLC ("Epiq") and the Debtors' retention and employment of Epiq as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors in lieu of the Clerk (the "Clerk") of the Court and for related relief, effective *nunc pro tunc* to the Petition Date; and (b) granting related relief.

73.    Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Epiq to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.    Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Epiq's rates are competitive and comparable to the rates charged by their competitors for similar services.

74.    The Debtors anticipate that there will be thousands of entities to be noticed.    In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of Epiq as the Claims and Noticing Agent is both necessary and in the best interests of the Debtors' estates and their creditors because the Debtors will be relieved of the burdens associated with the Claims and Noticing Services.    Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Retention Application.

**XVI.    Debtors' Motion for Entry of an Order (A) Approving Sale of Substantially All of the Debtors' Assets, and (B) (I) Approving Bidding Procedures in Connection Therewith, (II) Scheduling a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (V) Granting Related Relief (the "Bidding Procedures Motion").**

75.    Pursuant to the Bidding Procedures Motion, the Debtors seek entry of orders: (i) approving the proposed procedures (the "Bidding Procedures") to be used in connection with the sale (the "Sale") of the Debtors' assets (the "Assets"); (ii) scheduling a final hearing for approval of the Sale (the "Sale Hearing"); (iii) approving the form and manner of notice of the

Bidding Procedures, the Auction, and the Sale Hearing (the "Sale Notice"); (iv) authorizing certain procedures related to the assumption by the Debtors and assignment to the Successful Bidder of executory contracts and unexpired leases in connection with any Sale (the "Assumption and Assignment Procedures"); and (v) granting certain related relief; and (B) authorizing and approving the Sale (the "Sale Order").

76.    I believe the Bidding Procedures and proposed timeline set forth in the Bidding Procedures Motion and below will best position to Debtors and their professionals to maximize the value of the Debtors' assets.

| Event | Date |
|---|---|
| Bid Deadline | **April 16, 2021, at 5:00 p.m. (prevailing Eastern time)** |
| Notice of Qualified Bidder Deadline | **No later than 5:00 p.m. (prevailing Eastern time) on the date two days following the Bid Deadline** |
| Auction | **April 21, 2021, at [●]:00 a/p.m. (prevailing Eastern time),** or as may be adjourned to such later date by the Debtors |
| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |
| Sale Hearing | **April 30, 2021, at [●]:00 a/p.m. (prevailing Eastern time)**, or such other date and time that the Court may later direct and as agreed upon by the Debtors |
| Sale Closing | **May 26, 2021** |

77.    Moreover, the sale of all or substantially all of the Debtors' assets may include the sale of "personally identifiable information" as that term is defined in Section 101(41A) of the Bankruptcy Code.  It is my understanding that Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") when a debtor seeks to sell or transfer Personally Identifiable Information to the extent such sale would be inconsistent with the Debtors' existing privacy policy.  Because the sale of any personally identifiable information

would be consistent with the Company's existing privacy policy, I do not believe the appointment

of such an Ombudsman is required.

78.     First, the Company's privacy policy is available on the Company's website and

discloses to customers that their Personally Identifiable information is sold.   Specifically, the

privacy policy states:

> In the event Paper Source goes through a transition (such as a
> merger, acquisition, bankruptcy or sale of all or a portion of its
> assets, including, without limitation, during the course of any
> due diligence process), *your information (including your
> Personal Information) will likely be among the assets
> transferred.  By providing your Personal Information, you
> agree that we may transfer such information to the acquiring
> entity without your further consent.* (emphasis added).[4]

79.     Second, data collection and processing is transparent and consumers are required

to affirmatively consent or opt-in to receive marketing and other promotional materials from the

Debtors.  Further, consumer consent to receive marketing or other materials can be revoked at any

time, and all emails and text messages provide a clear road map for consumers to opt-out of

communications from the Debtors or limit marketing offers.  The Debtors process opt-out requests

upon receipt of either an email requesting to unsubscribe or following the opt-out instructions

contained in any marketing material.  Consistent with the Privacy Policy, the Debtors do not intend

to transfer the Personally Identifiable Information of any consumer who opted-out of receiving

communications and such information will be transferred only to the extent it can be aggregated

or anonymized.

80.     The Debtors believe that the relief sought in the Bidding Procedures Motion, and

Assumption and Assignment Procedures will allow the Debtors to maximize value for their

---

[4]     Paper Source, https://www.papersource.com/security.html (last visited March 1, 2021)

stakeholders while producing a fair and transparent bidding process.  I believe that the relief requested in the Bidding Procedures Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest.  For these reasons, I respectfully submit that the Bidding Procedures Motion should be approved.

*[Remainder of page intentionally left blank]*