John C. Longmire (*pro hac vice* admission pending)       Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (*pro hac vice* admission pending)     David W. Gaffey (VSB# 85088)
James H. Burbage (*pro hac vice* admission pending)       Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**                          **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue                                        Two James Center
New York, NY 10019                                        1021 E. Cary Street, Suite 1700
                                                          Richmond, VA 23219
Telephone:       (212) 728-8000                           Telephone:       (804) 977-3300
Facsimile:       (212) 728-8111                           Facsimile:       (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY, (F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (together, the "Debtors") move (this "Motion") for entry of an interim order the (the "Proposed Interim Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders"), pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001,

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"),

and rules 2002-1, 4001(a)-1 6004-2, 9013-1, and 9014-1 of the Local Rules of the United States

Bankruptcy Court for the Eastern District of Virginia (the "<u>Local Bankruptcy Rules</u>"):

(a) authorizing the Debtors to enter into the DIP Facility; (b) authorizing the Debtors to use Cash

Collateral; (c) granting liens and providing superpriority administrative expense status to the DIP

Secured Parties (as defined below); (d) granting adequate protection to the Prepetition Secured

Parties (as defined below); (e) modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders;

(f) scheduling the final hearing to consider approval of this Motion on a final basis (the "<u>Final</u>

<u>Hearing</u>"); and (g) granting related relief.  In support of the Motion, the Debtors rely upon and

incorporate by reference the *Declaration of Ronald Kruczynski, Chief Financial Officer of Paper*

*Source, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day</u>

<u>Declaration</u>") and the *Declaration of Colin M. Adams in Support of the Debtors' Motion for Entry*

*of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing,*

*(B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing*

*Superpriority Administrative Expense Status, (D) Granting Adequate Protection, (E) Modifying*

*the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "<u>Adams</u>

<u>Declaration</u>") which were filed with the Court concurrently herewith, and respectfully represent

as follows:

## <u>Jurisdiction and Venue</u>

1.      The United States Bankruptcy Court for the Eastern District of Virginia (the

"<u>Court</u>") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the

*Standing Order of Reference from the United States District Court for the Eastern District of*

*Virginia*, dated August 15, 1984.  The Debtors confirm their consent, pursuant to Bankruptcy Rule

7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue of the cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 14090.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)

4.      The predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rules 2002-1, 4001(a)-1 6004-2, 9013-1, and 9014-1.

**<u>Background</u>**

5.      The Debtors operate a leading lifestyle brand and retailer of premium paper products, crafting supplies and related gifts, including custom invitations, greeting cards and personalized stationery and stamps.  Through their 158 domestic stores and e-commerce website, the Debtors are an omnichannel provider of fine and artisanal papers, wedding paper goods, books and gift wrap.  The Debtors also provide wedding consultation, crafting supplies and instructions, and subscription services.  The Debtors' administrative headquarters is in Chicago, Illinois.

6.      The Debtors commenced these cases on the date hereof (the "<u>Petition Date</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to facilitate a timely and efficient sale process for all or substantially all of their business.  As set forth in the First Day Declaration, the Debtors believe the sale process will maximize the value of the Debtors' estates for the benefit of all stakeholders.

7.      The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural

consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  As of the date hereof, no trustee, examiner, or official committee has been appointed in these chapter 11 cases.

**Preliminary Statement**

8.      The Debtors require immediate access to incremental liquidity in the form of postpetition financing and access to Cash Collateral.  Such relief is critical to preserving and maximizing the value of the Debtors' estates.  The Debtors have commenced these chapter 11 cases ("Chapter 11 Cases") to implement a comprehensive restructuring that will allow the Debtors to achieve certain objectives that are critical to their survival: (a) continue a marketing process whereby the Debtors will seek to sell all or substantially all of their assets to MidCap Funding Investment XI LLC, an affiliate of the DIP Agent and Prepetition First Lien Agent, or another buyer; (b) evaluate and rationalize the Debtors' real estate portfolio, including renegotiating lease terms to align the Debtors' rent expenditures with prevailing market rates; and (c) continue operations without interruption, including minimizing any potential adverse effects to the Debtors' businesses, customers, employees, trade partners and other key stakeholders. The Debtors will not be able to achieve any of these goals, and will instead  suffer immediate and irreparable harm absent access to additional liquidity.  Indeed, at the time of the commencement of these chapter 11 cases, the Debtors have an amount insufficient to operate the Debtors' businesses or continue in the ordinary course.

9.      The Debtors commenced these chapter 11 cases with firm commitments for $16.0 million of postpetition financing to support their business at this critical juncture.  As described below and in the Adams Declaration, the Debtors' proposed DIP Facility has been market tested, contains customary interest rates, fees, and other economic and non-economic terms, and allows the Debtors avoid a costly priming fight at the outset of these Chapter 11 Cases.  Access to the

DIP Facility is essential to ensuring that the Debtors have the liquidity necessary to run a successful sale processes, while continuing to operate in the ordinary course of business.  For these reasons, and for the reasons set forth below, in the Adams Declaration and First Day Declaration, the Debtors believe that entry into the DIP Documents and incurrence of the DIP Facility is vital, will avoid immediate and irreparable harm, will maximize the value of the Debtors' estates, and is a sound exercise of the Debtors' business judgment.

## Concise Statements Pursuant to Bankruptcy Rule 4001(b)

**I.      Concise Statement Regarding the DIP Facility.**

10.     The Debtors seek entry of the DIP Orders:

a) authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a delayed-draw term loan facility (the "DIP Facility") consisting of (a) $7.75 million available upon entry of the Interim Order (the "Interim Amount"), and (b) an additional $8.25 million available upon entry of the Final Order (the "Final Amount"), pursuant to the terms and conditions of the DIP Orders that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), to be entered into by and among Paper Source, Inc., as borrower, Pine Holdings, Inc., as guarantor, MidCap Financial Trust, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties");

b) approving the terms of and authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet and any other agreements, instruments and documents related thereto (the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

c) authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties (collectively, the "DIP Obligations"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined in the DIP Orders), subject to the Carve-Out (as defined herein);

d)  granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and superpriority liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "Cash Collateral"), which liens shall be subject to the priorities set forth in the DIP Orders;

e)  authorizing and directing the Debtors to use proceeds of the DIP Facility to (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the Lender Professionals (as defined in the DIP Orders); (b) make permitted adequate protection payments; and (c) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget (as defined in DIP Orders), the DIP Orders and the DIP Documents;

f)  authorizing the Debtors to use the Prepetition Collateral (as defined in the DIP Orders), including the Cash Collateral on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties for any diminution of their interests in the Prepetition Collateral, including the Cash Collateral;

g)  modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this DIP Orders;

h)  authorizing payment of the DIP Fees (as defined in the DIP Orders);

i)  scheduling a Final Hearing to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing; and

j)  granting related relief.

11.     The chart below contains a summary of the material terms of the proposed DIP

Facility, together with references to the applicable sections of the relevant source documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B).[2]

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B) | Paper Source, Inc.<br><br>*See* DIP Term Sheet, "Borrower" Section |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | Pine Holdings, Inc.<br><br>*See* DIP Term Sheet, "Guarantor" Section |
| **Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Entities forth on **Exhibit A** of DIP Term Sheet.<br><br>*See* DIP Term Sheet, Exhibit A |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition Secured Parties under the Prepetition First Lien Credit Documents and Prepetition Second Lien Credit Documents, respectively.<br><br>*See* Interim Order, ¶ J(ii). |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "Maturity Date"):<br><br>(i)     June 30, 2021;[3]<br><br>(ii)    the consummation of a sale of all or substantially all of the assets of the Debtors;<br><br>(iii)   the termination of the Stalking Horse Agreement for any reason without the prior written consent of the DIP Lenders and the Stalking Horse Purchaser other than a termination of the Stalking Horse Agreement to pursue approval of an Alternative Transaction (as defined in the Stalking Horse Agreement) that results in the indefeasible payment in full in cash of the Prepetition First Lien Obligations as of the closing of such Alternative Transaction; |

---

[2]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Documents and the Interim Order.   To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

[3]     120 days from the Petition Date.

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | (iv) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; |
| | (v) entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; and |
| | (vi) the date of acceleration of all or any portion of the DIP Loans and the termination of the commitments in respect thereof upon the occurrence of an Event of Default (as defined below). |
| | *See* DIP Term Sheet, Maturity Date Section. |
| **Adequate Protection for Prepetition First Lien Secured Parties** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any diminution of the Prepetition First Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition First Liens to the DIP Liens and the Carve-Out, the Prepetition First Lien Agent shall receive, for the benefit of the Prepetition First Lien Secured Parties: |
| | (i) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens and Permitted Liens (the "<u>First Lien Secured Parties' Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; |
| | (ii) administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>First Lien Adequate Protection Superpriority Claims</u>"), junior and subordinate only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and |
| | (iii) (x) monthly reimbursement payments of the Prepetition First Lien Secured Parties' respective reasonable fees and expenses including the |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | professional fees of Proskauer Rose LLP, Tavenner & Beran PLC, and Carl Marks & Co., Inc. (in each case, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date), and (y) payment in kind of monthly interest, calculated at the non-default rate under the Prepetition First Lien Credit Agreement and added to the principal amounts of the Prepetition First Lien Secured Parties' allowed secured claims.<br><br>*See* Interim Order ¶ 13. |
| **Adequate Protection for Prepetition Second Lien Secured Parties** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | As adequate protection for any Diminution of the Prepetition Second Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition Second Liens to the DIP Liens, the Carve-Out, and the First Lien Replacement Liens, the Prepetition Second Lien Agent shall receive, for the benefit of the Prepetition Second Lien Secured Parties:<br><br>(i)    continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the Permitted Liens, the DIP Liens, the First Lien Replacement Liens, and the Prepetition First Liens (the "<u>Second Lien Secured Parties' Replacement Liens</u>," and together with the First Lien Secured Parties' Replacement Liens, the "<u>Replacement Liens</u>") and which shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; and<br><br>(ii)   administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>Second Lien Adequate Protection Superpriority Claims</u>," and together with the First Lien Adequate Protection Superpriority Claims, the "<u>Adequate Protection Superpriority Claims</u>"), junior and subordinate to the Carve-Out, the DIP Obligations (including the DIP Superpriority Claims), the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations, and pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 14. |
| **Waiver/Modification of the Automatic Stay** | The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B)(iv) | Parties and the Prepetition First Lien Secured Parties to accomplish the transactions contemplated by this Interim Order.<br><br>*See* Interim Order ¶ 19. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B); | As used herein, "Carve-Out" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the notice set forth in (iii) below); (iii) subject to the Approved Budget to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "Allowed Debtor Professional Fees") incurred by  persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and unpaid fees and expenses (the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, collectively, the "Allowed Professional Fees") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "Committee") pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve Out Amounts"); and (iv) Allowed Professional Fees not to exceed $500,000, incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").<br><br>*See* Interim Order ¶ 34. |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x) | The DIP Secured Parties, and subject to entry of a Final Order, the Prepetition First Lien Secured Parties, shall each be entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 46. |
| **Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Secured Parties, and subject to entry of a Final Order, the Prepetition First Lien Secured Parties, shall each be entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 48. |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
| --- | --- |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Interim DIP Loan</u>:  On or after the Interim Closing Date, Borrower may request loans in a single draw in an aggregate principal amount of up to $7.75 million, subject to the provisions of the DIP Term Sheet and for use strictly in accordance with the Approved Budget (and the terms of the Interim Order approving the DIP Credit Facility on an interim basis (the "<u>Interim DIP Loans</u>"); and<br><br><u>Final DIP Loan</u>:  On or after the Final Closing Date, Borrower may request loans in one or more borrowings up to amounts, not to exceed at any time outstanding aggregate commitments of $16.0 million, less amounts drawn under the Interim DIP Loans (the "<u>Final DIP Loan</u>", together with the Interim DIP Loans, the "<u>DIP Loans</u>"), <u>subject to the provisions of the DIP Term Sheet and for use strictly in accordance with the "Use of Proceeds" section of the DIP Term Sheet and the terms of the Final Order</u>. |
| **Materials Conditions of Borrowing** to the Interim Commitment<br>Bankruptcy Rule 4001(c)(1)(B) | The obligations of the DIP Lenders to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender in its sole and absolute discretion, of each of the following conditions precedent in connection with each draw request:<br><br>(i)   Debtors shall have timely delivered to the DIP Agent the Approved Budget or any update thereto required to be delivered in accordance with the DIP Term Sheet;<br><br>(ii)  the Interim Order (in form and substance acceptable to the DIP Agent and each DIP Lender in its sole and absolute discretion) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and each DIP Lender and the Debtors shall be in compliance in all respects with the Interim Order<br><br>(iii) The DIP Agent shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP Collateral and shall constitute first-priority liens (subject only to Prepetition Permitted Liens)<br><br>*See* DIP Term Sheet, "Conditions Precedent to the Interim DIP Loan" |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to the LIBOR Rate (as defined in the Prepetition First Lien Credit Agreement) for an Interest Period (as defined in the Prepetition First Lien Credit Agreement) of one month <u>plus</u> 10.00%, payable monthly on the first (1st) business day of each month in arrears.  All accrued interest which for any reason has not theretofore been |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br>*See* DIP Term Sheet, "Interest Rate" Section. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | Unless waived by the Required DIP Lenders (as defined below) in their sole discretion, the failure of the Debtors to meet the following milestones (each, a "Case Milestone") by the applicable specified deadlines set forth therefor (the "Specified Deadline") shall constitute an Event of Default:<br><br>(i)    no later than three (3) business days after the Petition Date, entry by the Bankruptcy Court of the Interim Order;<br><br>(ii)   no later than thirty (30) calendar days after the entry of the Interim Order, entry by the Bankruptcy Court of the Final Order;<br><br>(iii)  no later than thirty (30) calendar days after the Petition Date, entry by the Bankruptcy Court of an order approving a motion establishing bidding procedures in respect of the Sale, which order shall be reasonably acceptable to the Required DIP Lenders ("Bid Procedures");<br><br>(iv)  no later than forty-five (45) calendar days after the Petition Date, submission of qualified bids in respect of the Sale;<br><br>(v)   no later than sixty (60) calendar days after the Petition Date, the conduct of a sale hearing;<br><br>(vi)  no later than sixty-five (65) calendar days after the Petition Date, entry by the Bankruptcy Court of a sale order, which order shall be reasonably acceptable to the Required DIP Lenders (the "Sale Order"); and<br><br>(vii) no later than eighty-five (85) calendar days after the Petition Date, consummation a Sale approved by the Bankruptcy Court.<br><br>*See* DIP Term Sheet, Section "Case Milestones" |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(1)(B) | Proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition First Lien Facility and Prepetition First Lien Secured Parties (but not the DIP Facility) (the "Investigation").<br><br>*See* Interim Order ¶ 34(i). |
| **Use of DIP Facility and Cash Collateral** | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances), for (a) working capital and general |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| Bankruptcy Rule 4001(b)(l)(B)(ii) | corporate purposes of the Debtors, (b) for bankruptcy-related costs and expenses, and (c) for costs and expenses related to the DIP Credit Facility. *See* DIP Term Sheet, Section "Use of Proceeds Section" |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | After consultation with their attorneys and advisors, and without prejudice to the rights of parties in interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity of the Prepetition First Lien Lenders' claims and liens. *See* Interim Order ¶ G. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve-Out, the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein. *See* Interim Order ¶ 20. |
| **Repayment Features** | Optional Prepayment The Debtors may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Agent no later than 1:00 PM ET three (3) business days prior to the date of such prepayment (or such later time as the DIP Agent may agree to in its sole discretion). Mandatory Prepayment The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows: (i)    100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget and (b) in an amount negotiated in good faith by the DIP Lenders and the Debtors that is necessary to fund costs for the wind- |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | down of Debtors' bankruptcy estates following the closing of such Sale;<br><br>(ii) 100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for the (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders (as defined in the DIP Term Sheet) or (b) sale of goods or services in the ordinary course of business); and<br><br>*(iii)* 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget) by any Debtor.<br><br>*See* DIP Term Sheet, "Optional Prepayments" and "Mandatory Prepayments" Sections |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Arrangement Fee</u><br><br>The Debtors shall pay to the DIP Agent a fee equal to $50,000 (the "<u>Arrangement Fee</u>"), which shall be fully earned and non-refundable, on the Interim Closing Date. The Arrangement Fee shall be due and payable in cash upon the initial draw made in accordance with the Draw Schedule and may be netted from the proceeds of the initial DIP Loans funded.<br><br><u>Commitment Fees</u><br><br>The Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their DIP Commitments on the Interim Closing Date, a commitment fee (the "<u>Commitment Fee</u>") equal to 3.00% of the aggregate DIP Commitment. The Commitment Fee shall be fully-earned and non-refundable on the Interim Closing Date. The Commitment Fee shall be paid in kind on the Interim Closing Date and capitalized to the principal amount of the Interim DIP Loans.<br><br>*See* DIP Term Sheet, See "Arrangement Fee" and Commitment Fees" Section. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B) | By no later than the Petition Date, Debtors shall deliver to the DIP Agent a weekly budget for the 13-week period commencing on the Petition Date, and such weekly budget shall be approved by the DIP Agent in its sole discretion and shall set forth, among other things, the projected cash receipts, sales and cash disbursements (the "<u>Approved Budget</u>"). Commencing at 5:00 P.M. (Eastern Time) on the Wednesday of the second full calendar week after the Petition Date, and continuing on 5:00 P.M. (Eastern Time) on the Wednesday of every second week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Agent |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | in its sole discretion, it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders.<br><br>*See* Interim Order ¶ 17(i), DIP Term Sheet, Section "Approved Budget; Approved Cash Flow Projection; Variance Reports" |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B) | Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances.   "**Permitted Variances**" shall mean, as of any Testing Date:<br><br>(i)     the sum of (x) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period, *plus* (y) to the extent such amount is greater than $0, the amount by which the actual cumulative cash receipts of the Debtors for the immediately preceding Testing Period exceeded the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period, may not vary negatively from the Approved Budget for such Testing Period by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts; and<br><br>(ii)    the difference of (x) the Debtors' actual cash operating disbursements for each line item within the Approved Budget (excluding professional fees) for the applicable Testing Period, *minus* (y) to the extent such amount is greater than $0, the amount by which such line item within the Approved Budget for the immediately preceding Testing Period exceeded the Debtors' actual cash operating disbursements for such line item within the Approved Budget for the immediately preceding Testing Period, may not vary negatively from the Approved Budget by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual disbursements in any line item are greater than the projected disbursements in the same line item.<br><br>*See* Interim Order ¶ 18, DIP Term Sheet, Section "Approved Budget; Approved Cash Flow Projection; Variance Reports" section. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B) | Each of following shall constitute an "Event of Default":<br><br>(i)     the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Agent in its sole discretion;<br><br>(ii)    failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet, the DIP Orders and/or the Final Order (as applicable); |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | (iii) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and each DIP Lender; |
| | (iv) failure of any of the Case Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court); |
| | (v) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made; |
| | (vi) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is pari passu with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender; |
| | (vii) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the DIP Orders; |
| | (viii) (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any DIP Order or the Term Sheet, or the disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender); |
| | (ix) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a sale pursuant to the terms of the Stalking Horse Agreement) or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of DIP Loans and all other amounts outstanding under |

| Bankruptcy Code | Senior Secured Superpriority Debtor-in-Possession Credit Facility |
|---|---|
| | this Term Sheet, the DIP Orders on closing of such sale or the effective date of such plan; |
| | (x) the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); |
| | (xi) the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate; |
| | (xii) since the Petition Date, the occurrence of any Material Adverse Change; and |
| | (xiii) failure to pay principal, interest or other DIP Obligations in full when due, including without limitation, on the Maturity Date. |
| | *See* DIP Term Sheet, "Events of Default Section" |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction. *See* Interim Order ¶ 38. |

## II.    The Debtors' Prepetition Capital Structure.[4]

12.     As of the Petition Date, the Debtors have approximately $103,188,208.08 in aggregate principal amount outstanding of funded debt obligations, which includes the following:

---

[4]     The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits.  In the event of inconsistency between this summary (including the defined terms therein) and such documents, the source documents shall control and govern.  Additional detail regarding the Debtors' capital structure is available in the First Day Declaration.  *See* First Day Declaration, Part II.

| Funded Debt | Maturity | Interest Rates | Funded Debt Outstanding as of the Petition Date |
|---|---|---|---|
| **Revolving Credit Facility** | May 22, 2024 | Libor + 7.00% | $15,000,000.00 |
| **First Lien Term Loan Facility** | May 22, 2024 | Libor + 7.00% | $55,100,000.00 |
| **First Lien Fourth Amendment Delayed Draw Term Loan** | February 26, 2021 | Libor + 12.00% | $2,706,000.00 |
| **Second Lien Term Loan Facility** | November 22, 2024 | 5.00% (cash) 11.50% (PIK) | $30,382,208.08 |
| **Total** | | | **$103,188,208.08** |

### A.     Prepetition First Lien Facility.

13.     Paper Source, Inc., as borrower, Pine Holdings, Inc. as guarantor, MidCap Financial Trust, as administrative agent (in such capacity, together with any successor thereto, the "Prepetition First Lien Agent"), the term loan lenders party thereto from time to time (the "Prepetition First Lien Lenders," and together with the Prepetition First Lien Agent, collectively, the "Prepetition First Lien Secured Parties"), are party to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as amended, novated, supplemented, extended or restated from time to time, the "Prepetition First Lien Credit Agreement"), which provides for a first lien secured credit facility consisting of (a) a term loan A commitment, which is scheduled to mature on May 22, 2024 ("Prepetition First Lien Term Loan"), (b) a delayed draw term loan commitments, which matured on February 26, 2021 (the "Fourth Amendment Delayed Draw Term Loan") and (c) a revolving credit commitment, which is scheduled to mature on May 22, 2024 (the "Prepetition First Lien Revolving Credit Facility").

14.     The obligations under the First Lien Credit Agreement are secured, subject to certain exceptions, by a first priority lien on the Debtors' assets.  As of the Petition Date, approximately $55.1 million in Prepetition First Lien Term Loan borrowings, $2.7 million in

Fourth Amendment Delayed Draw Term Loan borrowings, and $15.0 million in Prepetition First

Lien Revolving Credit Facility borrowings are outstanding under the First Lien Credit Agreement.

**B.      Prepetition Second Lien Term Loan Facility.**

15.      Paper Source, Inc., as borrower, Pine Holdings, Inc. as guarantor, Victory Park

Management, LLC, as administrative agent (the "Prepetition Second Lien Term Agent"), and

certain financial institutions as lenders ("Prepetition Second Lien Lenders" and together with the

Prepetition Second Lien Agent, collectively, the "Prepetition Second Lien Secured Parties"), are

party to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as amended,

novated, supplemented, extended or restated from time to time, the "Prepetition Second Lien Term

Loan Agreement"), which provides for a second lien secured term credit facility consisting of a

term commitment of $25.0 million, which is scheduled to mature on November 22, 2024 (the

"Prepetition Second Lien Facility").

16.      The obligations under the Prepetition Second Lien Term Loan Agreement are

secured, subject to certain exceptions, by a second priority lien on the Debtors' assets.  As of the

Petition Date, as a result of paid-in-kind interest that has accrued and capitalized since the closing

of the Prepetition Second Lien Term Loan Agreement, and approximately $30,382,208.08 million

aggregate principal amount is outstanding under the Prepetition Second Lien Term Loan

Agreement.

**C.      Prepetition Subordination and Intercreditor Agreement.**

17.      The Prepetition First Lien Agent, Prepetition Second Lien Term Agent and Debtors

are parties to a subordination and intercreditor agreement, dated May 22, 2019, (the "Prepetition

Intercreditor Agreement"), which governs: (a) the relative lien priorities of the secured parties with

respect to the Prepetition First Lien Facility and the Prepetition Second Lien Facility; (b) the rights

of the respective secured parties to take enforcement actions against collateral; and (c) waivers of

certain rights of certain of the secured parties with respect to, among other things: (i) the provision of debtor-in-possession financing to the Debtors and the Debtors' use of cash collateral; (ii) the ability to seek adequate protection under the Bankruptcy Code; and (iii) the ability to contest certain asset sales in a bankruptcy case.

### D.      Equity Interests and Outstanding Warrants.

a.      Funds affiliated with, or managed by, Investcorp International Inc. ("Investcorp") constitute the majority owners of the Debtors through their equity holdings of debtor Pine Holdings, Inc. Debtor Pine Holdings, Inc. has three classes of equity—Series A Common, Series D Common, and Series A Convertible Preferred.  MidCap Financial Trust and certain affiliated funds own both nonvoting preferred equity and nonvoting common equity in Pine Holdings, Inc. as a result of a capital infusion transaction described in the First Day Declaration.[5]  A summary of the approximate ownership interests in Pine Holdings, Inc. is provided below:

| Party | % Ownership of Convertible Preferred Stock | % Ownership of Common Stock |
|---|---|---|
| Investcorp | 60.00% | 80.0% |
| Lenders | 40.00% | 10.0% |
| Former Management[6] | 0.00% | 3.0% |
| Other Investors | 0.00% | 7.0% |

18.      Current and former management of the Debtors own options to purchase common equity in Pine Holdings, Inc.  Moreover, the largest of the Debtors' Prepetition Second Lien Lenders, VPC Special Opportunities Fund III Onshore, L.P. ("Victory Park"), owns unexercised warrants, which, if exercised, would give Victory Park the right to purchase common equity in Pine Holdings, Inc.

---

[5]      The Prepetition First Lien Lenders' shares in the Debtors are non-voting, and as a result, neither the First Lien Lenders, nor MidCap, constitute "insiders" as defined in Bankruptcy Code § 101(31).

[6]      This group includes two current members of the Debtors' management, both of whom were employed by the Debtors in 2013.

### The Debtors' Immediate Need for Cash

**I.      The Debtors Cannot Prudently Operate Their Business With Cash Collateral Alone.**

19.      As set forth above, the Debtors commenced these Chapter 11 Cases in pursuit of three goals: a robust marketing process, real estate portfolio rationalization, and improving business operations.  The Debtors' decision to pursue these goals through a chapter 11 filing was driven by multiple factors, including the Debtors' dire liquidity profile prior to the Petition Date. As set forth in the First Day Declaration and Adams Declaration, the Debtors' liquidity profile has been strained since the onset of the COVID-19 pandemic and a corresponding decline in in-store retail sales.

20.      Prior to the Petition Date, the Debtors engaged their proposed restructuring advisor, M-III Advisory Partners, LP ("M3") to assist in various projects, including the development and administration of its short-term cash flow forecasting, budgeting, cash management planning, and operational restructuring efforts, including assisting with a store rationalization strategy.  As set forth in in the Adams Declaration, in late January 2021, M3 concluded that the Debtor's liquidity profile, among other issues, would require the Debtors to file for chapter 11 protection in the near term.

21.      Following the decision to begin prepping for a chapter 11 filing, the Debtors worked tirelessly with their advisors to project their cash needs following a the petition date.  The Debtors shared these projections with the DIP Lenders and their advisors.  Following weeks of hard fought negotiations, the Debtors and DIP Lenders have agreed to a 13-week cash flow projection outlining the Debtors' postpetition cash flow and borrowing needs.  This cash flow projection is attached as **Exhibit 2** to the Proposed Interim Order (the "Initial Approved Budget").

22.      In connection with these negotiations, the Debtors, in consultation with their advisors, determined that the use of Cash Collateral alone would be insufficient to meet the

Debtors' postpetition liquidity needs. Accordingly, the Debtors determined that they would require access to both postpetition financing sufficient to provide liquidity to administer the Debtors' estates during these chapter 11 cases and the Cash Collateral securing such postpetition financing. Among other things, the DIP Facility provides liquidity that is essential to (i) acquire inventory, (ii) pay vendors and other participants in the Debtors' supply chain, (iii) conduct a marketing and sale process for all or substantially all of their assets, and (iv) to pay chapter 11-related fees and costs.

23.     Immediate access to the DIP Facility and Cash Collateral is essential to not only meet working capital and business operating needs, but also to fund the administration of these chapter 11 cases, enabling the Debtors and their stakeholders to develop a value-maximizing transaction. *See* Adams Declaration ¶ 8. Moreover, the Debtors believe that access to post-petition financing will help the Debtors stabilize their operations, and restore the confidence of the Debtors' landlords, the, customers, employees and other stakeholders at this critical stage. *See* Adams Declaration ¶ 12.

24.     In sum, without the immediate relief requested by this Motion, the Debtors face a material risk of substantial, irreparable harm that could drive the Debtors into liquidation. Access to liquidity to fund these Chapter 11 Cases will ensure the Debtors have sufficient funds to preserve and maximize the value of their estates and avoid such an outcome.

**II.     The Proposed DIP Facility Represents the Best Available Financing Option for the Debtors' Business.**

25.     Prior to the start of the marketing process for post-petition financing, the Prepetition First Lien Lenders informed the Debtors that they would not consent to having their prepetition liens primed. *See* Adams Declaration ¶ 9. The Debtors concluded that the Prepetition First Lien Lender's unwillingness to consent to the priming of its liens meant that, in order to avoid a

disruptive, protracted, expensive and uncertain priming fight, the Debtors would need to locate a third-party lender willing to provide DIP financing on an unsecured or junior lien basis. *Id.* M3 solicited proposals for postpetition financing, secured by liens junior to the liens of the Prepetition First Lien Lenders, by contacting 4 well-established and experienced financial institutions and other capital sources. *Id.* In addition, M3 solicited a post-petition financing proposal from Victory Park, who declined to offer financing to the Debtors' on a basis that would have their post-petition liens be subordinated to the existing liens of the Prepetition First Lien Lenders.

26.    Ultimately, none of the parties contacted by M3 expressed a willingness to provide debtor-in-possession financing secured by liens junior to the liens of the Debtors' Prepetition First Lien Lenders. *See* Adams Declaration ¶ 10. In light of the market feedback and preexisting liens as of the petition date, the Debtors are seeking authorization to enter in to the DIP Facility with MidCap Financial Trust acting as DIP Agent, and funds affiliated with the Prepetition First Lien Lenders, thereby avoiding a protracted, expensive and uncertain priming litigation. *Id.*

27.    The negotiations with the Prepetition First Lien Lender to enter in to the DIP Facility were conducted at arm's length and in good faith by the Debtors and their advisors. *Id.* Over the course of several weeks, the Debtors and Prepetition First Lien Lenders negotiated over the size and scope of a post-petition financing package that would allow the Debtors the achieve their restructuring goals. The Debtors negotiated significant concessions from the Prepetition First Lien Lenders during the course of these negotiations and submit that the DIP Facility and Approved Budget represent the best available financing option for the Debtors' and their business.

**III.    The Proposed DIP Facility Will Send a Positive Signal to the Market and the Debtors' Creditors.**

28.    As described in the First Day Declaration, the significant drop in in-store retail sales due to the COVID-19 pandemic immediately began straining the Debtors' liquidity profile. In the

months prior to the Petition Date, the Debtors worked tirelessly with their vendors, landlords, and

other key stakeholders, to negotiate arrangements aimed at preserving the Debtors' liquidity.  As

set forth in the Adams Declaration, the Debtors are certain that their vendors, landlords, and other

stakeholders will be focused on whether these Chapter 11 Cases are appropriately capitalized. *See*

Adams Declaration ¶ 12.  The Debtors' ability to show its vendors that they are sufficiently

capitalized and are pursuing a value-maximizing sale transaction to sell Paper Source as a going

concern will minimize any potential repercussions to the Debtors' business.  This is especially

critical for businesses like the Debtors' who generally place orders for merchandise through

purchase orders rather than long term contracts.  Granting the relief requested herein will send a

positive signal to the market that the Debtors will continue to operate as a going concern following

these Chapter 11 Cases.

## **Basis for Relief**

I.      **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the
        DIP Documents and the DIP Orders.**

        A.      **Entry into the DIP Documents is an Exercise of the Debtors' Sound Business
        Judgment.**

29.      The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Documents, obtain access to the DIP Facility, and continue using

Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing under certain circumstances that are present in these chapter 11 cases, as

discussed herein.   Courts grant a debtor in possession considerable deference when acting in

accordance with its business judgment in obtaining postpetition secured credit, so long as the

agreement to obtain such credit does not run afoul of the provisions of, and policies underlying,

the Bankruptcy Code.  *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011)

("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the

lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a

postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent

business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)

("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on

grounds that permit reasonable business judgment to be exercised so long as the financing

agreement does not contain terms that leverage the bankruptcy process and powers or its purpose

is not so much to benefit the estate as it is to benefit a party-in-interest").

30.     Specifically, to determine whether the business judgment standard is met, a court

need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006), *rev'd on

other grounds* 607 F.3d 957 (3d Cir. 2010); *see also In re Curlew Valley Assocs.*, 14 B.R. 506,

513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business

decision when that decision involves "a business judgment made in good faith, upon a reasonable

basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

31.     Furthermore, in considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see

also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba

(In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a

debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  The Court

may also appropriately take into consideration non-economic benefits to the Debtors offered by a

proposed postpetition facility.  For example, in *In re ION Media Networks Inc.*, the bankruptcy

court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

32.    The decision to move forward with the DIP Facility following a marketing and arm's length negotiation process is well within the Debtors' sound business judgment. Specifically, the DIP Facility will allow the Debtors to: (a) continue a marketing process whereby the Debtors will seek to sell all or substantially all of their assets; (b) evaluate and rationalize the Debtors' real estate portfolio, including renegotiating lease terms to align the Debtors' rent expenditures with prevailing market rates; and (c) continue operations without interruption. Moreover, the Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors. The Debtors believe the proposed DIP Facility represents the best available financing under the current circumstances. Further, entry into the DIP Facility with certain of the Debtors' Prepetition First Lien Lenders will likely avoid a disruptive, costly and uncertain adequate protection fight at the outset of these Chapter 11 Cases that would cause significant uncertainty among the Debtors' vendors, employees, landlords, and others. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens, Priming Liens, and Superpriority Claims.**

33.      The Debtors propose to obtain financing under the DIP Facility by providing security interests, liens (including priming liens), and superpriority claims as set forth in the DIP Documents and the DIP Orders pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. Priming liens on encumbered assets, and liens on unencumbered assets, are common features of postpetition financing facilities and, as made clear by the DIP Lenders, were a necessary feature to obtain the DIP Facility.  Specifically, the Debtors propose to provide to the DIP Lenders, subject to the Carve Out and the priorities set forth in the DIP Orders (i) a perfected first-priority lien on the DIP Collateral to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date or subject to valid, unavoidable liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code ("Permitted Liens"), (ii) a perfected junior lien on DIP Collateral, to the extent such DIP Collateral is subject to a Permitted Lien, and (iii) a perfected first-priority priming lien on DIP Collateral, subject to Permitted Liens.

34.      The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

>      a.      the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.      the credit transaction is necessary to preserve the assets of the estate; and

c.      the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *Ames Dep't Stores*, 115 B.R. at 37-40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

35.     The Debtors satisfy each part of this test: ***First***, as described above and as set forth in the Adams Declaration, due to the Debtors' existing obligations under the Prepetition First Lien Credit Agreement and Prepetition Second Credit Agreement, no third-party lender was willing to provide postpetition financing on an unsecured or junior priority basis.  *See* Adams Declaration ¶ 10. ***Second***, the Debtors require access to the DIP Facility to provide adequate liquidity for the operation of the Debtors' business.   Absent such relief, the Debtors will suffer material, immediate, and irreparable harm—including the inability to meet payroll at the beginning of the week—and the value of the Debtors' estates will be significantly impaired to the detriment of all stakeholders. ***Finally***, the Debtors and DIP Lenders negotiated the DIP Facility in good faith, at arm's length, in the context of a competitive marketing process.    Given these circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents, are fair, reasonable, and adequate.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

36.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the estate that is not

otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims and liens over property of the Debtors in favor of the DIP Lenders is also reasonable and appropriate

37.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109,

113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case

No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10

38.     As set forth in the Adams Declaration, (i) better alternative financing was not

available to the Debtors meaning the Debtors' access to post-petition financing was contingent on

granting priming liens to the DIP Lenders, (ii) access to the financing is necessary, appropriate and

essential to the Debtor's ability to continue meeting its working capital needs, (iii) the terms of the

DIP Facility, including fees and the interest rate are reasonable given the circumstances of the

Debtors, and (iv) the terms of the financing were negotiated in good faith and at arm's length

between the Debtors and DIP Lenders, the Debtors and their respective advisors.  Under these

circumstances, relief under section 364(d)(1) of the Bankruptcy Code  should be granted.

39.     Separately, consent by secured creditors to priming obviates the need to show

adequate protection.  *See Anchor Savs. Bank  FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga.

1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved

the debtor of having to demonstrate that they were adequately protected.").  Here, the First Lien

Lenders have consented to the DIP Facility and the priming liens granted thereunder.  Additionally,

the Prepetition Intercreditor Agreement provides that the Prepetition Second Lien Lenders are

deemed or required to consent to debtor in possession financing if the Prepetition First Lien

Lenders consent and certain conditions are met.  The Prepetition Second Lien Lenders are

permitted to object only to the extent such conditions have not been met, and depending on what

condition has not been met, potentially object only with respect to that condition. *See Prepetition*

*Intercreditor Agreement* § 2.3(b).  Accordingly, the relief requested pursuant to section 364(d)(1)

of the Bankruptcy Code is appropriate.

40.      Any objection to the granting of priming liens in connection with the DIP Facility should be overruled.  First, granting the priming liens is an essential component of this critical financing.  Without access to the DIP Facility, the Debtors will run out of working capital and could set the Debtors on a path towards liquidation. *See* Adams Declaration ¶ 8.  For example, absent the relief requested in this Motion, the Debtors will not be able to fund payroll in the days immediately following the Petition Date.  That failure would be catastrophic for the Debtors' business at this critical moment, likely leading to an exodus of employees, negative publicity, and vendors refusing to ship merchandise.  Conversely, if the relief herein is granted, then the Debtors will have an opportunity to stabilize their business, convey the goals of the Chapter 11 Cases to key stakeholders, and run a successful section 363 sales and marketing process, which will increase the likelihood that both the Prepetition First Lien Lenders and Prepetition Second Lien Lenders receive a meaningful recovery in these cases.  Moreover, the Prepetition Second Lien Lenders are also receiving adequate protection pursuant to the DIP Order in the form of both replacement liens and superpriority claims.  Given this adequate protection package—and the Debtors' need for post-petition financing—any potential objections regarding the priming liens should be overruled.

### C.      No Comparable Alternative to the DIP Facility Is Reasonably Available.

41.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.   *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also Snowshoe*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful

contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–40 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code). As set forth in the Adams Declaration, the Debtors, with their advisors, undertook a thorough marketing process, contacting 6 financial institutions, including 4 that specialize in debtor in possession lending. Adams Declaration ¶ 9.

42.     None of the parties that were contacted by M3 expressed a willingness to provide debtor-in-possession financing secured by liens junior to the liens of the Debtors' Prepetition First Lien Lender. Adams Declaration ¶¶ 9, 10. Given the circumstances, the Debtors believe that the DIP Facility is the best possible financing arrangement possible. *See* Adams Declaration ¶ 14. Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.     The Use of Cash Collateral is Warranted and Should be Approved.**

43.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use cash collateral with the consent of the secured party or upon notice and a hearing authorizing use of such cash collateral. Here, the Prepetition First Lien Lenders and Prepetition Second Lien Lenders have either consented to the Debtors' use of the Cash Collateral (as well as the other Prepetition Collateral), or the Debtors will not be able to use such Cash Collateral unless otherwise in accordance with Section 363, subject to the terms and limitations set forth in the Interim Order.

44.     Section 363(e) of the Bankruptcy Code provides for adequate protection against diminution in value of a creditor's interests in cash when a debtor uses cash collateral. Further,

section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Rocco*, 319 B.R. 411, 419 (Bankr. W.D. Pa. 2005); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")). It was the intent of Congress in section 361 of the Bankruptcy Code to give courts flexibility to fashion relief in each case in light of general equitable principals. *In re Wilson*, 30 B.R. 371, 373 n.11 (Bankr. E.D. Pa. 1983).

45. As set forth in the Interim Order and as described herein, the Debtors propose to provide the Prepetition First Lien Lenders and Prepetition Second Lien Lenders with a variety of forms of adequate protection to protect against the postpetition diminution in value of their collateral, including Cash Collateral. Specifically, the Debtors seek to provide the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties with:

- ***Prepetition First Lien Secured Parties Adequate Protection***: (i) replacement liens upon all of the DIP Collateral ("First Lien Adequate Protection Liens") which shall be subordinate to the DIP Liens, (ii) superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code ("First Lien Adequate Protection Claims"), (iii) monthly payments to reimburse the Prepetition First Lien Secured Parties' reasonable professional

fees, (ii) monthly payment in kind of interest to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement and (iii) an acknowledgement of the unconditional right to credit bid the Prepetition First Lien Obligations (as defined in the DIP Term Sheet).

- ***Prepetition Second Lien Secured Parties Adequate Protection***: (i) replacement liens upon all of the DIP Collateral ("Second Lien Adequate Protection Liens"), which shall be subordinate to the DIP Liens and First Lien Adequate Protection Liens, and (ii) superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code ("Second Lien Adequate Protection Claims" and collectively, with the Second Lien Adequate Protection Liens, First Lien Adequate Protection Liens and First Lien Adequate Protection Claims, the "Adequate Protection Obligations").

The Debtors submit that the proposed adequate protection package for Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties is sufficient to protect such parties from any diminution in value of the Cash Collateral and the other Prepetition Collateral. In light of the foregoing, the Debtors further submit that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties are adequate and appropriate. This adequate protection package is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

**III.    The Debtors Should Be Authorized to Pay the Fees and Payments Required Under the DIP Documents.**

46.    Pursuant to the DIP Documents and as consideration for the extension of postpetition financing, the Debtors have agreed, subject to Court approval, to pay aggregate fees equal to approximately 3.3% percent of the total financing proposed to be obtained.

47.    It is understood and agreed by all parties that these fees are an integral and customary component of the overall terms of the DIP Facility and were required by the DIP Agent and the DIP Lenders as consideration for the extension of postpetition financing after arm's-length and good faith negotiations. *See* Adams Declaration ¶ 10.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.

**IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).**

48.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

49.    As explained herein and in the Adams Declaration, the DIP Documents and the DIP Orders are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain critical postpetition financing and arm's-

length, good-faith negotiations between the Debtors and the Agent and DIP Lenders.  *See* Adams

Declaration ¶ 10.  The terms and conditions of the DIP Documents are reasonable and appropriate

under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that

are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any

party to the DIP Documents or under the DIP Orders other than as described herein.  Accordingly,

the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section

364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.     The Automatic Stay Should Be Modified on a Limited Basis.**

50.     The proposed Interim Order provides that the automatic stay provisions of section

362 of the Bankruptcy Code will be modified to allow the DIP Agent, the Prepetition First Lien

Agent, and the Prepetition Second Lien Agent to file any financing statements, security

agreements, notices of liens, and other similar instruments and documents in order to validate and

perfect the liens and security interests granted to them under the Interim Order.   The proposed

Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors

to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the

Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an

Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit

the Agent to exercise all rights and remedies in accordance with the DIP Documents, the DIP

Orders, or applicable law.

51.     Stay modifications of this kind are ordinary and standard features of debtor-in-

possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair

under the circumstances of these chapter 11 cases.   *See, e.g.*, *In re Guitar Center, Inc.*, No. 20-

34656 (KRH) (Bankr. E.D. Va. Nov. 23, 2020) (modifying automatic stay as necessary to

effectuate the terms of the order); *Ascena Retail Group, Inc.*, No. 20-33113 (KRH) (Bankr. E.D.

Va. July 23, 2020) (same); *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. May

5, 2020) (same); *In re Pier 1 Imports. Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Feb. 18, 2020)

(same); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Oct. 24, 2017) (same); *In

re Gymboree Corp.*, No. 17-32986 (KLP) (Bankr. E.D. Va. July 11, 2017) (same); *In re Penn

Va. Corp.*, No. 16-3395 (KLP) (Bankr. E.D. Va. June 8, 2016) (same); *In re Patriot Coal

Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015) (same); *see also In re Deluxe Entm't

Servs. Grp. Inc.*, No. 19-23774 (RDD)  (Bankr. S.D.N.Y. Oct. 7, 2019) (same).[7]

## VI.      Interim Relief Should be Granted.

52.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the

service of such motion.  Upon request, however, a court may conduct a preliminary, expedited

hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent

necessary to avoid immediate and irreparable harm to a debtor's estate.

53.      For the reasons noted above, the Debtors have an immediate postpetition need to

use Cash Collateral and access the liquidity provided by the DIP Facility.  The Debtors cannot

maintain the value of their estates without access to cash to, among other things, fund the operation

of their business, including to ensure that vendors continue to manufacture and ship inventory, and

fund the administration of these chapter 11 cases.  Substantially all of the Debtors' available cash

constitutes Cash Collateral of the Prepetition First Lien Lenders or Prepetition Second Lien

Lenders.  The Debtors will therefore be unable to operate their business or otherwise fund these

chapter 11 cases without access to Cash Collateral and will suffer immediate and irreparable harm

---

[7]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this
Motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to administer these Chapter 11 Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

54.    The Debtors request that the Court conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive funding under the DIP Facility on the terms and conditions set forth in the Interim Order.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

55.    Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires the Debtors to demonstrate that such relief "is necessary to avoid immediate and irreparable harm."  As described herein, the Adams Declaration and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm if the relief requested herein is not granted.  Accordingly, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 to support immediate authorization to continue to pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs and administer the Employee Compensation and Benefits Programs

## Request for Final Hearing

56.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

57.    To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

58.    The Debtors respectfully request that this Court treat this Motion as a written

memorandum of points and authorities or waive any requirement that this Motion be accompanied

by a written memorandum of points and authorities as described in Local Bankruptcy Rule

9013-1(G).

**Reservation of Rights**

59.    Nothing contained herein is intended or shall be construed as: (a) an admission as

to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code,

any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of

the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise

or requirement to pay any particular claim; (d) an implication or admission that any particular

claim is of a type specified or defined in this Motion; (e) a request or authorization to assume,

adopt, or reject any prepetition agreement, contract, or lease pursuant to section 365 of the

Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any

lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a

waiver of any claims or causes of action which may exist against any entity under the Bankruptcy

Code, or any other applicable law.

**Notice**

60.    The Debtors will provide notice of this Motion via first class mail, facsimile or

email (where available) to: (a) the United States Trustee for the Eastern District of Virginia; (b) the

holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the agents under the Debtors' prepetition first and second lien secured term loans and counsel thereto; (d) MidCap Financial Trust and counsel thereto; (e) Victory Park Management, LLC and counsel thereto; (f) the United States Attorney's Office for the Eastern District of Virginia; (g) the Internal Revenue Service; (h) the office of the attorneys general for the states in which the Debtors operate; (i) the National Association of Attorneys General; (j) DIP Lenders; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,

granting the relief requested herein, and such other relief as the Court deems appropriate under the

circumstances.

Richmond, Virginia
Dated: March 2, 2021

/s/ Christopher A. Jones

| | |
|---|---|
| Christopher A. Jones (VSB# 40064) | John C. Longmire (*pro hac vice* admission pending) |
| David W. Gaffey (VSB# 85088) | Matthew A. Feldman (*pro hac vice* admission pending) |
| Jae Won Ha (VSB# 94781) | James H. Burbage (*pro hac vice* admission pending) |
| **WHITEFORD TAYLOR & PRESTON LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Two James Center | 787 Seventh Avenue |
| 1021 E. Cary Street, Suite 1700 | New York, NY 10019 |
| Richmond, VA 23219 | |
| Telephone:     (804) 977-3300 | Telephone:      (212) 728-8000 |
| Facsimile:     (804) 977-3299 | Facsimile:      (212) 728-8111 |
| | |
| *Proposed Co-Counsel to the Debtors* | *Proposed Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

## Exhibit A

**Proposed Interim Order**

John C. Longmire (*pro hac vice* admission pending)          Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (*pro hac vice* admission pending)     David W. Gaffey (VSB# 85088)
James H. Burbage (*pro hac vice* admission pending)          Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**                                  **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue                                                              Two James Center
New York, NY 10019                                                           1021 E. Cary Street, Suite 1700
                                                                                        Richmond, VA 23219
Telephone:       (212) 728-8000                                       Telephone:       (804) 977-3300
Facsimile:       (212) 728-8111                                        Facsimile:       (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| Paper Source, Inc., *et al.*[1] | ) Case No. 21-30660 |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) (Emergency Hearing Requested) |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion, dated March 2, 2021 (the "Motion") of Paper Source Inc. ("PSI") and its

affiliated debtor-in-possession (collectively, the "Debtors") in the above-captioned chapter 11

cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order (this "Interim

Order")[2] and a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364(c)(l),

364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507 and 552 of chapter 11 of title 11 of the United States

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]      Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Term Sheet.

Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 4001(a)-1 of the Local Rules for the Eastern District of Virginia (the "Local Bankruptcy Rules"), *inter alia*:

(i)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis under a delayed-draw term loan facility (the "DIP Facility") consisting of (a) $7.75 million available upon entry of the Interim Order (the "Interim Amount"), and (b) an additional $8.25 million available upon entry of the Final Order (the "Final Amount"), pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Term Sheet"), to be entered into by and among PSI, as borrower, Pine Holdings, Inc. ("Holdings"), as guarantor, MidCap Financial Trust, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders thereto from time to time, (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties"), attached hereto as **Exhibit 1**;

(ii)      approving the terms of and authorizing the Debtors party thereto to execute and deliver the DIP Term Sheet and any other agreements, instruments and documents related thereto (the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)      authorizing the Debtors to enter into the DIP Facility and to incur all obligations owing thereunder and under the DIP Documents to the DIP Secured Parties (collectively, the "DIP Obligations"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined herein);

- 2 -

(iv)    granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and superpriority liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date) or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v)    authorizing and directing the Debtors to use proceeds of the DIP Facility to (a) pay the principal, interest, fees, expenses and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, commitment fees and the fees and disbursements of the Lender Professionals (as defined below); (b) make permitted adequate protection payments as specified below; and (c) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order and the DIP Documents;

(vi)    authorizing the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral (as defined below) on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties for any Diminution (as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral;

(vii)    approving the stipulations by the Debtors herein;

- 3 -

(viii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(ix)    authorizing the DIP Agent, at the direction of the Required DIP Lenders (or as otherwise provided in the DIP Documents), to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens;

(x)    authorizing payment of the DIP Fees (as defined below); and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Bankruptcy Court having considered the Motion, the exhibits attached thereto, the First Day Declaration, the DIP Documents, and the evidence submitted and argument made at the interim hearing (the "Interim Hearing"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Bankruptcy Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Bankruptcy Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, the Bankruptcy Court makes the following findings of fact and conclusions of law:**[3]**

A.      **Disposition.**  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.      **Petition Date**.  On March 2, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

C.      **Debtors in Possession**.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.      **Jurisdiction and Venue**.  This Bankruptcy Court has jurisdiction over the chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to

---

[3] The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014, and the Local Bankruptcy Rules.

E.    **Committee**.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.    **Notice**.  Upon the record presented to the Bankruptcy Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to (a) the Office of the U.S. Trustee for the Eastern District of Virginia; (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent and Prepetition First Lien Agent, Proskauer Rose LLP, One International Place, Boston, MA 02110, Attn: Charles A. Dale III, Elliot R. Stevens and Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: David Hillman; (d) counsel to the Second Lien Prepetition Agent, Katten Muchin Rosenman LLP, 525 West Monroe Street, Chicago, Illinois 60661, Attn:  Mark R. Grossmann, Mark D. Rasmussen, and Peter A. Siddiqui; (e) the United States Attorney's Office for the Eastern District of Virginia; (f) the Internal Revenue Service; (g) the state attorneys general for states in which the Debtors conduct business; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002, (collectively, the "Notice Parties"), which notice was appropriate under the circumstances and sufficient for the Motion.  No further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth therein is

necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.    **Debtors' Stipulations**.    Subject to Paragraph 43 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the Debtors, their assets that will be used to satisfy the claims of creditors (the "Estates") and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes. The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the date of the Petition Date.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest as set forth in Paragraph 43 herein, the Debtors, on their own behalf and on behalf of their Estates, admit, stipulate, acknowledge, and agree as follows (Paragraphs G(i) through G(v) below are referred to, collectively, as the "Debtors' Stipulations"):

(i)    *Prepetition First Lien Facility*.  Pursuant to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition First Lien Credit Agreement", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, otherwise modified from time to time, the "Prepetition First Lien Credit Documents"), among (a) PSI, (b) Holdings, (c) the other borrowers and guarantors party thereto from time to time (if any), (d) MidCap Financial Trust, as administrative agent (in such capacity, together with any successor thereto, the "Prepetition First Lien Agent"), and (e) the term loan lenders party thereto from time to time (the "Prepetition First Lien Lenders," and together with the Prepetition First

Lien Agent, collectively, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Lenders provided secured term loans and revolving loans to the Debtors (the "Prepetition First Lien Facility").

(ii)     *Prepetition First Lien Obligations*.  As of the Petition Date, the Debtors were indebted and jointly and severally liable to the Prepetition First Lien Secured Parties in the aggregate principal amount outstanding under the Prepetition First Lien Facility of $72,806,000.00 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition First Lien Facility pursuant to the Prepetition First Lien Credit Documents, the "Prepetition First Lien Obligations").

(iii)     *Prepetition First Liens and Prepetition Collateral*.  As more fully set forth in the Prepetition First Lien Credit Documents, prior to the Petition Date, the Debtors granted to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties, a security interest in and continuing lien (the "Prepetition First Liens") on all of their right, title and interest in substantially all of their assets, other than the "Excluded Collateral" (as defined in the Prepetition First Lien Credit Agreement) (the "Prepetition Collateral").

(iv)     *Validity, Extent, Perfection and Priority of Prepetition First Liens and Prepetition First Lien Obligations*. As of the Petition Date: (a) the Prepetition First Liens on the Prepetition Collateral were valid, binding, enforceable, non-avoidable and properly perfected

- 8 -

and were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition First Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law or otherwise permitted by the Prepetition First Lien Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Liens as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, the "Prepetition Permitted Liens"); (c) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition First Lien Secured Parties enforceable in accordance with the terms of the applicable Prepetition First Lien Credit Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature, whether arising at law or in equity,  to any of the Prepetition First Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Liens or Prepetition First Lien Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors and employees arising out of, based upon or related to the Prepetition First Lien Facility; (f) the Debtors have waived, discharged, and released any right

to, and are forever barred from bringing any, challenge to any of the Prepetition First Lien Obligations, the priority of the Prepetition First Lien Secured Parties' obligations thereunder, and the legality, validity, extent, and priority of the Prepetition First Liens; and (g) the Prepetition First Lien Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

(v)    *Subordination and Intercreditor Agreement*.  PSI, Holdings, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent (as defined below) are parties to that certain Subordination and Intercreditor Agreement, dated as of May 22, 2019 (as the same has been amended, restated, supplemented or otherwise modified, the "Intercreditor Agreement"), which governs the respective rights, obligations and priorities of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties with respect to the matters referred to therein.

H.    **Prepetition Second Lien Facility**.    Without acknowledging the validity, enforceability, or the allowance of such claims and liens, the Debtors make reference to that certain Credit and Guaranty Agreement, dated as of May 22, 2019 (as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement," and collectively with all other agreements, instruments and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, otherwise modified from time to time, the "Prepetition Second Lien Credit Documents"), among PSI, Holdings, Victory Park Management, LLC ("Victory Park"), as administrative agent (in its capacity as administrative agent, together with any successor thereto, the "Prepetition Second Lien Agent"), and the lenders party thereto from time to time (the "Prepetition Second Lien Lenders," and together with the Prepetition Second Lien Agent, the "Prepetition Second Lien Secured

Parties"). Pursuant to the Prepetition Second Lien Credit Documents, the Prepetition Second Lien Lenders purportedly provided junior priority secured term loans to the Debtors (the "Prepetition Second Lien Facility"). The Prepetition Second Lien Facility is purportedly secured by a security interest in the Prepetition Collateral that is subordinate to the Prepetition First Liens (the "Prepetition Second Liens").

I.    **Releases**. Subject to paragraph 43 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the Prepetition First Lien Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "Released Parties") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "Released Claims") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the Prepetition First Lien Credit Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions reflected thereby and the obligations

and financial obligations made thereunder, in each case that the Debtors at any time had, now have

or may have, or that their successors or assigns hereafter can or may have against any of the

Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising

at any time on or prior to the date of this Interim Order.  The Debtors further waive and release

any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition

First Lien Obligations that the Debtors may now have or may claim to have against the Released

Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring

prior to this Court entering this Interim Order relating to the Debtors' secured lending relationship

with the Prepetition First Lien Secured Parties.

        (i)    *Cash Collateral*.  All of the Debtors'  cash and cash equivalents, including

cash on deposit in any account or accounts as of the Petition Date, securities or other property,

wherever located, whether subject to control agreements or otherwise, whether as original

collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the

Prepetition First Lien Secured Parties.

**J.**        **Findings Regarding Postpetition Financing**

        (i)    *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter

into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash

Collateral on the terms described herein to administer their Chapter 11 Cases and fund their

operations in accordance with the Approved Budget (as defined herein) (subject to Permitted

Variances unless otherwise expressly specified in the DIP Term Sheet).  At the Final Hearing,

the Debtors will seek final approval of the proposed postpetition financing and use of Cash

Collateral arrangements pursuant to a proposed final order (the "<u>Final Order</u>"), which shall be in

form and substance acceptable to the DIP Agent (acting at the direction of the Required DIP

Lenders (as defined in the DIP Term Sheet)).  Notice of the Final Hearing and Final Order will

be provided in accordance with this Interim Order.

(ii)    *Priming of the Prepetition Liens*.  The priming of (1) the Prepetition First

Liens on the Prepetition Collateral and (2) the Prepetition Second Liens on the Prepetition

Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents

and as further described below, will enable the Debtors to obtain the DIP Facility and to continue

to operate their businesses to the benefit of their Estates and creditors.  The Prepetition First Lien

Secured Parties and Prepetition Second Lien Secured Parties (together, the "Prepetition Secured

Parties") shall receive adequate protection as set forth in this Interim Order pursuant to

sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value

("Diminution") of their respective interests in the Prepetition Collateral (including Cash

Collateral).

(iii)    *Need for Postpetition Financing and Use of Cash Collateral*.  The Debtors

have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to

continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other

things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii)

fund any obligations benefitting from the Carve-Out, (iii) permit the orderly continuation of the

operation of their businesses, (iv) maintain business relationships with customers, vendors and

suppliers, (v) make payroll, and (vi) satisfy other working capital and operational needs.  The

incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and

vital to the preservation and maintenance of the going concern value of the Debtors.  Immediate

and irreparable harm will be caused to the Debtors and their Estates if immediate financing is

not obtained and permission to use Cash Collateral is not granted.  The terms of the proposed

financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)    *No Credit Available on More Favorable Terms*.  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility.  Further, the Prepetition First Lien Secured Parties have consented to the Debtors incurring debtor-in-possession financing, the priming of their Prepetition Liens and the use of their Cash Collateral, on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtors have also been unable to obtain:  (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien.  Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims and liens, and (3) the other protections set forth in this Interim Order.

(v)    *Use of Cash Collateral and Proceeds of the DIP Facility*.  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined herein).

(vi)    *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

K.    **Adequate Protection**.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens, and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

L.    **Sections 506(c) and 552(b)**.  In light of (i) the DIP Secured Parties' agreement that its liens and superpriority claims shall be subject to the Carve-Out and (ii) the Prepetition First Lien Secured Parties' agreement that, with respect to the Prepetition Collateral, their respective liens and claims, including any adequate protection liens and claims, shall be subject to the Carve-Out and subordinate to the DIP Liens, (a) the DIP Secured Parties, and, subject to entry of the Final Order, the Prepetition First Lien Secured Parties, are each entitled to a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and (b) the DIP Secured Parties,

and, subject to entry of a Final Order, the Prepetition First Lien Secured Parties, are each entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

      M.    **Good Faith of the DIP Secured Parties**.

      (i)    *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Bankruptcy Court that the DIP Facility is essential to the Debtors' estates, that the DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

      (ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  Based on the Motion, the declaration filed in support of the Motion, and the record presented to the Bankruptcy Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the fees, expenses and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances and are appropriate for secured financings to debtors in possession.

(iii)  *Good Faith Pursuant to Section 364(e)*.  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition First Lien Secured Parties with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition First Lien Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)  *Consent to DIP Facility and Use of Cash Collateral.* Except as set forth in the DIP Documents and absent an order of this Court and the provision of adequate protection, consent of the Prepetition First Lien Secured Parties is required for the Debtors' use of Cash Collateral and other Prepetition Collateral. The Prepetition First Lien Secured Parties have consented, or are deemed to have consented, or have not objected to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

N.    **Good Cause**.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to meet payroll, pay premiums on critical professional liability insurance policies and other expenses necessary to maximize the value of the Estates.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection

- 17 -

arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

O.  **Immediate Entry**.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Bankruptcy Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.  DIP Financing Approved.  On an interim basis, entry into the DIP Facility is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2.  Authorization of the DIP Financing.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents, and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. The Debtors are

- 18 -

hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the term hereof and thereof, including, without limitation, any closing fees and commitment fees, as well as any reasonable and documented fees and disbursements of Proskauer Rose LLP, Tavenner & Beran, PLC, and Carl Marks & Co. Inc., as the DIP Professionals (as defined below), as set forth herein and in the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms.  Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.

3.    <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be

used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents and the Approved Budget.

4.       DIP Obligations.   The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations.  All DIP Obligations shall be enforceable against the Debtors, their Estates and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the DIP Termination Date, subject to the Carve-Out requirements herein. No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Secured Parties, and including in connection with any adequate protection provided hereunder, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement,

avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.     DIP Collateral.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "DIP Liens") the DIP Collateral. "DIP Collateral" means, collectively, all assets of each Debtor and its Estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, leases, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, books and records, and all proceeds, rents, profits, and offspring of the foregoing, including, subject to entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, in each case, other than contracts, leases and other licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases and other licenses shall be DIP Collateral.

6.     DIP Liens.  The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be subject to the Carve-Out, and shall otherwise be junior only to the Permitted Liens (as defined in the DIP Term Sheet).  Other than as set forth herein or in the DIP Documents, the DIP Liens shall

not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or First Lien to the DIP Liens.

       7.    <u>DIP Superpriority Claims</u>.  Subject to the Carve-Out, upon entry of this Interim Order, the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as set forth herein, with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claims shall be junior to the Carve-Out.

- 22 -

8.      No Obligation to Extend Credit.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required DIP Lenders in accordance with the terms of the DIP Documents.

9.      Use of Proceeds of DIP Facility.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents.

10.      No Monitoring Obligation.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

**Authorization to Use Cash Collateral**

11.      Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date. Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

12.    <u>Consent of Prepetition First Lien Secured Parties.</u>  The Prepetition First Lien Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein, and (c) the Approved Budget.

13.    <u>Adequate Protection for Prepetition First Lien Secured Parties</u>. As adequate protection for any Diminution of the Prepetition First Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition First Liens to the DIP Liens and the Carve-Out, the Prepetition First Lien Agent shall receive, for the benefit of the Prepetition First Lien Secured Parties,

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the DIP Liens and Permitted Liens (the "<u>First Lien Secured Parties' Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; (b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>First Lien Adequate Protection Superpriority Claims</u>"), junior and subordinate only to the Carve-Out and the DIP Obligations (including the DIP

Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code; and

(c) (x) monthly reimbursement payments of the Prepetition First Lien Secured Parties' respective reasonable fees and expenses including the professional fees of Proskauer Rose LLP, Tavenner & Beran PLC, and Carl Marks & Co., Inc. (in each case, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date), and (y) payment in kind of monthly interest, calculated at the non-default rate under the Prepetition First Lien Credit Agreement and added to the principal amounts of the Prepetition First Lien Secured Parties' allowed secured claims.

14.    <u>Adequate Protection for Prepetition Second Lien Secured Parties</u>.    As adequate protection for any Diminution of the Prepetition Second Lien Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition Second Liens to the DIP Liens, the Carve-Out, and the First Lien Replacement Liens, the Prepetition Second Lien Agent shall receive, for the benefit of the Prepetition Second Lien Secured Parties,

(a) continuing valid, binding, enforceable and perfected postpetition replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject and subordinated only to the Carve-Out, the Permitted Liens, the DIP Liens, the First Lien Replacement Liens, and the Prepetition First Liens (the "<u>Second Lien Secured Parties' Replacement Liens</u>," and

together with the First Lien Secured Parties' Replacement Liens, the "Replacement Liens") and which shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code; and

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "Second Lien Adequate Protection Superpriority Claims," and together with the First Lien Adequate Protection Superpriority Claims, the "Adequate Protection Superpriority Claims"), junior and subordinate to the Carve-Out, the DIP Obligations (including the DIP Superpriority Claims), the First Lien Adequate Protection Superpriority Claims, and the Prepetition First Lien Obligations, and pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

15.    Adequate Protection Reservation.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of

the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral

or for additional adequate protection.

**Provisions Common to DIP Financing
and Use of Cash Collateral**

16.    <u>Amendment of the DIP Documents</u>.    The Debtors irrevocably waive any

right to seek any amendment, modification or extension of this Order without the prior written

consent of the Required DIP Lenders, which they may grant in their sole discretion. No such

consent shall be implied by any action, inaction or acquiescence of the DIP Secured Parties. After

obtaining the Required DIP Lenders' prior written consent, the Debtors are authorized and

empowered, without further notice and hearing or approval of this Court, to amend, modify,

supplement, or waive any provision of the DIP Documents in accordance with the provisions

thereof.

17.    <u>Approved Budget</u>.

(i)    Attached to this Interim Order as **<u>Exhibit 2</u>** is a 13-week budget approved

by the Required DIP Lenders, which sets forth, among other things, projected cash receipts and

cash disbursements (the "<u>Approved Budget</u>"). Commencing at 5:00 P.M. (Eastern Time) on the

Wednesday of the second full calendar week after the Petition Date, and continuing on 5:00 P.M.

(Eastern Time) on the Wednesday of every second week thereafter, the weekly budget shall be

updated, and if such updated budget is in form and substance satisfactory to the DIP Agent in its

sole discretion, it shall become the "Approved Budget" for purposes of this Term Sheet and the

Interim Order and Final Order, (the "<u>DIP Orders</u>").    Any amendments, supplements or

modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior

written approval of the DIP Agent in its sole discretion prior to the implementation thereof.  If the

DIP Agent has not objected, in writing, to a proposed updated budget, or an amendment,

supplement or modification to the Approved Budget or an Approved Variance Report, within three (3) business days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Agent. Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the DIP Agent, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(ii)     The Approved Budget is approved on an interim basis. The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors in accordance with the Approved Budget, this Interim Order and the DIP Documents.

(iii)    Other than with respect to the Carve-Out, and except as provided in Paragraphs 31 and 32, none of the DIP Secured Parties' and the Prepetition First Lien Secured Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the Maturity Date (as defined in the DIP Term Sheet) or the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)     Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

18.     <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the variances provided in this Interim Order.  By not later than 5:00 PM ET on Wednesday after the second full calendar week following the Petition Date (the "<u>First Testing Date</u>"), and no later than 5:00 PM ET on each Wednesday thereafter (together with the First Testing Date, each a "<u>Testing Date</u>"), the Debtors shall deliver to the DIP Agent a variance report for the

applicable Testing Period (as defined below) in form and detail acceptable to the DIP Agent (an

"Approved Variance Report") showing comparisons of (a) aggregate actual cumulative cash

receipts for such Testing Period compared to the aggregate projected cumulative cash receipts of

the Debtors for such Testing Period as set forth in the Approved Budget and (b) actual cumulative

cash disbursements on a line by line basis (excluding professional fees) of the Debtors for such

Testing Period compared to the projected cumulative cash disbursements on a line by line basis

(excluding professional fees) for such Testing Period as set forth in the Approved Budget.  The

term "Testing Period" means the weekly period beginning on Sunday and ending on the Saturday

immediately prior to the applicable Testing Date.  Each Approved Variance Report shall indicate

whether there are any adverse variances that exceed the Permitted Variances (as defined below)

and shall provide a written explanation for such variances.  "Permitted Variances" shall mean, as

of any Testing Date:

1.    the sum of (x) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period, *plus* (y) to the extent such amount is greater than $0, the amount by which the actual cumulative cash receipts of the Debtors for the immediately preceding Testing Period exceeded the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period, may not vary negatively from the Approved Budget for such Testing Period by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts; and

2.    the difference of (x) the Debtors' actual cash operating disbursements for each line item within the Approved Budget (excluding professional fees) for the applicable Testing Period, *minus* (y) to the extent such amount is greater than $0, the amount by which such line item within the Approved Budget for the immediately preceding Testing Period exceeded the Debtors' actual cash operating disbursements for such line item within the Approved Budget for the immediately preceding Testing Period, may not vary negatively from the Approved Budget by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual disbursements in any line item are greater than the projected disbursements in the same line item.

- 29 -

19.    <u>Modification of Automatic Stay</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition First Lien Secured Parties to accomplish the transactions contemplated by this Interim Order.

20.    <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Carve-Out, the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent (together with the Prepetition First Lien Agent, the "<u>Prepetition Agents</u>") are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agents all such financing statements, mortgages, notices and other documents

as each may reasonably request.  The DIP Agent and the Prepetition Agents may each, in its

discretion, file a photocopy of this Interim Order as a financing statement with any filing or

recording office or with any registry of deeds or similar office in addition to or in lieu of such

financing statements, notices of lien or similar instruments.  To the extent that the Prepetition

Agents are, with respect to the DIP Collateral, the secured party under any security agreement,

mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee

letters, custom broker agreements, financing statement, account control agreements or any other

Prepetition First Lien Credit Documents or is listed as loss payee, lenders' loss payee or additional

insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP

Lenders) shall also be deemed to be the secured party or mortgagee, as applicable, under such

documents or to be the loss payee or additional insured, as applicable.  The Prepetition Agents

shall act as agent for the DIP Secured Parties solely for purposes of perfecting the DIP Secured

Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this

Interim Order, is of a type such that perfection of a lien therein may be accomplished only by

possession or control by a secured party (including any deposit account control agreement), and

all of the Prepetition Agents' respective rights in such DIP Collateral shall inure to the benefit of

and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly

repaid in full in cash; *provided*, that the DIP Agent may, in its sole discretion, require the Debtors

and the Prepetition Agents to (and the Debtors and the Prepetition Agents shall) use commercially

reasonable efforts to provide the DIP Agent with such possession or control as is necessary to

perfect the DIP Obligations and DIP Priority Liens.  Notwithstanding the foregoing, in the event

any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in

full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall

not be effective for five (5) business days to permit the DIP Agent and the Prepetition Agents to enter into any agreements or file any documents (including credit agreements, financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Agents to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

21.    _Application of Proceeds of Collateral_.  Proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the Required DIP Lenders in their sole discretion), after giving effect to the Carve-Out and any other payments required pursuant to the DIP Orders:

(1) _first_, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of the DIP Professionals);

(2) _second_, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders;

(3) _third_, to repay any principal amounts outstanding in respect of the DIP Loans (including any amounts, other interest, that have been added to the principal balance);

(4) _fourth_, all other amounts owing to the DIP Lenders and the DIP Agent; and

(5) _last_, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Lenders.

22.    <u>Access to Books and Records</u>.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise reasonably requested by the DIP Agent, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective senior management independent public accountants to the extent required by the DIP Documents or the Prepetition First Lien Credit Documents, and (iv) permit the DIP Agent, and the Prepetition First Lien Agent, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors'  businesses, financial condition, operations and assets, as provided for in the DIP Documents.

23.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and

- 33 -

such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

24.    <u>Cash Management</u>.  The Debtors shall maintain their cash management system consistent with the terms and conditions of the Cash Management Order (as defined below) and the DIP Documents.  Unless authorized by the Interim Order or otherwise agreed to in writing by the DIP Agent and the Prepetition First Lien Agent, the Debtors shall not maintain any accounts except those identified in any interim and/or final order granting the Debtors authorization to continue their cash management systems and certain related relief (as amended, supplemented or otherwise modified, the "<u>Cash Management Order</u>"), which order (and any amendments, supplements or modifications thereto) shall be in form and substance acceptable to the Required DIP Lenders.   Subject to Paragraphs 31, 32, and 34, the Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in the Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in any such deposit accounts upon receipt of any direction to that effect from the DIP Agent (on behalf of the DIP Lenders) in accordance with the DIP Documents and this Interim Order.

25.     <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition First Lien Obligations, all Prepetition Second Lien Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents, the Prepetition First Lien Credit Documents, or the Prepetition Second Lien Credit Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

26.     <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral other than in the ordinary course of business without the prior consent of the Required DIP Lenders, or pursuant to a sale of all or substantially all of the Debtors' assets in accordance with the 363 Sale Process.

27.     <u>Termination Date</u>.  On the applicable Termination Date (defined below), all applicable DIP Obligations shall be immediately due and payable and, all commitments to extend credit under the applicable DIP Facility will terminate.

28.     <u>Events of Default</u>. Until the DIP Obligations are indefeasibly paid in full and all commitments thereunder are terminated (the "<u>DIP Repayment</u>"), the occurrence of any of the following events, unless waived by the Required DIP Lenders in writing (which may be by electronic mail) and in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events of Default</u>"): (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants or obligations under this Interim Order, including, without limitation, failure to make any payment under this Interim Order when due or

comply with any Milestones; or (b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheet or an event of default under any other DIP Documents.

29.    <u>Milestones</u>. As a condition to the DIP Facility and the use of Cash Collateral, the Debtors shall comply with the following milestones (the "<u>Milestones</u>"):

(a) no later than three (3) business days after the Petition Date, entry by the Bankruptcy Court of the Interim Order;

(b) no later than thirty (30) calendar days after the entry of the Interim Order, entry by the Bankruptcy Court of the Final Order;

(c) no later than thirty (30) calendar days after the Petition Date, entry by the Bankruptcy Court of an order approving a motion establishing bidding procedures in respect of the Sale, which order shall be reasonably acceptable to the DIP Lenders (the "<u>Bid Procedures</u>");

(d) no later than forty-five (45) calendar days after the Petition Date, submission of qualified bids in respect of the Sale;

(e) no later than sixty (60) calendar days after the Petition Date, the conduct of a sale hearing;

(f) no later than sixty-five (65) calendar days after the Petition Date, entry by the Bankruptcy Court of a sale order, which order shall be reasonably acceptable to the DIP Lenders (the "<u>Sale Order</u>"); and

(g) no later than eighty-five (85) calendar days after the Petition Date, consummation a Sale approved by the Bankruptcy Court.

For the avoidance of doubt, unless waived by the Required DIP Lenders in their sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth therefor shall constitute an Event of Default under the DIP Documents and this Interim Order.

30.    <u>Rights and Remedies Upon Event of Default.</u> Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court, other than, subject to the terms of this Interim Order: (a) the DIP Agent (at the direction of the Required DIP Lenders or as otherwise provided in the DIP Documents) may

send a written notice to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve-Out Trigger Notice to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) the DIP Agent may declare a termination, reduction, or restriction on the ability of the Debtors to use cash collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Estates. The earliest date on which a Termination Declaration is delivered by the DIP Agent shall be referred to herein as the "Termination Date". Following a Termination Date, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee (if appointed), and the U.S. Trustee. After the DIP Repayment, the Prepetition First Lien Agent shall be entitled to make a Termination Declaration with respect to the foregoing subclause (a)(4) in accordance with the same procedures set forth herein.

      31.    <u>Emergency Hearing</u>. The Debtors and the Committee (if any) may seek an emergency hearing during the five (5) business days following the date a Termination Declaration

is delivered (such five (5) business day period, the "Remedies Notice Period") for the sole purpose of determining whether an Event of Default has in fact occurred or is continuing, and the Debtors hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties or, if applicable, the Prepetition Secured Parties.  During the Remedies Notice Period, the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of this Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.

32.    Certain Rights and Remedies Following Termination Date.  Following a Termination Date and upon further order of the Bankruptcy Court (which may further authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Bankruptcy Court) upon an emergency motion by the DIP Agent (at the direction of the Required DIP Lenders) to be heard on no less than five (5) business days' notice (and the Debtors and the Committee (if any) and any other party-in-interest shall not object to such shortened notice) (the "Termination Enforcement Order"), the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, this Interim Order and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Superpriority Claims, subject to the Carve-Out.  Following entry of the Termination Enforcement Order, the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Lenders) one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents and this Interim Order.  In furtherance of the foregoing, (a) each bank or other financial institution with an account of any Debtor is hereby authorized and instructed to (i) comply

at all times with any instructions originated by the DIP Agent to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including without limitation, any instruction to send to the DIP Agent by wire transfer or in such other manner as the DIP Agent directs, all cash, securities, investment property and other items held by such bank or financial institution, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance, (b) the DIP Agent (at the direction of the Required DIP Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the Collateral pursuant to section 363 (or any other applicable provision) of the Bankruptcy Code on terms and conditions pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code, (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code, (c) the DIP Agent (at the direction of the Required DIP Lenders) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose or liquidate the DIP Collateral via one or more sales of such DIP Collateral and/or the monetization of other DIP Collateral with the Required DIP Lenders having sole authority over the price of any DIP Collateral to be disposed of, (d) the DIP Agent may (at the direction of the Required DIP Lenders), or may direct the Debtors to, (and the Debtors shall comply with such direction to) collect accounts receivable, without setoff by any account debtor, and (e) the DIP Agent shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production of any inventory. The Debtors shall take all action that is reasonably necessary to cooperate with the DIP Secured Parties in the exercise

of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Secured

Parties.

33.    <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the

contrary and without limiting any other rights or remedies of the DIP Secured Parties under the

Interim Order, the DIP Documents and applicable law, after the occurrence of a Termination Date

and the entry of a Termination Enforcement Order, and subject to Paragraph 32, for the purpose of

exercising any remedy with respect to any of the DIP Collateral, the DIP Agent (or any of its

employees, agents, consultants, contractors, or other professionals) (collectively, the "<u>Enforcement</u>

<u>Agents</u>") shall have the right (to be exercised at the direction of the Required DIP Lenders), at the

sole cost and expense of the Debtors, to: (i) enter upon, occupy, and use any real or personal

property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by

the Debtors, (ii) enter into the premises of any Debtor in connection with the orderly sale or

disposition of the DIP Collateral (including, without limitation, complete any work in process),

and (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held

by any third party; *provided*, *however*, the Enforcement Agent may only be permitted to do so in

accordance with (a) existing rights under applicable non-bankruptcy law, including, without

limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) landlord waivers

or consents, or (c) further order of this Court on motion and notice appropriate under the

circumstances; and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents,

equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a

lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*,

the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy

law.  The Enforcement Agents will be responsible for the payment of any applicable fees, rentals,

royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupies any real property or uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupies or uses such assets or properties). Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph.

34.    <u>Carve-Out</u>.    Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition First Liens, the Prepetition Second Liens, the Replacement Liens and the Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.

(i)    "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (iii) subject to the Approved Budget, to the extent allowed at any time, whether by interim or final compensation order, procedural order or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "<u>Allowed Debtor Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and unpaid fees and expenses (the "<u>Allowed Committee Professional Fees</u>" and together with the Allowed Debtor Professional Fees, collectively, the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "<u>Committee</u>") pursuant to section 328 or 1103 of the Bankruptcy Code (the

- 41 -

"Committee Professionals") and, together with the Debtor Professionals, the "Professional
Persons") at any time before or on the first business day following delivery by the DIP Agent of a
Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to
or after delivery of a Carve-Out Trigger Notice (these clauses (i) through (iii), the "Pre-Carve-Out
Amounts"); and (iv) Allowed Professional Fees not to exceed $500,000, incurred after the first
business day following delivery by the DIP Agent of the Carve-Out Trigger Notice (including
transaction fees or success fees earned or payable to a Professional Person), to the extent allowed
at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this
clause (iv) being the "Post-Carve-Out Trigger Notice Cap"). For the avoidance of doubt, other than
the Carve-Out, no other amounts owed by any of the Debtors to any party (including any amounts
set forth in the Approved Budget) as of the date the Carve-Out Trigger Notice is delivered shall be
payable from the Prepetition Collateral or DIP Collateral. For purposes of the foregoing, "Carve-
Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by
the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee and lead counsel
to the Committee (if any), which notice may be delivered following the occurrence and during the
continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility,
stating that the Post-Carve-Out Trigger Notice Cap has been invoked. No portion of the Carve-
Out, any Cash Collateral, any other DIP Collateral, or any proceeds of the DIP Facility, including
any disbursements set forth in the Budget or obligations benefitting from the Carve-Out, shall be
used for the payment of Allowed Professional Fees, disbursements, costs or expenses incurred by
any person, including, without limitation, any Committee, in connection with challenging the DIP
Secured Parties' liens or claims, preventing, hindering or delaying any of the DIP Secured Parties'
enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim

or action against any DIP Secured Party. Proceeds from the DIP Facility and/or Cash Collateral not to exceed $25,000 in the aggregate (the "Investigation Budget Cap") may be used on account of Allowed Professional Fees incurred by Committee Professionals (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition First Lien Facility and Prepetition First Lien Secured Parties (but not the DIP Facility) (the "Investigation"). Notwithstanding anything herein, any fees, expenses or costs incurred by the Committee Professionals (if any) in connection with the Investigation in excess of the Investigation Budget Cap shall not constitute an administrative expense claim, including for purposes of section 1129(a)(9)(A) of the Bankruptcy Code; *provided*, that the U.S. Trustee reserves its rights with respect to this sentence as well as the amount of the Investigation Budget Cap.

(ii)     Carve-Out Reserve.  Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund a reserve (the "Carve-Out Reserve") from the DIP Credit Facility or cash on hand into a segregated escrow account (the "Funded Reserve Account") held by Epiq Corporate Restructuring LLC in trust for the benefit of Professional Persons an amount equal to the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons for the prior week set forth in the Approved Budget.  In addition, on the day on which a Carve-Out Trigger Notice is given by the DIP Agent to the Debtors with a copy to their lead restructuring counsel, the United States Trustee, and counsel to the Committee (the "Carve-Out Trigger Notice Date"), the Carve-Out Trigger Notice shall (i) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the Carve-Out Reserve in an amount equal to the Carve-Out and (ii) be deemed a draw request and notice of borrowing by the Debtors for DIP Loans under the DIP Credit Facility (each, as

defined in the DIP Term Sheet), in an amount equal to the Post-Carve Out Trigger Notice Cap into the Funded Reserve Account.    Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral or assets of the Debtors' estates; *provided*, that, notwithstanding anything to the contrary herein, in the DIP Term Sheet or in the DIP Documents, the DIP Collateral shall include the DIP Agent's reversionary interest in funds held in the Funded Reserve Account, if any, after all Allowed Professional Fees are satisfied in full.  On the first business day after the DIP Agent gives such notice to such DIP Lenders, notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of an Event of Default (as defined in the DIP Term Sheet), the failure of the Debtors to satisfy any or all of the conditions precedent for DIP Loans under the DIP Facility, any termination of the DIP Obligations following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Term Sheet), each DIP Lender with an outstanding DIP Commitment (as defined in the DIP Term Sheet) shall make available to the DIP Agent such DIP Lender's share with respect to such borrowing request in accordance with the DIP Documents but in no event shall any DIP Lender be required to fund any amount in excess of its then-outstanding Commitment.  The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy Court.  Any amounts remaining in the Funded Reserve Account after payment of the Carve-Out shall be paid to the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all Commitments have been terminated, in which case any such excess shall

be paid to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties in accordance with their respective rights and priorities.  Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve has been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserve.

(iii)    Payment of Allowed Professional Fees Prior to the Carve-Out Trigger Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Carve-Out Trigger Notice Date in respect of any Allowed Professional Fees shall not reduce the Post-Carve-Out Trigger Notice Cap.

(iv)    No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees. None of the DIP Secured Parties or Prepetition First Lien Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition First Lien Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

- 45 -

35.      <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification</u>
<u>or Stay of this Interim Order</u>.  The DIP Secured Parties and the Prepetition First Lien Secured
Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon
the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the
findings set forth in this Interim Order and the record made during the Interim Hearing, and in
accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions
of this Interim Order are hereafter modified, amended or vacated by a subsequent order of this
Bankruptcy Court or any other court, the DIP Secured Parties and Prepetition First Lien Secured
Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any
such modification, amendment or vacatur shall not affect the validity and enforceability of any
advances previously made or made hereunder, or lien, claim or priority authorized or created
hereby.

36.      <u>Approval of DIP Fees</u>.  In consideration for the DIP Financing and the
consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP
Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP
Documents as such become due, including, without limitation, commitment fees, original issue
discounts, extension fees and the reasonable and documented fees and expenses of the DIP Secured
Parties in connection with the facility, without regard to whether or not the transactions
contemplated hereby are consummated (all such fees, together, the "<u>DIP Fees</u>").  The DIP Fees
shall be fully earned and payable upon entry of this Interim Order.  The DIP Fees shall be part of
the DIP Obligations.  Any and all DIP Fees paid prior to the Petition Date by any of the Debtors
to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case is
hereby approved in full.

37.    <u>Lender Professionals' Fees</u>.  Professionals for the DIP Secured Parties (the "<u>DIP Professionals</u>") and professionals for the Prepetition First Lien Secured Parties ("<u>Prepetition Professionals</u>," and together with the DIP Professionals, the "<u>Lender Professionals</u>") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court.  The Lender Professionals shall submit copies of summary invoices to the Debtors, which invoices shall be forwarded by the Debtors to the U.S. Trustee, and counsel for any Committee.  The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  If the Debtors, U.S. Trustee or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "<u>Fee Objection</u>"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice.  Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed.

38. <u>Indemnification</u>.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's gross negligence, actual fraud, or willful misconduct as determined in a final order by a court of competent jurisdiction.

39. <u>Right to Credit Bid</u>.  To the fullest extent permitted by section 363(k) of the Bankruptcy Code, in connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code (any of the foregoing sales or dispositions, a "<u>Sale</u>"), the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition First Lien Agent (in accordance with the Prepetition First Lien Credit Agreement) shall be authorized to credit bid on a dollar-for-dollar basis the full amount of the respective outstanding DIP Obligations and Prepetition First Lien Obligations, including any accrued interest and expenses, in a Sale of any DIP Collateral or Prepetition Collateral (including any deposit in connection with such Sale), whether, respectively, such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, or by a Chapter 7 trustee under section 725 of the Bankruptcy Code or otherwise.

40. <u>Proofs of Claim</u>.  Neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or

Successor Cases for any claim arising under the DIP Documents or the Prepetition First Lien Credit

Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of

this Interim Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured

Parties and the Prepetition First Lien Secured Parties with regard to all claims arising under the

DIP Documents and the Prepetition First Lien Credit Documents, and, as a result, the Prepetition

First Lien Obligations shall be deemed allowed for all purposes in accordance with section 502(a)

of the Bankruptcy Code.

41.    <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>.

Except as otherwise permitted in this Interim Order, the DIP Facility, the DIP Collateral, the

Prepetition Collateral, the Cash Collateral and the Carve-Out may not be used in connection with:

(a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition First Lien Secured

Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral;

(b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral

without the consent of the Required DIP Lenders; (c) outside the ordinary course of business, using

or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the

Required DIP Lenders; (d) incurring any indebtedness without the prior consent of the Required

DIP Lenders, except to the extent permitted under the DIP Documents; (e) seeking to amend or

modify any of the rights granted to the DIP Secured Parties or the Prepetition First Lien Secured

Parties under this Interim Order, the DIP Documents or the Prepetition First Lien Credit

Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the

Prepetition Liens or the Prepetition First Lien Obligations, the DIP Collateral (including Cash

Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or

on behalf of any of the DIP Secured Parties or the Prepetition First Lien Secured Parties,

respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition First Lien Secured Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition First Liens, the Prepetition First Lien Obligations or any other rights or interests of the DIP Secured Parties or the Prepetition First Lien Secured Parties; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations or the Prepetition First Lien Obligations.

42. <u>Turn Over.</u>  Prior to the indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations and termination of the commitment in accordance with the DIP Documents, any party who holds a lien or security interest in DIP Collateral that is junior and/or subordinate to the DIP Liens or a claim that is subordinate to the DIP Superpriority Claims (including any of the Prepetition First Lien Secured Parties) receives or is paid the proceeds of any DIP Collateral or receives any other payment or consideration from the Debtors or any other source (including under any chapter 11 plan) other than as expressly permitted in the DIP Documents and this Interim Order, such party shall be deemed to have received, and shall hold, such proceeds or payments in trust for the DIP Secured Parties and shall immediately turn over such amounts to the DIP Agent for distribution to the DIP Lenders to repay the DIP Obligations in accordance with the DIP Documents and this Interim Order until indefeasibly paid in full in cash.

43.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph I hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order and upon their Estates upon entry of the Final Order.  The Debtors' Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the earlier of (x) the Bid Deadline (as defined in the Bidding Procedures Order), (y) sixty (60) calendar days after the formation of any Committee, and (z) seventy-five (75) calendar days following the date of entry of the Interim Order if no Committee is appointed, and (such time period established by the earlier of clauses (x), (y) and (z), shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "<u>Challenge</u>"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "<u>Challenge Period Termination Date</u>") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "<u>Successful Challenge</u>").  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor

Cases), and without further notice, notion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition First Lien Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition First Lien Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; *provided*, that all other stipulations (other than those subject to a successful Challenge) shall remain binding on any Committee or other party-in-interest.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-interest, including any Committee, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination

Date as required under this Paragraph 43 or to require or permit an extension of the Challenge Period Termination Date. To the extent any such Challenge is timely and properly commenced, the Prepetition First Lien Agent and any other Prepetition First Lien Secured Party shall be entitled to payment of the related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in defending themselves and the other Prepetition First Lien Secured Parties in any such proceeding as adequate protection. The Challenge Period may be extended, after notice and hearing, for good cause shown.

44.     No Third-Party Rights.  Except as explicitly provided for herein or in any of the DIP Documents, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or direct, indirect, or incidental beneficiary.

45.     No Lender Liability.  In determining to make any loan (whether under the DIP Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured Parties shall (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the *United States Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation) or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition First Lien Secured Parties of any liability for any claims

arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

46.    <u>Section 506(c) Claims</u>.  Subject to entry of a Final Order and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the consent of the Prepetition First Lien Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition First Lien Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition First Lien Secured Parties.

47.    <u>No Marshaling</u>.   The DIP Secured Parties, and subject to entry of the Final Order, the Prepetition First Lien Secured Parties, shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

48.    <u>Section 552(b)</u>.  The DIP Secured Parties, and subject to entry of a Final Order, the Prepetition First Lien Secured Parties, shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition

First Lien Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral, as applicable.

49.    <u>Exculpation</u>. Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition First Lien Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.   In addition, (a) the DIP Secured Parties shall not in any way or manner be liable or responsible for: (i) the safe-keeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any Diminution thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors.

50.    <u>Release of DIP Secured Parties</u>.   Upon entry of this Interim Order, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind)

as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP

Obligations.

51.    <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order and to

the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders),

shall be, and shall be deemed to be, without any further action or notice, named as additional

insured and loss payee on each insurance policy maintained by the Debtors that in any way relates

to the DIP Collateral.

52.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties

or Prepetition First Lien Secured Parties to seek relief or otherwise exercise their rights and

remedies under this Interim Order, the DIP Documents, the Prepetition First Lien Credit

Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights

hereunder, thereunder, or otherwise.

53.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim

Order by this Court, the terms and provisions of this Interim Order shall become valid and binding

upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien

Secured Parties, the Prepetition Second Lien Secured Parties, all other creditors of any of the

Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11

Cases and all other parties-in-interest and their respective successors and assigns, including any

trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases,

or upon dismissal of any Chapter 11 Case or Successor Case.

54.    <u>No Modification of Interim Order</u>.  Until and unless the DIP Obligations

and Prepetition First Lien Obligations have been indefeasibly paid in full in cash, and all

commitments to extend credit under the DIP Facility have been terminated, the Debtors irrevocably

waive the right to seek and shall not seek or consent to, directly or indirectly, without the prior written consent of the Required DIP Lenders or Required Prepetition First Lien Lenders (as defined below), (i) any modification, stay, vacatur or amendment to this Interim Order; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (iii) any order allowing use of Cash Collateral resulting from DIP Collateral or Prepetition Collateral; (iv) without the prior written consent of the Required DIP Lenders, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Documents; or (v) without the prior written consent of the Prepetition First Lien Agent, in the case of the Prepetition Agreement, any lien on any of the Prepetition Collateral with priority equal or superior to the Prepetition Liens or Replacement Liens.

55.    <u>Discharge</u>.  Except as otherwise agreed in writing by the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Lenders, as that term is defined in the Prepetition First Lien Credit Agreement (the "<u>Required Prepetition First Lien Lenders</u>")), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, "payment in full" as provided by the DIP Documents), on or before the effective date of such

confirmed plan of reorganization.  If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Prohibited Plan or Sale") without the written consent of the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition First Lien Agent (acting at the direction of the Required Prepetition First Lien Lenders), the Debtors' proposal or support of a Prohibited Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

56.    Joint and Several.  The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

57.    Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Bankruptcy Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition First Lien Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this

Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP

Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being

without prejudice to any terms or provisions contained in the DIP Facility which survive such

discharge by their terms), and all commitments to extend credit under the DIP Facility are

terminated; and (ii) in respect of the Prepetition First Lien Facility, all of the Prepetition First Lien

Obligations pursuant to the Prepetition First Lien Credit Documents and this Interim Order, have

been indefeasibly paid in full in cash.  The terms and provisions concerning the indemnification

of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases,

following dismissal of the Chapter 11 Cases or any Successor Cases, following termination of the

DIP Documents and/or the indefeasible repayment of the DIP Obligations.  In addition, the terms

and provisions of this Interim Order shall continue in full force and effect for the benefit of the

Prepetition First Lien Secured Parties notwithstanding the repayment in full or termination of the

DIP Obligations until such time as the Prepetition First Lien Obligations have been indefeasibly

paid in full.

58.    <u>Final Hearing</u>.  The Final Hearing on the Motion shall be held on

_____, 2021, at__:__ _.m., prevailing Eastern Time; provided that the Final Hearing may be

adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment.  The

Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice

of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any

other party that has filed a request for notices with this Court.  Any objections or responses to entry

of the Final Order shall be filed on or before ___:00 __.m., prevailing Eastern Time, on _____

_____, 2021.

59.    <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Order and the transactions contemplated hereby.

60.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9014 of the Bankruptcy Rules, any applicable Local Bankruptcy Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

61.    <u>Binding Effect of Interim Order</u>.  Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

62.    <u>Headings</u>. The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

63.    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to
enforce this Interim Order according to its terms.

_____

UNITED STATES BANKRUPTCY JUDGE

DATED:  _____, 2021
Richmond, Virginia

WE ASK FOR THIS:

*/s/ Christopher A. Jones* _____

  Christopher A. Jones (VSB# 40064)
  David W. Gaffey (VSB# 85088)
  Jae Won Ha (VSB# 94781)
  **WHITEFORD TAYLOR & PRESTON LLP**
  Two James Center
  1021 E. Cary Street, Suite 1700
  Richmond, VA 23219
  Telephone:    (804) 977-3300
  Facsimile:    (804) 977-3299

  - and –

  John C. Longmire (*pro hac vice* admission pending)
  Matthew A. Feldman (*pro hac vice* admission pending)
  James H. Burbage (*pro hac vice* admission pending)
  **WILLKIE FARR & GALLAGHER LLP**
  787 Seventh Avenue
  New York, NY 10019
  Telephone:    (212) 728-8000
  Facsimile:    (212) 728-8111

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT

## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order

has been endorsed by or served upon all necessary parties.

        */s/ Christopher A. Jones* _____

- 62 -

## Exhibit 1

**DIP Term Sheet**

EXECUTION VERSION

# PAPER SOURCE, INC.

## Senior Secured Superpriority
## Debtor-in-Possession Credit Facility Term Sheet

## Dated as of March 2, 2021

This Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, this "**Term Sheet**") describes the principal terms and conditions of a proposed senior secured superpriority debtor-in-possession term loan facility (the "**DIP Credit Facility**") to be provided by the DIP Lenders (as defined below) to Paper Source, Inc., an Illinois corporation (the "**Borrower**") in connection with cases (collectively, the "**Chapter 11 Cases**") filed by the Borrower and the Guarantor (as defined below) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "**Bankruptcy Code**") on March 2, 2021 (the "**Petition Date**"). The DIP Credit Facility is being provided by the DIP Lenders in reliance upon the promulgation and consummation of the 363 Sale Process (as defined below).

This Term Sheet is being provided on a confidential basis and it, along with its contents and existence, may not be distributed, disclosed or discussed with any other party and may be filed with the Bankruptcy Court in connection with the Chapter 11 Cases. This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities. The terms and conditions set forth in this Term Sheet do not constitute or create an agreement, obligation or commitment of any kind by or on behalf of any party, unless and until executed by each of the undersigned parties hereto.

| | |
|---|---|
| **BORROWER:** | Paper Source, Inc., an Illinois corporation, in its capacity as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **GUARANTOR:** | Pine Holdings, Inc., a Delaware corporation. The guaranty provisions set forth in Exhibit B attached hereto are hereby incorporated herein by reference. |
| **DIP LENDERS:** | The entities forth on Exhibit A hereto (each a "**DIP Lender**" and collectively, the "**DIP Lenders**"). |
| **DIP AGENT:** | MidCap Financial Trust shall be the sole administrative agent and collateral agent for the DIP Lenders (in such capacities, the "**DIP Agent**"). The DIP Agent and each DIP Lender hereby agree to the agency provisions set forth in Exhibit F hereto, which are incorporated herein by reference. |
| **DIP CREDIT FACILITY:** | The DIP Lenders agree, severally and not jointly, to make senior secured superpriority debtor-in-possession loans to the Borrower consisting of new money delayed-draw term loans to be made from time to time during the Availability Period (as defined below) in accordance with the Draw Schedule set forth below in an aggregate principal amount (exclusive of capitalized Commitment Fees (as defined below)) not to exceed at any time outstanding aggregate principal commitments of $16,000,000 (the "**DIP Commitment**"), |

| | |
|---|---|
| | of which up to $7,750,000 of the DIP Commitment will be funded on the Interim Closing Date (as defined below) (the "**Interim Commitment**") and up to the full remaining DIP Commitment will be funded on or after the Final Closing Date (as defined below) (the "**Final Commitment**"), *provided* that after giving effect to the principal balance of all DIP Loans, the aggregate principal balance of all DIP Loans shall not exceed the DIP Commitment; *provided, further*, that no DIP Lender shall be obligated to make DIP Loans in an amount in excess of the portion of the DIP Commitment set forth next to such DIP Lender's name in the table set forth on <u>Annex A</u> hereto. |
| **AVAILABILITY PERIOD & DRAW SCHEDULE:** | The DIP Credit Facility shall be available from the Interim Closing Date to the earliest of (i) the Maturity Date (as defined below) and (ii) the date of the termination of the DIP Credit Facility pursuant to the terms hereof or the DIP Orders (as hereinafter defined) (the "**Availability Period**"). Borrower may request draws under the DIP Credit Facility in accordance with the following schedule by delivering a notice of borrowing to the DIP Agent in substantially the form of <u>Exhibit C</u> attached hereto (the "**Notice of Borrowing**"), duly executed by an authorized officer of Borrower (the "**Draw Schedule**"): <br><br> (i)   <u>Interim DIP Loan</u>:  On or after the Interim Closing Date, Borrower may request loans in a single draw in an aggregate principal amount of up to $7,750,000, subject to the provisions of this Term Sheet and for use strictly in accordance with the Approved Budget (as defined below) and the terms of the Interim Order (as defined below) approving the DIP Credit Facility on an interim basis (the "**Interim DIP Loans**"); and <br><br> (ii)  <u>Final DIP Loan</u>:  On or after the Final Closing Date, Borrower may request loans in one or more borrowings up to amounts, not to exceed the DIP Commitment, less amounts drawn under the Interim DIP Loans (the "**Final DIP Loan**", together with the Interim DIP Loans, the "**DIP Loans**"), subject to the provisions of this Term Sheet and for use strictly in accordance with the "Use of Proceeds" hereof and the terms of the Final Order (as defined below). <br><br> The proceeds of the DIP Loans shall be funded into a deposit account of the Borrower.  Such account shall be subject to the DIP Liens (as defined below) in favor of the DIP Agent, which shall be perfected pursuant to the DIP Orders and shall be subject to an account control agreement reasonably satisfactory to the DIP Agent if required by the DIP Agent. |
| **CLOSING DATES:** | "**Interim Closing Date**" means the date on which the "Conditions Precedent to the Interim DIP Loan" (including, without limitation, |

| | |
|---|---|
| | entry of the Interim Order) shall have been satisfied or waived in accordance with this Term Sheet.<br><br>"**Final Closing Date**" means the date on which the "Conditions Precedent to the Final DIP Loan" as set forth below (including, without limitation, entry of the Final Order) shall have been satisfied or waived in accordance with this Term Sheet. |
| **DIP LOAN DOCUMENTATION; DIP TERM SHEET CONTROLS:** | At the option of the DIP Lenders in their reasonable discretion, Debtors shall execute definitive financing documentation with respect to the DIP Credit Facility, including, without limitation, guarantees and security documents, in each case, satisfactory in form and substance to each of the DIP Agent, the DIP Lenders and Debtors (the "**DIP Documents**").  The provisions of the DIP Documents shall, upon execution, supersede the provisions of this Term Sheet; *provided* that if the DIP Lenders determine not to require the Debtors to execute additional DIP Documents, the provisions of this Term Sheet, the Interim Order and the Final Order shall govern the DIP Credit Facility.  The provisions of the DIP Documents shall be consistent with this Term Sheet, the Interim Order and, once entered, a final order with respect to the Chapter 11 Cases and the DIP Credit Facility (in form and substance satisfactory to the DIP Agent and the DIP Lenders granting final approval of the DIP Credit Facility, the "**Final Order**", and together with the Interim Order, the "**DIP Orders**"). |
| **USE OF PROCEEDS:** | The DIP Loans will be used strictly in accordance with the Approved Budget (subject to the Permitted Variances (as defined below)), for (a) working capital and general corporate purposes of the Debtors, (b) for bankruptcy-related costs and expenses, and (c) for costs and expenses related to the DIP Credit Facility. |
| **APPROVED BUDGET; APPROVED CASH FLOW PROJECTION; VARIANCE REPORTS:** | By no later than the Petition Date, Debtors shall deliver to the DIP Agent a weekly budget for the 13-week period commencing on the Petition Date, and such weekly budget shall be approved by the Required DIP Lenders in their sole discretion and shall set forth, among other things, the projected cash receipts and cash disbursements (the "**Approved Budget**").<br><br>By not later than 5:00 PM ET on Wednesday after the second full calendar week following the Petition Date (the "**First Testing Date**"), and no later than 5:00 PM ET on each Wednesday thereafter (together with the First Testing Date, each a "**Testing Date**"), the Debtors shall deliver to the DIP Agent a variance report for the applicable Testing Period (as defined below) in form and detail acceptable to the DIP Agent (an "**Approved Variance Report**") showing comparisons of (a) aggregate actual cumulative cash receipts for such Testing Period compared to the aggregate projected cumulative cash receipts of the Debtors for such Testing Period as set forth in the Approved Budget and (b) actual cumulative cash disbursements on a line by line basis (excluding professional fees) |

of the Debtors for such Testing Period compared to the projected cumulative cash disbursements on a line by line basis (excluding professional fees) for such Testing Period as set forth in the Approved Budget.

The term "**Testing Period**" means the weekly period beginning on Sunday and ending on the Saturday immediately prior to the applicable Testing Date.

Each Approved Variance Report shall indicate whether there are any adverse variances that exceed the Permitted Variances (as defined below) and shall provide a written explanation for such variances. "**Permitted Variances**" shall mean, as of any Testing Date:

1.       the sum of (x) the aggregate actual cumulative cash receipts of the Debtors for the applicable Testing Period, *plus* (y) to the extent such amount is greater than $0, the amount by which the actual cumulative cash receipts of the Debtors for the immediately preceding Testing Period exceeded the cumulative cash receipts of the Debtors set forth in the Approved Budget for such Testing Period, may not vary negatively from the Approved Budget for such Testing Period by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual receipts are less than projected receipts; and

2.       the difference of (x) the Debtors' actual cash operating disbursements for each line item within the Approved Budget (excluding professional fees) for the applicable Testing Period, *minus* (y) to the extent such amount is greater than $0, the amount by which such line item within the Approved Budget for the immediately preceding Testing Period exceeded the Debtors' actual cash operating disbursements for such line item within the Approved Budget for the immediately preceding Testing Period, may not vary negatively from the Approved Budget by more than (a) 20.0% for the first two Testing Periods and (b) 15.0% for each Testing Period thereafter, for the avoidance of doubt, with negative variance meaning that actual disbursements in any line item are greater than the projected disbursements in the same line item.

Commencing at 5:00 P.M. (Eastern Time) on the Wednesday of the second full calendar week after the Petition Date, and continuing on 5:00 P.M. (Eastern Time) on the Wednesday of every second week thereafter, the weekly budget shall be updated, and if such updated budget is in form and substance satisfactory to the DIP Agent in its sole discretion, it shall become the "Approved Budget" for purposes of this Term Sheet and the DIP Orders.   Any amendments, supplements or modifications to the Approved Budget or an Approved Variance Report shall be subject to the prior written approval of the DIP Agent in its sole discretion prior to the implementation thereof.   If the DIP Agent has not objected, in

| | |
|---|---|
| | writing, to a proposed updated budget, or an amendment, supplement or modification to the Approved Budget or an Approved Variance Report, within three (3) business days after the DIP Agent's receipt thereof, such proposed updated budget, amendment, supplement or modification shall be deemed acceptable to and approved by the DIP Agent.  Until any such updated budget, amendment, supplement or modification has been approved (or deemed approved as provided above) by the DIP Agent, the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect. |
| **FIRST PRIORITY SECURITY INTEREST:** | All DIP Loans and other liabilities and obligations owed to the DIP Lenders and the DIP Agent under or in connection with this Term Sheet, the DIP Documents, the Interim Order and/or Final Order (collectively, the "**DIP Obligations**"), in all cases subject to the Carve-Out (as defined below), shall be:<br><br>(i)    pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Chapter 11 Cases of the Debtors with priority over any and all administrative expenses, whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(a) of the Bankruptcy Code;<br><br>(ii)    pursuant to sections 364(c)(2) secured by a perfected first-priority lien on the DIP Collateral (as defined below), to the extent that such DIP Collateral is not subject to the Prepetition Permitted Liens (as defined in the DIP Orders);<br><br>(iii)    pursuant to section 364(c)(3), secured by a perfected junior lien on DIP Collateral, to the extent such DIP Collateral is subject to a Prepetition Permitted Lien (other than the Prepetition First Liens or Prepetition Second Liens); and<br><br>(iv)    pursuant to section 364(d)(1), secured by a perfected first-priority priming lien on DIP Collateral subject to the Prepetition Permitted Liens (other than the Prepetition First Liens or the Prepetition Second Liens) but senior to all other liens (including the Prepetition First Liens and the Prepetition Second Liens) (collectively, the liens described in clauses (ii), (iii) and (iv), the "**DIP Liens**").<br><br>As used herein, "**Carve-Out**" means the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses incurred by a Trustee under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the notice set forth in (iii) below); (iii) subject to the Approved Budget to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and |

expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors) (the "**Allowed Debtor Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and unpaid fees and expenses (the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, collectively, the "**Allowed Professional Fees**") incurred by persons or firms retained by any statutory committees appointed in the Chapter 11 Cases (each, a "**Committee**") pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (these clauses (i) through (iii), the "**Pre-Carve Out Amounts**"); and (iv) Allowed Professional Fees not to exceed $500,000, incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**").

For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the United States Trustee, and counsel to the Committee (if any), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Credit Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Prior to the delivery of the Carve Out Trigger Notice, on a weekly basis, the Debtors shall fund from the DIP Credit Facility or cash on hand into a segregated escrow account (the "**Funded Reserve Account**") held by Epiq Corporate Restructuring LLC in trust for the benefit of Professional Persons an amount equal to the sum of the aggregate unpaid amount of the total budgeted weekly fees of Professional Persons for the prior week set forth in the Approved Budget. Promptly after the delivery of the Carve Out Trigger Notice, the Debtors shall fund from the DIP Credit Facility or cash on hand into the Funded Reserve Account an amount equal to the Post-Carve Out Trigger Notice Cap.

The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local bankruptcy rules of the Bankruptcy Court, and any interim or final orders of the Bankruptcy

<table>
<tr><td></td><td>Court; <em>provided</em> that when all Allowed Professional Fees have been paid in full (regardless of when such Allowed Professional Fees are allowed by the Bankruptcy Court), any funds remaining in the Funded Reserve Account shall revert to DIP Agent for the benefit of the DIP Lenders. Funds transferred to the Funded Reserve Account shall not be subject to any liens or claims granted to the DIP Lenders herein or any liens or claims granted as adequate protection, shall not constitute DIP Collateral, and shall not constitute cash collateral or assets of the Debtors' estates; provided, that, notwithstanding anything to the contrary herein or in the DIP Documents, the DIP Collateral shall include the DIP Agent's reversionary interest in funds held in the Funded Reserve Account, if any, after all Allowed Professional Fees are satisfied in full.<br><br>The DIP Liens under Section 364(d)(1) shall not be <em>pari passu</em> with, or subordinated to, any other liens or security interests (whether currently existing or hereafter created), subject in each case only to the Carve-Out and any Prepetition Permitted Liens (other than the Permitted First Liens and the Permitted Second Liens).</td></tr>
</table>

| **PREPETITION FIRST LIEN FACILITY:** | Credit and Guaranty Agreement dated as of May 22, 2019 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**", and the obligations thereunder, the "**Prepetition First Lien Obligations**"), by and among the Debtors, MidCap Financial Trust as the administrative agent for the lenders party thereto (in such capacity, the "**Prepetition First Lien Agent**"), and the lenders party thereto from time to time (the "**Prepetition First Lien Lenders**" and together with the Prepetition First Lien Agent, collectively, the "**Prepetition First Lien Secured Parties**"). |
| --- | --- |
| **PREPETITION SECOND LIEN FACILITY:** | Credit and Guaranty Agreement dated as of May 22, 2019 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**", and the obligations thereunder, the "**Prepetition Second Lien Obligations**"), by and among the Debtors, Victory Park Management, LLC, as the administrative agent for the lenders party thereto (in such capacity, the "**Prepetition Second Lien Agent**"), and the lenders party thereto from time to time (together with the Prepetition Second Lien Agent, collectively, the "**Prepetition Second Lien Secured Parties**"). |
| **ADEQUATE PROTECTION FOR PREPETITION FIRST LIEN SECURED PARTIES:** | As adequate protection for any diminution of the Prepetition First Lien Secured Parties' interest in the "Collateral" (as defined in the Prepetition First Lien Credit Agreement) resulting from the subordination of their existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition First Lien Agent shall receive, for the benefit of the Prepetition First Lien Secured Parties, the adequate protection granted to the Prepetition First Lien Secured Parties (A) pursuant to the DIP Orders (which shall include, without limitation, (i) monthly |

| | |
|---|---|
| | payments to reimburse the Prepetition First Lien Secured Parties' reasonable professional fees, (ii) monthly payment in kind of interest to the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement and (iii) an acknowledgement of the unconditional right to credit bid the Prepetition First Lien Obligations as further set forth in this Term Sheet under the section titled "Other Bankruptcy Matters") (B) as otherwise required by the Bankruptcy Court pursuant to sections 361, 507, 363(e) and 364(d)(1) of the Bankruptcy Code or otherwise. |
| **ADEQUATE PROTECTION FOR PREPETITION SECOND LIEN SECURED PARTIES:** | As adequate protection for any diminution of the Prepetition Second Lien Secured Parties' interest in the "Collateral" (as defined in the Prepetition Second Lien Credit Agreement) resulting from the subordination of their existing liens to the DIP Liens and/or the Debtors' use of cash collateral pursuant to the DIP Orders, the Prepetition Second Lien Agent shall receive, for the benefit of the Prepetition Second Lien Secured Parties, the adequate protection granted to the Prepetition Second Lien Secured Parties pursuant to the DIP Orders. |
| **DIP COLLATERAL:** | "**DIP Collateral**" means, collectively, all assets of each Debtor and its bankruptcy estate of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date, now owned or hereafter acquired, including all accounts, chattel paper, commercial tort claims, deposit accounts, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, books and records, and all proceeds, rents, profits, and offspring of the foregoing, other than contracts, leases and other licenses solely to the extent a lien is not permitted by law to attach to such property, in which case the proceeds of such contracts, leases and other licenses shall be DIP Collateral, and subject to entry of the Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

All of the liens described herein with respect to the assets of the Debtors shall be effective and perfected by the Interim Order and the Final Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. Notwithstanding the foregoing, the Debtors shall take all action that may be reasonably necessary or desirable, or that the DIP Lenders or the DIP Agent may reasonably request, to at all times maintain the validity, perfection, enforceability and priority of the security interest and liens of the DIP Agent in the DIP Collateral, or to enable the DIP Agent to protect, exercise or enforce its rights hereunder, under the DIP Orders and in the DIP Collateral. |
| **ARRANGEMENT FEE:** | The Debtors shall pay to the DIP Agent a fee equal to $50,000 (the "**Arrangement Fee**"), which shall be fully earned and non-refundable, on the Interim Closing Date. The Arrangement Fee shall be due and payable in cash upon the initial draw made in accordance |

| | with the Draw Schedule and may be netted from the proceeds of the initial DIP Loans funded. |
|---|---|
| **COMMITMENT FEES:** | The Debtors shall pay to the DIP Lenders, on a pro rata basis in accordance with their DIP Commitments on the Interim Closing Date, a commitment fee (the "**Commitment Fee**") equal to 3.00% of the aggregate DIP Commitment.  The Commitment Fee shall be fully-earned and non-refundable on the Interim Closing Date.  The Commitment Fee shall be paid in kind on the Interim Closing Date and capitalized to the principal amount of the Interim DIP Loans. |
| **INTEREST RATE:** | Interest will be payable on the unpaid principal amount of all DIP Loans and all overdue interest thereon at a rate per annum equal to the LIBOR Rate (as defined in the Prepetition First Lien Credit Agreement) for an Interest Period (as defined in the Prepetition First Lien Credit Agreement) of one month plus 10.00%, payable monthly on the first (1st) business day of each month in arrears.  All interest and fees under this Term Sheet shall be calculated on the basis of a 360-day year for the actual number of days elapsed.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br>The LIBOR Rate applicable to each DIP Loan for the initial one-month period beginning on the date on which such DIP Loan is funded and each succeeding one-month thereafter shall be determined in accordance with the provisions of the Prepetition First Lien Credit Agreement for determining the LIBOR Rate for an Interest Period of one month applicable to a LIBOR Rate Loan (as defined in the Prepetition First Lien Credit Agreement) thereunder, which provisions are incorporated by reference herein *mutatis mutandis*. |
| **DEFAULT RATE:** | At all times following the occurrence and during the continuance of an Event of Default, principal, interest and all other amounts due on the DIP Loans shall bear interest at a rate equal to 2.00% per annum in excess of the interest rate set forth under "Interest Rate" above. |
| **363 SALE PROCESS:** | The Debtors shall commence a public sale process with respect to their assets pursuant to Section 363 of the Bankruptcy Code (the "**Sale**"). In connection with the Sale, the DIP Lenders and the Prepetition First Lien Lenders (or one or more of their respective designees) will serve as the stalking horse purchaser (the "**Stalking Horse Purchaser**"), under an asset purchase agreement (the "**Stalking Horse Agreement**") in form and substance satisfactory to the Stalking Horse Purchaser.<br><br>The process set forth above, designation of the Stalking Horse Purchaser and use of the Stalking Horse Agreement shall collectively be referred to as the "**363 Sale Process**". |

| MATURITY DATE: | The DIP Loans (together with all other DIP Obligations) shall mature and be due and payable on the earliest to occur of the following (such date, the "**Maturity Date**"): |
|---|---|
| | (i)     June 30, 2021; |
| | (ii)    the consummation of a sale of all or substantially all of the assets of the Debtors; |
| | (iii)   the termination of the Stalking Horse Agreement for any reason without the prior written consent of the DIP Lenders and the Stalking Horse Purchaser other than a termination of the Stalking Horse Agreement to pursue approval of an Alternative Transaction (as defined in the Stalking Horse Agreement) that results in the indefeasible payment in full in cash of the Prepetition First Lien Obligations as of the closing of such Alternative Transaction; |
| | (iv)   the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; |
| | (v)    entry of an order by the Bankruptcy Court approving (A) a motion seeking conversion or dismissal of any or all of the Chapter 11 Cases or (B) a motion seeking the appointment or election of a trustee, a responsible officer or examiner with enlarged powers relating to the operation of the Debtors' business; and |
| | (vi)   the date of acceleration of all or any portion of the DIP Loans and the termination of the commitments in respect thereof upon the occurrence of an Event of Default (as defined below). |
| | Notwithstanding anything in this Term Sheet or the DIP Orders to the contrary, simultaneously with the consummation of any Alternative Transaction that results in the occurrence of the Maturity Date pursuant to clause (ii) above, the Debtors shall pay (or cause to be paid) the outstanding amount of the DIP Loans (together with all other DIP Obligations) from the proceeds of such Alternative Transaction, reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the date of the closing of such Alternative Transaction) to the extent set forth in the Approved Budget and (b) in an amount negotiated in good faith by the DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estates following the closing of such Alternative Transaction. |

| | |
|---|---|
| **OPTIONAL PREPAYMENTS:** | The Debtors may prepay the DIP Loans in whole or in part at any time upon delivery of written notice to the DIP Agent no later than 1:00 PM ET three (3) business days prior to the date of such prepayment (or such later time as the DIP Agent may agree to in its sole discretion).  All optional prepayments shall be applied to the DIP Loans in accordance with the application of payment provisions set forth in the "Mandatory Prepayments" section below.  Any amounts so prepaid may not be reborrowed. |
| **MANDATORY PREPAYMENTS; APPLICATION OF PREPAYMENTS:** | The Debtors shall pay or prepay the DIP Loans and all other DIP Obligations (together with a cash reserve established by the DIP to cover asserted contingent and indemnity obligations) until such obligations are paid in full immediately as follows:<br><br>(i)   100% of the net cash proceeds of any sale or disposition of all or substantially all of Debtors' assets pursuant to Section 363 of the Bankruptcy Code (other than a Sale to the Stalking Horse Purchaser pursuant to the Stalking Horse Agreement) simultaneous with the consummation thereof, after funding the Carve-Out and reserving proceeds (a) sufficient to pay accrued, unpaid and allowed administrative expenses (as of the closing of such Sale) to the extent set forth in the Approved Budget and (b) in an amount negotiated in good faith by the DIP Lenders and the Debtors that is necessary to fund costs for the wind-down of Debtors' bankruptcy estates following the closing of such Sale;<br><br>(ii)  100% of the net cash proceeds of any other sale or other disposition by any Debtor of any assets, in a single transaction or series of related transactions (except for the (a) de minimis asset sales approved by an order of the Bankruptcy Court that is in form and substance acceptable to the Required DIP Lenders (as defined below) or (b) sale of goods or services in the ordinary course of business); and<br><br>(iii) 100% of the net cash proceeds of extraordinary receipts (including tax refunds, indemnity payments and insurance proceeds not included as proceeds of asset dispositions but excluding sales tax receipts contemplated to be received by any of the Debtors as set forth in the Approved Budget) by any Debtor.<br><br>Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales or other proceeds described above shall be permitted without the prior written consent of the DIP Lenders.<br><br>Voluntary and mandatory payments or prepayments and proceeds of DIP Collateral received by the Debtors outside the ordinary course of business will be applied in the following order of priority (unless otherwise determined by the DIP Lenders in their sole discretion), |

| | |
|---|---|
| | after giving effect to the Carve-Out and any other payments required pursuant to the DIP Orders:<br><br>(1)  first, to pay all documented out-of-pocket expenses of the DIP Lenders and the DIP Agent (including, without limitation, fees and expenses of counsel and external advisors);<br><br>(2)  second, to pay an amount equal to all accrued and unpaid interest owing to the DIP Lenders;<br><br>(3)  third, to repay any principal amounts outstanding in respect of the DIP Loans (including any amounts, other interest, that have been added to the principal balance);<br><br>(4)  fourth, all other amounts owing to the DIP Lenders and the DIP Agent; and<br><br>(5)  last, the balance, if any, after all of the DIP Obligations have been paid in full, to the Borrower subject in all respects to the rights, liens and claims of the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Lenders. |
| **CONDITIONS PRECEDENT TO THE INTERIM DIP LOAN:** | The obligations of the DIP Lenders to make the Interim DIP Loans in accordance with the Draw Schedule will be subject to satisfaction, or written waiver, by the DIP Agent and each DIP Lender in its sole and absolute discretion, of each of the following conditions precedent in connection with each draw request:<br><br>(i)  Debtors shall have timely delivered to the DIP Agent the Approved Budget or any update thereto required to be delivered in accordance with this Term Sheet;<br><br>(ii)  Debtors shall have delivered to the DIP Agent a Notice of Borrowing in connection with such draw request no later than 11:00 AM ET one (1) business day prior to the requested funding date for the Interim DIP Loan (or such later time as the DIP Agent may agree to in its sole discretion);<br><br>(iii)  Debtors shall have delivered to the DIP Agent a Closing Certificate, substantially in the form attached hereto as Exhibit D, duly executed by the chief executive officer or chief financial officer of the Debtors, delivered to the DIP Agent, appropriately completed, by which such officer shall certify to the DIP Agent and the DIP Lenders that all of the conditions precedent to the Interim DIP Loan have been satisfied (at any time delivered, a "**Closing Certificate**");<br><br>(iv)  the interim order (in form and substance acceptable to the DIP Agent and each DIP Lender in its sole and absolute discretion) has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any |

portion of the DIP Collateral) and shall not have been reversed, modified, amended, stayed or vacated, or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and each DIP Lender (the "**Interim Order**") and the Debtors shall be in compliance in all respects with the Interim Order;

(v)     all of the "first day" motions, orders and related pleadings shall have been reviewed in advance by the DIP Agent and each DIP Lender and shall be reasonably satisfactory in form and substance to the DIP Agent and each DIP Lender;

(vi)    The DIP Agent shall be satisfied that the liens and security interests of the DIP Agent have been perfected in the DIP Collateral and shall constitute first-priority liens (subject only to Prepetition Permitted Liens);

(vii)   Debtors shall have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is reasonably acceptable to the DIP Agent and each DIP Lender (which shall be deemed satisfied if such insurance as required by under the Prepetition First Lien Credit Agreement remains in place);

(viii)  no Default or Event of Default shall have occurred and be continuing on the Interim Closing Date or after giving effect to the Interim DIP Loan;

(ix)    all representations and warranties of the Debtors hereunder shall be true and correct in all material respects (except those qualified by materiality or Material Adverse Change (as defined below), which shall be true and correct in all respects);

(x)     subject to Bankruptcy Court approval, (i) each Debtor shall have the corporate power and authority to make, deliver and perform its obligations under this Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) shall be required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of this Term Sheet and the Interim Order except for consents, authorizations and filings which shall have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change (as defined below);

(xi)    the DIP Agent and each DIP Lender shall have received a copy of the fully-executed Stalking Horse Agreement, which shall

13

be in form and substance consistent with the terms hereof and otherwise acceptable to the DIP Agent and each DIP Lender in its sole and absolute discretion;

(xii)  receipt by the DIP Agent of a certificate, in form and substance satisfactory to the DIP Agent, executed by the secretary, chief executive officer, president, chief financial officer, treasurer or controller of each Debtor on behalf of each such Debtor, certifying that attached to such certificate are true, correct and complete copies of (a) (x) the certificate of incorporation, certificate of limited partnership or articles of organization, as applicable of such applicable Debtor and (y) the by-laws, partnership agreement or an operating, limited liability company agreement, as applicable, of such applicable Debtor, in each case, then in full force and effect, (b) the resolutions then in full force and effect adopted by the board of directors (or comparable governing body) of such applicable Debtor authorizing and ratifying the execution, delivery and performance by such applicable Debtor of this Term Sheet and the transactions contemplated hereby, (c) a certificate of good standing, dated as of a recent date, from the secretary of state of the state under whose laws such applicable Debtor was incorporated or formed and (d) an incumbency certificate evidencing the identity, authority and capacity of the chief executive officer, president, chief financial officer, treasurer or controller thereof authorized to execute the Term Sheet and any other related document to which such Debtor is a party or is to be a party and specimen signatures thereof; and

(xiii)  substantially concurrently with the Interim Closing Date, all fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) shall have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

Modifications of the Interim Order shall require the prior written consent of the DIP Agent and the Required DIP Lenders.

For the purposes of this Term Sheet, "**Material Adverse Change**" shall mean: since the Petition Date, any material adverse change, individually or in the aggregate, in (i) the operations, business, assets, financial condition, or customer relations of Debtors, taken as a whole (other than as a result of the filing of the Chapter 11 Cases or the assertion of prepetition claims against the Debtors) (but excluding as a result of, or relating to, any epidemic, pandemic, disease outbreak or public health crisis, including the COVID-19 virus), (ii) the ability of the Borrower or the other Debtors to perform their respective obligations under the DIP Documents or this Term

| | |
|---|---|
| | Sheet or (iii) the validity or enforceability of this Term Sheet or any of the other DIP Documents or the rights or remedies of the DIP Agent and the DIP Lenders hereunder or thereunder. |
| **CONDITIONS PRECEDENT TO A FINAL DIP LOAN:** | The obligations of the DIP Lenders to make a Final DIP Loan shall be subject to satisfaction or waiver of each of the following conditions: <br><br> (i) the receipt by the DIP Agent of a Notice of Borrowing no later than 11:00 AM ET three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the DIP Agent may agree to in its sole discretion); <br><br> (ii) all representations and warranties being true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects); <br><br> (iii) no Default or Event of Default then existing or after giving effect to the Final DIP Loan; <br><br> (iv) prior to or substantially concurrently with the making of such Final DIP Loan, all fees and expenses, including reasonable attorney's fees of the DIP Agent and the DIP Lenders, shall have been paid in full (or will be paid in connection with such Final DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance; <br><br> (v) the Final Order (in form and substance acceptable to the DIP Agent and the DIP Lenders in their sole and absolute discretion) shall have been entered, which Final Order shall not have been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Lenders and the Debtors shall be in compliance in all respects with the Final Order; <br><br> (vi) DIP Agent shall have received additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies, in form and substance reasonably acceptable to the DIP Agent; and <br><br> (vii) receipt by the DIP Agent of a Closing Certificate certifying that the foregoing conditions have been satisfied. <br><br> Modifications of the Final Order shall require the prior written consent of the DIP Agent and the Required DIP Lenders. |
| **REPRESENTATIONS AND WARRANTIES:** | Subject to entry of the DIP Orders, the representations and warranties set forth in Sections 3.1 (except any restrictions arising on account of the Debtors' status as "debtors" under the Bankruptcy |

| | |
|---|---|
| | Code), 3.2, 3.3, 3.6 (except the Chapter 11 Cases and any litigation that is stayed by operation of the Bankruptcy Code), 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13 (other than Taxes that are excused or stayed by an order of the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases and other than ongoing sales & use tax audits currently being conducted by the states of California, Massachusetts, Texas and Wisconsin), 3.14, 3.18, 3.19, 3.22, 3.23, and 3.24 of the Prepetition First Lien Credit Agreement are incorporated herein by reference and, together with the applicable schedules hereto, shall be deemed made by the Debtors for the benefit of the DIP Agent and the DIP Lenders in respect of the DIP Credit Facility and DIP Obligations, *mutatis mutandis*, as if fully set forth herein.  Defined terms used therein but not otherwise defined herein shall have the meanings given to them in the Prepetition First Lien Credit Agreement; provided, that, as used therein, "Closing Date" shall mean the Interim Closing Date; "Credit Party" means "Debtor"; "Financing Documents" means this Term Sheet, the DIP Orders and the DIP Documents; "Loans" and "Term Loans" mean the DIP Loans; "Permitted Liens" means the Prepetition Permitted Liens; "Administrative Agent" means the DIP Agent; and "Lender" means a DIP Lender. |
| **AFFIRMATIVE COVENANTS:** | Each Debtor shall:<br><br>(i) timely deliver, or cause to be timely delivered, to the DIP Agent the Approved Budget and Approved Variance Reports, all in accordance with the provisions set forth in the Interim Order;<br><br>(ii) (a) keep proper books, records and accounts in accordance with GAAP in which full, true and correct entries shall be made of all dealings and transactions in relation to their business and activities, (b) cooperate, consult with, and provide to the DIP Agent all such information as required or as reasonably requested by the DIP Agent or such DIP Lender, and (c) permit during normal business hours, upon reasonable notice, representatives of the DIP Agent to visit and inspect any of their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective senior management and independent public accountants as often as may reasonably be desired; provided that no disclosure of information by the Debtors to the DIP Agent or the DIP Lenders shall be required to the extent that such disclosure would result in the breach of any confidentiality obligations to which the Debtors are subject or |

if such disclosure would compromise attorney-client privilege or require the disclosure of attorney work product;

(iii) comply with the Approved Budget (subject to the Permitted Variances) and with provisions of this Term Sheet and the Interim Order and/or the Final Order (as applicable);

(iv) comply with the schedule of Case Milestones (as defined below);

(v) take, or cause to be taken, all reasonably appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable law, and to execute and deliver such documents and other papers, as may be required or reasonably requested by the DIP Agent to carry out the provisions of this Term Sheet, the Interim Order or the Final Order;

(vi) except to the extent contemplated by the Approved Budget or otherwise consented to by the DIP Agent in writing, continue, and cause to be continued, the business of the Debtors, maintain, and cause to be maintained, the Debtors' existence and material relationships, rights and privileges, and comply with all material contractual obligations;

(vii) take, or cause to be taken, all appropriate action to remain the sole owner of the DIP Collateral, free of liens other than the Prepetition Permitted Liens, liens granted or incurred after the Petition Date in the ordinary course of business or other liens granted or imposed pursuant to an order of the Bankruptcy Court that is in form and substance acceptable to the DIP Agent (collectively, "**Permitted Liens**");

(viii) take, or cause to be taken, all appropriate action to comply with all material applicable laws with respect to the DIP Collateral unless failure to comply could not reasonably be expected to result in a Material Adverse Change;

(ix) subject to the Approved Budget, pay when due all taxes prior to the date on which penalties attach, except where such tax is being contested in good faith and adequate reserves have been established in accordance with GAAP or to the extent payment and/or enforcement thereof is stayed as a result of the Chapter 11 Cases;

(x) after the same is available, provide copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Borrower or any other Debtor with the Bankruptcy Court in the Chapter 11 Cases (except to the extent such documents are available on the website maintained by the Debtors' claims and noticing agent and except to the extent such disclosure

|  | would result in the breach of any confidentiality obligations to which the Debtors are subject); |
|  | (xi) promptly provide such additional information concerning the Debtors, the Sale, or the DIP Collateral as the DIP Agent or any DIP Lender may reasonably request; |
|  | (xii) maintain its cash management system in a manner reasonably acceptable to the DIP Agent (which shall be deemed satisfied if the cash management system is substantially the same as the cash management system in existence on the Petition Date, with such modifications as permitted under the cash management order, as entered); |
|  | (xiii) cause the Debtors' senior management and legal and financial advisors to be available to conduct a telephonic conference at least once per calendar week, if reasonably requested by the DIP Lenders, to discuss the Approved Budget, the Approved Variance Report, the Chapter 11 Cases, the Sale, and the financial condition, performance and business affairs of the Debtors; provided that the Debtors shall not be required to provide confidential information concerning competing bids or bidders (including term sheets, letters of intent or other documents reflecting the terms of any such bid, whether preliminary, interim or final in form and content) in connection with the Sale; and |
|  | (xiv) provide the DIP Agent, its financial advisor and its counsel with written notice by no later than 11:00 AM ET one (1) business day (notice by email is sufficient, provided that such notice shall be deemed received upon the recipient's acknowledgment thereof) prior to any transfer of $100,000 or more on account of a prepetition critical vendor claim; *provided* that the Debtors shall be authorized to make such payment unless the DIP Agent has provided a written objection or request to postpone such payment (notice by email is sufficient) within such one (1) business day period. On each Testing Date, the Debtors shall also provide the DIP Agent, its financial advisor and its counsel with a report scheduling the payments made by the Debtors to their critical vendors during the previous calendar week. |
| **NEGATIVE COVENANTS:** | Unless otherwise provided in the Approved Budget, no Debtor shall, without the express, prior written consent of the DIP Agent and the Required DIP Lenders, do, cause to be done, or agree to do or cause to be done, any of the following: |
|  | (i) create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except Permitted Liens which, other than the Prepetition Permitted Liens or other liens that are permitted |

to be senior to the DIP Liens by the DIP Agent in its sole discretion, are junior to the liens securing the DIP Credit Facility, and shall not cause, or permit to be caused, any direct or indirect subsidiary of Borrower that is not a Debtor to, create, incur, assume or suffer to exist any such liens;

(ii)   other than the Sale, convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any of its property, business or assets, whether now owned or hereafter acquired, out of the ordinary course of business;

(iii)  amend, modify or compromise any term or amount owed under a real property lease or material contract without the consent of the DIP Agent (not to be unreasonably withheld, delayed or conditioned); *provided* that if the Borrower provides written notice of any proposed amendment, modification or compromise of a real property lease (a "**Lease Modification**") to the DIP Agent, including a summary of the material terms thereof or a copy of the relevant documentation therefor, and the DIP Agent has not objected, in writing, to such proposed Lease Modification within three (3) business days after receipt thereof, such proposed Lease Modification shall be deemed acceptable to and approved by the DIP Agent;

(iv)   incur or make any expenditure, Restricted Payment (as defined below), investment, loan or other payment, other than in accordance with the Approved Budget, subject to the Permitted Variances;

(v)    create, or acquire any ownership interest in, any subsidiaries (whether direct or indirect) other than those existing on the Petition Date; or

(vi)   engage in any activities that will result in any of the Debtors becoming an "investment company" as defined in, or subject to regulation under the Investment Company Act of 1940;

provided that notwithstanding the foregoing, the Debtors may make payments with respect to the Debtors' Insurance Premium Financing Agreement as in effect on the Petition Date in accordance with the Approved Budget.

As used in this Term Sheet, "**Restricted Payment**" means, with respect to any person (a) the declaration or payment of any dividend (whether in cash, securities or other property or assets) or distribution of cash or other property or assets in respect of equity interests of such person; (b) any payment (whether in cash, securities or other property or assets) on account of the purchase, redemption, defeasance, sinking fund or other retirement of the equity interests of such person or any other payment or distribution

| | |
|---|---|
| | (whether in cash, securities or other property or assets) made in respect thereof, either directly or indirectly; (c) any payment or prepayment of principal or premium, if any, or interest, fees or other charges on or with respect to, and any redemption, purchase, retirement, defeasance, sinking fund or similar payment and any claim for rescission with respect to any indebtedness; and (d) any payment made to redeem, purchase, repurchase or retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire equity interests of such person now or hereafter outstanding. |
| **CASE MILESTONES:** | Unless waived by the Required DIP Lenders (as defined below) in their sole discretion, the failure of the Debtors to meet the following milestones (each, a "**Case Milestone**") by the applicable specified deadlines set forth therefor (the "**Specified Deadline**") shall constitute an Event of Default:<br><br>(i)   no later than three (3) business days after the Petition Date, entry by the Bankruptcy Court of the Interim Order;<br><br>(ii)  no later than thirty (30) calendar days after the entry of the Interim Order, entry by the Bankruptcy Court of the Final Order;<br><br>(iii) no later than thirty (30) calendar days after the Petition Date, entry by the Bankruptcy Court of an order approving a motion establishing bidding procedures in respect of the Sale, which order shall be reasonably acceptable to the Required DIP Lenders ("**Bid Procedures**");<br><br>(iv)  no later than forty-five (45) calendar days after the Petition Date, submission of qualified bids in respect of the Sale;<br><br>(v)   no later than sixty (60) calendar days after the Petition Date, the conduct of a sale hearing;<br><br>(vi)  no later than sixty-five (65) calendar days after the Petition Date, entry by the Bankruptcy Court of a sale order, which order shall be reasonably acceptable to the Required DIP Lenders (the "**Sale Order**"); and<br><br>(vii) no later than eighty-five (85) calendar days after the Petition Date, consummation a Sale approved by the Bankruptcy Court. |
| **EVENTS OF DEFAULT:** | Each of following shall constitute an "**Event of Default**":<br><br>(i)   the entry of an Interim Order or Final Order in form or substance that is not acceptable to the DIP Agent in its sole discretion; |

(ii) failure by any Debtor to be in compliance in all respects with provisions of this Term Sheet, the DIP Orders and/or the Final Order (as applicable);

(iii) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court, without the prior written consent of the DIP Agent and each DIP Lender;

(iv) failure of any of the Case Milestones to be satisfied by the Specified Deadline (as such Specified Deadlines may be modified to accommodate the calendar of the Bankruptcy Court);

(v) failure of any representation or warranty to be true and correct in all material respects (or, to the extent qualified by materiality or Material Adverse Change, in all respects) when made;

(vi) the filing of any application by the Debtors (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations in full upon entry of the order approving such financing) for the approval of (or an order is entered by the Court approving) any claim arising under Section 507(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any security, mortgage, collateral interest or other lien in any of the Chapter 11 Cases which is pari passu with or senior to the DIP Liens, excluding liens arising under the DIP Orders, or pursuant to any other financing agreement made with the prior written consent of the DIP Agent and each DIP Lender;

(vii) the commencement of any action by the Debtors or other authorized person (other than an action permitted by the DIP Orders) against any of the DIP Agent or any DIP Lender or any of their agents and employees, to subordinate or avoid any liens made in connection with the DIP Orders;

(viii) (1) any Debtor files a pleading in any court seeking or supporting an order to revoke, reverse, stay, vacate, amend, supplement or otherwise modify any DIP Order or the Term Sheet, or the disallow the DIP Obligations, in whole or in part, or (2) any material provision of the DIP Orders or Term Sheet, or any other order of the Bankruptcy Court approving the Debtors' use of Cash Collateral (as defined in the DIP Orders), shall for any reason cease to be valid and binding (without the prior written consent of the DIP Agent and each DIP Lender);

(ix) the filing with the Bankruptcy Court of a motion seeking approval of a sale under Section 363 (other than approval of a sale pursuant to the terms of the Stalking Horse Agreement) or

|  | a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash to the DIP Agent and the DIP Lenders of DIP Loans and all other amounts outstanding under this Term Sheet, the DIP Orders on closing of such sale or the effective date of such plan; |
|---|---|
|  | (x)  the appointment in any of the Chapter 11 Cases of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); |
|  | (xi)  the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Cases with respect to any portion of the DIP Collateral exceeding $150,000 in value in the aggregate; |
|  | (xii) since the Petition Date, the occurrence of any Material Adverse Change; and |
|  | (xiii) failure to pay principal, interest or other DIP Obligations in full when due, including without limitation, on the Maturity Date. |
| **REMEDIES UPON EVENT OF DEFAULT:** | Upon the occurrence and during the continuance of any Event of Default, subject to five (5) business days' notice to the Debtors during which the Debtors may seek an emergency hearing before the Bankruptcy Court (at which hearing the sole issue shall be whether or not an Event of Default has occurred or is continuing), the DIP Agent may (and at the direction of the DIP Lenders, shall) take all or any of the following actions without further order of or application to the Bankruptcy Court, and notwithstanding the automatic stay: |
|  | (a)  declare all DIP Obligations (including principal of, and accrued interest on, any outstanding DIP Loans) to be immediately due and payable; |
|  | (b)  terminate any further commitment to lend to the Borrower; and/or |
|  | (c)  exercise rights and remedies pursuant to the terms of the DIP Orders, or applicable law (including, without limitation, direct any or all of the Debtors (or file a motion in the name of the Debtors)), (i) to enforce the terms and provisions of this Term Sheet, (ii) to collect accounts receivable, without setoff by any account debtor, including direct the Debtors to collect such account receivables, (iii) to sell or otherwise dispose of any all of the DIP Collateral on terms and conditions reasonably acceptable to the DIP Agent and the DIP Lenders pursuant to |

| | |
|---|---|
| | Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and without limiting the foregoing, direct the Debtors (or file a motion in the name of the Debtors) to assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code) and (iv) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, complete any work in process); *provided* that the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Agent in the DIP Agent's exercise of its rights and remedies and facilitate the realization upon the DIP Collateral by the DIP Agent. |
| **OTHER BANKRUPTCY MATTERS:** | All out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders relating to the DIP Credit Facility and the Chapter 11 Cases (including, without limitation, prepetition and post-petition reasonable and documented fees and disbursements of counsel and advisors) shall be payable by Borrower promptly upon written demand and without the requirement for Bankruptcy Court approval.  A copy of the summary invoice shall be provided by the Debtors to the Office of the U.S. Trustee, counsel to the Prepetition First Lien Secured Parties and counsel for any statutory committee. |
| | Borrower shall indemnify, pay and hold harmless the DIP Agent and each DIP Lender (and each of their respective directors, officers, members, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| | The DIP Orders shall contain releases and exculpations for the DIP Agent and each DIP Lender (in any capacity) and the Prepetition First Lien Secured Parties, in form and substance satisfactory to such party, respectively, including, without limitation, releases from any avoidance actions. |
| | The DIP Lenders shall have the unconditional right to credit bid the outstanding DIP Obligations (and any other applicable obligations) in connection with the Sale or any other non-ordinary course sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale   The Prepetition First Lien Agent at the direction of the Prepetition First Lien Lenders under the Prepetition First Lien Credit Agreement shall have the unconditional right to credit bid the Prepetition First Lien Obligations in connection with the Sale or any other non-ordinary course sale of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code, any plan or otherwise, including any deposit in connection with such sale. |

| | |
|---|---|
| **DIP ORDERS GOVERN:** | To the extent of any conflict or inconsistency between this Term Sheet and the DIP Orders, the DIP Orders shall govern. |
| **AMENDMENT AND WAIVER:** | No provision of this Term Sheet or the DIP Orders may be amended other than by an instrument in writing signed by the DIP Agent, the DIP Lenders holding, in the aggregate, a majority in principal amount of the outstanding DIP Loans and unfunded DIP Commitments (the "**Required DIP Lenders**") and Debtors. |
| **ASSIGNMENTS:** | The DIP Lenders may assign all or any part of the DIP Loans or the DIP Commitments from time to time without the prior written consent of the Borrower or the DIP Agent.  The parties to each assignment shall execute and deliver to the DIP Agent an assignment agreement in substantially the form of Exhibit E attached hereto (an "**Assignment Agreement**").  Subject to receipt and recording thereof by the DIP Agent, from and after the date specified in the applicable Assignment Agreement, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a DIP Lender hereunder, and the assigning DIP Lender thereunder shall, to the extent of the interest assigned under such Assignment Agreement, be released from its obligations hereunder. |
| **GOVERNING LAW AND JURISDICTION:** | The laws of the State of New York (except as governed by the Bankruptcy Code) shall govern this Term Sheet.<br><br>Debtors shall submit to the exclusive jurisdiction of the Bankruptcy Court and shall waive any right to trial by jury. |
| **COUNTERPARTS AND ELECTRONIC TRANSMISSION:** | This Term Sheet may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which when so executed and delivered, shall be deemed an original, and all of which, when taken together, shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Term Sheet by facsimile, "PDF" or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Term Sheet. |
| **CONSENT OF PREPETITION FIRST LIEN SECURED PARTIES:** | Each of the Prepetition First Lien Secured Parties (including on behalf of each of its respective successors and assigns), subject to the terms and conditions set forth in this Term Sheet consents to (a) the use of cash collateral, subject to the terms hereof, the Interim Order and the Final Order, as applicable, (b) the DIP Credit Facility, including the DIP Liens, as described in this Term Sheet and in the Interim Order and the Final Order, as applicable, (c) the 363 Sale Process, including the designation of the Stalking Horse Purchaser and the Bid Procedures and (d) the Approved Budget. |

| PATRIOT ACT: | The DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub. L. 107-57 (signed into law October 26, 2001)) (the "**Act**"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the DIP Lenders to identify the Borrower in accordance with the Act. |
| **COUNSEL TO DIP AGENT AND DIP LENDERS:** | Proskauer Rose LLP and Tavenner & Beran, PLC |

[*Remainder of page intentionally left blank*]

**THE DIP AGENT**:

**MIDCAP FINANCIAL TRUST**,
a Delaware statutory trust, as the DIP Agent

By: Apollo Capital Management, L.P.,
    its investment manager

By: Apollo Capital Management GP, LLC,
    its general partner

By: _____
    Name:  Maurice Amsellem
    Title:   Authorized Signatory


**DIP LENDERS**:

**MIDCAP FINANCIAL TRUST**,
a Delaware statutory trust, as a DIP Lender

By: Apollo Capital Management, L.P.,
    its investment manager

By: Apollo Capital Management GP, LLC,
    its general partner

By: _____
    Name:  Maurice Amsellem
    Title:   Authorized Signatory


[Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Facility Term Sheet]

**DIP LENDERS (CONTINUED)**:

**APOLLO INVESTMENT CORPORATION**,
as a DIP Lender

By:  Apollo Investment Management, L.P.,
     its investment adviser

By:  ACC Management, LLC,
     its general partner

By:  _____
     Name:  Joseph D. Glatt
     Title:   Vice President

**DIP LENDERS (CONTINUED)**:

**APOLLO HELIUS MULTI-CREDIT FUND I APOLLO CREDIT FUNDS ICAV**, an umbrella Irish Collective Asset-Management Vehicle with Segregated Liability between its Sub-Funds, acting in respect of its Sub-Fund, Apollo Helius Multi-Credit Fund I, as a DIP Lender

By:  ACF Europe Management, LLC,
      its portfolio manager

By:  Apollo Capital Management, L.P.,
      its sole member

By:  Apollo Capital Management GP, LLC,
      its general partner

By: _____
      Name:  Joseph D. Glatt
      Title:   Vice President

**<u>DEBTORS</u>**:

**PAPER SOURCE, INC.**, an Illinois corporation

By: _____

Name: Ron Kruczynski
Title:   Secretary, Treasurer and Chief Financial Officer


**PINE HOLDINGS, INC.**, a Delaware corporation

By: _____

Name: Ron Kruczynski
Title:   Secretary, Treasurer and Chief Financial Officer

[Signature Page to Senior Secured Super-Priority Debtor-in-Possession Credit Facility Term Sheet]

## EXHIBIT A TO TERM SHEET

## DIP LENDERS

| DIP Lender | DIP Commitment |
|---|---|
| MidCap Financial Trust | $10,816,203.24 |
| Apollo Investment Corporation | $3,287,671.24 |
| Apollo Helius Multi-Credit Fund I Apollo Credit Funds ICAV | $1,896,125.52 |
| **Total** | **$16,000,000.00** |

## EXHIBIT B TO TERM SHEET

## GUARANTY

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit B is attached.

1.    Guaranty.

(a)    The Guarantor hereby unconditionally and irrevocably, as a primary obligor and not only a surety, guarantees to the DIP Agent and each DIP Lender, the prompt and complete payment and performance by the Borrower when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (monetary (including post-petition interest, allowed or not) or otherwise) of the Borrower under the DIP Credit Facility all in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. The guarantee contained in this Exhibit B is a primary and original obligation of the Guarantor, is not merely the creation of a surety relationship, and is an absolute, unconditional, and continuing guaranty of payment and performance which will remain in full force and effect without respect to future changes in conditions.

(b)    Notwithstanding any provision of the DIP Credit Facility to the contrary, the maximum liability of the Guarantor under the DIP Credit Facility will in no event exceed the amount that can be guaranteed by the Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established herein).

(c)    The Guarantor agrees that the DIP Obligations may at any time and from time to time exceed the amount of the liability of the Guarantor under the DIP Credit Facility without impairing the guaranty contained in this Exhibit B or affecting the rights and remedies of the DIP Agent and each DIP Lender under the DIP Credit Facility.

(d)    The guaranty contained in this Exhibit B will remain in full force and effect until irrevocable payment in full of the DIP Obligations.

(e)    No payment made by the Borrower, any other guarantor, or any other person or received or collected by the DIP Agent or any DIP Lender from the Borrower, any other guarantor, or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the DIP Obligations will be deemed to modify, reduce, release, or otherwise affect the liability of the Guarantor under the DIP Credit Facility, which the Guarantor will, notwithstanding any such payment (other than any payment made by the Guarantor in respect of the DIP Obligations or any payment received or collected from the Guarantor in respect of the DIP Obligations), remain liable for the DIP Obligations up to the maximum liability of the Guarantor under the DIP Credit Facility until payment in full in cash of the DIP Obligations.

2.    No Subrogation. Notwithstanding any payment made by the Guarantor under this Agreement or any set-off or application of funds of the Guarantor by the DIP Lender, the Guarantor is not and will not be entitled to be subrogated to any of the rights of the DIP Lender against the Borrower or any collateral security or guaranty or right of offset held by the DIP Lender for the payment of the DIP Obligations, and the Guarantor may not seek and is not and will not be entitled to seek any contribution or reimbursement from the Borrower in respect of payments made by the Guarantor under the DIP Credit Facility until payment in full in cash of the DIP Obligations. If any amount is paid to the Guarantor on account of those subrogation rights at any time before payment in full in cash of the DIP Obligations, then

the Guarantor shall hold that amount in trust for the DIP Agent, for the benefit of the DIP Lenders,, segregated from other funds of the Guarantor, and shall, promptly upon receipt by the Guarantor, turn that amount over to the DIP Agent in the exact form received by the Guarantor (duly endorsed by the Guarantor to the DIP Agent, if required), to be applied against the DIP Obligations, whether matured or unmatured, in such order as the DIP Agent determines, unless otherwise specified in the DIP Credit Facility.

      3.    <u>Amendments, etc.</u>

      (a)    The Guarantor will remain obligated under the DIP Credit Facility notwithstanding that, without any reservation of rights against the Guarantor and without notice to or further assent by the Guarantor, (i) any demand for payment of any of the DIP Obligations made by the DIP Agent or any DIP Lender may be rescinded by the DIP Agent or such DIP Lender and any of the DIP Obligations may be continued; (ii) the DIP Obligations, or the liability of any other person upon or for any part thereof, or any collateral security or guaranty therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered, or released by the DIP Agent or the DIP Lenders; and (iii) the DIP Credit Facility and any other documents executed and delivered in connection therewith may be amended, modified, supplemented, or terminated, in whole or in part, as the DIP Agent and the DIP Lenders may deem advisable from time to time in accordance with the DIP Credit Facility. The DIP Agent and the DIP Lenders do not and will not have any obligation to protect, secure, perfect, or insure any lien at any time held by it as security for the DIP Obligations or for this guaranty or any property subject thereto.

      (b)    The DIP Agent and each DIP Lender may, from time to time, each in its respective sole discretion and without notice to the Guarantor, take any or all of the following actions: (i) retain or obtain a security interest in any property to secure any of the DIP Obligations or any obligation under the DIP Credit Facility; (ii) retain or obtain the primary or secondary obligation of any obligor or obligors, in addition to the undersigned, with respect to any of the DIP Obligations; (iii) extend or renew any of the DIP Obligations for one or more periods (whether or not longer than the original period), alter or exchange any of the DIP Obligations, or release or compromise any obligation of the Guarantor under the DIP Credit Facility or any obligation of any nature of any other obligor with respect to any of the DIP Obligations; (iv) release any guaranty or right of offset or its security interest in, or surrender, release, or permit any substitution or exchange for, all or any part of any property securing any of the DIP Obligations or any obligation under the DIP Credit Facility, or extend or renew for one or more periods (whether or not longer than the original period) or release, compromise, alter, or exchange any obligations of any nature of any obligor with respect to any such property; and (v) resort to the Guarantor for payment of any of the DIP Obligations when due, whether or not the DIP Agent or any DIP Lender has resorted to any property securing any of the DIP Obligations or any obligation under the Term Sheet or have proceeded against any other obligor primarily or secondarily obligated with respect to any of the DIP Obligations.

      4.    <u>Waivers.</u>

      (a)    The Guarantor waives, until the DIP Obligations are payment in full in cash, to the furthest extent permitted by applicable law, any and all notice of the creation, renewal, extension, or accrual of any of the DIP Obligations and notice of or proof of reliance by the DIP Agent and the DIP Lenders upon the guaranty contained in this <u>Exhibit B</u> or acceptance of the guaranty contained in this <u>Exhibit B</u>. The DIP Obligations, and any of them, will conclusively be deemed to have been created, contracted, or incurred, or renewed, extended, amended, or waived, in reliance upon the guaranty contained in this <u>Exhibit B</u>, and all dealings between the Borrower and the Guarantor, on the one hand, and the DIP Agent and each DIP Lender, on the other hand, likewise will be conclusively presumed to have been had or consummated in reliance upon the guaranty contained in this guaranty. To the furthest extent permitted by applicable law, the Guarantor waives, until the DIP Obligations are payment in full in cash, to the furthest extent

permitted by applicable law, (i) diligence, presentment, protest, demand for payment, and notice of default, dishonor, or nonpayment and all other notices whatsoever to or upon the Borrower or the Guarantor with respect to the DIP Obligations; (ii) notice of the existence or creation or non-payment of all or any of the DIP Obligations; and (iii) all diligence in collection or protection of or realization upon any DIP Obligations or any security for or guaranty of any DIP Obligations.  Without limiting the generality of any other waiver or other provision set forth in the guaranty contained in this Exhibit B, the Guarantor waives all rights and defenses that such Guarantor may have if all or part of the DIP Obligations are secured by real property to the furthest extent permitted by applicable law.

(b)    The waivers set forth in this guaranty mean, among other things:

(i)    that the DIP Agent and the DIP Lenders may collect from the Guarantor without first foreclosing on any real or personal property collateral that may be pledged by the Guarantor, Borrower, or any other guarantor;

(ii)    that if the DIP Agent or any DIP Lender forecloses on any real property collateral that may be pledged by the Guarantor, the Borrower, or any other guarantor:

(A)    the amount of the DIP Obligations or any obligations of any guarantor in respect thereof may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and

(B)    the DIP Agent and the DIP Lenders may collect from the Guarantor even if the DIP Agent or the DIP Lenders, by foreclosing on the real property collateral, has destroyed any right the Guarantor may have to collect from the Borrower or any other guarantor.

(c)    Each waiver set forth in this guaranty is an unconditional and irrevocable waiver of any rights and defenses the Guarantor may have if all or part of the DIP Obligations are secured by real property to the furthest extent permitted under applicable law.

(d)    Without limiting the generality of any other waiver or other provision set forth in this guaranty, to the maximum extent permitted by applicable law, the Guarantor waives all rights and defenses arising out of an election of remedies by the DIP Agent and the DIP Lenders, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for the DIP Obligations, has destroyed the Guarantor's rights of subrogation and reimbursement against the Borrower by the operation of applicable law.

5.    Payments. The Guarantor hereby guarantees that payments under the DIP Credit Facility will be paid to the DIP Agent and the DIP Lenders without set-off or counterclaim in United States dollars.

*[Remainder of page intentionally left blank]*

**EXHIBIT C TO TERM SHEET**

**FORM OF NOTICE OF BORROWING**

**Date: _____**

THIS NOTICE OF BORROWING (this "**Notice**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among PAPER SOURCE, INC., an Illinois corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Eastern District of Virginia pursuant to chapter 11 of title 11 of the United States Code on March 2, 2021.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Notice conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as [the chief executive officer, president or chief financial officer] of Borrower, hereby certifies to the DIP Agent and the DIP Lenders, on behalf of Borrower, and not in any individual capacity, that he/she is authorized to execute this Notice and hereby gives notice to the DIP Agent and the DIP Lenders of Borrower's request to borrow DIP Loan in the amount of $_____ on _____.

The undersigned hereby requests that such funds be disbursed to the following account:

      Name of Bank: Fifth Third Bank
      ACH Routing Number: 071923909
      Account No.: 2090001279
      Wire Transfer ABA: 042000314
      Fifth Third SWIFT: FTBCUS3C

The undersigned hereby certifies that, both before and after giving effect to the request above, each of the ["Conditions Precedent to the Interim DIP Loan"] ["Conditions Precedent to Final DIP Loan"] set forth in the Term Sheet has been satisfied (or waived in writing by the DIP Agent and each DIP Lender, each in its sole and absolute discretion).

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Notice as of the date first set forth above.

**<u>BORROWER</u>**:

**PAPER SOURCE, INC.**

By: _____
Name:
Title:

### EXHIBIT D TO TERM SHEET

### FORM OF CLOSING CERTIFICATE

### PAPER SOURCE, INC.

**Date:** _____

THIS CLOSING CERTIFICATE (this "**Certificate**") is delivered in accordance with the terms of that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among PAPER SOURCE, INC., an Illinois corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Eastern District of Virginia pursuant to chapter 11 of title 11 of the United States Code on March 2, 2021.  Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet.  To the extent the provisions set forth in this Certificate conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

The undersigned, as the [chief executive officer, president or chief financial officer] of each Debtor, hereby certifies to the DIP Agent and each DIP Lender, on behalf of such Debtor, and not in any individual capacity, that (i) he/she is authorized to execute this Certificate and (ii) as of the date hereof, each of the conditions precedent set forth below and in the Term Sheet has been satisfied (or waived in writing by the DIP Agent and each DIP Lender in its sole and absolute discretion):

[Conditions Precedent to the Interim DIP Loan][1]

1.      Debtors have timely delivered to the DIP Agent the weekly budget for the 13-week period commencing on the Petition Date or any update thereto required to be delivered in accordance with the Term Sheet.

2.      Debtors have delivered to the DIP Agent a Notice of Borrowing no later than 11:00 AM ET one (1) business day prior to the requested funding date for the Interim DIP Loan (or such later time as the DIP Agent may agree to in its sole discretion).

3.      The Interim Order has been entered by the Bankruptcy Court (after a hearing on notice to all parties having or asserting a lien on all or any portion of the DIP Collateral) and has not been reversed, modified, amended, stayed or vacated, or in the case of any modification or

---

[1] The following list should be included in the Closing Certificate delivered for the Interim DIP Loan.

amendment, in a manner without the consent of the DIP Agent and each DIP Lender and the Debtors are in compliance in all respects with the Interim Order.

4.      All of the "first day" motions, orders and related pleadings have been provided to the DIP Agent.

5.      All fees and out-of-pocket expenses of the DIP Agent and each DIP Lender relating to the DIP Credit Facility (including, without limitation, reasonable fees and expenses of their counsel and external advisors) have been paid in full (or will be paid in connection with such Interim DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

6.      Debtors have insurance (including, without limitation, commercial general liability and property insurance) with respect to the DIP Collateral in such amounts and scope as is disclosed to the DIP Agent.

7.      No Default or Event of Default has occurred and is continuing on the Interim Closing Date, or after giving effect to the Interim DIP Loan.

8.      All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects).

9.      Subject to Bankruptcy Court approval, (i) each Debtor has the corporate power and authority to make, deliver and perform its obligations under the Term Sheet and the Interim Order, and (ii) no consent or authorization of, or filing with, any person (including, without limitation, any governmental authority) is required in connection with the execution, delivery or performance by each Debtor, or for the validity or enforceability in accordance with its terms against such Debtor, of the Term Sheet and the Interim Order except for consents, authorizations and filings which have been obtained or made and are in full force and effect and except for such consents, authorizations and filings, the failure to obtain or perform, could not reasonably be expected to cause a Material Adverse Change.

10.     The DIP Agent has received a copy of the fully-executed Stalking Horse Agreement.

[Conditions Precedent to Final DIP Loan][2]

1.      Debtors have delivered to the DIP Agent a Notice of Borrowing no later than 11:00 AM ET three (3) business days prior to the requested funding date for such Final DIP Loan (or such later time as the DIP Agent may agree to in its sole discretion).

---

[2] The following list should be included in the Closing Certificate delivered for the Final DIP Loan.

2.     All representations and warranties of the Debtors set forth in the Term Sheet are true and correct in all material respects (except those qualified by materiality or Material Adverse Change, which shall be true and correct in all respects).

3.     Debtors have delivered to the DIP Agent additional insured and loss payee endorsements, as applicable, with respect to the Debtors' commercial general liability and property insurance policies.

4.     No Default or Event of Default has occurred and is continuing on the Final Closing Date, or after giving effect to the Final DIP Loan.

5.     Prior to or substantially concurrently with the making of such Final DIP Loan, all fees and expenses, including reasonable attorney's fees of the DIP Agent and each DIP Lender, have been paid in full (or will be paid in connection with such Final DIP Loan draw) to the extent an invoice has been delivered to the Borrower at least 24 hours in advance.

6.     The Final Order approving the DIP Credit Facility has been entered, which final order has not been reversed, modified, amended, stayed or vacated or in the case of any modification or amendment, in a manner without the consent of the DIP Agent and each DIP Lender and the Debtors are in compliance in all respects with the Final Order.

*[Signature page follows]*

IN WITNESS WHEREOF, each of the undersigned has duly executed and delivered this Certificate as of the date first set forth above.

<u>**DEBTORS**</u>:

**PAPER SOURCE, INC.**, an Illinois corporation

By: _____
Name:
Title:

**PINE HOLDINGS, INC.**, a Delaware corporation

By: _____
Name:
Title:

## EXHIBIT E TO TERM SHEET

## FORM OF ASSIGNMENT AGREEMENT

THIS ASSIGNMENT AGREEMENT (this "**Assignment Agreement**") is entered into as of [_____ __], 20[__] by and between the Assignor named on the signature page hereto ("**Assignor**") and the Assignee named on the signature page hereto ("**Assignee**"). Reference is made to that certain Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among PAPER SOURCE, INC., an Illinois corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Eastern District of Virginia pursuant to chapter 11 of title 11 of the United States Code on March 2, 2021. Capitalized terms used herein without definition shall have the meanings set forth in the Term Sheet. To the extent the provisions set forth in this Assignment Agreement conflict with any provisions in the Term Sheet, the Term Sheet shall govern.

Assignor and Assignee hereby agree as follows:

1.      Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor the interests set forth on the schedule attached hereto (the "**Schedule**"), in and to Assignor's rights and obligations under the Term Sheet as of the effective date set forth on the Schedule (the "**Effective Date**"). Such purchase and sale is made without recourse, representation or warranty except as expressly set forth herein. On the Effective Date, Assignee shall pay to Assignor an amount equal to the aggregate amounts assigned pursuant to the Schedule (exclusive of unfunded portions of the DIP Commitment, as applicable).

2.      Assignor (i) represents that as of the Effective Date, it is the legal and beneficial owner of the interests assigned hereunder and such interest is free and clear of any adverse claim or lien; (ii) makes no other representation or warranty and assumes no responsibility with respect to any statement, warranties or representations made in or in connection with the Term Sheet or the execution, legality, validity, enforceability, genuineness, sufficiency or value of any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Debtors or the performance or observance by the Debtors of any of their respective obligations under the Term Sheet or any other instrument or document furnished pursuant thereto.

3.      Assignee (i) confirms that it has received a copy of the Term Sheet, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (ii) agrees that it will, independently and without reliance upon the DIP Agent, Assignor or any other DIP Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Term Sheet; (iii) irrevocably appoints and authorizes the DIP Agent to take such action as the DIP Agent on its behalf and to exercise such powers under the Term Sheet as are delegated the DIP Agent by the terms thereof, together with such powers as are reasonably incidental thereto; (iv) agrees that it will be bound by the Term Sheet and perform in accordance with their terms all obligations which by the terms of the Term Sheet are required to be performed by it as a DIP Lender; and (v) represents and warrants that it has experience and expertise in the making or the purchasing of loans such as the DIP Loans, and that it has acquired the interests described herein for its own account and without any present intention of selling all or any portion of such interests.

4.      Each of Assignor and Assignee represents and warrants to the other party hereto that it has full power and authority to enter into this Assignment Agreement and to perform its obligations hereunder in accordance with the provisions hereof, that this Assignment Agreement has been duly authorized, executed and delivered by such party and that this Assignment Agreement constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity.

5.      Upon the effectiveness of this Assignment Agreement pursuant to <u>Section 6</u> below, (i) Assignee shall be a party to the Term Sheet and, to the extent provided in this Assignment Agreement, have the rights and obligations of a DIP Lender thereunder, (ii) Assignor shall, to the extent provided in this Assignment Agreement, relinquish its rights and be released from its obligations under the Term Sheet and (iii) the DIP Agent shall thereafter make all payments in respect of the interest assigned hereby (including payments of principal, interest, fees and other amounts) to Assignee.  Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date by the DIP Agent or with respect to the making of this assignment directly between themselves.

6.      This Assignment Agreement shall become effective as of the Effective Date upon the satisfaction of each of the following conditions:  (i) the execution of a counterpart hereof by each of Assignor and Assignee, (ii) to the extent requested by the DIP Agent in its reasonable discretion, the receipt by the DIP Agent of such forms, certificates or documents prescribed by the applicable tax-related governmental authority as applicable in connection with this Assignment Agreement, properly completed and executed by Assignee, and (iii) the receipt by the DIP Agent of originals or telecopies of the counterparts described above.

7.      Each of Assignor and Assignee hereby agrees from time to time, upon request of the other such party hereto, to take such additional actions and to execute and deliver such additional documents and instruments as such other party may reasonably request to effect the transactions contemplated by, and to carry out the intent of, this Assignment Agreement.

8.      Neither this Assignment Agreement nor any term hereof may be changed, waived, discharged or terminated, except by an instrument in writing signed by the party (including, if applicable, any party required to evidence its consent to or acceptance of this Assignment Agreement) against whom enforcement of such change, waiver, discharge or termination is sought.

9.      In case any provision in or obligation under this Assignment Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

10.     THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

11.     This Assignment Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

12.     This Assignment Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto were upon the same agreement.

13.     Delivery of an executed signature page of this Assignment Agreement by facsimile transmission or electronic transmission shall be as effective as delivery of a manually executed counterpart hereof or thereof.

[*Signature page follows*]

       The parties hereto have caused this Assignment Agreement to be executed and delivered as of the date first written above.

**[NAME OF ASSIGNOR]**,
as Assignor


By:   _____
Name: _____
Title:  _____

**[NAME OF ASSIGNEE]**,
as Assignee


By:   _____
Name: _____
Title:  _____

[Signature Page to Assignment Agreement]

<u>**SCHEDULE**</u>

**TO**

**ASSIGNMENT AGREEMENT**

**Assignor:**      _____

**Assignee:**      _____

**Effective Date:**      _____

        Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, including all schedules, annexes and exhibits hereto, the "**Term Sheet**"), by and among PAPER SOURCE, INC., an Illinois corporation (the "**Borrower**"), the other Debtors (as defined below) party thereto, the DIP Lenders (as defined therein), the DIP Agent (as defined therein) and the other parties party thereto, in connection with cases to be filed by Borrower and the Guarantor (as defined therein) (collectively, the "**Debtors**") in the United States Bankruptcy Court for the Eastern District of Virginia pursuant to chapter 11 of title 11 of the United States Code on March 2, 2021.

**Interests Assigned:**

| DIP Commitment / DIP Loan | DIP Loan | DIP Loan |
|---|---|---|
| Assignor Amounts | $_____ | $_____ |
| Amounts Assigned | $_____ | $_____ |
| Assignor Amounts (post-assignment) | $_____ | $_____ |

Closing Fee:      $_____

**Assignee Information:**

Address for Notices:

_____

_____

Attention: _____

Telephone: _____

Facsimile: _____

## EXHIBIT F TO TERM SHEET

## DIP AGENT

Capitalized terms used herein without definition having the meaning set forth in the Senior Secured Superpriority Debtor-in-Possession Credit Facility Term Sheet to which this Exhibit F is attached.

1.    <u>Appointment and Authorization</u>. Each DIP Lender hereby irrevocably authorizes DIP Agent to take such actions as DIP Agent on its behalf and to exercise such powers under the Term Sheet as are delegated to DIP Agent by the terms thereof, together with all such powers as are reasonably incidental thereto.  The provisions of this Exhibit F are solely for the benefit of DIP Agent and the DIP Lenders and neither the Borrower nor any other Debtor shall have any rights as a third party beneficiary of any of the provisions hereof.  In performing its functions and duties under the Term Sheet, DIP Agent shall act solely as agent of DIP Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower or any other Debtor.  DIP Agent may perform any of its duties under the Term Sheet, by or through its agents, servicers, trustees, investment managers or employees.  DIP Agent shall have the same rights and powers under the Term Sheet as any other DIP Lender and may exercise or refrain from exercising the same as though it were not DIP Agent. DIP Agent may exercise remedies set forth in the DIP Term Sheet on behalf of the DIP Lenders.

2.    <u>Action by DIP Agent</u>. The duties of DIP Agent shall be mechanical and administrative in nature.  DIP Agent shall not have by reason of the Term Sheet a fiduciary relationship in respect of any DIP Lender.  Nothing in the Term Sheet or this Exhibit F is intended to or shall be construed to impose upon DIP Agent any obligations in respect of Term Sheet or this Exhibit F except as expressly set forth therein or herein.  DIP Agent may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken by it in good faith in accordance with the advice of such counsel, accountants or experts.

3.    <u>Liability of DIP Agent</u>.  Neither DIP Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be liable to any DIP Lender for any action taken or not taken by it in connection with the Term Sheet, except that DIP Agent shall be liable with respect to its specific duties set forth hereunder, but only to the extent of its own gross negligence or willful misconduct in the discharge thereof as determined by a final non-appealable judgment of a court of competent jurisdiction.  Neither DIP Agent nor any of its directors, officers, agents, trustees, investment managers, servicers or employees shall be responsible for or have any duty to ascertain, inquire into or verify (i) any statement, warranty or representation made in connection with the Term Sheet or any borrowing thereunder; (ii) the performance or observance of any of the covenants or agreements specified in the Term Sheet; (iii) the satisfaction of any condition specified in the Term Sheet, except receipt of items required to be delivered to DIP Agent; (iv) the validity, effectiveness, sufficiency or genuineness of the Term Sheet, any lien purported to be created or perfected thereby or under any DIP Order or any other instrument or writing furnished in connection therewith; (v) the existence or non-existence of any Event of Default; or (vi) the financial condition of any Debtor.  DIP Agent shall not incur any liability by acting in reliance upon any notice, consent, certificate, statement, or other writing (which may be a bank wire, telex, facsimile or electronic transmission or similar writing) believed by it to be genuine or to be signed by the proper party or parties.  DIP Agent shall not be liable for any apportionment or distribution of payments made by it in good faith and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any DIP Lender to whom payment was due but not made, shall be to recover from other DIP Lenders any payment in excess of the amount to which they are determined to

be entitled (and such other DIP Lenders hereby agree to return to such DIP Lender any such erroneous payments received by them).

4.    <u>Indemnification</u>.  Each DIP Lender shall, in accordance with its pro rata share of the DIP Loans and the undrawn DIP Commitments, indemnify DIP Agent (to the extent not reimbursed by the Debtors) upon demand against any cost, expense (including counsel fees and disbursements), claim, demand, action, loss or liability (except such as result from DIP Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) that DIP Agent may suffer or incur in connection with the Financing Documents or any action taken or omitted by DIP Agent hereunder or thereunder.  If any indemnity furnished to DIP Agent for any purpose shall, in the opinion of DIP Agent, be insufficient or become impaired, DIP Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against even if so directed by Required DIP Lenders until such additional indemnity is furnished.  The obligations of DIP Lenders under this Section 4 shall survive the payment in full of the DIP Obligations and the termination of this Agreement.

5.    <u>Right to Request and Act on Instructions</u>.  DIP Agent may at any time request instructions from DIP Lenders with respect to any actions or approvals which by the terms of the Term Sheet DIP Agent is permitted or desires to take or to grant, and if such instructions are promptly requested, DIP Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval and shall not be under any liability whatsoever to any person for refraining from any action or withholding any approval under any of the Financing Documents until it shall have received such instructions from Required DIP Lenders or all or such other portion of DIP Lenders as shall be prescribed by the Term Sheet.  Without limiting the foregoing, no DIP Lender shall have any right of action whatsoever against DIP Agent as a result of DIP Agent acting or refraining from acting the Term Sheet in accordance with the instructions of Required DIP Lenders (or all or such other portion of DIP Lenders as shall be prescribed by the Term Sheet) and, notwithstanding the instructions of Required DIP Lenders (or such other applicable portion of DIP Lenders), DIP Agent shall have no obligation to take any action if it believes, in good faith, that such action would violate applicable law or exposes DIP Agent to any liability for which it has not received satisfactory indemnification in accordance with the provisions of Section 4 above.

6.    <u>Credit Decision</u>.  Each DIP Lender acknowledges that it has, independently and without reliance upon DIP Agent or any other DIP Lender, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into the Term Sheet.  Each DIP Lender also acknowledges that it will, independently and without reliance upon DIP Agent or any other DIP Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking any action under the Term Sheet.

7.    <u>Notice of Default</u>.  DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default except with respect to defaults in the payment of principal, interest and fees required to be paid to DIP Agent for the account of DIP Lenders, unless DIP Agent shall have received written notice from a DIP Lender or the Borrower referring to the Term Sheet, describing such Event of Default and stating that such notice is a "notice of default".  DIP Agent will notify each DIP Lender of its receipt of any such notice.  DIP Agent shall take such action with respect to such Event of Default as may be requested by Required DIP Lenders in accordance with the terms hereof.  Unless and until DIP Agent has received any such request, DIP Agent may (but shall not be obligated to) take such action, or refrain

from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interests of DIP Lenders.

8.    <u>Successor DIP Agent</u>.

(a)    DIP Agent may at any time assign its rights, powers, privileges and duties hereunder to an affiliate without the consent of the DIP Lenders or any Borrower. Within five (5) business days after any such assignment, DIP Agent shall give notice to the DIP Lenders and Borrower. An assignment by DIP Agent pursuant to this subsection (a) shall not be deemed a resignation by DIP Agent for purposes of subsection (b) below.

(b)    The DIP Agent may resign as "DIP Agent" upon prior notice to the DIP Lenders and the Borrower; *provided*, that no prior notice shall be required following the occurrence and during the continuance of an Event of Default. Upon receipt of any such notice of resignation, Required DIP Lenders shall have the right, with the consent of the Borrower (so long as no Event of Default has occurred and is continuing), to appoint a successor DIP Agent. Upon the acceptance of a successor's appointment as DIP Agent hereunder and notice of such acceptance to the retiring DIP Agent, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP Agent, the retiring DIP Agent's resignation shall become immediately effective and the retiring DIP Agent shall be discharged from all of its duties and obligations hereunder and under the other Financing Documents (if such resignation was not already effective and such duties and obligations not already discharged, as provided below in this paragraph).

(c)    Upon (i) an assignment permitted by clause (a) above or (ii) the acceptance of a successor's appointment as DIP Agent pursuant to clause (b) above, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations under the Term Sheet (if not already discharged therefrom as provided above in this paragraph). After the retiring DIP Agent's resignation, the provisions of this Exhibit F shall continue in effect for the benefit of such retiring DIP Agent and its sub-agents in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting or was continuing to act as DIP Agent.

9.    <u>Disbursements of DIP Loan Payments</u>.

(a)    <u>DIP Loan Payments</u>. Payments of principal, interest and fees in respect of the DIP Loans will be settled on the date of receipt if received by DIP Agent on the first (1st) business day of each fiscal quarter or on the business day immediately following the date of receipt if received on any day other than the first (1st) business day of each fiscal quarter.

(b)    <u>Return of Payments</u>.

(i)    If DIP Agent pays an amount to a DIP Lender under this Agreement in the belief or expectation that a related payment has been or will be received by DIP Agent from any Debtor and such related payment is not received by DIP Agent, then DIP Agent will be entitled to recover such amount from such DIP Lender on demand without setoff, counterclaim or deduction of any kind, together with interest accruing on a daily basis at the Federal Funds Rate.

(ii)    If DIP Agent determines at any time that any amount received by DIP Agent under this Agreement must be returned to any Debtor, then, notwithstanding any other term or condition of the Term Sheet, DIP Agent will not be required to distribute any portion thereof to any DIP Lender. In addition, each DIP Lender will repay to DIP Agent on demand any portion of such amount that DIP

Agent has distributed to such DIP Lender, together with interest at such rate, if any, as DIP Agent is required to pay to such Debtor, without setoff, counterclaim or deduction of any kind.

10.     <u>Appointment of Sub-Agents</u>.

DIP Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  DIP Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective their respective agents, employees, directors, officers, professional advisors, subsidiaries, affiliates, representatives, attorneys, auditors, professional consultants, rating agencies, insurance industry associations, equity holders, partners, controlling persons, investors, financing sources and portfolio management servicers (the "**Related Parties**").  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of DIP Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent. DIP Agent shall not be liable for any actions taken or omitted to be taken by any sub-agent selected with reasonable care by DIP Agent.

## Exhibit 2

**Budget**

## *Paper Source - Weekly Cash Flow Projection*

| | Forecast Week: | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Calendar Month: | MAR | MAR | MAR | MAR | MAR | APR | APR | APR | APR | MAY | MAY | MAY | MAY | MAR - MAY |
| | Week Ending: | 3/6/21 | 3/13/21 | 3/20/21 | 3/27/21 | 4/3/21 | 4/10/21 | 4/17/21 | 4/24/21 | 5/1/21 | 5/8/21 | 5/15/21 | 5/22/21 | 5/29/21 | 5 - 17 |
| | *($ in 000s)* | | | | | | | | | | | | | | |
| | **Operating Items** | | | | | | | | | | | | | | |
| [1] | Total Operating Receipts | $1,818 | $1,964 | $1,843 | $1,938 | $2,532 | $2,572 | $2,402 | $3,052 | $2,992 | $4,055 | $2,575 | $2,376 | $2,327 | $32,447 |
| [2] | Total Operating Disbursements | (1,813) | (1,265) | (2,323) | (1,606) | (2,122) | (1,561) | (1,329) | (2,754) | (4,444) | (2,140) | (1,836) | (2,425) | (1,786) | (27,403) |
| [3] | **Net Cash From Operations** | **$5** | **$699** | **($480)** | **$333** | **$411** | **$1,011** | **$1,073** | **$298** | **($1,452)** | **$1,915** | **$739** | **($49)** | **$541** | **$5,043** |
| | **Non-Operating Items** | | | | | | | | | | | | | | |
| | Restructuring Items: | | | | | | | | | | | | | | |
| [4] | Professional Fees | ($908) | ($606) | ($614) | ($506) | ($651) | ($569) | ($569) | ($569) | ($536) | ($464) | ($512) | ($512) | ($1,108) | ($8,124) |
| [5] | Chapter 11 Items | (905) | (16) | (6) | (6) | – | – | – | (158) | – | – | – | – | (1,504) | (2,595) |
| [6] | Critical Vendors/Shippers Payments | – | (1,000) | (700) | (400) | (250) | (250) | – | – | – | – | – | – | – | (2,600) |
| [7] | Deferred Admin Rent | – | – | – | – | – | – | – | – | – | – | – | – | (5,508) | (5,508) |
| [8] | **Total Restructuring Items** | **($1,813)** | **($1,621)** | **($1,320)** | **($912)** | **($901)** | **($819)** | **($569)** | **($727)** | **($536)** | **($464)** | **($512)** | **($512)** | **($8,119)** | **($18,827)** |
| | Financing: | | | | | | | | | | | | | | |
| [9] | Interest | – | – | – | – | (87) | – | – | – | (75) | – | – | – | (91) | (254) |
| [10] | Commitment/Arrangement Fee | (50) | – | – | – | – | – | – | – | – | – | – | – | – | (50) |
| [11] | (+) Draws | 7,750 | – | – | – | – | – | – | – | 1,750 | – | – | – | 6,500 | 16,000 |
| [12] | (-) Repayments | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| [13] | **Total Finance Related Items** | **$7,700** | **–** | **–** | **–** | **($87)** | **–** | **–** | **–** | **$1,675** | **–** | **–** | **–** | **$6,409** | **$15,696** |
| [14] | *Memo: DIP Financing (w. PIK Commit. Fee)* | *$8,230* | *$8,230* | *$8,230* | *$8,230* | *$8,230* | *$8,230* | *$8,230* | *$8,230* | *$9,980* | *$9,980* | *$9,980* | *$9,980* | *$16,480* | *$16,480* |
| [15] | **Net Change in Cash** | **$5,892** | **($923)** | **($1,800)** | **($579)** | **($578)** | **$192** | **$504** | **($430)** | **($313)** | **$1,451** | **$227** | **($560)** | **($1,170)** | **$1,913** |
| [16] | Beginning Book Cash Balance | ($490) | $5,403 | $4,480 | $2,680 | $2,101 | $1,523 | $1,715 | $2,218 | $1,789 | $1,476 | $2,926 | $3,153 | $2,593 | ($490) |
| [17] | Net Change in Cash | 5,892 | (923) | (1,800) | (579) | (578) | 192 | 504 | (430) | (313) | 1,451 | 227 | (560) | (1,170) | 1,913 |
| [18] | **Ending Book Cash Balance** | **$5,403** | **$4,480** | **$2,680** | **$2,101** | **$1,523** | **$1,715** | **$2,218** | **$1,789** | **$1,476** | **$2,926** | **$3,153** | **$2,593** | **$1,423** | **$1,423** |
| [19] | Plus: Checks Outstanding | 923 | 1,110 | 1,403 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 |
| [20] | **Ending Bank Cash Balance** | **$6,325** | **$5,590** | **$4,083** | **$3,601** | **$3,023** | **$3,215** | **$3,718** | **$3,289** | **$2,976** | **$4,426** | **$4,653** | **$4,093** | **$2,923** | **$2,923** |

3/1/2021