John C. Longmire (*pro hac vice* admission pending)  Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (*pro hac vice* admission pending)  David W. Gaffey (VSB# 85088)
James H. Burbage (*pro hac vice* admission pending)  Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**   **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue    Two James Center
New York, NY 10019    1021 E. Cary Street, Suite 1700
    Richmond, VA 23219
Telephone:    (212) 728-8000    Telephone:    (804) 977-3300
Facsimile:    (212) 728-8111    Facsimile:    (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| PAPER SOURCE, INC., *et al.*,[1] | ) Case No. 21-30660 |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF COLIN M.
ADAMS IN SUPPORT OF DEBTORS'
MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO
OBTAIN POSTPETITION FINANCING, (B) AUTHORIZING
THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
EXPENSE STATUS, (D) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES, (E) MODIFYING THE AUTOMATIC STAY,
(F) SCHEDULING A FINAL HEARING, AND (G) GRANTING RELATED RELIEF**

I, Colin M. Adams, hereby declare under penalty of perjury:

1.    I am a Senior Managing Director at M-III Advisory Partners, LP ("M3"), the proposed financial advisor to Paper Source, Inc., and its debtor affiliate, as debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

2.     I submit this Declaration in support of the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Obtain Senior Secured Postpetition Financing, (B) Authorizing the Use of Cash Collateral, (C) Granting Liens and Superpriority Administrative Expense Status, (D) Granting Adequate Protection to Certain Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief* (the "Motion") and the financing package proposed therein (the "DIP Facility").[2]

3.     Except as otherwise indicated, all statements set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations and finances gleaned during the course of M3's engagements with the Debtors, (b) my discussions with the Debtors' senior management, other members of the M3 team and the Debtors' other advisors, and (c) my review of relevant documents and/or my opinion based upon my experience.  If I were called upon to testify, I could and would testify competently to the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

## BACKGROUND AND QUALIFICATIONS

4.     I am a Senior Managing Director of M3, an independent corporate turnaround and advisory firm founded in 2015 that specializes in financial and operational restructurings, performance improvement and business management across a broad range of industries.  I have more than 20 years of experience in the restructuring sector, having been both an advisor and a principal in numerous U.S. and European restructurings and special situations.  Prior to becoming a Managing Director at M3 in 2017, I served as a Managing Director at Morgan Stanley & Co., LLC in New York and London from 2010-2017 and as a Managing Director at Citadel Securities

---

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Motion.

in New York from 2009-2010.  Prior to that, I was a partner at Kirkland & Ellis LLP in New York. I hold a J.D. with a Certificate in Business Law from the University of California, Los Angeles School of Law and graduated with an A.B. in Economics and History from Duke University.

5. Over the course of my career, I have served as an advisor, attorney, officer or investor in chapter 11 cases such as American Airlines, Belk, Bertucci's, Cengage Learning, Colt Defense, Cornerstone Propane, Craftworks, Energy Future Holdings, Extended Stay Hotels, General Motors, GST Auto Leather, Neiman Marcus, Relativity Media, Remington Outdoor, Sears, Solutia, Tailored Brands, Tronox, and WorldCom.

## THE DEBTORS' NEED FOR DIP FINANCING

6. In September 2020, and then again in late January 2021, the Debtors engaged M3 to assist in various projects, including the development and administration of its short-term cash flow forecasting, budgeting, cash management planning, and operational restructuring efforts, including assisting with a store rationalization strategy.  I lead the M3 team, and, working closely with the Debtors' management, I have become well acquainted with the Debtors' capital structure, liquidity needs and business operations.  Based on my firm's prior engagement in the fall of 2020, I was aware that the Debtors' liquidity profile had been strained following the beginning of the COVID-19 pandemic and its impact on retailers including, government mandated shut downs, capacity restrictions and the general decline of store traffic and purchasing.

7. The Debtors engaged M3 in January 2021, in part, to assist the Debtors in projecting their short-term cash flow needs.  In completing this exercise, it became clear to me that the Debtors would not have sufficient liquidity to fund their operations adequately, meet their funded debt obligations, and continue making monthly rent payments, including catch-up payments on previously negotiated rent deferrals, on their 158 retail store locations and other leased properties. The Debtors' liquidity profile, among other issues, led the Debtors to determine that a chapter 11

filing was imminent.  In light of that decision, M3, at the Debtors' direction, has reviewed and analyzed the Debtors' projected cash needs and—following intense negotiations with the Debtors' Prepetition First Lien Lenders—prepared a 13-week cash flow projection outlining the Debtors' postpetition cash needs.  This cash flow projection is attached as Exhibit 2 to the proposed interim DIP order (the "DIP Budget").

8.    As the DIP Budget shows, the Debtors require immediate access to liquidity to ensure that they are able to meet their working capital needs during these Chapter 11 Cases.  It is my professional opinion that immediate access to such liquidity is essential to ensuring the success of the Debtors' near-term restructuring objectives, including running a fulsome sales and marketing process for substantially all of the Debtors' assets.  Without the DIP Facility, the Debtors will not have sufficient liquidity to operate their business, pay employee wages, or pay other critical business expenses.  Moreover, failure to pay these expenses would materially and negatively impact the Debtors' marketing process.  In my view, absent the DIP Facility and the immediate access to liquidity that it provides, the Debtors would suffer immediate and irreparable harm and the value of their assets and businesses would be severely diminished to the detriment of all stakeholders.

### THE DEBTORS' EFFORTS TO SECURE POSTPETITION FINANCING

9.    M3 solicited proposals for postpetition financing by contacting various well-established and experienced financial institutions and other capital sources.  Among others, M3 contacted MidCap Financial Trust who informed me that they would be unwilling to consent to the priming of prepetition liens held by the Prepetition First Lien Lenders.  In addition to MidCap Financial Trust, I reached out to five other capital sources to solicit financing proposals.  These five parties are lenders that I know often make loans in distressed and bankruptcy situations and include traditional lending sources and alternative credit funds.  In addition, I also contacted the

Debtors' largest Prepetition Second Lien Lender, VPC Special Opportunities Fund III Onshore, L.P. ("Victory Park") and inquired whether Victory Park was prepared to extend postpetition credit to the Debtors on a subordinated basis. During our conversation, Victory Park indicated that they were unwilling to provide postpetition financing subordinate to the liens of the Prepetition First Lien Lenders.

10. As mentioned above, the Prepetition First Lien Lenders advised us that they would not consent to having their liens primed by any third party postpetition financing facility. No other party we contacted expressed interest in providing postpetition credit on an unsecured or subordinated basis given the preexisting liens on the Debtors' assets. In addition, because of these liens, either the prepetition secured parties would need to consent to priming financing from a new party or the Debtors would have to prevail on a protracted, expensive and uncertain priming litigation. Accordingly, to gain access to critical and necessary postpetition financing in the form of the DIP Facility, the Debtors focused their postpetition financing negotiations with MidCap Financial Trust (as DIP Agent for the DIP Lenders). These negotiations were conducted at arm's length and in good faith by myself, the Debtors and the Debtors' other professional advisors.

11. A critical component of the negotiations was preparation of the Initial Approved Budget. In reaching agreement on this budget, M3 worked closely with the Debtors' management team and the Debtors' other professional advisors. After weeks of hard fought negotiations with the MidCap Financial Trust and its legal and financial advisors, the parties agreed that the Initial Approved Budget attached to the Motion was an acceptable and a reasonable projection of the Debtors' likely cash receipts and operating and other disbursements and could serve as the basis on which debtor in possession financing could be extended. Based on M3's analysis of the Debtors' liquidity needs under the projections and assumptions underlying the DIP Budget, I

believe the requested DIP Facility will allow the Debtors to continue their operations and fund an orderly marketing process.

## **THE DIP FACILITY REPRESENTS THE BEST OFFER FOR THE DEBTORS**

12. I have reviewed the Motion, and believe that the DIP Facility is essential to ensure the uninterrupted operation of the Debtors' business and to avoid immediate and irreparable harm to the Debtors and their estates. Without a prompt grant of authority to obtain financing on the terms proposed under the DIP Credit Agreement, the Debtors will not be able to pay employees and satisfy business and operating expenses, which will cause immediate and irreparable harm to their estates, including the need for a near-term liquidation. I believe that immediate access to the DIP Facility enables the Debtors to stabilize and maintain their operations, helping to restore the confidence of the Debtors' landlords, vendors, customers, employees and other stakeholders at this critical stage. It is my experience, based on past retail cases that I have worked on, that stakeholders such as vendors and landlords assess the likelihood of the Debtors' ability to continue as a going concern—including to the Debtors' access to post-petition financing—when determining how to engage with the debtor following the chapter 11 filing. I believe the $16 million in committed incremental financing provided under the DIP Facility sends a strong message to these stakeholders and will allow the Debtors to restore confidence with these stakeholders and continue performing in the ordinary course.

13. Based on my experience, the economic and non-economic terms of the DIP Facility are customary. The Debtors must pay approximately 3.3% of the total financing to be provided in fees. Based on my professional opinion, these fees are an integral and customary component of the overall terms of the DIP Facility, and similar facilities. Moreover, non-economic terms—such as events of default, termination, and the carve-out mechanism—are also consistent with terms that I have seen proposed and approved in other chapter 11 cases.

14. In addition, based on the DIP Budget and other financial information made available to me by the Debtors, I believe the liquidity provided under the DIP Facility will enable the Debtors to execute their immediate restructuring objectives, including running a successful sales and marketing process for substantially all of the Debtors' assets. Based on my experience and involvement in the consideration and negotiation of the DIP Facility, I believe that the DIP Facility is the best available option, in the best interest of the Debtors' estates and stakeholders and is necessary and appropriate under the circumstances. As such, in my opinion, the Debtors' request to enter into the DIP Facility is a sound exercise of their business judgment and should be approved.

## CONCLUSION

15. For all of the reasons set forth herein and in the Motion, I believe that obtaining postpetition financing in accordance with the terms of the proposed DIP Credit Agreement is absolutely essential to the Debtors' ability to minimize disruption and avoid immediate and irreparable harm to their estates.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   March 2, 2021
         New York, New York

                                            /s/ Colin M. Adams
                                            Colin M. Adams
                                            Senior Managing Director
                                            M-III Advisory Partners, LP