John C. Longmire (*pro hac vice* admission pending)
Matthew A. Feldman (*pro hac vice* admission pending)
James H. Burbage (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

Telephone:     (212) 728-8000
Facsimile:     (212) 728-8111

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:     (804) 977-3300
Facsimile:     (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS
(A) APPROVING SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, AND (B) (I) APPROVING BIDDING PROCEDURES IN
CONNECTION THEREWITH, (II) SCHEDULING A SALE HEARING,
(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(IV) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (together, the

"Debtors") move (this "Motion") for entry of orders: (A) substantially in the form attached hereto

as **Exhibit A** (the "Bidding Procedures Order") (i) approving the proposed procedures to be used

in connection with the sale (the "Sale") of the Debtors' assets (the "Assets") attached as **Exhibit 1**

to the Bidding Procedures Order (the "Bidding Procedures"); (ii) scheduling a final hearing for

approval of the Sale (the "Sale Hearing"); (iii) approving the form and manner of notice of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

Bidding Procedures, the Auction, and the Sale Hearing attached as **Exhibit 2** to the Bidding Procedures Order ("Sale Notice"); (iv) authorizing certain procedures related to the assumption by the Debtors and assignment to the Successful Bidder (as defined below) of executory contracts and unexpired leases in connection with any Sale (the "Assumption and Assignment Procedures"); and (v) granting certain related relief; and (B) authorizing and approving the Sale (the "Sale Order").

In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Ronald Kruczynski, Chief Financial Officer of Paper Source, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"),[2] which was filed with the Court concurrently herewith, and respectfully represent as follows:

**Background**

1.      The Debtors operate a leading lifestyle brand and retailer of premium paper products, crafting supplies and related gifts, including custom invitations, greeting cards and personalized stationery and stamps. Through their 158 domestic stores and e-commerce website, the Debtors are an omnichannel provider of fine and artisanal papers, wedding paper goods, books and gift wrap. The Debtors also provide wedding consultation, crafting supplies and instructions, and subscription services. The Debtors' administrative headquarters is in Chicago, Illinois.

2.      The Debtors commenced these cases on the date hereof (the "Petition Date") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to facilitate a timely and efficient sale process for all or substantially all of their business. As set forth in the

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings given to them in the First Day Declaration.

First Day Declaration, the Debtors believe the sale process will maximize the value of the Debtors' estates for the benefit of all stakeholders.

3.       The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  As of the date hereof, no trustee, examiner, or official committee has been appointed in these chapter 11 cases.

**Jurisdiction and Venue**

4.       The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.       Venue of the cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.       The predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and rules 2002-1, 6004-2 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

### **Relief Requested**

8.      By this Motion, the Debtors seek entry of two orders.  The first of these—the

Bidding Procedures Order—would grant the following relief:

a.      ***Bidding Procedures.***  Approving the proposed auction and bid procedures,
attached to the Bidding Procedures Order as **Exhibit 1**;

b.      ***Auction.***  Scheduling an auction to sell the Assets detailed in the Bidding
Procedures for April 21, 2021;

c.      ***Sale Hearing.***  Scheduling the Sale Hearing for April 30, 2021, subject to
the availability of the Court;

d.      ***Sale Notice.***  Approving the form and manner of notice of the Sale Notice
attached to the Bidding Procedures Order as **Exhibit 2**;

e.      ***Notice of Successful Bidder.***  Approving the form and manner of notice of
the Successful Bidder (as defined in the Bidding Procedures) at the Auction
attached to the Bidding Procedures Order as **Exhibit 3**;

f.      ***Assumption and Assignment Procedures.***  Authorizing and approving
(A) notice, substantially in the form attached to the Bidding Procedures
Order as **Exhibit 4** (the "Potential Assumption and Assignment Notice"),
to each non-Debtor counterparty (each, a "Counterparty") to an executory
contract or unexpired lease (each, as applicable, an "Executory Contract" or
"Unexpired Lease" and, collectively, the "Contracts") that the Debtors
reasonably believe may be transferred as part of the Sale as well as of the
proposed respective cure amounts (the "Cure Costs"), (B) procedures and
deadlines for asserting related objections, and (C) the Assumption and
Assignment Procedures; and

g.      granting related relief.

The second order—the Sale Order—would approve the Sale of the Debtors' Assets to

MidCap (defined below) or such other party as may submit the highest or otherwise best offer for

such Assets, the assumption and assignment of leases and executory contracts to the acquirer, and

provide related relief.  A proposed Sale order will be filed with the Court prior to the Sale Hearing.

9.      In connection with the foregoing and subject to this Court's availability, the Debtors respectfully request that the Court approve the following schedule of proposed dates to govern the Sale of the Assets (the "Sale Dates and Deadlines"):

| Event | Date |
|---|---|
| Bid Deadline | **April 16, 2021, at 5:00 p.m. (prevailing Eastern time)** |
| Notice of Qualified Bidder Deadline | **No later than 5:00 p.m. (prevailing Eastern time) on the date two days following the Bid Deadline** |
| Auction | **April 21, 2021, at [●]:00 a/p.m. (prevailing Eastern time),** or as may be adjourned to such later date by the Debtors |
| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |
| Sale Hearing | **April 30, 2021, at [●]:00 a/p.m. (prevailing Eastern time)**, or such other date and time that the Court may later direct and as agreed upon by the Debtors |
| Sale Closing | **May 26, 2021** |

## **The Marketing Process**

10.      As discussed in the First Day Declaration, the Debtors commenced these chapter 11 cases ("Chapter 11 Cases") to facilitate a timely and efficient sale process of all or substantially all of their business.  The cornerstones of this strategy are twofold:

- *First*, following a comprehensive and thorough prepetition marketing process, the Debtors seek to conduct an additional, postpetition marketing process lasting approximately 50 days.  This process will supplement the thorough and extensive pre-petition marketing process that the Debtors launched in December 2020 whereby by the Debtors—with

assistance from their investment banker at the time—contacted nearly 140 potential acquirers.

- *Second*, the Debtors have entered into the "stalking horse" agreement (the "<u>Stalking Horse Agreement</u>") with MidCap Funding Investments XI LLC (the "<u>Stalking Horse Purchaser</u>") which is attached hereto as **<u>Exhibit B</u>**.  The Stalking Horse Purchaser is an acquisition entity designated by (a) MidCap Financial Trust ("<u>MidCap</u>") in its capacity as administrative agent and collateral agent for the DIP Lenders[3] (in such capacities, the "<u>DIP Agent</u>") and (b) MidCap in its capacity as administrative agent and collateral agent for the Prepetition First Lien Lenders[4] (in such capacities, the "<u>Prepetition First Lien Agent</u>").

11.    The Stalking Horse Agreement provides for the Stalking Horse Purchaser's acquisition of the Purchased Assets (as defined in the Stalking Horse Agreement) in consideration for, among other things, a credit bid equal to (a) the full amount of the obligations under the DIP Facility (the "<u>DIP Obligations</u>") in the expected aggregate principal amount of $16.0 million and (b) up to the full amount of the obligations under the Prepetition First Lien Facility (the "<u>Prepetition First Lien Obligations</u>") in the aggregate principal of roughly $72.8 million as of the Petition Date (together, the "<u>Credit Bid</u>").

12.    Debtors believe the Stalking Horse Agreement will help to generate significant interest in the Assets from third party buyers, and best position the Debtors to maximize creditor recoveries and continue as a going concern.

---

[3]     "<u>DIP Lenders</u>" refer to the lenders that are parties to that certain Secured Superpriority Debtor-in-Possession Credit Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>DIP Facility</u>") with the Debtors.

[4]     "<u>Prepetition First Lien Lenders</u>" refer to the lenders that are parties to that certain Credit and Guaranty Agreement, dated as of March 22, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Prepetition First Lien Facility</u>") with the Debtors.

13.    The Debtors believe that the proposed Bidding Procedures and corresponding timeline will allow the Debtors to build off the significant progress made prepetition to market and sell the Debtors as a going concern.  Beginning in November 2020, the Debtors began working exploring a sale of all or substantially all of the Debtors' assets.   Their investment banker distributed teasers to potential acquirers starting on December 11, 2020 and began distributing more substantive materials starting on December 20.  As part of that sale process, their investment banker reached out to approximately 138 potential buyers—10 strategic buyers and investors, who were selected based on their business model, historical acquisition activity, and financial capabilities, and 128 financial buyers and investors, who were selected based on their historical interest in retail, consumer and branding opportunities, existing and past investment and financial capabilities.   Approximately 65 of those institutions executed non-disclosure agreements and received a "confidential information memorandum" and other information containing business and brand overviews, product positioning, management team information, channel overviews, customer demographics, strategic plans, growth opportunities, and historical and projected financial information.

14.    Despite this robust marketing process, by late January 2021 it became clear that the sales process would not generate any bids in excess of the amount of the Prepetition First Lien Facility.  While out-of-court options were discussed with potential buyers, most potential acquirers contemplated effectuating any transaction through a chapter 11 proceeding to address the Debtors' significant lease liabilities.  Based on the results of the prepetition marketing process, feedback from potential acquirers, and discussions with both the Debtors' lenders and their advisors, the Debtors determined to pursue a section 363 sale in connection with a chapter 11 filing.  Since making this decision, the Debtors and their advisors have worked tirelessly to negotiate the

Stalking Horse Agreement, prepare for the filing of these Chapter 11 cases, and refine sales and marketing materials.

15.     Both the Bidding Procedures and the Stalking Horse Agreement are designed to maximize the likelihood of generating value for the benefit of enterprise-wide stakeholders as expeditiously as possible.

a.   *First*, the Bidding Procedures are intended to provide the Debtors with sufficient time to attempt to rationalize their real estate expenditures, in an effort to increase market interest in the Debtors.

b.   *Second*, the Bidding Procedures are intentionally designed to generate the interest of third party buyers, as evidenced by the lack of bid protections for the Stalking Horse Purchaser and the Stalking Horse Purchaser's willingness to consider bids for less than the full amount of the Credit Bid.

c.   *Third*, the Bidding Procedures provide flexibility to maximize value by allowing for the possibility of Qualified Bids to be financed by MidCap (as described in the Bidding Procedures as "Non-Conforming Alternative Bids").

d.   *Finally*, the Stalking Horse Agreement will help preserve estate value during the sale process by providing assurance to employees, contract counterparties, and other stakeholders that there will be a going concern business that emerges from these Chapter 11 Cases.

**Approval of the Bidding Procedures**

16.     To efficiently solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bidding Procedures to govern the Sale.  The Bidding Procedures are designed to encourage all entities to put their best bids forward and to maximize

the value of the Debtors' estates.  The key provisions of the Bidding Procedures are summarized

below:[5]

(a) **Qualification as Bidder**:  Any person or entity that wishes to participate in the bidding process for the Assets (each, a "Potential Bidder") must first become an "Acceptable Bidder" in the reasonable discretion of the Debtors in consultation with the Consultation Parties.  In order to become an Acceptable Bidder, and thus be able to conduct due diligence and gain access to the Debtors' confidential electronic data room concerning the Assets (the "Data Room"), a Potential Bidder must submit to the Debtors and their advisors (unless waived by the Debtors):

   i.   an executed confidentiality agreement (unless the Potential Bidder has already executed a confidentiality agreement on terms acceptable to the Debtors) (a "Confidentiality Agreement");

   ii.  identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and

   iii. proof by the Potential Bidder of its financial capacity to close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with the Consultation Parties (as defined in the Bidding Procedures)).

(b) **Obtaining Due Diligence**:  The Debtors, with their advisors, have established an electronic Data Room that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

(c) **Bid Deadline**:  An Acceptable Bidder that desires to make a Bid must transmit via email (in .pdf or similar format) or deliver written copies of its Bid not later than **5:00 p.m. (prevailing Eastern Time) on April 16, 2021** (the "Bid Deadline") to:

   i.   proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com), and James H. Burbage (jburbage@willkie.com); and

---

[5]    This summary is qualified in its entirety by the Bidding Procedures attached as **Exhibit 1** to the Bidding Procedures Order.  To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

    ii.    the Debtors' proposed investment banker, SSG Capital Advisors, LLC, located at 300 Barr Harbor, Suite 420, West Conshohocken, PA 19428 Attn: Teresa Kohl (tkohl@ssgca.com) and J. Scott Victor (jsvictor@ssgca.com).

**(d) Qualified Bid:**  Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, is submitted by the Bid Deadline, and, in the exercise of the Debtors' business judgment and in consultation with the Consultation Parties, complies with all of the following conditions (a "Qualified Bid" and such bidder a "Qualified Bidder"):

    i.    *Bid Deadline*.  The Bid must be submitted by the Bid Deadline.

    ii.    *Confidentiality*.  The Acceptable Bidder shall have executed and delivered to the Debtors a Confidentiality Agreement.

    iii.    *Assets*.  The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

    iv.    *Purchase Price*.  The Bid must (a) clearly set forth the purchase price to be paid (the "Purchase Price"), and (b) provide for the Purchase Price to be paid for entirely in cash, except as set forth herein.  If a Potential Bidder cannot consummate its proposed transaction entirely in cash and intends to finance its Bid with financing from MidCap, such Potential Bidder shall contact (i) the Debtors' proposed counsel and investment banker, and (ii) MidCap's financial advisor, Carl Marks Advisors, 900 Third Avenue 33rd Fl., New York, NY 10022, Attn:  Keith Daniels (kdaniels@carlmarks.com) to discuss such alternative proposal.  Following such discussion, the Debtors, in consultation with and with MidCap's consent, shall determine if such alternative non-cash proposal (a "Non-Conforming Alternative Bid") constitutes a "Qualified Bid" and such bidder a "Qualified Bidder."

    v.    *Deposit*.  Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate Purchase Price of the Bid, to be held in an escrow account to be identified and established by the Debtors (the "Deposit"), provided that if a Qualified Bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to match the proposed Purchase Price submitted at the Auction within three (3) business days after the Auction.

    vi.    *Bid Documents*.  Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include: (a) a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse

Agreement requested by the Acceptable Bidder ("Proposed Revised APA")), (b) a schedule of Proposed Assumed Contracts (as defined below) to the extent applicable to the Bid, (c) any other material documents integral to such Bid, (d) evidence of "adequate assurance of future performance" with respect to the contracts and leases to be assumed and assigned, and (e) a statement from the Acceptable Bidder that: (i) it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than May 26, 2021 and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or the Backup Bid) until the consummation of the Sale.

vii.    ***Legal Capacity***.  Each Bid must demonstrate to the Debtors' satisfaction that the Acceptable Bidder has the legal capacity to consummate the transaction it is proposing.

viii.    ***Financial Wherewithal***.  The Acceptable Bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make a reasonable determination as to such Acceptable Bidder's ability to consummate a sale as contemplated.

ix.    ***Contingencies***.  The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing (other than in connection with a Non-Conforming Alternative Bid) or any internal approvals or performing any additional diligence) and all diligence must be completed before the Bid Deadline.

x.    ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

xi.    ***Irrevocable***.  ALL BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT.  IN THE EVENT THAT AN ACCEPTABLE BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

xii.    ***Backup Bidder***.  By submitting a Bid, each Acceptable Bidder agrees to be a Backup Bidder, should the Bid be so selected.

xiii.    ***As-Is, Where-Is***.  The Bid must include the following representations and warranties (or the Acceptable Bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except (with respect to the Debtors only) as expressly stated in the representations and warranties contained in the Acceptable Bidder's Proposed Revised APA.

xiv.    ***Authorization***.  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder.  The Bid shall expressly provide that the Acceptable Bidder is prepared to consummate the transaction promptly following entry of the Sale Order and that the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction.

xv.    ***Disclaimer of Fees***.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break- up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

xvi.    ***Adherence to Bid Procedures***.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a bona fide offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

xvii.    ***No Collusion***.  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion

that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

xviii.  *Other Information*.  The Bid contains such other information as may be reasonably requested by the Debtors.

**(e)  Qualification of Bidders**.  No later than 5:00 p.m. (prevailing Eastern Time) on the date two days following the Bid Deadline, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder.  The Debtors shall determine in their discretion, and in consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "Qualified Bid" and such Acceptable Bidder shall constitute a "Qualified Bidder"; provided, however, MidCap's express prior written consent shall be required in order for the Debtors to qualify an Non-Conforming Alternative Bid as a Qualified Bid (a "Qualified Non-Conforming Alternative Bid").  Any Bid that the Debtors determine in consultation with the Consultation Parties does not meet the above requirements shall be rejected as a non-conforming Bid.  The Debtors shall inform the Acceptable Bidders whether or not their respective Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date two days following the Bid Deadline.  A joint bid (a Bid submitted on behalf of more than one Acceptable Bidder) may, in the Debtors' business judgment, and in consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above.  Notwithstanding anything to the contrary herein, unless the Stalking Horse Purchaser consents, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid unless it provides for cash consideration of an amount at least equal to the Prepetition First Lien Obligations and DIP Obligations (as each term is defined in the Interim DIP Order at Docket No. [ ]) unless (a) such Bid is a Qualified Non-Conforming Alternative Bid or (b) such Bid is otherwise acceptable to the DIP Agent and Prepetition First Lien Agent.

**(f)  Auction.**  If the Debtors receive more than one Qualified Bid, the Debtors shall conduct the Auction to determine the Successful Bidder.  **The Auction shall take place on April 21, 2021.**  The Auction shall take place (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors. Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with the Bidding Procedures. The Auction shall be governed by the procedures set forth in the Bidding Procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment, including:

i.   *Baseline Bid as Price Floor*.  Bidding shall commence at the amount of the Baseline Bid (as defined in the Bidding Procedures).

ii.  *Minimum Overbid*.  Qualified Bidders may submit successive Bids higher than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "Overbid").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $250,000 increase in cash or cash equivalents,

over the previous price (the "Minimum Overbid"). The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.

iii. ***Announcement of Rules***. At the commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

iv. ***Highest or Best Offer***. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid"). Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

v. ***Modification of Procedures***. The Debtors may (in consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

vi. ***No Collusion***. Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding and (b) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**(g) Successful Bidder.** Immediately prior to the conclusion of the Auction, the Debtors shall (a) determine, consistent with the Bidding Procedures and in consultation with the Consultation Parties, which Bid constitutes the highest or otherwise best Bid ("Successful Bid"); and (b) notify all Qualified Bidders at the Auction of the identity of the Qualified Bidder that submitted the Successful Bid ("Successful Bidder") and the amount of the Purchase Price and other material terms of the Successful Bid.

**(h) Backup Bidder.** If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "Backup Bid" and "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated. In the event that the Stalking Horse Bid is the Backup Bid, it shall not be extended beyond the End Date (as defined in the Stalking Horse Agreement) without the prior written consent of the Stalking Horse Purchaser.

**(i) Sale Hearing.** Subject to Court availability, the hearing to consider approval of the sale of the Debtors' Assets to the Successful Bidder, or Backup Bidder (if applicable) (the "Sale Hearing") is currently scheduled to take place on **April 30, 2021**, at [●], (prevailing Eastern Time). The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such

continuance will be required to be provided to any party.

**(j) Return of Deposit.** The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.

**(k) Reservation of Rights.** The Debtors reserve their rights to modify the Bidding Procedures in their reasonable business judgment and in consultation with the Consultation Parties in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

17.    Most importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value for the benefit of their estates, and, as such, do not impair the Debtors' ability to consider all potential Bids, and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for the Debtors' estates.

**Summary of the Sale Notice Procedures**

18.    Within three (3) business days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable, the Debtors shall cause the Sale Notice, in the form attached to the Bidding Procedures Order as **Exhibit 2,** to be served upon the Notice Parties (as defined herein) or as otherwise provided in an applicable Case Management Order.  The Sale Notice will indicate that copies of this Motion and any future sale documents, if applicable, can be obtained on the website of the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC ("Epiq"), http://dm.epiq11.com/PaperSource (the "Case Website").

19.    Similarly, within three (3) business days after entry of the Order, or as soon as practicable thereafter, the Debtors shall cause the Sale Notice to be published once in the national edition of USA Today or another newspaper with national circulation.  This publication notice will

provide notice of the Sale to any other interested parties whose identities are unknown to the Debtors.

<h3 style="text-align:center"><u>Notice of Successful Bidder</u></h3>

20.    After the conclusion of the Auction, the Debtors will file on the docket, but not serve except with respect to each counterparty to a Proposed Assumed Contract, a notice identifying the Successful Bidder (the "<u>Notice of Successful Bidder</u>"), identifying the applicable Successful Bidder and key terms of the agreement, substantially in the form attached to the Bidding Procedures Order as **<u>Exhibit 3</u>**.

<h3 style="text-align:center"><u>Stalking Horse Agreement</u></h3>

21.    The Debtors have executed the Stalking Horse Agreement with the Stalking Horse Purchaser.  Pursuant to the Stalking Horse Agreement, the Stalking Horse Purchaser will serve as the Stalking Horse Purchaser for the Purchased Assets for consideration in the form of the Credit Bid plus assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement). Importantly, the terms of the Stalking Horse Agreement do not require the Debtors to pay any break-up fee, expense reimbursement, or other forms of protections benefiting the Stalking Horse Purchaser.  The Debtors believe that this important concession from MidCap will help foster increased interest in the Debtors' business and aid the Debtors in maximizing value.

22.    The Debtors are not seeking to assume the Stalking Horse Agreement pursuant to 11 U.S.C. § 365 unless and until the Stalking Horse Purchaser is selected as the Successful Bidder. By this Motion, the Debtors seek authority to assume the Stalking Horse Agreement if it is the Successful Bid (as defined in the Bidding Procedures).  To the extent it is later determined to be necessary, the Debtors also seek approval under Section 280G(b)(5) of the Internal Revenue Code of payments that could constitute "excess parachute payments" within the meaning of Section 280G of the Internal Revenue Code.

**<u>Assumption and Assignment Procedures</u>**

23.    In connection with any Sale, the Debtors propose to assume and assign to the

Successful Bidder the applicable Proposed Assumed Contracts in accordance with the following

procedures:

a.    <u>Potential Assumption and Assignment Notice</u>:  Within ten days after entry of the Bidding Procedures Order, the Debtors will file with the Court, serve on the Notice Parties, and cause to be published on the Case Website, the "<u>Potential Assumption and Assignment Notice</u>," which will (i) identify the Contracts; (ii) list the Debtors' good faith calculation of the proposed respective Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of any Contract is not guaranteed; and (iv) prominently display the deadline for filing objections to the proposed Cure Costs.  In the event that the Debtors identify non-Debtor Contract counterparties (the "<u>Counterparties</u>") that were not served with the Potential Assumption and Assignment Notice, the Debtors will serve such Counterparties with a Potential Assumption and Assignment Notice (or the Proposed Assumed Contracts Notice, as applicable), and the Assumption and Assignment Procedures will nevertheless apply to such Counterparties.

b.    <u>Proposed Assumed Contracts Notice</u>:  As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file with the Court, serve on the Notice Parties, and cause to be published on the Case Website a list of the contracts that the Debtors will seek to assume and assign pursuant to the Successful Bidder (the "<u>Proposed Assumed Contracts Notice</u>" and, each Contract listed therein, a "<u>Proposed Assumed Contract</u>").

c.    <u>Cure Objections Deadline</u>:  Any Counterparty that wishes to object to the proposed Cure Costs under the relevant Contract (each, a "<u>Cure Objection</u>"), must file with the Court and serve on the Objection Recipients (defined below) its Cure Objection, which must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state, with specificity, the legal and factual bases therefor, including any appropriate documentation in support thereof and served on the Objection Recipients (as defined in the Order), (iv) state the cure amount alleged to be owed, and (v) be filed with the Court and served on the Objection Recipients by no later than **5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following service of the Potential Assumption and Assignment Notice.**  In the event that the Debtors identify any Counterparties that were not served with the Potential Assumption and Assignment Notice, the Debtors shall subsequently serve such Counterparty with the Potential Assumption and Assignment Notice, and these Assumption and Assignment Procedures shall nevertheless apply to such Counterparty; provided, however, that the deadline for such Counterparty to file a Cure Objection shall be **5:00 p.m. (prevailing Eastern Time) on the date that is the later of (a) the date that is 14 days following**

**service of the Potential Assumption and Assignment Notice, and (b) the date that is seven days following service of the supplemental Potential Assumption and Assignment Notice.**

d.  <u>Resolution of Cure Objections</u>:  If the parties are unable to consensually resolve any Cure Objection prior to the commencement of the Sale Hearing, the Court will make all necessary determinations relating to the Cure Objection at or subsequent to the Sale Hearing; <u>provided</u> that the determination of whether a Cure Objection may be heard at the Sale Hearing is in the Debtors' and the Court's discretion.  An adjourned Cure Objection may be resolved after the closing date of the applicable Sale.  Upon the Court's resolution of any Cure Objection, whether or not such resolution occurs prior to or after the closing of the Sale, the Successful Bidder will have the right to exclude the Proposed Assumed Contract subject to such Cure Objection from the Assets subject to the Sale.

e.  <u>Assumption and Assignment Following Resolution of Cure Objection</u>:  Upon resolution of a Cure Objection, provided that the Successful Bidder has not determined to exclude the relevant Proposed Assumed Contract from the Assets included in the applicable Sale, and upon the payment of the applicable cure amount and subject to the Asset Purchase Agreement of the Successful Bidder, if any, the applicable Proposed Assumed Contract will be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale.

f.  <u>Failure to Timely File Cure Objection</u>:  If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty will be deemed to have consented to the Cure Costs set forth in the Potential Assumption and Assignment Notice and forever will be barred from asserting any objection to such Cure Costs or any other claims related to the applicable Proposed Assumed Contract against the Debtors, the Successful Bidder, or their respective property, and such Cure Costs will constitute the only amount necessary to cure outstanding defaults under the applicable Proposed Assumed Contract in accordance with section 365(b) of the Bankruptcy Code, notwithstanding anything to the contrary in any Proposed Assumed Contract, or any other document.

g.  <u>Adequate Assurance Objections</u>: Any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed adequate assurance of future performance by the applicable Successful Bidder with respect to such Proposed Assumed Contract (each, an "<u>Adequate Assurance Objection</u>") must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state, with specificity, the legal and factual bases therefor, including any appropriate documentation in support thereof and served on the Objection Recipients (as defined in the Order), and (iv) be filed with the Court and served on the Objection Recipients by no later than **12:00 p.m. (prevailing Eastern Time) on the date prior to the Sale Hearing.**

h.  <u>Failure to Timely File Adequate Assurance Objections</u>:  If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection or other objection, such Counterparty will be deemed to have consented to the assumption and assignment of the Proposed Assumed Contract (unless the Counterparty has filed a timely Cure Objection with respect to such Proposed Assumed Contract) and to the adequate assurance of future performance offered in connection therewith, and forever will be barred from asserting any objection with regard to such assumption and assignment or adequate assurance of future performance or otherwise.  The applicable Successful Bidder will be deemed to have provided adequate assurance of future performance with respect to the applicable Proposed Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Proposed Assumed Contract, or any other document.

i.  <u>Objection Recipients</u>:  As used in this Motion, the term "Objection Recipient" shall mean (a) proposed counsel to the Debtors Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, Attn: John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com) and James H. Burbage (jburbage@willkie.com), (b) counsel to the Debtors' prepetition first lien secured lender Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn:  Charles A. Dale (CDale@proskauer.com) and David M. Hillman (DHillman@proskauer.com); (c) counsel to any statutory committee appointed in the Chapter 11 Cases; (d) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Wilmington, DE 19801, Attn: Attn: Nicholas S. Herron (usdoj.gov); and (e) any Successful Bidder (if known).

<u>**Basis for Relief**</u>

**I.    Approval of the Sale is Warranted Under Section 363 of the Bankruptcy Code.**

24.    Section 363 of the Bankruptcy Code provides that the debtor "after a notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property outside of the ordinary course under section 363, bankruptcy courts in this District routinely hold that the business judgment standard applies. *See, e.g., In re On-Site Sourcing, Inc.*, 412 B.R. 817, 824 (Bankr. E.D. Va. 2009) ("the bankruptcy court must conclude, from the evidence, that the movant satisfied its fiduciary obligations and established a valid business justification."); *In re U.S. Airways Grp.*, 2002 WL 31829093, at *1 (Bankr. E.D. Va. Dec. 16, 2002) (holding that the debtors' sound business judgement was sufficient to allow for

the termination of mortgages); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) (applying the "sound business purpose" test); *WBQ P'ship v. Va. Dept. of Med. Assistance Servs. (In re WBQ P'ship)*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995) (same).

25.     When a debtor articulates a valid business justification for disposition of estate property outside of the ordinary course of business, the business judgment rule is a presumption that the debtor's decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

26.     As set forth above, in the First Day Declaration, the Debtors have a sound business justification for selling the Assets.  Following the onset of the COVID-19 pandemic, the Debtors do not have the liquidity or capital to continue operating their business as it existed prior to the Petition Date; selling the Assets quickly in accordance with the Bidding Procedures is necessary to preserve and maximize their value and to control the Debtors' costs, consistent with the Debtors' fiduciary duties to their economic stakeholders.  Ultimately, the competitive bidding process, and the "market check" that any potential Auction will provide, will, in the Debtors' reasonable business judgment, result in the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than any known available alternative.

27.     Additionally, under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In essence, the Court may enter any order safeguarding the value of the debtor's estate if doing so is consistent with the Bankruptcy Code. *See, e.g., A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 1003 (4th Cir. 1986) ("[U]nder § 105, the Bankruptcy Court may use its injunctive authority to protect the integrity of a bankrupt's estate. . . .") (quoting *In re Johns-Manville Corp.*,

40 B.R. 219, 226 (Bankr. S.D.N.Y. 1984)); *Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Tr., Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (acknowledging that "the [b]ankruptcy [c]ourt is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

28.    The Debtors believe that the proposed Sale reflects a sound exercise of their business judgment and should be approved.

**II.    The Bidding Procedures are Fair, Designed to Maximize the Value Received for the Assets.**

29.    The paramount goal in any proposed disposition of property of the estate is to maximize the proceeds received by the estate. *See In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res., Inc.*, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (citations omitted).  Moreover, courts in other jurisdictions that have addressed this issue are consistent in holding that a debtor's business judgment is entitled to substantial deference with respect to establishing the procedures to be used in such proposed dispositions of property of the estate. *See, e.g.; In re Trilogy Dev. Co., LLC*, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the Bankruptcy Code permits the debtor to sell their assets

if a sound business purpose exists); *In re Channel One Commc'ns, Inc.*, 117 B.R. 493 (Bankr. E.D.
Mo. 1990) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the
debtor in possession can sell property of the estate . . . if he has an 'articulated business
justification.'") (citing *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir. 1986)).

30.     The proposed Bidding Procedures are designed to provide a method by which the
Debtors will be able to maximize the value of the Assets.  With the assistance of their advisors,
the Debtors have structured the Bidding Procedures to encourage competitive bidding, while
giving the Debtors the opportunity to review and analyze all competitive Bids only from Qualified
Bidders, who will have been vetted prior to the Auction.  Importantly, the Sale Notice will be
served in a manner that provides adequate notice of the date, time, and location of the Sale Hearing
and informs parties in interest of the deadlines for objecting to the Sale or the assumption and
assignment of the Contracts and Unexpired Leases.  The Bidding Procedures were designed to
yield the highest or otherwise best value for the Assets, which will inure to the benefit of all parties
in interest in these cases.  As such, creditors of the Debtors' estates can be assured that the
consideration obtained will be fair and reasonable in light of the circumstances and at or above
market-value.

31.     The Debtors submit that the Bidding Procedures will encourage competitive
bidding, are appropriate under the relevant standards governing auction proceedings and bidding
incentives in bankruptcy proceedings, and are consistent with other procedures previously
approved by this Court.  Moreover, similar procedures in complex chapter 11 cases have been
previously approved by the Court. *See, e.g., In re Le Tote, Inc.*, No. 20-33332 (KLP) (Bankr. E.D.
Va. Aug. 28, 2020); *In re Ascena Retail Group, Inc.*, No. 20-33113 (KRH) (Bankr. E.D. Va. Aug.
27, 2020); *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Feb. 18, 2020); *In re*

*Gemstone Solutions Group, Inc. (f/k/a Gymboree Group, Inc.)*, No. 19-030258 (KLP) (Bankr. E.D. Va. Jan. 17, 2019); *In re Toys "R" Us, Inc.*, No. 17–34665 (KLP) (Bankr. E.D. Va. Mar. 23, 2018); *In re Alpha Nat. Res., Inc.*, No. 15–33896 (KRH) (Bankr. E.D. Va. Nov. 6, 2015); *In re Patriot Coal Corp.*, No. 15–32450 (KLP) (Bankr. E.D. Va. June 25, 2015); *In re James River Coal Co.*, No. 14–31848 (KRH) (Bankr. E.D. Va. May 8, 2014).[6]

## III.    The Sale Should be Approved "Free and Clear" Under Section 363(f).

32.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of any interest in such property of an entity other than estate if: (a) applicable nonbankruptcy law permits sale of such property free and clear of such interest; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of the property exceeds the value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f).

33.    As section 363(f) is stated in the disjunctive, it is only necessary to satisfy one of the five requirements enumerated therein to warrant the sale of the Debtors' property free and clear of all liens, claims, rights, interests, charges, or encumbrances. *In re Collins*, 180 B.R. 447, 450 (Bankr. E.D. Va. 1995) ("Section 363(f) is phrased in the disjunctive, such that only one of the enumerated conditions must be met. . . ."); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

---

[6]      Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.  Copies of these orders are available upon request to the Debtors' proposed counsel.

34.     The Debtors submit that, in the interest of attracting the best offers, it is appropriate to sell the Assets on a final "as is" basis, free and clear of any and all Encumbrances (except as otherwise expressly set forth in the Sale Order and the Stalking Horse Agreement or an asset purchase agreement with a Successful Bidder, as applicable) in accordance with section 363(f) of the Bankruptcy Code because one or more of the tests of section 363(f) are satisfied with respect to such Sale.  First, the Debtors believe that section 363(f)(2) of the Bankruptcy Code is met with respect to the Prepetition First Lien Lenders because the Prepetition First Lien Agent has consented to the Sale.  Second, section 363(f)(3) of the Bankruptcy Code will be satisfied to the extent that the sales and marketing process yields a purchase price greater than the aggregate value of the liens encumbering the Debtors' property.  Finally, section 363(f)(5) is also met because, to the extent a party objects to the Sale on the basis that it holds a prepetition lien or encumbrance on the Assets, the Debtors believe that any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code.

35.     Moreover, with respect to any other party asserting a lien, claim, or encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code.  In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested.  Such lienholders that do not object to the Sale should be deemed to have consented.  *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to

object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same). Consistent with the foregoing, the Bidding Procedures Order provides that the absence of a timely objection to the sale of the Assets in accordance therewith shall be "consent" to such sale within the meaning of section 363(f)(2) of the Bankruptcy Code.

36.    A sale of the Assets other than one free and clear of all interests would yield substantially less value for the Debtors' estates. The Debtors submit that the Stalking Horse Purchaser will not, and other bidders are unlikely to, consummate the Sale absent the ability to purchase the Assets free and clear of all interests. Accordingly, the Debtors request that the Assets be sold free and clear with such interests attaching to the proceeds of the Sale, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.

## IV.    The Sale is Proposed in Good Faith and Without Collusion, and the Purchaser is a Good Faith Purchaser.

37.    The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale. Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good faith purchaser, and provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . .were stayed pending appeal.

11. U.S.C. § 363(m).

38.    While the Bankruptcy Code does not define good faith, many courts have held that a purchaser shows its good faith through the integrity of its conduct during the course of the sale process. *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between

the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *Andy Frain Services*, 798 F.2d 1113, 1125 (7th Cir. 1986); *In re Sasson Jeans*, 90 B.R. 608, 610 (S.D.N.Y. 1988).

39.    The Bidding Procedures are designed with the goal of producing a fair and transparent bidding process and to ensure that no party is able to exert undue influence over the process.  The Successful Bidder and the Debtors will have negotiated at arm's-length and in good faith, pursuant to a transparent process that, if necessary, will culminate in a public Auction. Notably, the Bidding Procedures require each Qualified Bidder to certify that it has not colluded with any other party in making its Bid or participating in the Auction.

40.    In addition, there is no indication that the Sale will be the result of any "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct that would cause Sale to be of violation of section 363(n) of the Bankruptcy Code.  As such, the Debtors submit that any Successful Bidder is or will be a good faith purchaser, entitled to the protections of section 363(m) of the Bankruptcy Code, and that none of the Debtors, the Successful Bidder, nor their respective affiliates, principals, employees or their representatives has engaged in any conduct that would cause the Sale to be avoided under Section 363(n).

## V.    Assumption and Assignment of Executory Contracts and Unexpired Leases

41.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease . . ." 11 U.S.C. § 365(a). Courts employ a business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989) (describing deference to a debtor's business

judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code."); *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., (In re Lubrizol Enters., Inc.)*, 756 F.2d 1043, 1046-47 (4th Cir. 1985) (affording debtor's decision the deference mandated by the sound business judgment rule); *In re Alpha Nat. Res., Inc.*, 555 B.R. 520, 529 (Bankr. E.D. Va. 2016) (same); *In re US Airways Grp., Inc.*, 287 B.R. 643, 645 (Bankr. E.D. Va. 2002) ("The standard in [the Fourth] Circuit for approving a request to [assume or reject an executory contract] is whether the trustee or debtor in possession has exercised sound business judgment.").

42.     The Bidding Procedures allow the Successful Bidder to designate the contracts and leases they wish to assume in connection with the Sale.  Certain of these contracts and unexpired leases are necessary to run the Debtors' business and, as such, they are essential to inducing the highest and best offer for the Assets.  As the Debtors intend to sell substantially all of their Assets as a going concern, it is in the Debtors' best interests that Successful Bidder have flexibility with regard to the assumption of contracts, including unexpired leases for the Debtors' multiple store locations, in order to maximize the value the Debtors' estates receive through the Sale.  Facilitating assumption and assignment of unexpired leases is clearly in the best interests of the Debtors, their creditors and their estates.

43.     At the same time, the Assumption and Assignment Procedures are designed to ensure that the Counterparties' rights are fully protected.  Section 365(b), which codifies the requirements for assuming an executory contract, provides, in pertinent part that the debtor may only assume an executory contract if it: (a) cures, or provides adequate assurance of promptly curing, any defaults existing under the executory contract; (b) compensates, or provides adequate assurance of promptly compensating, for actual pecuniary loss to contract counterparties resulting

from such default; and (c) provides adequate assurance of future performance under such contract or lease. 11 U.S.C. § 365(b).

44.     Further, section 365(f)(1) gives the Debtors the ability to assume and assign executory contracts or unexpired leases regardless of any provision, or applicable law, "that prohibits, restricts, or conditions the assignment of such contract or lease." 11 U.S.C. § 365(f)(1). The relevant limitation on this ability being the requirement to provide adequate assurance. *See* 11 U.S.C. § 365(f)(2)(B).

45.     While only defined by the Bankruptcy Code in limited circumstances, adequate assurance is otherwise determined by courts using "a practical, pragmatic construction based upon the facts and circumstances of each case." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term is "borrowed . . . from Section 2-609 of the Uniform Commercial Code," which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, the adequate assurance requirement "attempts to strike a balance between two sometimes competing interests, the right of the contracting non-debtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain." *In re Luce Industries, Inc.*, 8 B.R. 100, 107 (Bankr. S.D.N.Y. 1980).  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986).

46.     The Assumption and Assignment Procedures provide a clear process by which to resolve disputes over Cure Costs or other defaults such as lack of adequate assurance.  Because of

this, the Debtors are confident that any defaults that must be cured will be addressed fairly and efficiently, with due respect to the rights of non-Debtor contract parties.  In addition, the Bidding Procedures require all Qualified Bidders to provide financial and other information that would provide the Counterparties with adequate assurance of future performance of obligations under the applicable Proposed Assumed Contracts.  Counterparties unsatisfied with the proposed adequate assurance of future performance provided to them will be able to lodge objections with respect thereto.

47.      Moreover, the Debtors' believe that their ability to assign leases pursuant to section 365(f) of the Bankruptcy Code in connection with the sales and marketing process is essential to the success of the Chapter 11 Cases.  While shopping center leases must be assigned subject to the existing lease provisions, restrictive provisions within such leases will still be characterized as anti-assignment clauses and therefore not enforced. *See In re Trak Auto Corp.*, 367 F.3d 237 244-45 (4th Cir. 2004) (noting that section 365(f)(1) can still invalidate restrictive provisions in shopping center leases because, for example, section 365(b)(3) "is not intended to enforce requirements to operate under a specified trade name."); *6711 Glen Burnie Retail, LLC v. Toys "R" Us, Inc.*, 2018 WL 6787942 (E.D. Va. Dec. 26, 2018) (holding that a recapture provision in a lease was an anti-assignment clause due to its restrictive nature); *18601 Alderwood Mall Pkwy LLC v. Propco I Debtors*, 2020 WL 1056303 (E.D. Va. Mar. 4, 2020) ("[C]ourts look beyond the literal wording of a contractual provision to see whether it operates as a de facto anti-assignment clause in violation of § 365(f).").  Section 365(f) is routinely used to override these "de facto" restrictions on assignment, including in agreements to which debtors are not a party.  *See e.g., In re Toys "R" Us, Inc., et al.*, Case No. 17-34665 (KLP) (Bankr. E.D. Va. February 6, 2018) [Docket No. 641]; *In re Winn-Dixie, Inc.*, Case No. 05-03817 (M. D. Fla 2005) [Docket No. 2733].  This

application of section 365(f) comports with the underlying concerns of the Bankruptcy Code and ensure that a debtor will be able to monetize estate property for the benefit of the *estate as a whole*, rather than allowing a single creditor (*e.g.*, the landlord or reciprocal easement agreement counterparty, by virtue of its ability to block assignment) from usurping the value of estate property for its sole benefit.

48.     Finally, if the Stalking Horse Purchaser is the Successful Bidder then the Debtors will assume the Stalking Horse Agreement.  In that scenario, assuming the Stalking Horse Agreement will allow the Debtors to maximize the value for their creditors and other stakeholders.

49.     Accordingly, the Debtors submit that the requirements of section 365 of the Bankruptcy Code with respect to the potential assumption of the Stalking Horse Agreement have been satisfied, the assumption and assignment of the Proposed Assumed Contracts have been satisfied, and that the Assumption and Assignment Procedures should be approved.

**The Form and Manner of the Sale Notice Should Be Approved**

50.     As noted above, within three days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors will serve the Sale Notice upon the Notice Parties or as otherwise provided in an applicable Case Management Order, and also publish an abbreviated version of the Sale Notice in the national edition of USA Today (or another newspaper with national circulation) and post it onto the Case Website.

51.     The Debtors submit that notice of this Motion and the related hearing to consider entry of the Order, coupled with service of the Sale Notice constitutes good and adequate notice of the Auction.  Accordingly, the Debtors request that the Court approve the form and manner of the Sale Notice.

**The Sale of Personally Identifiable Information Should be Allowed Without Appointment of a Consumer Privacy Ombudsman.**

52.     Section 101(41A) of the Bankruptcy Code defines "personally identifiable information" ("Personally Identifiable Information") as an individual's name, residence address, email address, telephone number, social security number, or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual. 11 U.S.C. § 101(41A). Section 332 of the Bankruptcy Code requires the appointment of a consumer privacy ombudsman (an "Ombudsman") when a debtor seeks to sell or transfer Personally Identifiable Information notwithstanding restrictions in the debtor's privacy policy with respect to the transfer of such Personally Identifiable Information. *See* 11 U.S.C. § 363 (b)(1)(A).

53.     As set forth in the First Day Declaration, the Debtors' privacy policy (the "Privacy Policy")—available on the Debtors' website—in effect on the Petition Date provides for the sale of Personally Identifiable Information:

> In the event Paper Source goes through a transition (such as a merger, acquisition, bankruptcy or sale of all or a portion of its assets, including, without limitation, during the course of any due diligence process), *your information (including your Personal Information) will likely be among the assets transferred. By providing your Personal Information, you agree that we may transfer such information to the acquiring entity without your further consent.* (emphasis added).[7]

Further, the Debtors, with the consent of the consumer, has maintained optionality with respect to the permitted disclosure of customer records and Personally Identifiable Information to third parties pursuant to its privacy policy.

---

[7]     Paper Source, https://www.papersource.com/security.html (last visited March 1, 2021)

54.     As set forth in the First Day Declaration, the Debtors' data collection and processing is transparent and consumers are required to affirmatively consent or opt-in to receive marketing and other promotional materials from the Debtors.  Further, consumer consent to receive marketing or other materials can be revoked at any time, and all emails and text messages provide a clear road map for consumers to opt-out of communications from the Debtors or limit marketing offers.  The Debtors process opt-out requests upon receipt of either an email requesting to unsubscribe or following the opt-out instructions contained in any marketing material.

55.     Finally, consistent with the Privacy Policy and the Motion, the Debtors do not intend to transfer the Personally Identifiable Information of any consumer who opted-out of receiving communications and such information will be transferred only to the extent it can be aggregated or anonymized.  Accordingly, as set forth in the First Day Declaration, the Debtors submit that a sale of Personally Identifiable Information is consistent with the Debtors' privacy policy and the appointment of an Ombudsman is not required.

### Waiver of Memorandum of Law

56.     The Debtors respectfully request that this Court treat this Motion as a written memorandum of law or waive any requirement that this Motion be accompanied by a written memorandum of law as described in Local Bankruptcy Rule 9013-1(G).

### Requests for Immediate Relief and Waiver of Stay

57.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property…is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

58.     Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Sale Order.  As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders.

59.     Accordingly, the Debtors submit that ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that each Rule applies.

### Reservation of Rights

60.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code, any foreign bankruptcy or insolvency law, or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

### Notice

61.     The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the United States Trustee for the Eastern District of Virginia; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition First Lien Agent and its counsel; (d) the agent under the Debtors' prepetition second lien secured term loan its counsel; (e) the Stalking Horse Purchaser and its counsel; (f) Victory Park Management, LLC and its counsel; (g) the United States Attorney's Office for the Eastern

District of Virginia; (h) the Internal Revenue Service; (i) the offices of the attorneys general for

the states in which the Debtors operate; (j) the National Association of Attorneys General; (k) all

known holders of currently valid liens on or security interests in the Assets; and (l) any party that

has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The

Debtors submit that, in light of the nature of the relief requested, no other or further notice need

be given.

### No Prior Request

62.    No prior request for the relief sought in this Motion has been made to this or any

other court.

*[Remainder of page intentionally left blank]*

Richmond, Virginia
Dated: March 2, 2021

*/s/ Christopher A. Jones*

| | |
|---|---|
| Christopher A. Jones (VSB# 40064) | John C. Longmire (*pro hac vice* admission pending) |
| David W. Gaffey (VSB# 85088) | Matthew A. Feldman (*pro hac vice* admission pending) |
| Jae Won Ha (VSB# 94781) | James H. Burbage (*pro hac vice* admission pending) |
| **WHITEFORD TAYLOR & PRESTON LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Two James Center | 787 Seventh Avenue |
| 1021 E. Cary Street, Suite 1700 | New York, NY 10019 |
| Richmond, VA 23219 | |
| Telephone:        (804) 977-3300 | Telephone:        (804) 977-3300 |
| Facsimile:        (804) 977-3299 | Facsimile:        (804) 977-3299 |

*Proposed Co-Counsel to the Debtors*          *Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*                      *and Debtors in Possession*

## Exhibit A

**Bidding Procedures Order**

John C. Longmire (*pro hac vice* admission pending)
Matthew A. Feldman (*pro hac vice* admission pending)
James H. Burbage (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

| | |
|---|---|
| Telephone: | (212) 728-8000 |
| Facsimile: | (212) 728-8111 |

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219

| | |
|---|---|
| Telephone: | (804) 977-3300 |
| Facsimile: | (804) 977-3299 |

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**ORDER (I) APPROVING BIDDING PROCEDURES IN
CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS (II) SCHEDULING A SALE HEARING,
(III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
(IV) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the debtors and debtors in possession in the above-

captioned cases (together, the "Debtors"), for entry of: (A) an order (this "Order"):

(i) approving the proposed procedures to be used in connection with the sale (the "Sale") of the

Debtors' assets (the "Assets") attached as **Exhibit 1** to this Order (the "Bidding Procedures");

(ii) scheduling a final hearing for approval of the Sale (the "Sale Hearing"); (iii) approving the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are set forth in the *Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*, filed contemporaneously herewith. The location of the Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing attached as **Exhibit 2** to this Order ("Sale Notice"); (iv) authorizing certain procedures related to the assumption by the Debtors and assignment to the Successful Bidder (as defined below) of executory contracts and unexpired leases in connection with any Sale (the "Assumption and Assignment Procedures"); and (v) granting certain related relief; and (B) authorizing and approving the Sale (the "Sale Order"); it appearing that the relief granted herein is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *EDVA District Court Order Granting Original Jurisdiction to EDVA Bankruptcy Judges* dated August 15, 1984; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, **THE COURT FINDS THAT:**

A.    Findings of Fact and Conclusions of Law.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.    Jurisdiction and Venue.  This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     <u>Bases for Relief Requested</u>.  The bases for the relief requested in the Motion are: (a) sections 105, 363, 365, and 503 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "<u>Bankruptcy Code</u>");  (b) Rules 2002(a)(2), 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"); and (c) rules 2002-1, 6004-2, and 9013-1 of the Local Bankruptcy Rules of United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Local Bankruptcy Rules</u>").

D.     <u>Notice</u>.  Notice of the Motion and the hearing on the Bidding Procedures was sufficient under the circumstances and no other or further notice need be provided except as set forth in the Bidding Procedures and Assumptions and Assignment Procedures.  A reasonable opportunity to object and be heard regarding the relief requested in the Motion has been afforded to parties in interest.

E.     <u>Bidding Procedures</u>.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bidding Procedures, which are fair, reasonable, and appropriate under the circumstances and designed to maximize the recovery on, and realizable value of, the Assets, as determined by the Debtors in an exercise of their business judgment.

F.     <u>Assumption and Assignment Procedures</u>.   The Assumption and Assignment Procedures set forth below are fair, reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code.

G.     <u>Sale Notice</u>.  The Sale Notice, substantially in the form attached hereto as **<u>Exhibit 2</u>**, is reasonably calculated to provide interested parties with timely and proper notice of the proposed Sale, including, without limitation: (a) the date, time, and place of the Auction (if one is held) and Bidding Procedures; (b) reasonably specific identification of the Assets to be sold; and (c) a description of the Sale as being free and clear of liens, claims, encumbrances, and

other interests (except as set forth in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds (to the extent applicable), and no other or further notice of the Sale shall be required.

H.    <u>Auction</u>.  The Auction, if held, is necessary to determine whether any entity other than the Stalking Horse Purchaser is willing to enter into a definitive agreement on terms or conditions more favorable to the Debtors and their estates than the Stalking Horse Agreement.

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is granted as provided herein.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to this Court at the hearing on the Motion or by stipulation filed with this Court, are overruled.

**I.    Important Dates and Deadlines.**

3.    The following dates and deadlines are hereby approved (and may be adjourned from time to time by the Debtors):

| Event | Date |
|---|---|
| Bid Deadline | **April 16, 2021, at 5:00 p.m. (prevailing Eastern time)** |
| Notice of Qualified Bidder Deadline | **No later than 5:00 p.m. (prevailing Eastern time) on the date two days following the Bid Deadline** |
| Auction | **April 21, 2021, at [●]:00 a/p.m. (prevailing Eastern time),** as may be adjourned by the Debtors |
| Notice of Successful Bidder | **As soon as reasonably practicable after the conclusion of the Auction** |
| Sale Hearing | **April 30, 2021, at [●]:00 a/p.m. (prevailing Eastern time)**, or such other date and time that the Court may later direct and as agreed upon |

| Event | Date |
|---|---|
| | by the Debtors |
| Sale Closing | **May 26, 2021** |

4.      **Bid Deadline**:  **April 16, 2021, at 5:00 p.m., prevailing Eastern Time**, is the deadline by which all Bids must be actually received pursuant to the Bidding Procedures; *provided*, that the Debtors, may extend the Bid Deadline in their reasonable business judgment for all or certain Potential Bidders without further order of the Court.

5.      **Auction**:  **April 21, 2021, at [●]:00 a/p.m., prevailing Eastern Time**, is the date and time by which the Auction, if needed, will be held.  The Auction shall be held in accordance with the Bidding Procedures and take place (i) virtually by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors.

6.      **Notice of Successful Bidder**:  If applicable, as soon as reasonably practicable after the Auction, the Debtors shall file on the docket, but not serve on any party except with respect to each counterparty to a Proposed Assumed Contract, the Notice of Successful Bidder, substantially in the form attached to this Order as **Exhibit 3**.

7.      **Sale Hearing**:  **April 30, 2021, at [●] a/p.m., prevailing Eastern Time**, is the date and time at which the hearing on approval of the Sale of the Debtors' Assets to the designated Successful Bidder in connection with the Auction will be held.  The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

**Auction and Bidding Procedures.**

8.      The Bidding Procedures and any exhibits attached thereto, attached as **<u>Exhibit 1</u>** hereto, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids related to the Sale.  Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

9.      If the Debtors receive no more than one Qualified Bid (including from the Stalking Horse Purchaser), the Debtors may determine in their discretion and in consultation with the Consultation Parties not to hold the Auction and shall have the right to declare such Qualified Bidder as the Successful Bidder and request, at the Sale Hearing, that the Court approve the applicable Asset Purchase Agreement.

10.      At the Auction, each Qualified Bidder will be entitled, but will not be obligated, to submit Overbids and will be entitled in any such Overbids to credit bid all or a portion of the value of the secured portion of its claims against the Debtors, if any, within the meaning of section 363(k) of the Bankruptcy Code.

11.      At or following the Auction, and subject to the Bidding Procedures, the Debtors may, in consultation with the Consultation Parties: (a) select, in their business judgment, pursuant to the Bidding Procedures, (i) the highest or otherwise best Bid as the Successful Bidder and (ii) the second highest or otherwise second-best Bid as the Backup Bidder; and (b) reject any Bid (regardless of whether such Bid is a Qualified Bid) that, in such Debtor's business judgment, is (i) inadequate, insufficient, or not the highest or best Bid, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bankruptcy Rules, or the Bidding Procedures, or (iii) contrary to, or otherwise not in the best interests of the Debtors' estates, affected stakeholders, or other parties in interest, in each case subject to and in accordance with the Bidding Procedures.

12.     No person or entity, subject to further order from this Court, shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

**Sale Notice**

13.     The Sale Notice, substantially in the form attached to this Order as **Exhibit 2**, is approved.  Within three (3) business days following entry of the Order, the Debtors shall cause the Sale Notice to be served upon the Notice Parties or as otherwise provided in an applicable Case Management Order.  The Sale Notice will indicate that copies of the Motion and any future sale documents, if applicable, can be obtained on the Debtors' Case Website: http://dm.epiq11.com/PaperSource.

14.     Within three (3) business days after entry of this Order, or as soon as practicable thereafter, the Debtors shall place a publication version of the Sale Notice for one day in *USA Today (National Edition)* and post it onto the Case Website.  Such notice shall be deemed sufficient and proper notice of the Sale with respect to known interested parties.

**Notice of Successful Bidder**

15.     The Notice of Successful Bidder, substantially in the form attached to this Order as **Exhibit 3**, is approved.  After the conclusion of the Auction, the Debtors will file on the docket, but not serve except with respect to each counterparty to a Proposed Assumed Contract, the Notice of Successful Bidder identifying the applicable Successful Bidder and key terms of the agreement.

**Assumption and Assignment Procedures**

16.     The Potential Assumption and Assignment Notice attached hereto as **Exhibit 4** is approved and fully incorporated into this Order.

17.     The procedures set forth below regarding the assumption and assignment of the executory contracts and unexpired leases proposed to be assumed by the Debtors pursuant to section 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Purchaser or otherwise Successful Bidder, as applicable, pursuant to section 365(f) of the Bankruptcy Code in connection with the Sale (the "Assumption and Assignment Procedures") are hereby approved to the extent set forth herein.

18.     These Assumption and Assignment Procedures shall govern the assumption and assignment of all of the Debtors' Executory Contracts and Unexpired Leases to be assumed and assigned in connection with the Sale, subject to the payment of any amounts necessary to cure any defaults arising under any Assigned Contract (as defined below) (the "Cure Cost"):

    a.  Potential Assumption and Assignment Notice:  Within ten days after entry of the Bidding Procedures Order, the Debtors will file with the Court, serve on the Notice Parties, and cause to be published on the Case Website, the "Potential Assumption and Assignment Notice," which will (i) identify the Contracts; (ii) list the Debtors' good faith calculation of the proposed respective Cure Costs with respect to each Contract; (iii) expressly state that assumption or assignment of any Contract is not guaranteed; and (iv) prominently display the deadline for filing objections to the proposed Cure Costs.  In the event that the Debtors identify non-Debtor Contract counterparties (the "Counterparties") that were not served with the Potential Assumption and Assignment Notice, the Debtors will serve such Counterparties with a Potential Assumption and Assignment Notice (or the Proposed Assumed Contracts Notice, as applicable), and the Assumption and Assignment Procedures will nevertheless apply to such Counterparties.

    b.  Proposed Assumed Contracts Notice:  As soon as reasonably practicable after the conclusion of the Auction, the Debtors will file with the Court, serve on the Notice Parties, and cause to be published on the Case Website a list of the contracts that the Debtors will seek to assume and assign pursuant to the Successful Bidder (the "Proposed Assumed Contracts Notice" and, each Contract listed therein, a "Proposed Assumed Contract").

    c.  Cure Objections Deadline:  Any Counterparty that wishes to object to the proposed Cure Costs under the relevant Contract (each, a "Cure Objection"), must file with the Court and serve on the Objection Recipients (defined below) its Cure Objection, which must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state, with specificity, the legal and

factual bases therefor, including any appropriate documentation in support thereof and served on the Objection Recipients (as defined in the Order), (iv) state the cure amount alleged to be owed, and (v) be filed with the Court and served on the Objection Recipients by no later than **5:00 p.m. (prevailing Eastern Time) on the date that is 14 days following service of the Potential Assumption and Assignment Notice.** In the event that the Debtors identify any Counterparties that were not served with the Potential Assumption and Assignment Notice, the Debtors shall subsequently serve such Counterparty with the Potential Assumption and Assignment Notice, and these Assumption and Assignment Procedures shall nevertheless apply to such Counterparty; provided, however, that the deadline for such Counterparty to file a Cure Objection shall be **5:00 p.m. (prevailing Eastern Time) on the date that is the later of (a) the date that is 14 days following service of the Potential Assumption and Assignment Notice, and (b) the date that is seven days following service of the supplemental Potential Assumption and Assignment Notice.**

d.  Resolution of Cure Objections:  If the parties are unable to consensually resolve any Cure Objection prior to the commencement of the Sale Hearing, the Court will make all necessary determinations relating to the Cure Objection at or subsequent to the Sale Hearing; provided that the determination of whether a Cure Objection may be heard at the Sale Hearing is in the Debtors' and the Court's discretion.  An adjourned Cure Objection may be resolved after the closing date of the applicable Sale.  Upon the Court's resolution of any Cure Objection, whether or not such resolution occurs prior to or after the closing of the Sale, the Successful Bidder will have the right to exclude the Proposed Assumed Contract subject to such Cure Objection from the Assets subject to the Sale.

e.  Assumption and Assignment Following Resolution of Cure Objection:  Upon resolution of a Cure Objection, provided that the Successful Bidder has not determined to exclude the relevant Proposed Assumed Contract from the Assets included in the applicable Sale, and upon the payment of the applicable cure amount and subject to the Asset Purchase Agreement of the Successful Bidder, if any, the applicable Proposed Assumed Contract will be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale.

f.  Failure to Timely File Cure Objection:  If a Counterparty fails to timely file with the Court and serve on the Objection Recipients a Cure Objection, the Counterparty will be deemed to have consented to the Cure Costs set forth in the Potential Assumption and Assignment Notice and forever will be barred from asserting any objection to such Cure Costs or any other claims related to the applicable Proposed Assumed Contract against the Debtors, the Successful Bidder, or their respective property, and such Cure Costs will constitute the only amount necessary to cure outstanding defaults under the applicable Proposed Assumed Contract in accordance with section 365(b) of the Bankruptcy Code, notwithstanding anything to the contrary in any Proposed Assumed Contract, or any other document.

g. <u>Adequate Assurance Objections</u>: Any Counterparty to a Proposed Assumed Contract that wishes to object to the proposed adequate assurance of future performance by the applicable Successful Bidder with respect to such Proposed Assumed Contract (each, an "<u>Adequate Assurance Objection</u>") must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state, with specificity, the legal and factual bases therefor, including any appropriate documentation in support thereof and served on the Objection Recipients (as defined in the Order), and (iv) be filed with the Court and served on the Objection Recipients by no later than **12:00 p.m. (prevailing Eastern Time) on the date prior to the Sale Hearing.**

h. <u>Failure to Timely File Adequate Assurance Objections</u>: If a Counterparty fails to timely file with the Court and serve on the Objection Recipients an Adequate Assurance Objection or other objection, such Counterparty will be deemed to have consented to the assumption and assignment of the Proposed Assumed Contract (unless the Counterparty has filed a timely Cure Objection with respect to such Proposed Assumed Contract) and to the adequate assurance of future performance offered in connection therewith, and forever will be barred from asserting any objection with regard to such assumption and assignment or adequate assurance of future performance or otherwise. The applicable Successful Bidder will be deemed to have provided adequate assurance of future performance with respect to the applicable Proposed Assumed Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code, notwithstanding anything to the contrary in the Proposed Assumed Contract, or any other document.

i. <u>Objection Recipients</u>: The term "Objection Recipient" shall mean (a) proposed counsel to the Debtors Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, Attn: John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com) and James H. Burbage (jburbage@willkie.com), (b) counsel to the Debtors' prepetition first lien secured lender Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn: Charles A. Dale (CDale@proskauer.com) and David M. Hillman (DHillman@proskauer.com); (c) counsel to any statutory committee appointed in the Chapter 11 Cases; (d) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Wilmington, DE 19801, Attn: Attn: Nicholas S. Herron (usdoj.gov); and (e) any Successful Bidder (if known).

19.     The Debtors shall file with this Court and cause to be published on the Case

Website, the Potential Assumption and Assignment Notice within ten days after the entry of this

Order.

**Miscellaneous**

20.     The failure to include or reference a particular provision of the Bidding Procedures or Assumption and Assignment Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

21.     The Debtors are authorized to establish an escrow account (or accounts) to accept Deposits from Qualified Bidders and may pay any reasonable fees related to such account.  Any Deposits made by Qualified Bidders into the escrow account (or accounts) shall not be property of the Debtors.

22.     In the event of any inconsistencies between this Order and the Motion, this Order shall govern.  In the event of any inconsistencies between this Order and the Bidding Procedures, the Bidding Procedures shall govern.

23.     The requirement under Local Bankruptcy Rule 9013-1(b) to file a memorandum of law in connection with the Motion is waived.

24.     Notice of the Motion as provided therein shall be deemed good and sufficient notice as to such Motion and the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules for the Eastern District of Virginia are satisfied by such notice.

25.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

26.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

27.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____     _____
Richmond, Virginia                                         United States Bankruptcy Judge

WE ASK FOR THIS:

*/s/ Christopher A. Jones*
  Christopher A. Jones (VSB# 40064)
  David W. Gaffey (VSB# 85088)
  Jae Won Ha (VSB# 94781)
  **WHITEFORD TAYLOR & PRESTON LLP**
  Two James Center
  1021 E. Cary Street, Suite 1700
  Richmond, VA 23219
  Telephone:      (804) 977-3300
  Facsimile:      (804) 977-3299

  - and –

  John C. Longmire (*pro hac vice* admission pending)
  Matthew A. Feldman (*pro hac vice* admission pending)
  James H. Burbage (*pro hac vice* admission pending)
  **WILLKIE FARR & GALLAGHER LLP**
  787 Seventh Avenue
  New York, NY 10019
  Telephone:      (212) 728-8000
  Facsimile:      (212) 728-8111

  *Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/ Christopher A. Jones*

**<u>Exhibit 1 to Bidding Procedures Order</u>**

**Bidding Procedures**

John C. Longmire (*pro hac vice* admission pending)
Matthew A. Feldman (*pro hac vice* admission pending)
James H. Burbage (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

| Telephone: | (212) 728-8000 |
| Facsimile: | (212) 728-8111 |

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:       (804) 977-3300
Facsimile:       (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## BIDDING PROCEDURES FOR THE DISPOSITION OF THE DEBTORS' ASSETS

On [●], the United States Bankruptcy Court for the Eastern District of Virginia entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets, (II) Scheduling a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "Auction") for a sale or disposition (the "Sale") of all or substantially all of the Debtors' Assets (as defined herein) or any portion thereof (the "Bidding Procedures").

### I.    ASSETS TO BE SOLD.

The Debtors seek to sell substantially all of the Debtors' assets (the "Assets"), described in the Stalking Horse Agreement (as defined below) as the Purchased Assets.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035).  The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Order.

## II.    FREE AND CLEAR OF ANY AND ALL CLAIMS AND INTERESTS

Except as otherwise provided in the Successful Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances, and interests (collectively, the "Encumbrances") to the maximum extent permitted by section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities, each as defined in the Stalking Horse Agreement).

## III.    STALKING HORSE AGREEMENT

In connection with the Sale, the Debtors entered into the Asset Purchase Agreement (the "Stalking Horse Agreement") on March 2, 2021 with MidCap Funding Investments XI LLC (the "Stalking Horse Purchaser"), which is an acquisition entity designated by (a) MidCap Financial Trust ("MidCap") in its capacity as administrative agent and collateral agent for the DIP Lenders[3] (in such capacities, the "DIP Agent") and (b) MidCap in its capacity administrative agent and collateral agent for the Prepetition First Lien Lenders[4] (in such capacities, the "Prepetition First Lien Agent").  The Stalking Horse Agreement for the Stalking Horse Purchaser's acquisition of the Purchased Assets in consideration for the Credit Bid (as defined in the Stalking Horse Agreement).  The DIP Agent and Prepetition First Lien Agent have consented to the sale of Assets pursuant to the Stalking Horse Agreement.

The Stalking Horse Purchaser is deemed to be a Qualified Bidder (as defined below) and the Stalking Horse Agreement is deemed to be a Qualified Bid (as defined below).  The Stalking Horse Purchaser is credit bidding pursuant to 11 U.S.C. § 363(k), and thus is not required to make a Deposit with the Debtors.  The Stalking Horse Purchaser shall have the unqualified right at any time to credit bid on a dollar-for-dollar basis up to the full amount of the Prepetition First Lien Obligations and the DIP Obligations (as each term is defined in the Interim DIP Order at [Docket No. [●]]).

## IV.    PARTICIPATION REQUIREMENTS.

### A.    Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose hereunder, a person or entity interested in the Assets (a "Potential Bidder") must deliver to each of the Debtors' advisors the following documents and information (unless the Debtors, in their business judgment, choose to waive any of the following requirements for any Potential Bidder):

---

[3]    "DIP Lenders" refers to the lenders that are parties to that certain Secured Superpriority Debtor-In-Possession Credit Term Sheet, dated as of March 2, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "DIP Facility") with the Debtors.

[4]    "Prepetition First Lien Lenders" refer the lender that are parties to that certain Credit and Guaranty Agreement, dated as of March 22, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition First Lien Facility") with the Debtors.

1.      an executed confidentiality agreement unless the Potential Bidder has already executed a confidentiality agreement on terms acceptable to the Debtors (a "<u>Confidentiality Agreement</u>");

2.      identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated Sale; and

3.      proof by the Potential Bidder of its financial capacity to close a proposed Sale, which may include financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the desired Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors and their advisors (including in consultation with the Consultation Parties).

The Debtors, in consultation with their advisors and the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a Bid (such Potential Bidder, an "<u>Acceptable Bidder</u>").

### B.      Obtaining Due Diligence.

The Debtors, with their advisors, have established an electronic data room (the "<u>Data Room</u>") that provides standard and customary diligence materials, including the necessary information to allow Acceptable Bidders to submit a Qualified Bid (as defined below) and to seek and obtain commitments for debt financing.

Only Acceptable Bidders shall be eligible to receive diligence materials and access to the Debtors' Data Room and to additional non-public information regarding the Debtors and the Assets.  The Debtors (with the assistance of their advisors) shall coordinate all reasonable requests from Acceptable Bidders for additional information and due diligence access; *provided* that (i) the Debtors shall have the right to reasonably limit the information and due diligence provided to competitors, and (ii) the Debtors may decline to provide such information to Acceptable Bidders who, at such time and in the Debtors' reasonable business judgment, have not established, or who have raised doubt, that such Acceptable Bidder intends in good faith to, or has the capacity to, consummate a proposed Sale.  The due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.  The Debtors shall not furnish any confidential information relating to the Assets or liabilities of the Debtors, or the Sale to any person except to such party or to such party's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement.  Additional due diligence will not be provided after the Bid Deadline, unless otherwise deemed reasonably appropriate by the Debtors.  The Debtors, their representatives and advisors are not responsible for, and will bear no liability with respect to, any information obtained by any Acceptable Bidder in connection with any Sale.

**C.**      **Bid Deadline.**

An Acceptable Bidder that desires to make a Bid must transmit via email (in .pdf or similar format) **or** deliver written copies of its Bid to the following parties so as to be received not later than **5:00 p.m. (prevailing Eastern Time) on April 16, 2021** (the "Bid Deadline"):

i.       proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com), and James H. Burbage (jburbage@willkie.com); and

ii.      the Debtors' proposed investment banker, SSG Capital Advisors, LLC, located at 300 Barr Harbor, Suite 420, West Conshohocken, PA 19428 Attn: Teresa Kohl (tkohl@ssgca.com) and J. Scott Victor (jsvictor@ssgca.com).

The Debtors will provide copies of all Bids via electronic mail as soon as reasonably practicable to the Office of the United States Trustee for the Eastern District of Virginia (the "U.S. Trustee") and counsel for any official committee appointed in these chapter 11 cases.

## V.      QUALIFIED BIDS.

**A.**      **Requirements for Qualified Bids.**

Any proposal, solicitation, or offer (each, a "Bid") will be considered a qualified bid only if the Bid is submitted in writing by an Acceptable Bidder, is submitted by the Bid Deadline, and, in the exercise of the Debtors' business judgment and in consultation with the Consultation Parties, complies with all of the following conditions (a "Qualified Bid" and such bidder a "Qualified Bidder"):

1.      ***Bid Deadline***.  The Bid must be submitted by the Bid Deadline.

2.      ***Confidentiality***.  The Acceptable Bidder shall have executed and delivered to the Debtors a Confidentiality Agreement.

3.      ***Assets***.   The Bid must clearly identify the following: (a) the particular Assets, or the portion thereof identified with reasonable specificity, to be purchased and/or liquidated or otherwise disposed of; (b) the liabilities and obligations to be assumed, including any debt to be assumed; and (c) whether the Acceptable Bidder intends to operate the Debtors' business as a going concern, or to liquidate the business.

4.      ***Purchase Price***.  The Bid must (a) clearly set forth the purchase price to be paid (the "Purchase Price"), and (b) provide for the Purchase Price to be paid for entirely in cash, except as set forth herein.  If an Acceptable Bidder cannot consummate its proposed transaction entirely in cash and intends to finance its Bid with financing from MidCap, such Acceptable Bidder shall contact (i) the Debtors' proposed counsel and investment banker, and (ii) MidCap's financial advisor, Carl Marks Advisors, 900 Third Avenue

33rd Fl., New York, NY 10022, Attn: Keith Daniels (kdaniels@carlmarks.com) to discuss such alternative proposal. Following such discussion, the Debtors, in consultation with and with MidCap's consent, shall determine if such alternative non-cash proposal (a "Non-Conforming Alternative Bid") constitutes a "Qualified Bid" and such bidder a "Qualified Bidder."

5.   ***Deposit***.   Each Bid (other than the Stalking Horse Bid) must be accompanied by a cash deposit in the amount equal to 10 percent of the aggregate Purchase Price of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit"), provided that if a Qualified Bidder increases its Bid at the Auction and is the Successful Bidder or Backup Bidder (each as defined herein), such bidder must increase its Deposit to match the proposed Purchase Price submitted at the Auction within three (3) business days after the Auction.

6.   ***Bid Documents***.   Each Bid must include duly executed, non-contingent transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents").  The Bid Documents shall include: (a) a clearly marked executed written agreement that is substantially similar to the form of the Stalking Horse Agreement (with a redline showing any changes from the Stalking Horse Agreement requested by the Acceptable Bidder ("Proposed Revised APA")), (b) a schedule of Proposed Assumed Contracts to the extent applicable to the Bid, (c) any other material documents integral to such Bid, (d) evidence of "adequate assurance of future performance" with respect to the contracts and leases to be assumed and assigned; and (e) a statement from the Acceptable Bidder that: (y) it is prepared to enter into and consummate the transactions contemplated in the Proposed Revised APA no later than May 26, 2021 and (z) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the Successful Bid or the Backup Bid) until the consummation of the Sale.

7.   ***Legal Capacity***.   Each Bid must demonstrate to the Debtors' satisfaction that the Acceptable Bidder has the legal capacity to consummate the transaction it is proposing.

8.   ***Financial Wherewithal***.   The Acceptable Bidder shall submit financial and other information to the Debtors, including support indicating the availability of funds to satisfy the Purchase Price, sufficient to allow the Debtors to make a reasonable determination as to such Acceptable Bidder's ability to consummate a sale as contemplated.

9.   ***Contingencies***.   The Bid shall be an unqualified and binding bid with no contingencies or conditions (including obtaining financing (other than in connection with a Non-Conforming Alternative Bid) or any internal

approvals or performing any additional diligence) and all diligence must be completed before the Bid Deadline.

10. ***Identity***.  The Bid must fully disclose the legal identity of each person or entity bidding or otherwise participating in connection with such Bid (including each equity holder or financial backer of the Acceptable Bidder if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed transaction contemplated by such Bid), and the complete terms of any such participation, and must also disclose any connections or agreements with the Debtors, any other known Potential Bidder, Acceptable Bidder, or Qualified Bidder, and/or any officer or director of the foregoing.  Under no circumstances will any undisclosed principals, equity holders, or financial backers be associated with any Bid.

11. ***Irrevocable***.  ALL BIDS SHALL BE DEEMED IRREVOCABLE, NOTWITHSTANDING ANY CONDITIONS LISTED IN THE APPLICABLE AGREEMENT.  IN THE EVENT THAT AN ACCEPTABLE BIDDER SEEKS TO REVOKE SUCH BID, THE DEBTORS SHALL BE ENTITLED TO KEEP SUCH BIDDER'S DEPOSIT AND PURSUE ALL OTHER CONTRACTUAL REMEDIES UNDER LAW OR EQUITY.

12. ***Backup Bidder***.  By submitting a Bid, each Acceptable Bidder agrees to be a Backup Bidder, should the Bid be so selected.

13. ***As-Is, Where-Is***.  The Bid must include the following representations and warranties (or the Acceptable Bidder must otherwise agree that such representations and warranties may be incorporated into the applicable Bid Documents should the Bid be selected as the Successful Bid): (a) expressly state that the Acceptable Bidder has had an opportunity to conduct any and all due diligence regarding the Debtors' businesses and the Assets prior to submitting its Bid; and (b) a statement that the Acceptable Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Assets in making its Bid and did not rely on any of the Debtors' or any of their advisors' written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' businesses or the Assets or the completeness of any information provided in connection therewith, except (with respect to the Debtors only) as expressly stated in the representations and warranties contained in the Acceptable Bidder's Proposed Revised APA.

14. ***Authorization***.  The Bid must include evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or comparable governing body) acceptable to the Debtors with respect to the submission, execution, and delivery of its Bid, participation in the Auction, and closing of the proposed transaction contemplated in such Bid.  The Bid

shall further state that any necessary filings under applicable regulatory, antitrust, and other laws will be made in a timely manner and that payment of the fees associated therewith shall be made by the Acceptable Bidder. The Bid shall expressly provide that the Acceptable Bidder is prepared to consummate the transaction promptly following entry of the Sale Order and that the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction or May 26, 2021 (only if such Bid is the Successful Bid or Backup Bidder).

15.     ***Disclaimer of Fees***.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break- up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

16.     ***Adherence to Bid Procedures***.  Each Bid must include (a) a statement that the Acceptable Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code, and (b) that the Bid constitutes a bona fide offer to consummate the proposed transactions, and agrees to be bound by these Bidding Procedures.

17.     ***No Collusion***.  The Acceptable Bidder must acknowledge in writing that (a) in connection with submitting its Bid, it has not engaged in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids or the Sale, specifying that it did not agree with any Potential Bidders, Acceptable Bidders or Qualified Bidders to control price; and (b) it agrees not to engage in any collusion that would be subject to section 363(n) of the Bankruptcy Code with respect to any Bids, the Auction, or the Sale.

18.     ***Other Information***.  The Bid contains such other information as may be reasonably requested by the Debtors.

**B.      Rejection of "Qualified Bid" Status for Non-Conforming Bids.**

The Debtors shall determine in their discretion, and in consultation with the Consultation Parties, which Bids meet the above criteria, and if so, such Bid shall constitute a "Qualified Bid" and such Acceptable Bidder shall constitute a "Qualified Bidder"; provided, however, MidCap's express prior written consent shall be required in order for the Debtors to qualify a Non-Conforming Alternative Bid as a Qualified Bid (a "Qualified Non-Conforming Alternative Bid"). Any Bid that the Debtors determine in consultation with the Consultation Parties does not meet the above requirements shall be rejected as a non-conforming bid.  The Debtors shall inform the Acceptable Bidders whether or not their Bids have been designated as Qualified Bids no later than 5:00 p.m. (prevailing Eastern Time) on the date two days following the Bid Deadline.  A joint bid

(a Bid submitted on behalf of more than one Acceptable Bidder) may, in the Debtors' business judgment, and in consultation with the Consultation Parties, be deemed a Qualified Bid if it otherwise complies with all of the requirements set forth above.

Notwithstanding anything herein, unless the Stalking Horse Purchaser consents, no Bid other than the Stalking Horse Bid shall be determined to be a Qualified Bid or the Successful Bid unless it provides for cash consideration of an amount at least equal to the Prepetition First Lien Obligations and DIP Obligations, unless (a) such Bid is a Qualified Non-Conforming Alternative Bid or (b) such Bid is otherwise acceptable to the DIP Agent and Prepetition First Lien Agent.

### C.    No Representation; Qualified Bidder's Duty to Review.

Neither the Debtors nor any of their advisors are making or have at any time made any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets. All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the Assets, except to the extent expressly provided in the Bankruptcy Court's order approving the Sale. Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Bankruptcy Court's order approving the Sale.

### VI.    QUALIFICATION OF BIDDERS.

No later than 5:00 p.m. (prevailing Eastern Time) on the date two days following the Bid Deadline, the Debtors shall notify each Acceptable Bidder whether such party is a Qualified Bidder.

If any Bid is determined by the Debtors in consultation with the Consultation Parties not to be a Qualified Bid, the Debtors will refund such Acceptable Bidder's Deposit on or before the date that is five (5) business days after the Bid Deadline.

Between the date that the Debtors notify an Acceptable Bidder that it is a Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

The Debtors reserve the right to cooperate with any Acceptable Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.

Each Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors.  Failure by a Qualified Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such Acceptable Bidder is no longer a Qualified Bidder or that a Bid made by such Acceptable Bidder is not a Qualified Bid.

## VII.   THE AUCTION.

If the Debtors receive more than one Qualified Bid, the Debtors shall conduct the Auction to determine the Successful Bidder.  If the Debtors do not receive a Qualified Bid, the Debtors will not conduct the Auction and will seek approval of the Stalking Horse Agreement.

No later than two days prior to the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, as determined in the Debtors' reasonable business judgment in consultation with the Consultation Parties (the "Baseline Bid"), and provide copies of the Bid Documents supporting the Baseline Bid to all Qualified Bidders.  The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, but not limited to, among other things: (a) the number, type, and nature of any changes to the Stalking Horse Agreement requested by the Qualified Bidder, including the type and portion of the Purchased Assets sought and Assumed Liabilities (as defined in the Stalking Horse Agreement) to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the net economic effect of any changes to the value to be received by the Debtors' estates from the transactions contemplated by the Bid Documents; (d) the tax consequences of such Qualified Bid; and (e) the ability and likelihood to close the transaction contemplated by the Qualified Bid (collectively, the "Bid Assessment Criteria").

### D.    Auction Participation

1.   *Time, Date and Location of Auction; Adjournment of Auction; Appearance of Qualified Bidders at Auction*.  The Auction shall take place (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors.

2.   *Participants and Attendees*.  Only Qualified Bidders, parties invited by the Debtors, and counsel to any official committee appointed in these chapter 11 cases are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with these Bidding Procedures.  Qualified Bidders participating in the Auction must appear in person via videoconference at the Auction, or through a duly authorized representative.

E.    **Auction Procedures.**

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.  All incremental Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis in the presence of all other Qualified Bidders, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  All Qualified Bidders shall have the right to submit additional Bids and make modifications to any prior Qualified Bid or Overbid at the Auction to improve their Bids; *provided that* any Overbid made by a Qualified Bidder (including with respect to any Backup Bid (as defined below)) must remain open and binding on the Qualified Bidder until and unless the Debtors accept a higher or otherwise better Qualified Bid as the Leading Bid.  The Debtors may, in their reasonable business judgment, negotiate with any and all Qualified Bidders participating in the Auction.  The Debtors shall maintain a written transcript of the Auction and of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid (as defined below).

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment:

1.    ***Baseline Bid as Price Floor***.  Bidding shall commence at the amount of the Baseline Bid.

2.    ***Minimum Overbid***.  Qualified Bidders may submit successive Bids higher than the previous Bid, based on and increased from the Baseline Bid for the relevant Assets (each such Bid, an "Overbid").  Any Qualified Bidder's initial Overbid and each subsequent Overbid shall be at least a $250,000 increase in cash or cash equivalents over the previous price (the "Minimum Overbid").  The Debtors may, in their reasonable business judgment, announce increases or reductions to the Minimum Overbid at any time during the Auction.

3.    ***Announcement of Rules***.  At commencement of the Auction, the Debtors may announce procedural and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive Bid(s).

4.    ***Overbid Alterations***.  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

5.    ***Highest or Best Offer***.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the Bid that they believe in their reasonable business judgment and upon consultation with their advisors, and the Consultation Parties, to be the highest or otherwise best offer for the relevant Assets (the "Leading Bid").  Each round of

bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent Bid with full knowledge of the Leading Bid.

6.    ***Rejection of Bids***. The Debtors, in their reasonable business judgment, and in consultation with the Consultation Parties, may reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

7.    ***Additional Information***.  The Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction.

8.    ***Modification of Procedures***.  The Debtors may (in consultation with the Consultation Parties) announce at the Auction modified or additional procedures for conducting the Auction or otherwise modify these Bidding Procedures.

9.    ***No Collusion***.  Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding and (ii) its Qualified Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the Successful Bidder.

**F.    Adjournment of the Auction.**

The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt or equity funding commitments to consummate the proposed Sale at the prevailing Bid amount.

**G.    Successful Bidder.**

Immediately prior to the conclusion of the Auction, the Debtors shall, in consultation with the Consultation Parties, (i) determine, consistent with these Bidding Procedures, which Bid constitutes the highest or otherwise best Bid for the Assets (such Bid, a "<u>Successful Bid</u>"); and (ii) notify all Qualified Bidders at the Auction of the identity of the Qualified Bidder that submitted

the Successful Bid (each such Qualified Bidder, the "Successful Bidder") and the amount of the Purchase Price and other material terms of the Successful Bid.

> **H.      Backup Bidder.**

If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their reasonable business judgment, shall be required to serve as a backup bidder (as applicable, the "Backup Bid" and "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated.  In the event that the Stalking Horse Bid is the Backup Bid, it shall not be extended beyond the End Date (as defined in the Stalking Horse Agreement) without the prior written consent of the Stalking Horse Purchaser.

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors, in consultation with the Consultation Parties, may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.  The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

## VIII.   ACCEPTANCE OF SUCCESSFUL BID.

The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of such Qualified Bid.  The Debtors will be deemed to have accepted a Bid only when the Bid has been approved by the Court at the Sale Hearing (as defined below).  The Debtors shall seek approval by the Court to consummate the Backup Bid, solely in the event the Successful Bidder fails to close the transaction as required and with all rights reserved against the Successful Bidder.

## IX.     SALE HEARING.

A hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder, or Backup Bidder (if applicable) (the "Sale Hearing") is currently scheduled to take place on **April 30, 2021**, at [●], (prevailing Eastern Time), before the Honorable [●], at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4000, Richmond, Virginia 23219, or such other date and time that the Court may later direct and as agreed upon by the Debtors.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.

## X.      RETURN OF DEPOSIT.

The Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more accounts on terms acceptable to the Debtors in their sole discretion and shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) on or before the date that is five business days after the Auction.

The Backup Bidder's Deposit shall be held in escrow until the closing of the Sale with the Successful Bidder.  In the event the Successful Bidder fails to consummate the Sale transaction set forth in the Successful Bid and the Debtors opt to close on the Sale transaction set forth in the Backup Bid, the Backup Bidder's Deposit shall be applied to the Purchase Price of such transaction at closing.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Backup Bidder, as applicable, the defaulting Successful Bidder's Deposit or Backup Bidder's Deposit, as applicable, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder or Backup Bidder, as applicable.

## XI.      RESERVATION OF RIGHTS.

The Debtors reserve their rights to modify, in consultation with the Consultation Parties, these Bidding Procedures in their reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the conclusion of the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids.

## XII.      CONSENT TO JURISDICTION.

All Potential Bidders, Acceptable Bidders, and Qualified Bidders shall be deemed to have consented to the exclusive jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the construction and enforcement of these Bidding Procedures, and/or the Bid Documents, as applicable.

## XIII.  FIDUCIARY OUT.

Nothing in these Bidding Procedures shall require the Debtors' management or board of directors to take any action or to refrain from taking any action with respect to these Bidding Procedures when the Debtors' management or board of directors determine, based on the advice of their counsel, that taking such action or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law.

## XIV.  CONSULTATION BY THE DEBTORS

Where indicated, the Debtors shall consult with the advisors to the Debtors and any official committee (collectively, the "Consultation Parties").

The DIP Agent and the Prepetition First Lien Agent shall not have consultation rights with regard to (a) any review of competing Bids or Qualified Bids; (b) any determination regarding which competing Bids constitute Qualified Bids, and (c) the selection of the Successful Bidder; provided, however, that the DIP Agent and Prepetition First Lien Agent shall automatically become a Consultation Party in the event that the Stalking Horse Purchaser withdraws its Bid for any reason and shall have consultation and consent rights with respect to any Non-Conforming Alternative Bid.

## Exhibit 2 to Bidding Procedures Order

**Sale Notice**

John C. Longmire (*pro hac vice* admission pending)          Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (*pro hac vice* admission pending)        David W. Gaffey (VSB# 85088)
James H. Burbage (*pro hac vice* admission pending)          Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**                             **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue                                          Two James Center
New York, NY 10019                                          1021 E. Cary Street, Suite 1700
                                                            Richmond, VA 23219
Telephone:        (212) 728-8000                            Telephone:      (804) 977-3300
Facsimile:        (212) 728-8111                            Facsimile:      (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### NOTICE OF SALE, BIDDING
### PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE** that, on March 2, 2021 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"), commencing these chapter 11 cases (the "Chapter 11 Cases").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2021, the Debtors filed a motion [D.I. [●]] (the "Sale Motion") seeking entry of orders (a) approving the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), and (b) an order (the "Bidding Procedures Order"), (i) approving bidding procedures (the "Bidding Procedures")[2] to be used in connection with the, (ii) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "Auction"), if applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (iii) approving the form and manner of notice of the Bidding Procedures, the Auction, if any, and the Sale Hearing, (iv) authorizing certain procedures for the assumption and assignment of certain executory

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]     Capitalized terms not defined in this notice are used as defined in the Sale Motion or the Bidding Procedures, as applicable.

-1-

contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2021, the Court entered the Bidding Procedures Order [D.I. [●]], approving, among other things, the Bidding Procedures, which establish key dates and times relating to the Sale and the Auction. All interested bidders should carefully read the Bidding Procedures Order and the Bidding Procedures in their entirety.[3]

### Contact Persons for Parties Interested in Submitting a Bid

The Bidding Procedures set forth in detail the requirements for submitting Qualified Bids, and any person interested in making an offer to purchase the Assets must comply strictly with the Bidding Procedures. Only Qualified Bids that are submitted in accordance with the Bidding Procedures will be considered by the Debtors.

**Any persons interested in making an offer to purchase the Assets should contact the Debtors' investment banker as soon as possible: SSG Capital Advisors, LLC, located at 300 Barr Harbor, Suite 420, West Conshohocken, PA 19428 Attn: Teresa Kohl (tkohl@ssgca.com) and J. Scott Victor (jsvictor@ssgca.com)**

### Important Dates and Deadlines[4]

- **Bid Deadline.** The deadline to submit a Qualified Bid is **April 16, 2021 at 5:00 p.m. (prevailing Eastern Time).**

- **Auction.** If two or more Qualified Bids (including the Stalking Horse Bid) are received by the Bid Deadline, the Debtors will conduct the Auction, which shall take place on **April 21, 2021 commencing at [●]:00 a/p.m (prevailing Eastern Time)** (i) by videoconference, or (ii) on such other date and/or at such other location or by other virtual means as determined by the Debtors. Only Qualified Bidders are eligible to participate in the Auction, subject to other limitations as may be reasonably imposed by the Debtors in accordance with the Bidding Procedures. The Auction shall be governed by the procedures set forth in the Bidding Procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment and in consultation with the Consultation Parties. If the Debtors receive no more than one Qualified Bid (including by the Stalking Horse Purchaser), the Debtors may determine, in their discretion, not to conduct the Auction and shall have the right to declare such Qualified Bidder as the Successful Bidder.

- **Objection Deadlines.**

  - The deadline to file an objection with the Court to the consummation of the Sale (excluding objections relating solely to the conduct of the Auction or identity of the

---

[3]    To the extent of any inconsistencies between the Bidding Procedures and the summary descriptions of the Bidding Procedures in this notice, the terms of the Bidding Procedures shall control in all respects.

[4]    The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bidding Procedures and the Bidding Procedures Order.

Successful Bidder other than the Stalking Horse Purchaser) is [●]**, 2021 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

- Objections relating to the assumption and assignment to the Successful Bidder of the Proposed Assumed Contracts or to the adequate assurance of future performance provided by the Successful Bidder, other than an objection with respect to Cure Costs, must be filed with the Court by no later than **12:00 p.m. (prevailing Eastern Time) on the date prior to the Sale Hearing** (the "Assumption and Assignment Objection Deadline"). Any objections not resolved prior to the Sale Hearing shall be argued at the Sale Hearing or such other time as set by the Court.

- **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held before the Honorable [●] on **April 30, 2021 at [10:00 a.m.] (prevailing Eastern Time)**, or such other date as determined by the Court, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division 701 East Broad Street, Suite 4000, Courtroom No. [●], Richmond, Virginia 23219.

## Filing Objections

Objections to the Sale or conduct of the Auction, if any, must (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and all orders of the Court entered in the Chapter 11 Cases, (iii) be filed with the Court by the Sale Objection Deadline or Assumption and Assignment Objection Deadline, as applicable, and (iv) be served upon the following parties:

i.     proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn:, John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com), and James H. Burbage (jburbage@willkie.com);

ii.    counsel to the Stalking Horse Purchaser, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn:  Charles A. Dale (CDale@proskauer.com) and David M. Hillman (DHillman@proskauer.com);

iii.   the Office of the United States Trustee for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4304, Richmond, VA 23219, Attn: Nicholas S. Herron (usdoj.gov);

iv.    counsel to any statutory committee appointed in the chapter 11 cases

v.     any Successful Bidder (if applicable).

## Consequences of Failing to Timely File an Objection

**ANY PARTY WHO FAILS TO MAKE A TIMELY SALE OBJECTION ON OR BEFORE THE SALE OBJECTION DEADLINE OR, WITH RESPECT TO OBJECTIONS**

**RELATING TO THE ASSUMPTION AND ASSIGNMENT TO THE SUCCESSFUL BIDDER OF THE PROPOSED ASSUMED CONTRACTS OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE PROVIDED BY THE SUCCESSFUL BIDDER, THE ASSUMPTION AND ASSIGNMENT OBJECTION DEADLINE, AS APPLICABLE, IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION, INCLUDING WITH RESPECT TO THE TRANSFER OF THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS.**

### Obtaining Additional Information

Copies of the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://dm.epiq11.com/PaperSource, or can be requested by calling the Debtors' claims and noticing agent, Epiq Corporate Restructuring, LLC, at 866-225-1105 (U.S. and Canada) or 503-520-4491 (International).

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING**

**PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THE**

**CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID.**

## Exhibit 3 to Bidding Procedures Order

**Notice of Successful Bidder**

John C. Longmire (*pro hac vice* admission pending)
Matthew A. Feldman (*pro hac vice* admission pending)
James H. Burbage (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

Telephone:        (212) 728-8000
Facsimile:        (212) 728-8111

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:        (804) 977-3300
Facsimile:        (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### NOTICE OF SUCCESSFUL AND BACKUP BIDDER WITH RESPECT TO THE AUCTION OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

On [●], 2021 the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets, (II) Scheduling a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. [●]] (the "Order"),[2] by which the Court approved procedures setting forth the process by which the Debtors are authorized to conduct an auction (the "Auction") for the sale of any portion, all, or substantially all of the Debtors' Assets.

**PLEASE TAKE FURTHER NOTICE** that, on **April 21, 2021, at [●]:00 a/p.m. (prevailing Eastern Time)**, pursuant to the Order, the Debtors conducted the Auction with respect to the Assets by videoconference.

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Order or the Sale Motion, as applicable.

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Debtors, in consultation with their professionals and the Consultation Parties, selected the following Successful Bidder and Backup Bidder with respect to the Debtors' Assets:

| Assets | Successful Bidder | Backup Bidder | Key Terms of Proposed Sale |
|--------|-------------------|---------------|----------------------------|
|        |                   |               |                            |

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of the Sale of the Debtors' Assets to the Successful Bidder at the Auction will be held before the Honorable Judge [  ], at the Court, 701 East Broad Street, [  ], Richmond, Virginia 23219, on **April 30, 2021, at [●] a/p.m.** (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE**, that at the Sale Hearing, the Debtors will seek the Court's approval of the Successful Bid and the Backup Bid (if any). Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder cannot or refuses to consummate the Sale following entry of an order approving the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Court.

**PLEASE TAKE FURTHER NOTICE** that this Notice of Successful Bidder and Backup Bidder is subject to the terms and conditions of the Motion and the Order, with such Order controlling in the event of any conflict, and the Debtors encourage parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the Sale or other disposition of the Assets may make a written request to: Epiq Corporate Restructuring, LLC ("Epiq") (the notice and claims agent retained in these chapter 11 cases) by calling 866-225-1105 (U.S. and Canada) or 503-520-4491 (international).

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion, the Order, this Notice, and any other related documents are available: (a) upon request to Epiq by calling 866-225-1105 (U.S. and Canada) or 503-520-4491 (international); (b) by visiting the website maintained in these chapter 11 cases at http://dm.epiq11.com/PaperSource; or (c) for a fee via PACER by visiting http://www.vaeb.uscourts.gov.

Richmond, Virginia
Dated:    March [  ], 2021

*/s/ Christopher A. Jones* _____

  Christopher A. Jones (VSB# 40064)
  David W. Gaffey (VSB# 85088)
  Jae Won Ha (VSB# 94781)
  **WHITEFORD TAYLOR & PRESTON LLP**
  Two James Center
  1021 E. Cary Street, Suite 1700
  Richmond, VA 23219
  Telephone:          (804) 977-3300
  Facsimile:          (804) 977-3299

  - and –

  John C. Longmire (*pro hac vice* admission pending)
  Matthew A. Feldman (*pro hac vice* admission pending)
  James H. Burbage (*pro hac vice* admission pending)
  **WILLKIE FARR & GALLAGHER LLP**
  787 Seventh Avenue
  New York, NY 10019
  Telephone:          (212) 728-8000
  Facsimile:          (212) 728-8111

  *Proposed Co-Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 4 to Bidding Procedures Order</u>**

**Potential Assumption and Assignment Notice**

John C. Longmire (*pro hac vice* admission pending)
Matthew A. Feldman (*pro hac vice* admission pending)
James H. Burbage (*pro hac vice* admission pending)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

Telephone:    (212) 728-8000
Facsimile:    (212) 728-8111

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:    (804) 977-3300
Facsimile:    (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT OF
## CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**PLEASE TAKE NOTICE** that, on March 2, 2021 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Court"), commencing these chapter 11 cases (the "Chapter 11 Cases").

**PLEASE TAKE FURTHER NOTICE** that, on [●], 2021, the Debtors filed a motion [D.I. [●]] (the "Sale Motion") seeking entry of orders (a) approving the sale (the "Sale") of all or substantially all of the Debtors' assets (the "Assets"), and (b) an order (the "Bidding Procedures Order"), (i) approving bidding procedures (the "Bidding Procedures")[2] to be used in connection with the Sale, (ii) establishing certain dates and deadlines for the sale process, including scheduling an auction of the Assets (the "Auction"), if applicable, in accordance with the Bidding Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (iii) approving the form and manner of notice of the Bidding Procedures, the Auction, if any, and the Sale Hearing, (iv) authorizing certain procedures for the assumption and assignment of certain executory

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035).  The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]    Capitalized terms not defined in this notice are used as defined in the Sale Motion or the Bidding Procedures, as applicable.

contracts and unexpired leases in connection with the Sale and approving the form and manner of notice thereof, and (v) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on [●], the Court entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets, (II) Scheduling a Sale Hearing, (III) Approving the Form and Manner of Notice Thereof, (IV) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. [●]] (the "Order"), by which the Court authorized certain procedures related to the assumption by the Debtors and assignment to the Successful Bidder of executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures").

**PLEASE TAKE FURTHER NOTICE** that, upon the closing of the Sale, the Debtors intend to assume and assign to the Successful Bidder certain executory contracts and unexpired leases (the "Proposed Assumed Contracts"). A schedule listing the contracts and leases that may potentially be assumed and assigned as part of the Sale is attached hereto as **Exhibit 1** (the "Contracts Schedule") and may also be viewed free of charge on the Debtors' case information website, located at https://dm.epiq11.com/PaperSource, or can be requested by calling the Debtors' claims and noticing agent, Epiq, at 866-225-1105 (U.S. and Canada) or 503-520-4491 (International). Each Proposed Assumed Contract listed on the Contracts Schedule has a corresponding cure amounts for each Contract (the "Cure Costs").

**PLEASE TAKE FURTHER NOTICE** that Cure Costs, if any, for the assumption and assignment of such contracts and leases are also set forth on the Contracts Schedule. Each Cure Amount listed on the Contracts Schedule represents all liabilities of any nature of the Debtors arising under a contract or lease prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease, whether known or unknown, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the closing of the Sale or other applicable effective date of the assumption and assignment of such contract or lease.

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU HAVE BEEN IDENTIFIED AS A COUNTERPARTY TO A CONTRACT OR LEASE THAT MAY BE ASSUMED AND ASSIGNED AS PART OF THE SALE**.

**PLEASE TAKE FURTHER NOTICE that, for the avoidance of doubt, the inclusion of an executory contract or unexpired lease on Exhibit 1 to this Notice, or any subsequent notice, shall not obligate the Debtors to assume and assign any unexpired lease or executory contract listed thereon or that the unexpired lease or executory contract will be designated as a contract or lease that will be assumed at any point by the Debtors or assumed and assigned pursuant to any Successful Bid. Prior to closing the sale, as contemplated in the Bid Procedures Order, the Successful Bidder reserves the right to amend the scheduled contracts and leases through and including the closing date of the Sale. In the event a timely Cure Costs Objection is still pending at the time of the closing of the sale to the Winning Bidder, such Winning Bidder shall have the option not to assume such contract until 30 days following the date on which the Cure Cost has been determined by the Bankruptcy Court or the**

counterparty to such contract and the Winning Bidder have agreed on the Cure Cost for such Designated Contract.

### Filing Objections

Pursuant to the Assumption and Assignment Procedures, objections to the proposed assumption and assignment of an executory contract or unexpired lease on any basis, including any objection relating to Cure Costs ("Cure Costs Objection") or otherwise, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, Local Bankruptcy Rules, and any order governing the administration of these chapter 11 cases; (iii) state, with specificity, the legal and factual bases therefor, including any appropriate documentation in support thereof and served on the Objection Recipients (as defined in the Order), and, if the objection is to the proposed Cure Costs, state the cure amount alleged to be owed, and (iv) be filed with the Court and served on the following parties:

i.     proposed counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: John C. Longmire (jlongmire@willkie.com), Matthew A. Feldman (mfeldman@willkie.com), and James H. Burbage (jburbage@willkie.com);

ii.    counsel to the Stalking Horse Purchaser, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn:  Charles A. Dale (CDale@proskauer.com) and David M. Hillman (DHillman@proskauer.com);

iii.   the Office of the United States Trustee for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4304, Richmond, VA 23219, Attn: Attn: Nicholas S. Herron (usdoj.gov); and

iv.    any Successful Bidder.

### A.    Cure Cost Objections

Any objection relating to Cure Costs proposed on the Contract Schedule must be filed with the Court and served on the Objection Recipients by no later than **5:00 p.m. (prevailing Eastern Time) on the date that is fourteen (14) days following service of the Potential Assumption and Assignment Notice**.  In the event that the Debtors identify any Counterparties that were not served with the Potential Assumption and Assignment Notice, the Debtors shall subsequently serve such Counterparty with the Potential Assumption and Assignment Notice, and these Assumption and Assignment Procedures shall nevertheless apply to such Counterparty; provided, however, that the deadline for such Counterparty to file a Cure Objection shall be **5:00 p.m. (prevailing Eastern Time) on the date that is the later of (a) the date that is fourteen (14) days following service of the Potential Assumption and Assignment Notice, and (b) the date that is seven (7) days following service of the supplemental Potential Assumption and Assignment Notice.**

### B.    Adequate Assurance Objections

The Debtors shall file a notice identifying the Successful Bidder and Backup Bidder (if selected) (the "Notice of Successful Bidder") and shall serve the Notice of Successful Bidder on

each counterparty to a Proposed Assumed Contract as soon as reasonably practicable after closing the Auction, if any.  Each counterparty to a Proposed Assumed Contract will then have an opportunity to object to the assumption and assignment to a Successful Bidder of its Proposed Assumed Contract or to the adequate assurance of future performance with respect to such counterparty's contract or lease provided by the Successful Bidder, which must be filed with the Court and served on the Objection Recipients by no later than **12:00 p.m. (prevailing Eastern Time) on the date prior to the Sale Hearing** (the "Adequate Assurance Objection Deadline").

The Court will hear and determine any objections to the assumption and assignment of the Proposed Assumed Contracts to the Successful Bidder at the Sale Hearing or at a later hearing, as determined by the Debtors.  The Sale Hearing to consider the proposed Sale shall be held before the Honorable [●] on April 30, 2021 at [ ] a/p.m. (prevailing Eastern Time), or such other date as determined by the Court, at the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, 701 East Broad Street, Suite 4304, Courtroom No. [●], Richmond, Virginia 23219.

## Consequences of Failing to Timely Assert an Objection

**UNLESS YOU FILE AN OBJECTION TO THE CURE AMOUNT, THE ASSUMPTION OR ASSIGNMENT OF YOUR CONTRACT OR LEASE, OR TO THE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE, IN ACCORDANCE WITH THE INSTRUCTIONS AND DEADLINES SET FORTH HEREIN, THE CURE AMOUNT SET FORTH IN THIS [SUPPLEMENTAL/INITIAL] CURE NOTICE SHALL BE CONTROLLING NOTWITHSTANDING ANYTHING TO THE CONTRARY IN ANY EXECUTORY CONTRACT, UNEXPIRED LEASE, OR OTHER DOCUMENT AS OF THE DATE OF THIS NOTICE, YOU SHALL BE (A) BARRED FROM OBJECTING TO THE CURE AMOUNT SET FORTH ON EXHIBIT 1, (B) ESTOPPED FROM ASSERTING OR CLAIMING THAT ANY ADDITIONAL AMOUNTS ARE DUE OR OTHER DEFAULTS EXIST, THAT CONDITIONS TO ASSIGNMENT MUST BE SATISFIED UNDER SUCH CONTRACT OR LEASE OR THAT THERE IS ANY OBJECTION OR DEFENSE TO THE ASSUMPTION AND ASSIGNMENT OF SUCH CONTRACT OR LEASE, INCLUDING ANY ARGUMENT THAT THERE EXIST CONDITIONS TO ASSUMPTION AND ASSIGNMENT THAT MUST BE SATISFIED UNDER SUCH CONTRACT OR LEASE OR THAT ANY REQUIRED CONSENT TO ASSIGNMENT HAS NOT BEEN GIVEN, (C) DEEMED TO HAVE STIPULATED THAT THE CURE COST SET FORTH IN THIS NOTICE IS CORRECT, AND (D) DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND/OR ASSIGNMENT OF YOUR CONTRACT OR LEASE.**

## Obtaining Additional Information

Copies of the Sale Motion, the Bidding Procedures, the Bidding Procedures Order, the Stalking Horse Agreement and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://dm.epiq11.com/PaperSource, or can be requested by calling the Debtors' claims and noticing agent, Epiq, at 866-225-1105 (U.S. and Canada) or 503-520-4491 (International).

Adequate assurance of future performance information for the Stalking Horse Purchaser is available by contacting counsel to the Stalking Horse Purchaser at:  Proskauer Rose LLP, Eleven Times Square, New York, NY 10036, Attn:  Charles A. Dale (CDale@proskauer.com) and David M. Hillman (DHillman@proskauer.com).

## **Exhibit B**

**Stalking Horse Agreement**

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

among

**MIDCAP FUNDING INVESTMENT XI LLC,**

AS PURCHASER;

and

**PAPER SOURCE, INC.,**

AS SELLER

and

**PINE HOLDINGS, INC.,**

AS PARENT

**March 2, 2021**

121645066v17

# Table of Contents

**Page**

ARTICLE I DEFINITIONS ...................................................................................2

    Section 1.1    Definitions...........................................................................2

    Section 1.2    Cross References................................................................15

ARTICLE II PURCHASE AND SALE .................................................................17

    Section 2.1    Purchase and Sale...............................................................17

    Section 2.2    Excluded Assets .................................................................20

    Section 2.3    Assumed Liabilities............................................................21

    Section 2.4    Excluded Liabilities ...........................................................22

    Section 2.5    Assumption/Assignment of Contracts and Rights ...................22

    Section 2.6    Designation; Later Discovery Contracts .................................23

    Section 2.7    Purchase Price; Allocation of Purchase Price ..........................23

    Section 2.8    Cure Costs .........................................................................24

    Section 2.9    Closing .............................................................................24

    Section 2.10    Deliveries by Seller............................................................25

    Section 2.11    Deliveries by Purchaser ......................................................26

    Section 2.12    Withholding Rights.............................................................26

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLER ................26

    Section 3.1    Organization ......................................................................27

    Section 3.2    Due Authorization ..............................................................27

    Section 3.3    Governmental Authorization.................................................27

    Section 3.4    Noncontravention ...............................................................27

    Section 3.5    [Reserved .........................................................................28

    Section 3.6    No Subsidiaries ..................................................................28

    Section 3.7    Litigation ..........................................................................28

    Section 3.8    Permits .............................................................................28

    Section 3.9    Intellectual Property Rights..................................................28

    Section 3.10    Compliance with Laws and Court Orders................................33

    Section 3.11    Environmental Matters.........................................................34

    Section 3.12    Employee Benefit Plans ......................................................35

    Section 3.13    Title to Properties; Condition of Assets; Inventory ...................38

i

Section 3.14      Real Property ................................................................................39

Section 3.15      Contracts ......................................................................................41

Section 3.16      Insurance ......................................................................................41

Section 3.17      Financial Statements ....................................................................41

Section 3.18      [Reserved] .....................................................................................42

Section 3.19      Absence of Certain Developments ...............................................42

Section 3.20      Material Suppliers ........................................................................42

Section 3.21      [Reserved] .....................................................................................42

Section 3.22      Affiliated Transactions .................................................................42

Section 3.23      Product Warranty ..........................................................................43

Section 3.24      Product Liability ...........................................................................43

Section 3.25      Occupational Safety and Health Matters ......................................43

Section 3.26      Taxes .............................................................................................44

Section 3.27      Certain Fees ..................................................................................45

Section 3.28      No Other Representations and Warranties ....................................45

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER .....................45

Section 4.1       Organization .................................................................................45

Section 4.2       Due Authorization ........................................................................46

Section 4.3       Governmental Authorization ........................................................46

Section 4.4       Noncontravention .........................................................................46

Section 4.5       Adequate Assurances ....................................................................46

Section 4.6       Litigation ......................................................................................47

Section 4.7       Certain Fees ..................................................................................47

Section 4.8       No Other Representations and Warranties ....................................47

Section 4.9       No Outside Reliance .....................................................................47

ARTICLE V COVENANTS OF SELLER ...........................................................................48

Section 5.1       Conduct of the Business ...............................................................48

Section 5.2       Access to Information ...................................................................51

Section 5.3       Cooperation with Purchaser .........................................................51

Section 5.4       Bankruptcy Action ........................................................................52

Section 5.5       Other Bids .....................................................................................52

Section 5.6       Sale Order .....................................................................................52

Section 5.7       Other Bankruptcy Matters ............................................................53

ii

Section 5.8        Stalking Horse Bidder Matters ....................................................53

Section 5.9        Rejected Contracts ....................................................................53

Section 5.10       Receipt of Property Relating to Assets ......................................53

Section 5.11       Confidentiality Obligations of Seller ........................................54

Section 5.12       Acknowledgement .....................................................................54

ARTICLE VI COVENANTS OF PURCHASER ...............................................55

Section 6.1        Insurance ...................................................................................55

ARTICLE VII COVENANTS OF PURCHASER AND SELLER ........................55

Section 7.1        Efforts; Further Assurances ......................................................55

Section 7.2        Certain Filings ..........................................................................55

Section 7.3        Public Announcements ..............................................................55

Section 7.4        Antitrust Filings ........................................................................56

Section 7.5        Notice of Certain Matters .........................................................57

Section 7.6        Access ........................................................................................57

Section 7.7        280G Matters .............................................................................58

Section 7.8        Negotiation and Execution of Restrictive Covenant Agreements.............58

ARTICLE VIII TAX MATTERS ........................................................................59

Section 8.1        Tax Cooperation .......................................................................59

Section 8.2        Transfer Taxes ..........................................................................59

Section 8.3        Asset Taxes ...............................................................................59

ARTICLE IX EMPLOYEE MATTERS ..............................................................60

Section 9.1        Employees and Offers of Employment ......................................60

Section 9.2        Service Credit ...........................................................................60

Section 9.3        Employment Tax Reporting Responsibility ...............................61

Section 9.4        No Third Party Beneficiaries; No Guarantee of Employment ..................61

Section 9.5        WARN Act .................................................................................61

Section 9.6        Workers' Compensation ............................................................62

ARTICLE X CLOSING CONDITIONS ..............................................................62

Section 10.1       Conditions to Obligations of Purchaser and Seller ...................62

Section 10.2       Conditions to Obligations of Purchaser ....................................63

Section 10.3       Conditions to Obligations of Seller ..........................................64

ARTICLE XI SURVIVAL; INDEMNIFICATION ..............................................64

Section 11.1       Survival .....................................................................................64

iii

Section 11.2      Indemnification ........................................................................65

ARTICLE XII TERMINATION .................................................................................65

Section 12.1      Grounds for Termination ........................................................65

Section 12.2      Effect of Termination..............................................................67

ARTICLE XIII MISCELLANEOUS ..........................................................................67

Section 13.1      Sale of Assets Subject to Bankruptcy Court Approval ...........67

Section 13.2      Notices.....................................................................................67

Section 13.3      Expenses...................................................................................68

Section 13.4      Waivers ....................................................................................69

Section 13.5      Successors and Assigns ...........................................................69

Section 13.6      Governing Law.........................................................................69

Section 13.7      Jurisdiction..............................................................................69

Section 13.8      Waiver of Jury Trial ................................................................70

Section 13.9      Specific Performance ..............................................................70

Section 13.10     No Third Party Beneficiaries ..................................................70

Section 13.11     Entire Agreement; Amendments; Counterparts ........................71

Section 13.12     Headings...................................................................................71

Section 13.13     Severability ..............................................................................71

Section 13.14     Negotiated Agreement .............................................................71

Section 13.15     Interpretation...........................................................................71

**Exhibits**

Exhibit A      Bid Procedures
Exhibit B      Bid Procedures Order
Exhibit C      Bill of Sale
Exhibit D      Assignment and Assumption Agreement
Exhibit E      Lease Assignment and Assumption Agreement

**Schedules**

Schedule A            Stores
Schedule 1.1(i)       Leased Real Property
Schedule 1.1(ii)      Significant Vendors
Schedule 2.1(a)       Purchased Contracts
Schedule 2.1(f)       Assumed Employee Benefit Plans
Schedule 2.2(g)       Excluded Employee Benefit Plans
Schedule 2.3(e)       Assumed Indebtedness

iv

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made and entered into as of March 2, 2021 (this "Agreement") among (a) MidCap Funding Investment XI LLC, a Delaware limited liability company (and/or its designee(s) in accordance with Section 13.5 herein (as applicable) "Purchaser"), (b) Paper Source, Inc., an Illinois corporation ("Seller"), and (c) for the limited purposes as set forth in this Agreement, Pine Holdings, Inc., a Delaware corporation ("Parent"). Purchaser and Seller (and Parent, as applicable) are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, Seller operates an omnichannel lifestyle brand that offers an assortment of highly differentiated products and experiences, including the selling of fine paper and related upscale merchandise, including stationery, greeting cards, invitations, gifts and craft items, through each of its retail stores (each, a "Store", and collectively, the "Stores", which are set forth on Schedule A attached hereto), E-Commerce Platform (as defined below), proprietary digital content, and selective wholesale network (the "Business");

**WHEREAS**, Seller intends to file a voluntary Petition (as defined below) for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (each as defined below) on or shortly after the date in which this Agreement is executed;

**WHEREAS**, Seller desires to Transfer the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume the Assumed Liabilities, subject to the terms and conditions set forth in this Agreement and the Bankruptcy Code;

**WHEREAS**, in connection with the Bankruptcy Case, Purchaser shall credit bid on a dollar-for-dollar basis a portion of the outstanding Pre-Petition First Lien Obligations and DIP Obligations pursuant to Section 363 of the Bankruptcy Code;

**WHEREAS,** the transactions contemplated by this Agreement and the Transaction Documents (collectively, the "Transactions") will be consummated pursuant to and in accordance with the Bid Procedures, the Bid Procedures Order and the Sale Order (each as defined below), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court;

**WHEREAS**, Seller, following filing of the voluntary Petition (the date of such filing, the "Petition Date"), as debtor and debtor-in-possession, will continue in the possession of its assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations and warranties set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1

# ARTICLE I
# DEFINITIONS

Section 1.1    <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

"<u>Accounts Receivable</u>" means all accounts, rights to payment and notes and other amounts receivable (whether current or non-current) of the Seller (including the E-Commerce Platform and wholesale business), including receivables from credit card processors, the sale of gift cards in retail outlets, and allowances due from landlords under Real Property Leases (but only to the extent such Real Property Leases constitute Purchased Contracts).

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"<u>Alternative Transaction</u>" means a transaction or series of transactions involving a sale, transfer or other disposition of all or any material portion of the assets of, used in the operation of, or otherwise related to, the Business (including the Purchased Assets) to another purchaser or purchasers other than Purchaser.

"<u>Anti-Corruption and Trade Control Laws</u>" means all U.S. and non-U.S. Laws relating to (a) the prevention of corruption and bribery, including, the U.S. Foreign Corrupt Practices Act of 1977, as amended ("<u>FCPA</u>"), (b) economic or trade sanctions, (c) export, re-export, transfer, and import controls, and the customs and import Laws administered by U.S. Customs and Border Protection Laws, and (d) the anti-boycott Laws administered by the U.S. Department of Commerce and the U.S. Department of Treasury's Internal Revenue Service.

"<u>Approved Budget</u>" shall have the meaning set forth in the DIP Order.

"<u>Auction</u>" means the auction to be conducted by Seller, as necessary or applicable, in connection with the sale of all or substantially all of Seller's assets, pursuant to the Bid Procedures Order if a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bid Procedures Order).

"<u>Avoidance Actions</u>" means any claim, right or cause of action arising under chapter 5 of the Bankruptcy Code and any analogous state law claims.

"<u>Bankruptcy Case</u>" means the chapter 11 case of Seller commenced in the Bankruptcy Court.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Eastern District of Virginia.

2

"Bankruptcy Rules" means The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as applicable to the Title III case.

"Bid Procedures" means bid procedures for the solicitation and submission of bids for a sale or other disposition of substantially all of Seller's assets to be approved by the Bankruptcy Court pursuant to the Bid Procedures Order, in the form attached hereto as Exhibit A, and otherwise in form and substance satisfactory to Purchaser in its sole discretion.

"Bid Procedures Order" means the form of Order attached hereto as Exhibit B, and otherwise in form and substance satisfactory to Purchaser in its sole discretion.

"Bid Procedures Order Deadline Date" means April 2, 2021.

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

"Business Employee" means all employees of Seller.

"Business Software" means all Software owned or otherwise Controlled by Seller that is used or held for use by Seller in the operation of the Business, excluding commercial "off-the-shelf" Software licensed on standardized terms from third parties with a replacement cost and/or aggregate annual license and maintenance fee payable by Seller of less than $15,000.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, as amended and modified, including by the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139) and the Paycheck Protection Program Flexibility Act of 2020 (Pub. L. 116-142), together with all rules and regulations and guidance issued by any Governmental Authority with respect thereto.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any regulations promulgated thereunder.

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code.

"Closing Date" means the date of the Closing.

"Code" means the Internal Revenue Code of 1986, as amended.

"Commercial Lease Cure Costs" means, collectively, the Pre-Petition Deferred Rent Cure Costs and the Post-Petition Deferred Rent Cure Costs.

"Commercial Lease Cure Costs Cap" means the sum of (a) the Pre-Petition Deferred Rent Cure Costs Cap *plus* (b) the Post-Petition Deferred Rent Cure Costs Cap.

"Confidential Information" means all non-public information (whether or not specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by,

121645066v17

the Business or Seller as owner of the Business (including the Purchased Assets and the Assumed Liabilities), as the case may be, and that relates to the Business in any respect, including: (a) internal business information which is related to the Business (including information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, the Business, its customers or any other third Persons involved or engaged with, in any respect, the Business and their respective confidential information; (c) any confidential or proprietary information of any third party that Seller or the Business have a contractual or other obligation to maintain the confidentiality of, or use only for certain limited purposes; (d) to the extent related to the Business, industry research compiled by, or on behalf of Seller or the Business; (e) to the extent related to the Business, non-public or proprietary compilations of data and analyses, processes, methods, performance records; and (f) non-public or proprietary information related to the Intellectual Property Rights used in the Business.

"Contracts" means any contract, sub-contract, agreement, lease or sub-lease, license or sub-license, occupancy agreement, purchase order, supply agreement, commitment, note, bond, franchise, guarantee, indemnity, indenture, instrument, lease, license or other legally binding arrangement, understanding, or obligation, whether written or oral (including all amendments, side letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith), including any IP Contract.

"Controlled" or "Controls" means, solely when used in reference to any item of or rights in or to Intellectual Property Rights, ownership or other enforceable legal authority or right of Seller (whether by license or otherwise) to grant the right to use such item, or a license or sublicense under such Intellectual Property Rights, to any other Person, or with respect to Trade Secrets or other confidential proprietary information, the right to disclose such Trade Secrets or other confidential information to a third party without breaching the terms of any Contract to which Seller is a party.

"COVID-19" means COVID-19 and any evolutions or mutations thereof or related or associated epidemics, pandemics or disease outbreaks.

"COVID-19 Measures" means any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester, return to work, employment or human resources law, safety or similar Law, directive, guideline or recommendation promulgated by any applicable industry group or Governmental Authority, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to COVID-19.

"Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of (a) any Purchased Contract, or (b) any Contract that becomes a Purchased Contract pursuant to Section 2.6.

4

"<u>DIP Facility</u>" means the superpriority debtor-in-possession term loan credit facility provided pursuant to the DIP Order.

"<u>DIP Lenders</u>" means, collectively, (a) MidCap Financial Trust and (b) Apollo Investment Corporation, and any assignee(s) of such Persons of all or a portion of the DIP Facility.

"<u>DIP Obligations</u>" means all obligations, liabilities and indebtedness of Seller and Parent arising from or related to the DIP Facility, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due.

"<u>DIP Order</u>" means, as applicable, the interim and final orders of the Bankruptcy Court setting forth the terms of the debtor-in-possession financing.

"<u>Disclosure Schedules</u>" means the disclosure schedules delivered by Seller to Purchaser concurrently with the execution and delivery of this Agreement.

"<u>Distribution Center</u>" means the distribution facility leased by Seller and located at 7801 Industrial Drive, Forest Park, IL 60130.

"<u>Distribution Center Lease</u>" means that certain lease by and between Seller and First Industrial, LP, with an effective date of March 13, 2015, as the same may have been amended, modified, restated, or otherwise supplemented, for the Distribution Center.

"<u>E-Commerce Platform</u>" means the series of software and hardware applications (and related services) integrated into and used in the operation of, and through which Seller sells inventory to consumers who place orders for such inventory through, the websites of Seller and related internet or "app" based sales, marketing, advertising and social media channels (including Business Social Media Accounts), including the Contracts pursuant to which such software and hardware applications (and related services) are owned and licensed by Seller.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" (as defined in ERISA § 3(3)) or other benefit or compensation plan, program, policy, practice, contract, agreement, or arrangement providing for retirement, medical, dental, vision, prescription, drug, employee assistance, wellness, severance, vacation, termination pay, workers' compensation, disability, death, hospitalization, relocation, cafeteria, dependent care, commuter or transportation, adoption assistance, tuition reimbursement, relocation, retention, change of control, deferred compensation, short-term incentive, long-term incentive, performance awards, stock or stock-related awards, fringe benefits or other employee benefits of any kind maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate for the benefit of any Business Employee, or with respect to which Seller or any ERISA Affiliate has, or could reasonably be expected to have, any liability related to a Business Employee, other than a Multiemployer Plan, and other than governmental plans, programs, agreements or arrangements, or any plans, programs, agreements or arrangements mandated by a Governmental Authority or by applicable Law.

"<u>Environmental Laws</u>" means all applicable federal, state, local, municipal and foreign Laws concerning public or human health and safety (as it relates to Hazardous Substances), endangered or threatened species, pollution, or protection of the environment (including natural

5

resources, ambient air, soil, surface water or groundwater or subsurface strata), including all those relating to the presence, use, manufacture, production, generation, handling, distribution, transportation, treatment, storage, disposal, processing, labeling, discharge, Release, threatened Release, exposure to, control, or cleanup of, or exposures to, any Hazardous Substances (including CERCLA and analogous state Laws).

"Environmental Permits" means all Permits required under any applicable Environmental Law.

"Equity Securities" means, with respect to any Person, all shares of capital stock, equity interests, profits interests and participations in such Person's capital stock or other equity interests (however designated), and any debt, rights, warrants, stock appreciation rights, shares of restricted stock, restricted stock units or options or warrants exercisable or exchangeable for or convertible into any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"ERISA Affiliate" means, collectively, Seller and any Person under common control or treated as a single employer with, Seller, within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"Estate Causes of Action" means any and all Claims, causes of action, defenses, and counterclaims accruing to the Debtors or that is property of their respective estates, based upon facts, circumstances, and transactions that occurred prior to the Closing, including any avoidance or recovery action that belongs to or could have been raised by the Debtors or the debtors in possession or their respective estates under Chapter 5 of the Bankruptcy Code; provided that, in the event that the restrictive covenant agreements contemplated by Section 7.8 are not delivered to Purchaser in compliance with Section 7.8, the foregoing Claims, causes of action, defenses, and counterclaims against the Restricted Parties and their respective Affiliates (excluding, for the avoidance of doubt, Parent and Seller) shall not constitute Estate Causes of Action for all purposes of this Agreement.

"Excluded Cash" means cash on hand of Seller and cash drawn under the DIP Facility to the extent necessary to (a) pay all of Seller's administrative expenses or other post-petition expenses that are accrued and unpaid as of the Closing Date in the Chapter 11 Cases, subject to the Approved Budget, and (b) $500,000.00 to fund an orderly liquidation or dismissal of the Bankruptcy Case and dissolution of the Seller.

"Excluded Stores" means all of the Stores that are not Acquired Stores.

"Final Order" means a judgment or other Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser) and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an

appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such judgment or other Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such judgment or other Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such judgment or other Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such judgment or other Order, shall not cause an Order not to be a Final Order.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental, self-regulatory, non-governmental regulatory or quasi-governmental authority of any nature (including any governmental agency, subdivision, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Hazardous Substances" means any pollutant, contaminant, chemical, material, substance, product, derivative, compound, mixture, solid, liquid, gas or waste and any other substance (in each instance, whether naturally occurring or manmade) that is hazardous (extremely, acutely or otherwise) toxic, infectious, carcinogenic, mutagenic, radioactive, a pollutant, a contaminant or is otherwise characterized by words of similar import or regulatory effect under or that could give rise to Liability under any Environmental Law, including petroleum and petroleum-derived substances, products, by products and wastes, radon, radioactive materials or wastes, asbestos in any form, urea, formaldehyde, lead or lead-containing materials, polychlorinated biphenyls and per- and polyfluoroalkyl substances.

"Headquarters" means the Seller's corporate offices located at 125 S. Clark St., 15th Floor, Chicago, IL 60603.

"Headquarters Lease" means that certain Office Lease by and between Seller and CR – Chicago 125 S. Clark  LLC, dated as of March 1, 2016, as the same may have been amended, modified, restated, or otherwise supplemented, for the Headquarters.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Improvements" means all leasehold improvements located, placed, constructed or installed on or under any parcel of Leased Real Property (but only to the extent the related Real Property Leases constitute Purchased Contracts), including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing, refrigeration and cooling systems, facilities, lines, installations and conduits.

"Indebtedness" means, with respect to Seller (including with respect to the Business and/or the Purchased Assets), as of any given time of determination, both the current and long-term

7

portions of any amount owed (whether or not contingent and including any and all principal, accrued and unpaid interest, prepayment premiums or penalties, related expenses, commitment and other fees, sale or liquidity participation amounts, reimbursements, indemnities and other amounts which would be payable thereon) with respect to, without duplication, (a) any indebtedness for borrowed money under any credit facilities, (b) any liabilities evidenced by bonds, debentures, notes or other similar instruments or debt securities, (c) any obligation evidenced by any letter of credit or bankers' acceptance, performance bonds, sureties or similar obligations, to the extent drawn, (d) any liabilities of Seller to a counterparty to settle interest rate and currency swap, cap and any other arrangements designed to provide protection against fluctuations in interest or currency rates, in each case, including any amounts payable to terminate such arrangements, (e) any obligations for the deferred purchase price or property, goods or services, (f) any obligations with respect to earnout, holdbacks or contingent payment obligations, (g) all capital leases, (h) any synthetic lease obligations or any obligations in respect of off-balance sheet agreements or transactions that are in the nature of, or in substitution of, financings, (i) any obligations for interest, penalties or collection costs in respect of any of the foregoing, and (j) any guarantees of obligations of the type described in clauses (a) through (h) above (including by way of agreement to purchase products or securities, to provide funds for payment, to maintain working capital or other balance sheet conditions, to provide security (or, pursuant to an existing right, to provide security at a later date) by a Lien on property or otherwise to assure a creditor against loss).

"Intellectual Property Rights" means any and all rights in, arising out of, or associated with the following in any jurisdiction throughout the world: (a) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, including all applications, registrations and renewals of any of the foregoing, together with the goodwill connected with the use of and symbolized by the foregoing ("Trademarks"); (b) copyrights, and works of authorship, whether or not copyrightable, including all applications, registrations and renewals related to the foregoing ("Copyrights"); (c) trade secrets, confidential and proprietary know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information ("Trade Secrets"); (d) patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models); (e) Software; (f) internet domain name registrations and social media account or user names (including "handles"), all associated web addresses, URLs, websites and web pages, social media sites and pages, and all content and data thereon or relating thereto; and (g) other intellectual property and related proprietary rights, interests and protections.

"Inventory" means all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory, wholesale inventory and stock in trade owned by Seller (or otherwise by the Business), whether or not prepaid, and wherever located (including in any storage facility), held or owned, including all fine paper and related upscale merchandise (including stationery, greeting cards, invitations, gifts and craft items), as well as, any in-store displays.

121645066v17

"<u>IP Contract</u>" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to Intellectual Property Rights to which Seller is a party, beneficiary or otherwise bound, and that are used or held for use in the conduct of the Business.

"<u>Key Employee</u>" means any senior management-level employee of Seller identified by Purchaser no later than ten (10) days prior to the Closing Date, but which shall include, unless otherwise determined by Purchaser in its sole discretion by no later than ten (10) days prior to the Closing Date, at least each of (a) Winnie Park, (b) Ronald Kruczynski, (c) Jenica Myszkowski, and (d) Karima Ridgley.

"<u>Knowledge of Seller</u>" or any other similar knowledge qualification in this Agreement means, as to a particular matter, the actual knowledge of the following individuals: (a) Winnie Park, (b) Ronald Kruczynski, (c) Jenica Myszkowski, and (d) Karima Ridgley.

"<u>Law</u>" means any federal, state, provincial, territorial, local, municipal, foreign, international, or multinational law (including common law), statute, regulation, rule, code, constitution, ordinance, judgment, decree, treaty, requirement or rule of law, or Order, enacted, adopted, promulgated, issued, applied by or administered or enforced by or on behalf of, any Governmental Authority or other similar authority.

"<u>Leased Real Property</u>" means any real property leased, subleased, licensed or otherwise occupied by Seller and used in the Business; a list setting forth each Leased Real Property as of the date hereof is attached hereto as <u>Schedule 1.1(i)</u>.

"<u>Legal Proceeding</u>" means any judicial, administrative or arbitral actions, investigation, litigation, suits, proceedings (public or private), causes of action, examination, dispute, charge, hearing, audit, assessment, inquiry or claims by or before any Governmental Authority, and any appeal from any of the foregoing.

"<u>Liability</u>" means any liability (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, direct, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), debt, obligation, deficiency, interest, Tax, penalty, fine, penalty, claim, demand, judgment, cause of action or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"<u>Licensed Intellectual Property</u>" means the rights to any Intellectual Property Rights used or held for use in the Business that Seller is licensed or otherwise is permitted by any other Person to use such Person's Intellectual Property Rights pursuant to an IP Contract.

"<u>Lien</u>" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), hypothecation, deed of trust, right of use or possession, right of setoff, successor liability, servitude, encroachment, pledge, security interest, Claim, encumbrance, restriction or restrictive covenant, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or

9

unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Effect" means any event, occurrence, fact, condition, development or change that (a) has, or could reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, assets, liabilities or condition (financial or otherwise) of the Business, the Purchased Assets and/or the Assumed Liabilities, taken as a whole, or (b) has, or would reasonably be expected to prevent, materially delay, or materially impair the ability of Seller to carry out its obligations under this Agreement and to consummate the Transactions, except, in each case, to the extent resulting from or arising in connection with (i) the pendency or consummation of the Transactions, the public announcement thereof; (ii) changes or conditions affecting the industries generally in the geographic regions in which the Business operates; (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index or any changes in currency exchange rates); (v) changes in Law (or other binding directives or determination issued or made by or agreements with or consents of any Governmental Authority (including any COVID-19 Measures or any changes in COVID-19 Measures or interpretations thereof)) or in GAAP or interpretations thereof; (vi) changes arising in connection with any earthquake, flood, hurricane, tornado, pandemic or other act of God ((including COVID-19 or any COVID-19 Measures or any changes in COVID-19 Measures or interpretations thereof) or any quarantine or trade restrictions relating thereto); (vii) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (but, for the avoidance of doubt, not the underlying cause(s) of any such failure to the extent such underlying cause is not otherwise expressly excluded from the definition of Material Adverse Effect); and/or (viii) (A) the commencement or pendency of the Bankruptcy Case; (B) any objections in the Bankruptcy Court to (1) this Agreement, any of the Transaction Documents and/or the Transactions, or (2) the Bidding Procedures Order; (C) any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith; or (D) any action taken as expressly required under the DIP Facility or by the DIP Lenders, except, in the case of the foregoing clauses (ii), (iii), (iv), (v) and (vi), to the extent such event, occurrence, fact, condition, development or change has a disproportionate adverse effect on the business, assets, liabilities, condition (financial or otherwise) or operating results of the Business, the Purchased Assets and/or the Assumed Liabilities, in each case, relative to other participants in the industries in which the Business operates.

"Multiemployer Plan" means any "multiemployer plan" (as defined in ERISA §3(37)) contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has, or could reasonably be expected to have, any liability.

"Occupational Safety and Health Law" means any Law of any federal, state or local Governmental Authority enacted or promulgated which requires or relates to Occupational Safety and Health Matters.

121645066v17

"<u>Occupational Safety and Health Liabilities</u>" means any cost, damage, expense, liability, obligation, duty to indemnify, defend or reimburse, or other responsibility consisting of or relating to (a) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, remedial costs, and expenses arising under Occupational Safety and Health Laws; (b) financial responsibility for corrective action, including any investigation, or abatement action including, but not limited to, engineering or administrative controls, or the use of required personal protective equipment, required by any applicable Occupational Safety and Health Law, or by any final Order of any applicable Occupational Safety and Health Law jurisdiction; and (c) any other compliance, corrective or remedial measures required under Occupational Safety and Health Laws.

"<u>Occupational Safety and Health Matters</u>" means all matters related to health and safety of employees, temporary employees, independent contractors or employees of independent contractors at the Leased Real Property.

"<u>Open Source Materials</u>" means any Software or code (including any source code components, applications, plug-ins or libraries) that is distributed as "open source software", "freeware," pursuant to any license identified as an "open source license" by the Open Source Initiative (www.opensource.org/licenses), or is otherwise distributed publicly or made generally available in source code form under terms that permit modification and redistribution of such Software or code, including, without limitation, Software that is licensed under the GNU General Public License (GPL), GNU Lesser General Public License (LGPL), GNU Affero General Public License (AGPL), Mozilla License, Common Public License, Creative Commons Share-Alike License, Apache License, BSD License, Artistic License, or MIT License .

"<u>Order</u>" means any award, decision, stipulation, determination, writ, declaration, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"<u>Ordinary Course of Business</u>" means the conduct by Seller of the Business in substantially the same manner as conducted as of the date of this Agreement, consistent with past practice.

"<u>Organizational Documents</u>" means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, articles of organization, certificate of formation, regulations, operating agreement, certificate of limited partnership, limited liability company agreement or partnership agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation or organization of a Person, including any amendments thereto.

"<u>Other Contracts Cure Costs</u>" means all Cure Costs, other than the Commercial Lease Cure Costs.

"<u>Other Contracts Cure Costs Cap</u>" means $3,250,000.00; <u>provided</u> that, such amount shall be reduced on a dollar-for-dollar basis for any amounts paid to the Persons set forth on <u>Schedule 1.1(ii)</u> prior to the Closing (including through the use of proceeds from the DIP Facility) on account of pre-petition claims of such Parties.

"<u>Permits</u>" means any licenses, permits, approvals, certificates (including certificates of occupancy), authorizations, operating permits, registrations, plans, consents, qualifications, waivers, franchises, filings, accreditations, certifications, easements, rights of way, notifications, exemptions, and clearances, together with all modifications, renewals, amendments, supplements and extensions thereof and applications therefor, of or from any Governmental Authority or issued or granted pursuant to any Law, as amended and supplemented, that are necessary or required to own, lease or use the Leased Real Property, Purchased Assets or to operate the Business.

"<u>Permitted Liens</u>" means (a) Liens that arise under applicable zoning Laws, building codes, and other similar land use restrictions imposed by Law; (b) Liens for utilities and current Taxes and assessments that are not yet due and payable, for which adequate reserves are being maintained and reflected on the Financial Statements to the extent required by GAAP, in each case, as set forth in the Sale Order; (c) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any applicable Purchased Asset which do not, individually or in the aggregate, adversely affect the operation of such Purchased Asset; (d) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common Law or statutory Liens incurred in the Ordinary Course of Business for amounts not yet due and payable; and (e) licenses granted on a non-exclusive basis in the Ordinary Course of Business, other than licenses for use of the Leased Real Property.

"<u>Person</u>" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

"<u>Personal Information</u>" means personally identifiable information of Seller's employees, other personnel, agents, officers, directors, contractors, customers, potential and prospective customers, suppliers, and/or other Persons, which information may include name, address, other contact information, persistent identifier, financial account information, heath or medical information, insurance information, social security number, tax ID number, driver's license, mother's maiden name, date of birth, password, PIN number, employee ID number, payroll records, salary information or other human resources records and information, personal identification number or code, other account information and/or account activity information, other information or data that can be used for identity theft (including that which is not personally identifiable) or to identify a particular natural person, computer, device or software, and any other sensitive information regarding such Persons.

"<u>Petition</u>" means a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

"<u>Post-Petition Assumed Liabilities Cap</u>" means $2,000,000.00.

"<u>Post-Petition Contracts</u>" means all Contracts entered into by Seller after the Petition Date (except any Contracts related to Indebtedness of Seller incurred from or owing to any bank or other financial institution), including all Contracts with vendors, suppliers and customers.

"<u>Post-Petition Deferred Rent Cure Costs</u>" means all Cure Costs under the Assumed Leases, but only to the extent arising after the Petition Date.

"Post-Petition Deferred Rent Cure Costs Cap" means $5,507,727.22; provided that, such amount shall be reduced on a dollar-for-dollar basis for any Post-Petition Deferred Rent Cure Costs paid prior to the Closing (including through the use of proceeds from the DIP Facility).

"Pre-Petition Deferred Rent Cure Costs" means all Cure Costs under the Assumed Leases as of the Petition Date.

"Pre-Petition Deferred Rent Cure Costs Cap" means $4,500,000.00.

"Pre-Petition First Lien Obligations" means the aggregate principal amount outstanding under that certain Credit and Guaranty Agreement, dated as of May 22, 2019, by and among Seller, Parent, certain subsidiaries of Seller as guarantors, the lenders party thereto, and MidCap Financial Trust, as administrative agent (as amended and modified from time to time prior to the date hereof), of $72,806,000.00 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, ant accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of Seller's or Parent's obligations in connection with such Credit and Guaranty Agreement).

"Privacy and Data Security Laws" means all privacy, security, data collection, data protection, data sharing, direct marketing, consumer protection, location tracking, customer tracking, behavioral marketing, and workplace privacy Laws, then-current industry standards, guidelines and practices, in each case, of any applicable jurisdiction, including with respect to the collection, processing, storage, protection and disclosure of Personal Information.

"Purchaser Group" means Purchaser, any Affiliate of Purchaser and each of their respective former, current or future Affiliates, officers, directors, employees, partners, members, managers, agents, advisors, successors or permitted assigns.

"Qualified Bid" has the meaning as shall be ascribed to such term in the Bid Procedures Order.

"Registered Purchased Intellectual Property" means all items of Purchased Intellectual Property that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued patents, registered trademarks, domain names, and copyrights, and pending applications for any of the foregoing.

"Related Party" means any member, employee, officer, director, equityholder or partner of Seller or any immediate family member of any of the foregoing or any of its Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escaping, dumping, injection, abandonment, deposit, disposal, discharge, dispersal, migration or leaching of any Hazardous Substance into the environment, any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium or the indoor or outdoor ambient air.

121645066v17

"Representative" of any Person shall mean such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives.

"Restricted Parties" means Investcorp International Inc. (and each of its Affiliates which directly or indirectly own (or otherwise hold) Equity Securities in the Seller as of the date hereof and/or as of immediately prior to the Closing).

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the Transactions or an Alternative Transaction.

"Sale Motion" means the motion, in form and substance reasonably acceptable to Seller and Purchaser, filed by Seller pursuant to, inter alia, Sections 363 and 365 of the Bankruptcy Code to obtain entry of the Sale Order.

"Sale Order" means the Final Order entered by the Bankruptcy Court, in the form acceptable to Purchaser in its sole discretion, expressly authorizing and approving, among other things, the (a) sale of the Purchased Assets free and clear of all Liens to Purchaser on the terms and conditions set forth herein, (b) assumption and assignment of the Purchased Contracts to Purchaser and the assumption by Purchaser of the Assumed Liabilities, in each case, on the terms and subject to the conditions set forth in this Agreement, and (c) mutual releases between Purchaser and Seller.

"Sale Order Deadline Date" means May 6, 2021, or such earlier date as may be agreed upon in accordance with the Bid Procedures Order.

"Sanctioned Person" means any individual or entity that is the subject or target of sanctions or restrictions under any Anti-Corruption and Trade Control Law, including: (a) any individual or entity listed on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including, OFAC's Specially Designated Nationals and Blocked Persons List; (b) any entity that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by a Person or Persons described in clause (a) above; or (c) any national of a Sanctioned Country.

"Software" means any and all computer programs, including operating system and applications software, firmware, computerized implementations of algorithms, program interfaces and other code, whether in source code or object code form (including all of the foregoing that is installed on computer hardware), including associated data files, databases, and related protocols, specifications, and all available documentation, including user manuals, relating to the foregoing.

"Straddle Period" means any Tax period that includes (but does not end on) the Closing Date.

"Subsidiary" of any Person means any other Person, of which such first Person (either alone or with any other Subsidiary) owns or controls, directly or indirectly, stock, other securities or other equity interests (a) having the ordinary voting power to elect a majority of the board of directors or other governing body of such Person, or (b) representing at least fifty percent (50%) of the outstanding stock, other securities or other equity interests of such Person.

14

"Tax" means, whether disputed or not, (a) any U.S. federal, state, local or non-U.S. income, profits, license, severance, occupation, windfall profits, capital gains, capital stock, transfer, registration, social security (or similar), production franchise, gross receipts, payroll, sales, employment, use, property (real or personal), excise, customs, value added, estimated, stamp, alternative or add-on minimum, withholding (including backup withholding), lease, service, service use, recording, documentary, intangibles, conveyancing, gains, unemployment, disability, net worth, escheat, abandoned property, environmental, premium, real property gains tax or impost, including any interest and penalties imposed with respect to such amounts and any additions to such amounts and (b) any liability for the payment of any amounts of the type described in clause (a) above relating to any other Person as a result of being party to any agreement (including, but not limited to, any tax sharing or allocation arrangement, any agreement to indemnify such other Person or deemed agreement created by operation of law), being a successor or transferee of such other Person, or being (or ceasing to be) a member of the same affiliated, consolidated, combined or unitary group with such other Person.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Transaction Documents" means this Agreement, the Assignment and Assumption Agreement, Bill of Sale, and each IP Assignment Agreement and Assignment and Assumption of Lease, and the other agreements, certificates, and instruments executed and delivered in connection with this Agreement or any of the foregoing (or the Transactions).

"Transfer" means to sell, assign, donate, contribute, pledge, hypothecate, convey, dispose, deliver or otherwise transfer.

"Transfer Taxes Cap" means $750,000.00.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq. (1988) and any similar state or local "mass layoff" or "plant closing" laws.

Section 1.2    Cross References.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Acquired Store and Acquired Stores | 2.1(a) |
| Agreement | Preamble |
| Allocation Notice of Objection | 2.7(b) |
| Antitrust Division | 7.4(a) |
| Antitrust Filings | 7.4(a) |
| Asset Taxes | 8.3 |
| Assignment and Assumption Agreement | 2.10(b) |
| Assumed Contracts | 2.1(a) |
| Assumed Employee Benefit Plans | 2.1(f) |

15

| **Term** | **Section** |
|---|---|
| Assumed Leases | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Audited Financial Statements | 3.17(a) |
| Audited Financials Date | 3.17(a) |
| Bill of Sale | 2.10(a) |
| Business | Recitals |
| Business Social Media Accounts | 3.9(b) |
| Business Systems | 3.9(m) |
| Closing | 2.9 |
| Credit Bid Amount | 2.7(a) |
| End Date | 12.1(b) |
| Enforceability Exceptions | 3.2 |
| Estimated Cure Costs | 2.5 |
| Excluded Assets | 2.2 |
| Excluded Employee Benefit Plan | 2.2(g) |
| Excluded Liabilities | 2.4 |
| Exclusivity Period | 5.5 |
| Express Representations | 4.9 |
| FCPA | 1.1 |
| Final Allocation Schedule | 2.7(b) |
| Final Order | 1.1 |
| Financial Statements | 3.17(a) |
| Furnishings and Equipment | 2.1(e) |
| FTC | 7.4(a) |
| HSR Filing | 7.4(a) |
| IP Assignment Agreement | 2.10(g) |
| Insurance Policies | 3.16 |
| Interim Balance Sheet Date | 3.17(a) |
| Interim Financial Statements | 3.17(a) |
| Lease Assignment and Assumption Agreement | 2.10(c) |
| Material Suppliers | 3.20 |
| Notice | 13.2 |
| Offered Employees | 9.1 |
| Omitted Contract | 2.6 |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Post-Petition Assumed Liabilities Cap | 2.3(d) |
| Post-Petition Payables | 2.3(d) |
| Proposed Allocation Schedule | 2.7(b) |
| Purchase Price | 2.7(a) |
| Purchased Assets | 2.1 |
| Purchased Contracts | 2.1(a) |
| Purchased Intellectual Property | 2.1(h) |
| Purchaser | Preamble |
| Purchaser Plan | 9.2 |

16

| Term | Section |
|------|---------|
| Real Property Leases | 3.14(c) |
| Sanctioned Country | 3.10(b) |
| Section 280G | 7.7 |
| Seller | Preamble |
| Stores | Recitals |
| Trade Secrets | 1.1 |
| Transactions | Recitals |
| Transfer Taxes | 8.2 |
| Transferred Employees | 9.1 |
| Transferred Permits | 2.1(g) |

ARTICLE II
PURCHASE AND SALE

Section 2.1    Purchase and Sale.  On to the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller agrees to Transfer, or cause to be Transferred, to Purchaser (and which Transfer(s) shall be in accordance with the Sale Order), and Purchaser agrees to purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all assets, properties, claims and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill) wherever located and whether now existing or hereafter acquired that are owned, held or used by Seller or otherwise arising in connection with or related to the Business, in each case other than the Excluded Assets (collectively, the "Purchased Assets"), in accordance with the Sale Order, including the following:

(a)    (i) the Contracts designated by Purchaser on Schedule 2.1(a)(i) (collectively, the "Assumed Contracts"), and (ii) the Real Property Leases (collectively, the "Assumed Leases", the Stores which are the subject of the Assumed Leases, each, an "Acquired Store" and collectively, the "Acquired Stores") designated by Purchaser on Schedule 2.1(a)(ii), in each case, when so designated in connection with the delivery of Schedule 2.1 in accordance with Section 2.5 (such Contracts, collectively, the "Purchased Contracts"); provided, however, that, for the avoidance of doubt, the term Purchased Contracts shall include all Post-Petition Contracts;

(b)    all deposits being held directly or indirectly by a third party, including, utility deposits, security deposits, deposits held by parties to the Purchased Contracts and deposits held by vendors or trade creditors;

(c)    all Accounts Receivable, and any security, Claim, remedy or other rights related to (or otherwise arising out of) such Accounts Receivable or to the collectability thereof;

(d)    all Inventory;

(e)    all tangible personal property, including all machinery, equipment, tools, computers, in-store processors, front-end systems, point-of-sale systems, credit card readers, mobile phones, personal digital assistants, computer equipment, hardware,

17

peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, store models, shelving, appliances, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Seller (collectively, the "<u>Furnishings and Equipment</u>"), wherever located, which Furnishings and Equipment relate to any Store, the Headquarters, the Distribution Center, or the Purchased Contracts (except for any Furnishings and Equipment which Purchaser, in its sole discretion, expressly rejects in writing prior to or in connection with the Closing, which rejected Furnishings and Equipment shall constitute Excluded Assets for all purposes of this Agreement);

(f)    all rights in or under the Employee Benefit Plans set forth on <u>Schedule 2.1(f)</u>, in each case other than any Excluded Employee Benefit Plans (collectively, the "<u>Assumed Employee Benefit Plans</u>"), including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith; <u>provided</u>, <u>however</u>, that Purchaser shall be permitted to designate any and all Assumed Employee Benefit Plans as Excluded Employee Benefits Plans from the date of this Agreement through the last date that Purchaser is permitted, pursuant to <u>Section 2.5</u> hereof, to deliver <u>Schedule 2.1</u> to Seller;

(g)    all transferable Permits (including all Environmental Permits) held by Seller that relate to the Business (other than any Permit that relates solely to an Excluded Store or is an Excluded Asset) (collectively, the "<u>Transferred Permits</u>");

(h)    all Intellectual Property Rights owned by Seller, including (A) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Intellectual Property Rights; (B) claims and causes of action with respect to such Intellectual Property Rights accruing on or after the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation or other violation thereof, and rights to protection of interests therein under the Laws of all jurisdictions; and (C) the E-Commerce Platform solely to the extent owned by Seller (collectively, the "<u>Purchased Intellectual Property</u>"), and all Licensed Intellectual Property of Seller (including, but not limited to, the E-Commerce Platform to the extent such constitutes Licensed Intellectual Property), and, in each case, all Avoidance Actions related thereto;

(i)    all automobiles, trucks, trailers, tractors, forklifts, other industrial vehicles and other motor vehicles used or held for use in the Business or otherwise owned by Seller;

(j)    all Improvements on any Leased Real Property (other than real property subject to any Real Property Lease that constitutes an Excluded Asset);

(k)    all rights to the telephone and facsimile numbers and email addresses used by Seller;

(l)    all books, records, files and papers of Seller relating solely to the Business, the Assumed Liabilities or the Purchased Assets, including customer sales,

18

marketing, advertising, packaging and promotional materials, equipment logs, operating guides and manuals, creative materials, equipment maintenance files, quality control reports and procedures, customer complaints and inquiry files, stationary, forms, labels, shipping material, brochures, art work, photographs, studies, reports (including environmental reports), invoices, shipping records, standard forms of documents, customer, vendor, distributor and supplier lists, correspondence, maintenance, service, financial and accounting records, documentation relating to Intellectual Property Rights, Tax records and Tax Returns (except to the extent set forth in Section 2.2(j)) and all customer data and information derived from branded loyalty promotions or programs and other similar information related to customer purchases at the Stores or through the E-Commerce Platform, the wholesale business, or any similar platform owned, operated, or controlled by Seller; provided, however, that Seller shall be entitled to retain copies of such books, records, files and papers;

(m)    except for the Excluded Cash, all of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions, including short-term marketable securities and any cash collateral used to secure surety bonds or other transactional assurances (including all cash located at the Stores, all cash in or en route or in transit to the Stores', Distribution Center's and/or Headquarters' depository accounts, and all petty cash located at the Stores, Distribution Center and/or Headquarters, in each case, as of immediately prior to the Closing and any cash in transit to or deposited in any such accounts with respect to Inventory sold prior to the Closing Date);

(n)    all tangible and intangible assets included in the E-Commerce Platform or any similar e-commerce platform owned, operated, or controlled by Seller (provided, that to the extent any such assets include rights to which Seller is entitled pursuant to any Contract, such rights shall only be included in the Purchased Assets if such Contract is a Purchased Contract);

(o)    all prepaid and deferred items that relate to the Business and/or the Purchased Assets (including prepaid rentals);

(p)    Tax refunds, rebates, abatements, credits, prepayment of Taxes and similar items relating to the Business and/or Purchased Assets received by Seller or Purchaser;

(q)    (i) all transferable Insurance Policies, (ii) all credits, premium refunds, proceeds, causes of action or rights arising under Insurance Policies, and (iii) the amount of, and all rights to any insurance proceeds received by Seller after the date hereof in respect of the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or relating to any Assumed Liabilities;

(r)    any rights, demands, claims, causes of action, commercial tort claims, Estate Causes of Action, credits, allowances, rebates, or rights of setoff (other than against Seller or any of its Affiliates) arising out of or relating to the Business or any of the Purchased Assets or Assumed Liabilities;

(s)    all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of Seller or with third parties (including, any non-disclosure or confidentiality, non-compete or non-solicitation agreements entered into in connection with the Auction), in each case, which relate to the Business or any of the Purchased Assets or Assumed Liabilities;

(t)    all unexpired, transferable warranties, indemnities, or guaranties from any third party with respect to the Business or any Purchased Asset or Assumed Liability, including any item of real property, personal property or equipment;

(u)    all goodwill, customer and referral relationships, other intangible property and all privileges, relating to, arising from or associated with any of the Purchased Assets, the Assumed Liabilities and/or the Business, in each case arising after the Closing; and

(v)    all other properties, assets and rights owned by Seller as of the Closing Date, or in which Seller has an interest, and which are not otherwise Excluded Assets.

Section 2.2    Excluded Assets.    Notwithstanding any other provision of this Agreement to the contrary, including the generality of Section 2.1, the Purchased Assets shall not include any assets, properties or rights not specifically identified in Section 2.1, including any of the following assets, properties or rights (collectively, the "Excluded Assets"):

(a)    all nontransferable Permits of Seller;

(b)    corporate seals, stock record books, minute books, and Organizational Documents of Seller; provided, however, that, at or prior to the Closing, complete copies of the foregoing items shall be provided by Seller to Purchaser (and which copies, for the avoidance of doubt, shall not be deemed Purchased Assets);

(c)    subject to Section 2.5, any Contract, including Real Property Leases, not identified in this Agreement as a Purchased Contract;

(d)    except to the extent included as a Purchased Asset, all Excluded Stores (including all Improvements at the Excluded Stores);

(e)    all rights of Seller arising under this Agreement or in connection with the Transactions, including the Purchase Price;

(f)    any shares of capital stock or other equity interest in or issued by Seller of any securities convertible into, exchangeable or exercisable for shares of capital stock of other equity interest in or issued by Seller, and any shares of capital stock or other equity interest in or issued by any other entity in which Seller holds an equity interest, or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any other entity in which Seller holds an equity interest;

(g)      any Employee Benefit Plan set forth in Schedule 2.2(g) (each, an "Excluded Employee Benefit Plan") and any assets of any Excluded Employee Benefit Plan or any right, title or interest in or to any of the assets thereof or relating thereto (in each case, for clarity, other than Assumed Employee Benefit Plans and any right, title or interest in or to any of the assets of such Assumed Employee Benefit Plans); provided, however, that Purchaser shall be permitted to designate any and all Excluded Employee Benefit Plans as Assumed Employee Benefits Plans from the date of this Agreement through the last date that Purchaser is permitted, pursuant to Section 2.5 hereof, to deliver Schedule 2.1 to Seller;

(h)      without limiting Section 2.1(a) in any respect, all records and documents (i) that Seller is required by applicable Law to retain, or (ii)(A) relating solely to Excluded Assets or Excluded Liabilities, (B) prepared by or on behalf of Seller in connection with this Agreement or the Transactions, or (C) relating to the Bankruptcy Case;

(i)      Excluded Cash; and

(j)      Tax Returns of Seller, Tax records and other similar documents and records (all in the state in which such records and information currently exist), other than such Tax Returns, Tax records and other documents relating solely to the Purchased Assets (copies of which may be retained by Seller).

Section 2.3      Assumed Liabilities.  Purchaser shall assume no obligation or other Liability of Seller, or of any predecessor or any Affiliate of Seller, other than the obligations and other liabilities explicitly set forth in this Section 2.3.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required (subject to any defenses or claimed offsets asserted in good faith against the obligee to whom such liabilities are owed), only the following obligations and other liabilities of Seller (collectively, the "Assumed Liabilities"):

(a)      all Claims and liabilities (not including any Taxes, other than the Taxes allocated to Purchaser pursuant to Section 8.3) related to or arising under the Assumed Leases and the Assumed Contracts or arising in connection with the ownership and operation of the Purchased Assets from and after the Closing;

(b)      Cure Costs;

(c)      all liabilities for gift cards on the E-Commerce Platform, store credits, customer loyalty programs, gift cards and gift certificates validly issued by Seller and outstanding as of immediately prior to the Closing;

(d)      all accounts payable of the Business incurred after the Petition Date in the Ordinary Course of Business after the Petition Date that are entitled to priority status under Section 503(b) of the Bankruptcy Code (it being understood that trade payables and accrued liabilities shall not include any fees or expenses due to professional persons

21

retained by Seller or any other party involved in the Bankruptcy Case, including any creditors' committee) (collectively, the "<u>Post-Petition Payables</u>");

(e)      all Indebtedness set forth on <u>Schedule 2.3(e)</u>, including the DIP Obligations under the DIP Facility; and

(f)      one hundred percent (100%) of Transfer Taxes and any Asset Taxes allocated to Purchaser pursuant to <u>Section 8.3</u>.

Nothing contained in this Agreement shall require Purchaser to pay or discharge any Assumed Liabilities prior to such Assumed Liabilities becoming due and payable in accordance with the underlying terms of any Purchased Contract giving rise to or governing such Assumed Liabilities. The Parties acknowledge and agree that the disclosure of any obligation or liability on any schedule to this Agreement or the Transaction Documents shall not create an Assumed Liability or liability of Purchaser, except where such disclosed liability has been expressly assumed by Purchaser as an Assumed Liability in accordance with the provisions of this <u>Section 2.3</u>.

Section 2.4      <u>Excluded Liabilities</u>.  Notwithstanding any other provision of this Agreement or any Transaction Document to the contrary, the Parties expressly acknowledge that Purchaser is assuming only the Assumed Liabilities as expressly set forth herein and is not assuming, and shall not be obligated to assume or pay, perform, or discharge, any other Claim against, obligation or other Liability of Seller (or any of its Affiliates) of whatever nature, whether presently in existence or arising hereafter, and shall under no circumstances be liable or responsible for any liabilities (other than the Assumed Liabilities) of Seller, or any predecessor or Affiliate thereof, whether existing on the Closing Date or arising thereafter as a result of any act, omission or circumstance taking place prior to the Closing.  Purchaser shall not be a successor in interest to Seller for any purpose and is not answerable for any successor liability Claims.  All other Claims, obligations and other Liabilities shall be retained by and remain obligations and Liabilities of Seller and its bankruptcy estate (all such obligations and other Liabilities not being expressly assumed herein as an Assumed Liability being herein referred to, collectively, as the "<u>Excluded Liabilities</u>").

Section 2.5      <u>Assumption/Assignment of Contracts and Rights</u>.  The Purchased Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.  On or before the date established by the Bankruptcy Court in the Bid Procedures Order for the submission of qualified bids, Purchaser shall deliver <u>Schedule 2.1</u> to Seller designating the Assumed Contracts and Assumed Leases that shall constitute Purchased Contracts hereunder.  Pursuant to and in accordance with the requirements of the Bid Procedures, promptly following the date hereof, Seller shall deliver a list of all executory Contracts to which Seller is a party (and Seller's good faith estimate of the Cure Cost associated with each such Contract (collectively, the "<u>Estimated Cure Costs</u>")) within the timeframe required pursuant to the Bid Procedures (but in no event later than ten (10) days following the date hereof), which shall reflect, if applicable, the amount of Cure Costs that may have been agreed to between Seller and the applicable counterparty(ies) to any Contract; <u>provided</u>, that, if at any time the Purchaser designates any Contract as a Purchased Contract which is not a Contract set forth on such list of executory Contracts, Seller shall promptly upon Purchaser's request therefor provide Seller's good faith estimate of all Cure Costs pursuant to Section 365 of the Bankruptcy Code with respect to

each such Contract.  Purchaser shall reasonably cooperate with Seller (which cooperation shall not require Purchaser to pay additional amounts or guaranty any obligations owed to any counterparties to Purchased Contracts) to assist Seller in complying with the requirements under Section 365 of the Bankruptcy Code necessary to assign to Purchaser the Purchased Contracts. From and after the date hereof through the Closing, Seller shall not reject or take any action (or fail to take any action that would or would reasonably be likely to) result in rejection by operation of Law) to reject, repudiate or disclaim any Real Property Lease or other Contract without the prior written consent of Purchaser; provided that Seller shall be able to reject any Real Property Lease or other Contract if Seller has provided written notice to Purchaser or Purchaser's counsel (electronic notice being sufficient) of such rejection (which written notice shall include (in reasonable detail) a description for the basis of such rejection), and Purchaser has not objected to such rejection following the fifth (5th) Business Day following Purchaser's receipt of such written notice.

Section 2.6    Designation; Later Discovery Contracts.  If it is discovered that a Real Property Lease or other Contract should have been listed on the list of executory contracts delivered by Seller in accordance with the Bid Procedures (as described in Section 2.5 above), but was not listed thereon (each, an "Omitted Contract"), Seller shall immediately following discovery thereof (but in no event later than five (5) Business Days after such discovery), (a) notify Purchaser in writing of such Omitted Contract and Seller's good faith estimate of the corresponding related Cure Costs thereof (if any) (which shall reflect, if applicable, the amount of Cure Costs that may have been agreed to between Seller and the applicable counterparty(ies) to such Omitted Contract), and (b) if requested by Purchaser in writing, file a motion with the Bankruptcy Court on notice to the counterparties to such Omitted Contract seeking entry of an Order fixing the Cure Costs and approving the assumption and assignment of such Omitted Contract (provided, however, that no Omitted Contract shall be assumed by and assigned to Purchaser unless such Omitted Contract shall be accepted at such time in writing by Purchaser as a Purchased Contract).  Upon approval of such motion by the Bankruptcy Court, such Omitted Contract shall become a Purchased Contract and be included on Schedule 2.1.

Section 2.7    Purchase Price; Allocation of Purchase Price.

(a)    The aggregate consideration for the Purchased Assets (the "Purchase Price") will be: (i) a credit bid (the "Credit Bid") pursuant to Section 363(k) of the Bankruptcy Code, on a dollar-for-dollar basis, of (A) a portion (which may, in the sole discretion of the Purchaser, be up to the full amount) of the Pre-Petition First Lien Obligations, and (B) the full amount of the DIP Obligations (the amounts set forth in the preceding clauses (A) and (B) collectively, the "Credit Bid Amount"); and (ii) the assumption of the Assumed Liabilities; provided, however, that any portion of the Pre-Petition First Lien Obligations that are not included in the Credit Bid shall remain outstanding following the consummation of the Transactions.

(b)    Purchaser shall, within ninety (90) days after the Closing Date, submit to Seller a statement of Purchaser's allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (or, if applicable, any similar provision under state, local or foreign Law or regulation) (the "Proposed Allocation

Schedule"). Seller will have thirty (30) days following delivery of the Proposed Allocation Schedule during which to notify Purchaser in writing (an "Allocation Notice of Objection") of any objections to the Proposed Allocation Schedule, setting forth in reasonable detail the basis of the objections. If Seller agrees in writing to the Proposed Allocation Schedule or fails to timely deliver an Allocation Notice of Objection in accordance with this Section 2.7(b), the Proposed Allocation Schedule will be conclusive and binding on all Parties (any such conclusive and binding allocation, together with any revisions thereto, the "Final Allocation Schedule"). If Seller submits an Allocation Notice of Objection, then for twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection (or such longer period as the Parties shall mutually agree), Purchaser and Seller will use commercially reasonable efforts to agree on the allocations. If Purchaser and Seller agree on the allocations, such revised allocations will become the Final Allocation Schedule. The allocation provided in the Final Allocation Schedule shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income Tax purposes, and except in connection with any contest or settlement described in the last sentence of this Section 2.7(b), each of the Parties agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax Returns consistent with the Final Allocation Schedule and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations. If Purchaser and Seller do not reach an agreement within twenty (20) Business Days after the date Purchaser receives the Allocation Notice of Objection (or such longer period as the Parties shall mutually agree) (and are not deemed to have agreed to the Proposed Allocation Schedule under this Section 2.7(b)), there shall be no Final Allocation Schedule, and each of Purchaser and Seller shall file, and shall permit its Affiliates to file, federal and applicable state income Tax Returns (including IRS Form 8594 or other applicable form) in any manner that it chooses regarding the allocation of the Purchase Price, applicable Assumed Liabilities and other relevant items. Seller and Purchaser each agree to provide the other with any information required to complete the allocation statement under this Section 2.7(b). If any Governmental Authority disputes the Final Allocation Schedule, the Party receiving notice of the dispute shall promptly notify the other Party hereto; provided, however, that either Party shall be entitled (in its complete discretion) to contest or to settle any allocation issue with any Governmental Authority.

Section 2.8    Cure Costs. Within ten (10) calendar days after the entry of the Bid Procedures Order and in accordance therewith, Seller shall deliver a written notice to all counterparties to any Assumed Contract and any Assumed Lease notifying such parties of: (a) the potential assignment and assumption of such Contracts and Real Property Leases; (b) the Estimated Cure Costs for such Contracts and Real Property Leases; and (c) an objection deadline for such counterparty to object to such Estimated Cure Cost.

Section 2.9    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of Proskauer Rose LLP, Eleven Times Square, New York, New York 10036 (or remotely via the electronic or other exchange of documents and signature pages), no later than five (5) Business Days after satisfaction or (if permissible) waiver of the conditions set forth in Article X (other than

24

those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree; provided, however, that the Parties intend to, and will use reasonable efforts to, cause the Closing to occur on or prior to the End Date (subject to applicable requirements and restrictions imposed by the Bankruptcy Code or the Bankruptcy Court). Upon consummation of the Closing, the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

Section 2.10 <u>Deliveries by Seller</u>. At the Closing, Seller will deliver, or cause to be delivered, to Purchaser (unless delivered to Purchaser prior to the Closing) the following:

(a) a Bill of Sale substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Bill of Sale</u>"), duly executed by Seller;

(b) an Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit D</u> (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Seller;

(c) the Lease Assignment(s) and Assumption Agreement(s) substantially in the form attached hereto as <u>Exhibit E</u> and, upon the request of Purchaser, in recordable form (the "<u>Lease Assignment and Assumption Agreement</u>") for the assumed Real Property Leases, duly executed by Seller;

(d) a copy of the Sale Order;

(e) copies of all Purchased Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the offices of the Business which constitute Purchased Assets;

(f) physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(g) an assignment agreement or agreements, duly executed by Seller, transferring the Intellectual Property Rights included in the Purchased Assets to Purchaser, such agreement to be on customary terms and conditions and negotiated and agreed in good faith by Seller and Purchaser as soon as reasonably practicable following the date of this Agreement (but in no event later than the Closing Date) (the "<u>IP Assignment Agreement</u>");

(h) a duly completed Form W-9 executed by Seller;

(i) an officer's certificate (in form and substance reasonably satisfactory to Purchaser) duly executed by a senior officer of Seller, certifying the matters set forth in <u>Sections 10.2(a)</u>, <u>(b)</u> and <u>Section 10.2(c)</u>; and

(j) all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement.

Section 2.11    <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless delivered to Seller prior to the Closing) the following:

(a)    a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Purchased Assets, in form and substance reasonably satisfactory to Seller;

(b)    an officer's certificate (in form and substance reasonably satisfactory to Seller), duly executed by a senior officer of Purchaser, certifying the matters set forth in <u>Sections 10.3(a), (b)</u> and <u>(c)</u>;

(c)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(d)    the Bill of Sale, duly executed by Purchaser;

(e)    the Lease Assignment and Assumption Agreement, duly executed by Purchaser;

(f)    the IP Assignment Agreement, duly executed by Purchaser;

(g)    the Excluded Cash; and

(h)    all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

Section 2.12    <u>Withholding Rights</u>.  Notwithstanding anything to the contrary in this Agreement, Purchaser and its Affiliates and Seller and its Affiliates, as applicable, will be entitled to deduct and withhold from the consideration otherwise deliverable under this Agreement, and from any other payments otherwise required pursuant to this Agreement, such amounts as Purchaser or its Affiliates or Seller or its Affiliates, as applicable, are required to deduct and withhold with respect to any such deliveries and payments under applicable Law.  In the event that any such withholding is made (other than any withholding resulting from Seller's failure to satisfy its obligations under <u>Section 2.10(h)</u>), Purchaser or Seller, as applicable, shall give the other Party at least five (5) Business Days' prior written notification of its intention to make any such deduction or withholding and shall cooperate with the other Party to mitigate, reduce or eliminate any such deduction or withholding.  To the extent that amounts are so withheld and paid to the applicable Governmental Authority, they will be treated for all purposes of this Agreement as having been delivered and paid to such Person in respect of which such deduction and withholding was made.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Disclosure Schedules (which disclosures in any section or paragraph of the Disclosure Schedules shall qualify only (a) the corresponding section or paragraph of this <u>Article III</u>, and (b) other sections or paragraphs of this <u>Article III</u> to the extent that such disclosure sets forth facts in sufficient detail so that the relevance of such disclosure

26

would be reasonably apparent to a reader of such disclosure), and subject to the terms, conditions and limitations set forth in this Agreement, Seller (and Parent, solely with respect to <u>Section 3.17</u>) hereby represents and warrants to Purchaser as of the date of this Agreement and as of the Closing as follows:

Section 3.1    <u>Organization</u>.  Seller is a corporation validly existing under the Laws of Illinois, and has the power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted.  Seller is duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the ownership of Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  <u>Schedule 3.1</u> sets forth a true, correct and complete list of each jurisdiction in which Seller is organized and licensed or qualified to do business as a foreign entity. Seller has made available to Purchaser true, complete and correct copies of its Organizational Documents.

Section 3.2    <u>Due Authorization</u>.  Subject to the entry of the Sale Order and receipt of requisite Bankruptcy Court approvals, the execution, delivery and performance by Seller of its obligations under this Agreement, the Transaction Documents and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or similar organizational action, and no other corporate or similar organizational proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement, the Transaction Documents and the consummation of the Transactions by the Seller.  Subject to entry of the Sale Order and requisite Bankruptcy Court approvals, this Agreement has been duly and validly executed and delivered by Seller, and, assuming this Agreement is a valid and binding obligation of Purchaser, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, receivership, insolvency, reorganization, moratorium, fraudulent conveyance, equitable subordination or similar Laws of general application and other Laws relating to or affecting creditors' rights or general principles of equity (whether considered in a proceeding in equity or at law) (collectively, the "<u>Enforceability Exceptions</u>").

Section 3.3    <u>Governmental Authorization</u>.  Except as disclosed on <u>Schedule 3.3</u>, Seller is not required to file, seek or obtain any notice, authorization, approval, Order, Permit or consent of or with any Governmental Authority in connection with the execution, delivery and performance by Seller of this Agreement, the Transaction Documents and the consummation of the Transactions by Seller other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, (b) such actions and filings required by the HSR Act or otherwise required pursuant to <u>Section 7.4</u>, or (c) where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, is not material to the Purchased Assets, taken as a whole.

Section 3.4    <u>Noncontravention</u>.  Subject to the entry of the Sale Order and receipt of requisite Bankruptcy Court approvals, and subject to the notices, authorizations, approvals, Orders, permits or consents set forth on <u>Schedule 3.3</u> (including approval under the HSR Act (if applicable)) being made, given or obtained, the execution, delivery and performance by Seller of

27

this Agreement and the Transaction Documents and the consummation of the Transactions do not and will not (a) violate Seller's Organizational Documents; (b) assuming compliance with the matters referred to in <u>Section 3.3</u>, violate any Law applicable to Seller or by which any of the Purchased Assets is bound; (c) violate, conflict with, constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, loss of benefit under, cancellation or acceleration of any Purchased Contract, except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code; or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities, except, in the case of the prior <u>clause (c)</u>, for any such violations, breaches, defaults or other occurrences that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.5    [Reserved].

Section 3.6    <u>No Subsidiaries</u>.  Seller has no Subsidiaries and does not own or have any interest in, directly or indirectly, any Equity Securities of any Person.

Section 3.7    <u>Litigation</u>.  Except as disclosed on <u>Schedule 3.7</u>, as of the date hereof, there are no Legal Proceedings pending against or, to the Knowledge of Seller, threatened against Seller with respect to the Purchased Assets, Assumed Liabilities or the Business before any Governmental Authority which (a) if determined adversely to Seller, would be, individually or in the aggregate, material with respect to the Purchased Assets and Assumed Liabilities, taken as a whole, or (b) questions the validity of this Agreement, any Transaction Document or the Transactions, or in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.  Other than in respect of the Bankruptcy Case, neither Seller nor, to the Knowledge of Seller, any manager, director, officer or key employee involved in the Business, in his or her capacity as such, is, or since January 1, 2018 has been,  a party to or in default with respect to any Order with respect to the Purchased Assets, Assumed Liabilities or the Business, other than any such Order where no injunctive or equitable relief was granted and where the monetary damages were covered by insurance.

Section 3.8    <u>Permits</u>.  <u>Schedule 3.8</u> sets forth a complete and correct list of all Permits (including Environmental Permits) required to own the Purchased Assets and conduct and operate the Business in a manner consistent with the current practices of Seller.   Except as set forth on <u>Schedule 3.8</u>, (a) Seller is, and has been since January 1, 2018, in material compliance with the terms and requirements of each Transferred Permit and each such Permit is valid as of the date hereof and is presently in full force and effect; and (b) no written notice of revocation, modification, refusal to renew or violation of any Transferred Permit has been received from any Governmental Authority and, as of the date hereof, there is no Legal Proceeding pending or, to Sellers' Knowledge, threatened that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any Transferred Permit.

Section 3.9    <u>Intellectual Property Rights</u>.

(a)    <u>Schedule 3.9(a)</u> sets forth an accurate, true and complete list of all Registered Purchased Intellectual Property, specifying as to each item, as applicable: the

title, mark, or patent (as applicable); the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; the current status; and all material unregistered Trademarks and Copyrights that are included in the Purchased Intellectual Property.

(b)     Schedule 3.9(b) sets forth an accurate, true and complete list of all social media accounts, pages and profiles relating to or used in the Business (the "Business Social Media Accounts"). All Business Social Media Accounts are associated with a Seller company email address and, to the Knowledge of Seller, all login credentials (*e.g.*, user names and passwords) are under the sole control of only Seller employees.

(c)     Seller is the sole and exclusive legal, beneficial owner, and with respect to Registered Purchased Intellectual Property, record owner, of all right, title and interest in and to the Purchased Intellectual Property, including the Intellectual Property Rights set forth on Schedule 3.9(a), and has the valid and enforceable right to use all Licensed Intellectual Property, in each case, free and clear of all Liens (except Permitted Liens). The Purchased Intellectual Property and the Licensed Intellectual Property constitute all of the Intellectual Property Rights used or held for use in or necessary to operate the Business as presently conducted by Seller (and as conducted in the Ordinary Course of Business). Neither the execution, delivery, or performance of this Agreement, nor the consummation of the Transactions, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, Purchaser's right to own or use any Purchased Intellectual Property or Licensed Intellectual Property in the conduct of the Business as currently conducted. Immediately following the Closing, all Purchased Intellectual Property and Licensed Intellectual Property will be owned or available for use by Purchaser on substantially the same terms as they were owned or available for use by Seller immediately prior to the Closing.

(d)     All of the material Purchased Intellectual Property is valid and enforceable. All Registered Purchased Intellectual Property is subsisting and in full force and effect and has not expired or been abandoned.  Seller has not received any written communications alleging that any of the Purchased Intellectual Property is not valid and enforceable, or that any Registered Purchased Intellectual Property is not subsisting and in full force and effect. All required filings and fees related to the Registered Purchased Intellectual Property have been timely filed with and paid (after giving effect to permitted extensions of relevant deadlines) to the relevant Governmental Authorities and authorized registrars, and all Registered Purchased Intellectual Property is otherwise in good standing. All assignments and other instruments necessary to establish, record, and perfect Seller's ownership interest in the Registered Purchased Intellectual Property have been validly executed, delivered, and filed with the relevant Governmental Authorities and authorized registrars. All Registered Purchased Intellectual Property and the filing, prosecution and maintenance thereof, have been and are in compliance with all requirements under applicable Law (including the duty of candor, payment of filing, examination, and maintenance fees and proofs of working or use).

121645066v17

(e)     Neither Seller nor, to the Knowledge of Seller, any other party to any material IP Contract is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal) or to withhold its consent in connection with a transfer to Purchaser (as required pursuant to the Transactions) of, any material IP Contract.

(f)     The conduct of the Business by Seller as currently conducted (and as conducted in the Ordinary Course of Business), including the use of the Purchased Intellectual Property and Licensed Intellectual Property in connection therewith, and the products, processes, and services of the Business, has not infringed upon, misappropriated or otherwise violated, and does not infringe, misappropriate or otherwise violate any Person's Intellectual Property Rights, and no such claims are pending or threatened in writing against Seller or have been received by Seller since January 1, 2018, and, to the Knowledge of Seller, no Person has infringed upon, misappropriated, diluted or otherwise violated, or is currently infringing upon, misappropriating, diluting, or otherwise violating any Purchased Intellectual Property, and no such claims are pending or threatened in writing against any Person by Seller or have been made by Seller against any Person since January 1, 2018.

(g)     There exist no Legal Proceedings by or before any Governmental Authority (including any oppositions, cancellations, revocations, reviews, challenges or other proceedings) pending or threatened or made since January 1, 2018 (i) alleging any infringement, misappropriation, dilution or other violation by Seller or by any product or service of Seller (or use thereof) (with respect to the Business) of the Intellectual Property Rights of any Person; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Purchased Intellectual Property or Seller's right, title, or interest in or to any Purchased Intellectual Property (excluding ordinary course patent and trademark prosecution communications and actions); or (iii) by Seller alleging any infringement, misappropriation or other violation by any Person of the Purchased Intellectual Property. To the Knowledge of Seller, there are no facts or circumstances that could reasonably be expected to give rise to any Legal Proceedings referred to in this Section 3.9(g). Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) relating to any Purchased Intellectual Property, that does, or could reasonably be expected to, materially restrict, impair or otherwise affect the ownership, use or value of any Purchased Intellectual Property.  None of the Intellectual Property Rights included in the Purchased Assets have been exclusively licensed by Seller to any other Person.

(h)     Seller has, with respect to the Business, taken commercially reasonable measures, including actions common in the industry, to maintain, protect, preserve and enforce the Trade Secrets included in the Purchased Intellectual Property and other confidential or proprietary information relating to the Business, including by requiring all Persons having access thereto to execute binding, enforceable, written non-disclosure Contracts and implementation and maintenance of appropriate and reasonable security measures. Without limiting the foregoing, Seller has not made any of its Trade Secrets or other confidential information of the Business that it intended to maintain as confidential available to any other Person, except pursuant to a binding, enforceable,

30

written non-disclosure Contract requiring such Person to maintain the confidentiality of such information. To the Knowledge of Seller, no unauthorized disclosure of any such Trade Secrets or other confidential or proprietary information has occurred.

(i)    To the Knowledge of Seller, no current or former employee, consultant, or independent contractor of Seller is in violation (in any material respect) of Seller's policies regarding maintaining the confidentiality of Trade Secrets or other confidential or proprietary information or Intellectual Property Rights.

(j)    Schedule 3.9(j) sets forth a true, correct and complete list of (i) all Business Software owned by Seller, and (ii) all Software (other than Open Source Materials listed in Schedule 3.9(j)(iii)) that is incorporated or embedded in or bundled with any Business Software, (iii) all Open Source Materials that are or have been included, incorporated or embedded in, linked to, combined or distributed with, or used in the delivery or provision of any Business Software or other Business product, service or offering, and (iv) all Software (including Business Software) within the Licensed Intellectual Property other than commercial "off-the-shelf" Software licensed on standardized terms from third parties. with a replacement cost and/or aggregate annual license and maintenance fee payable by Seller of less than $15,000, and including, for each item listed with respect to clauses (ii), (iii) and/or (iv) of Schedule 3.9(j), the name of the licensor or owner of the Software.

(k)    With respect to the operation of the Business, Seller has not used or incorporated into any Business Software any Open Source Materials in any manner that (i) requires the disclosure or distribution in source code form of any Purchased Intellectual Property; (ii) requires the licensing of any Purchased Intellectual Property for the purpose of making derivative works; (iii) imposes any restriction on the consideration to be charged for the distribution of any Purchased Intellectual Property; (iv) creates obligations for Seller with respect to Purchased Intellectual Property or grants to any Person any rights or immunities under any Purchased Intellectual Property; or (v) imposes any other limitation, restriction or condition on the right of Seller to use or distribute any Purchased Intellectual Property.

(l)    Seller has not disclosed or delivered to any escrow agent or any other Person any of the source code relating to any Business Software, and no other Person has the right, contingent or otherwise, to obtain access to or use any such source code.  No event has occurred, and to the Knowledge of Seller, no circumstance or condition exists, that (with or without notice or lapse of time or both) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any source code relating to any Business Software to any Person who is not, as of the date of this Agreement, a current employee or consultant of Seller. The Business Software is free from any material defect or bug, or material programming, design or documentation error.  To the Knowledge of Seller, none of the Business Software constitutes or contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "corruptant," "worm," "malware," "spyware," or "trackware" (as such terms are commonly understood in the Software industry) or any other code designed, intended to, or that does have any of the following functions: (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing

unauthorized access to, any computer, tablet computer, handheld device or other device; or (ii) damaging or destroying any data or file without a user's consent. Except in compliance in all material respects with the Privacy and Data Security Laws, none of the Business Software (A) sends information of a user to another Person without the user's consent, (B) records a user's actions without the user's knowledge, or (C) employs a user's Internet connection without the user's knowledge to gather or transmit information regarding the user or the user's behavior.

(m)     The computer systems, including Software, hardware, networks, databases, systems, telecommunications equipment and websites (and all information transmitted thereby or stored therein), owned, leased, licensed or otherwise used or held for use by Seller in the conduct of the Business (collectively, the "Business Systems") are reasonable for the Business as currently conducted and as currently proposed to be conducted. Seller has implemented and maintains commercially reasonable security and maintenance and support procedures and facilities and disaster recovery and business continuity plans (including periodic testing on at least an annual basis of such disaster recovery and business continuity plans) that comply with applicable Law to ensure the physical and electronic protection of the Business Systems from material disruptions in operation or unauthorized disclosure, use or modification. To the Knowledge of Seller, there has not been any material failure with respect to the Business Systems that has not been remedied or replaced in all material respects. Seller has taken commercially reasonable actions to protect the operation, security and integrity of the Business Systems. To the Knowledge of Seller, there have been no violations, intrusions or breaches of the Business Systems that have had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(n)     With respect to the Business, Seller complies and has complied (and, to the extent required by Applicable Privacy and Data Security Law, requires the compliance of all of its vendors which have access to Personal Information relating to the Business and collected or controlled by Seller) with (i) all applicable Privacy and Data Security Laws with respect to the collection, possession, maintenance, transfer or use of Personal Information; (ii) any applicable and published data security and privacy policies or related policies, programs or other notices of Seller relating to Seller's collection, possession, maintenance, transfer or use of Personal Information in the conduct of the Business; and (iii) contractual obligations to which Seller is a party relating to data security, privacy, or the collection or retention of Personal Information, in each case in connection with the conduct of the Business. Except as set forth on Schedule 3.9(n), to the Knowledge of Seller, there has been no incident, loss, unauthorized access to, disclosure or use of, or any security breach relating to or affecting, any Personal Information or other confidential information maintained or processed by Seller in the conduct of the Business that have had, or would reasonably be expected to have, a material and adverse effect on the Business, the Assumed Liabilities or the Purchased Assets. As of the date hereof, Seller has not received any written notice, complaint or claim from any Person alleging violation of any Applicable Privacy and Security Law or contract, and no Governmental Authority has served any subpoenas, demands or other written notices on Seller alleging a violation of any Applicable Privacy and Security Law in connection with the conduct of (or otherwise related to) the Business.

121645066v17

(o)      With respect to the Business, Seller posts all policies with respect to the matters set forth in Section 3.9(n) on its websites, mobile applications, SMS text applications, and other communications channels in conformance with, and to the extent required by, Applicable Privacy and Data Security Laws. With respect to the Business, Seller has implemented and currently maintains commercially reasonable technical, organizational and administrative security measures designed to protect all Personal Information under its control and/or in its possession in connection with the conduct of the Business from unauthorized access, use, disclosure, modification, deletion or other processing, and to detect, with respect to the Business, breaches of Personal Information. Seller has written agreements with each third party service provider or partner having access to Personal Information in connection with the conduct of the Business requiring compliance by such third party service provider or partner with Applicable Privacy and Data Security Laws. None of the execution, delivery and performance of this Agreement nor the consummation of the Transactions will constitute a violation of any Applicable Privacy and Data Security Laws.  Seller has the necessary rights to Personal Information to grant the rights and transfers thereof in accordance with the terms of and pursuant to this Agreement and the consummation of the Transactions. With respect to the Business and to the extent required by Applicable Privacy and Data Security Laws, Seller maintains records of its customers' communications preferences, such as opt-ins and opt-outs for various forms of direct marketing, behavioral advertising, and customer tracking, sufficient for Seller to honor such preferences and comply with all Applicable Privacy and Data Security Laws.

Section 3.10    Compliance with Laws and Court Orders.

(a)      Seller is, and since January 1, 2018 has been, in compliance, in all material respects, with all Laws applicable to the ownership, operation and use of the Purchased Assets and the Assumed Liabilities, and, since January 1, 2018 to the date hereof, the Company has not received any written (or, to the Knowledge of Seller, oral) notice of any action or other Legal Proceeding against it alleging any failure to comply in any material respect with any such Laws, except in each case as would not reasonably be expected to be, individually or in the aggregate, material to the Purchased Assets and the Assumed Liabilities, taken as a whole.  No investigation by any Governmental Authority with respect to Seller's ownership, operation and use of the Purchased Assets and the Assumed Liabilities is pending or, to the Knowledge of Seller, threatened, and since January 1, 2018 to the date hereof, the Seller has not received any written (or, to the Knowledge of Seller, oral) notice of any such investigation, except, in each case, for any such investigation that would not reasonably be expected to material to the Purchased Assets and the Assumed Liabilities, taken as a whole.

(b)      Neither Seller (or any of its Affiliates), nor, to the Knowledge of Seller, any Representatives acting on its behalf, nor the Business, is currently, or has been since January 1, 2018:  (i) a Sanctioned Person, (ii) organized, resident or located in any country or region that is subject or target of a comprehensive embargo under applicable Anti-Corruption and Trade Control Laws ("Sanctioned Country"), (iii) engaged in any dealings or transactions with any Sanctioned Person or in any Sanctioned Country; (iv) engaged in any export, re-export, transfer or provision of any goods, technology, or service

33

without, or exceeding the scope of, any required or applicable licenses or authorizations under all applicable Laws, or (v) otherwise in violation, in any material respect, of applicable Anti-Corruption and Trade Control Laws. Since January 1, 2018, Seller has not, nor has any of its Subsidiaries, in connection with or relating to the Business, (A) received from any Governmental Authority or any other Person any notice, inquiry, or internal or external allegation, (B) made any voluntary or involuntary disclosure to a Governmental Authority or (C) conducted any internal investigation or audit, in each case, concerning any actual or potential violation or wrongdoing related to Anti-Corruption and Trade Control Laws.

(c)     To the Knowledge of Seller, neither Seller nor any Representative acting on Seller's behalf, has made, directly or indirectly, any payment or promise to pay, or gift or promise to give or authorized such a promise or gift, of any money or anything of value, directly or indirectly, to: (i) any foreign official (as such term is defined in the FCPA) for the purpose of influencing any official act or decision of such official or inducing him or her to use his or her influence to affect any act or decision of a foreign government, or any agency or subdivision thereof; or (ii) any foreign political party or official thereof or candidate for foreign political office for the purpose of influencing any official act or decision of such party, official or candidate or inducing such party, official or candidate to use his, her or its influence to affect any act or decision of a foreign government or agency or subdivision thereof, in the case of both clauses (i) and (ii) above in order to assist Seller to obtain or retain business for or direct business to Seller and under circumstances which would subject Seller to material Liability under any Anti-Corruption and Trade Control Laws or any corresponding foreign Laws.

Section 3.11    Environmental Matters.  Except as set forth on Schedule 3.11:

(a)     Seller (i) is and has at all times since January 1, 2016, been in compliance in all material respects with all applicable Environmental Laws with respect to the Leased Real Property, the Business and the Purchased Assets; (ii) has obtained, and is and has at all times since January 1, 2016 been in compliance in all material respects with all Environmental Permits required in connection with the Leased Real Property, the Business and the Purchased Assets; and (iii) has not, since January 1, 2016 to the date hereof, received any written notice that any material Environmental Permits will be voided, canceled or withdrawn or will not be renewed.

(b)     Since January 1, 2016 to the date hereof, Seller has not received written notice from any Governmental Authority or other third party, or been the subject of any Legal Proceeding, in each case, alleging liability arising under Environmental Law or relating to any Hazardous Substance with respect to the Leased Real Property, the Business or the Purchased Assets, including any obligation of Seller to undertake or bear the cost of any investigation, corrective action, remediation or monitoring with respect to the Leased Real Property, the Business or the Purchased Assets, in each case, which remains unperformed, outstanding or unresolved.  To the Knowledge of Seller, no such Legal Proceeding is threatened with respect to the Leased Real Property, the Business, the Purchased Assets or any real property previously owned, leased, subleased, occupied or operate by Seller.

(c)     Since January 1, 2016 to the date hereof, there has been no Release of Hazardous Substances on, in, at, under or from any of the real property associated with the Assumed Leases, or any of the Improvements thereon, or otherwise in connection with the Business or the Purchased Assets, or, to the Knowledge of Seller, any real property previously owned, leased, subleased, occupied or operated by Seller.

(d)     With respect to the Leased Real Property, the Business and the Purchased Assets, (i) neither Seller nor, to the Knowledge of Seller, any other Person has treated, recycled, stored, disposed of, arranged for or permitted the disposal of, transported, handled, or Released any Hazardous Substances, and (ii) no real property owned, leased, subleased, occupied, or operated by Seller has been contaminated by any Hazardous Substance, in each case, in a manner that has given or would reasonably be expected to give rise to a material Liability to Seller under any Environmental Law.

(e)     Seller has not retained or assumed by Contract or operation of Law, any Liability of any third party under Environmental Law.

(f)     Seller has delivered or made available to Purchaser copies of all material (i) reports, assessments, audits or tests prepared within the last seven (7) years with respect to compliance of the Leased Real Property, the Business or the Purchased Assets with any applicable Environmental Laws, (ii) documents related to the use or the presence of Hazardous Substances on, in, at, under or from the Leased Real Property or otherwise relating to the Purchased Assets or the Business, (iii) notices of violation or Orders with respect to compliance of the Leased Real Property, the Business or the Purchased Assets with any applicable Environmental Law, (iv) Seller's Environmental Permits relating to the Leased Real Property, the Business or the Purchased Assets, and (v) documents and agreements related to any Legal Proceedings arising under or pursuant to any Environmental Law that have been asserted, or which are pending or threatened against Seller or any of its Affiliates relating to any Leased Real Property, the Purchased Assets or the Business, in each case in <u>clauses (i)</u> through <u>(v)</u> of this clause <u>(f)</u>, which are in Seller's or any of its Affiliates' possession, custody or control.

Section 3.12    <u>Employee Benefit Plans</u>.

(a)     <u>Schedule 3.12(a)</u> sets forth a complete and accurate list of all material Employee Benefit Plans.  Seller has provided to, or made available to, Purchaser true and correct copies of each material Employee Benefit Plan (including all plan documents and amendments thereto) including (i) each plan document, including all amendments thereto, and in the case of an unwritten plan, a written description thereof, (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the most recently filed annual report (Form 5500 and all schedules thereto), (v) the most recent Internal Revenue Service determination or opinion letter, (vi) the most recent summary annual report, actuarial report, financial statement and trustee report, and (vii) any material correspondence with any Governmental Authority.

(b)     Each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws and there has been no written notice issued by any Governmental Authority questioning or challenging such compliance. There are no Legal Proceedings (other than non-material routine claims for benefits) pending, or, to the Knowledge of Seller, threatened involving any such Employee Benefit Plan or the assets of any such Employee Benefit Plan, in each case, that could reasonably be expected to impact in any material respect any Business Employee or result in any material Liability to Purchaser. No Employee Benefit Plan is subject to any audit, investigation, or examination by any Governmental Authority and no such actions are pending or, to the Knowledge of Seller, threatened with respect to any Employee Benefit Plan.  Seller and its Affiliates have performed all obligations required to be performed by it under, is not in any respect in default under or in violation of and, to the Knowledge of Seller, there has been no default or violation by any party to, any Employee Benefit Plan.

(c)     Each Employee Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received, or timely requested, a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and, to the Knowledge of Seller, nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.  Each trust established in connection with any Employee Benefit Plan which is intended to be exempt from federal income taxation under Section 501(a) of the Code is so exempt, and no fact or event has occurred that would reasonably be expected to adversely affect the exempt status of any such trust.

(d)     Neither Seller nor any of its ERISA Affiliates maintains, sponsors, contributes to or is required to contribute to, or has ever maintained, sponsored, contributed to or been required to contribute to, any (i) Multiemployer Plan, (ii) plan or arrangement subject to Title IV or Section 302 of ERISA, or (iii) plan that has two (2) or more contributing sponsors, at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA.

(e)     With respect to each Employee Benefit Plan, (i) no breaches of fiduciary duty or other failures to act or comply in connection with the administration or investment of the assets of such Employee Benefit Plan have occurred, (ii) no Lien has been imposed under the Code, ERISA or any other applicable Law, and (iii) all contributions, distributions, reimbursements and premium payments that are due have been made in accordance with the terms of the Employee Benefit Plan and in compliance with the requirements of applicable Laws, and all contributions, distributions, reimbursements and premium payments for any period ending on or before the Closing that are not yet due have been made or properly accrued.  There has not been any prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Employee Benefit Plan. None of the Company or any Company Subsidiary has made any filing in respect of any Employee Benefit Plan under the Employee Plans Compliance Resolution System or the Department of Labor Delinquent Filer Program. Seller has not incurred (whether or not assessed), and is not reasonably expected to incur or to be subject

36

to, any Tax or other penalties with respect to the reporting requirements under Sections 6055 and 6056 of the Code, as applicable, or under Section 4980B, 4980D or 4980H of the Code.

(f)     Each of Seller and its ERISA Affiliates is, and during all relevant times has been, in compliance in all material respects with the applicable requirements of (i) Section 4980B of the Code and any similar state Law, (ii) the Health Insurance Portability and Accountability Act of 1996, as amended, and the Laws (including the proposed regulations) thereunder, and (iii) the Patient Protection and Affordable Care Act of 2010, and all rules and official guidance promulgated thereunder, and no circumstance exists or event has occurred, which reasonably could be expected to result in a violation of, or Liability under, any of the foregoing. The obligations of all Employee Benefit Plans that provide health, welfare or similar insurance are fully insured by bona fide third-party insurers.  No Employee Benefit Plan is maintained through a human resources and benefits outsourcing entity, professional employer organization, or other similar vendor or provider.

(g)     Except as required by Section 4980B of the Code or any similar state Law, no Employee Benefit Plan provides health or welfare benefits for any former employee, or his or her beneficiaries or dependents, nor is Seller or any of its Affiliates obligated to provide health or welfare benefits to any Business Employee following such Business Employee's termination of service or employment.

(h)     Seller has neither sponsored, maintained, contributed to, nor has been required to sponsor, maintain, participate in or contribute to, any employee benefit plan, program, or other arrangement providing compensation or benefits to any employee or former employee (or any dependent thereof) which is subject to the Laws of any jurisdiction outside of the United States.

(i)     Each Business Employee and each individual who is or was classified as an employee or an independent contractor of Seller has been properly classified (including "exempt" or "non-exempt") for all purposes (including for purposes of participation and benefit accrual under each Employee Benefit Plan) and Seller has properly reported all compensation paid to such Persons for all such purposes.

(j)     Except as set forth on Schedule 3.12(j), neither the execution and delivery of this Agreement or any Transaction Document, nor the consummation of the Transactions could (either alone or in conjunction with any other event) (i) to the Knowledge of Seller, result in, or cause the accelerated vesting, payment, funding or delivery of, or increase the amount or value of, any material payment or benefit to any Business Employee; or (ii) result in a requirement to pay any tax "gross-up" or similar "make-whole" payments to any Business Employee.

(k)     Each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code, complies in both form and operation with the requirements of Section 409A of the Code.

(l)    (i) Neither Seller nor any of its Affiliates are a party to or bound by any union collective bargaining agreements or other labor contracts covering any Business Employee; (ii) neither Seller nor any of its Affiliates are experiencing or have experienced in the five (5) years prior to the date of this Agreement, any material labor disputes or work stoppages due to labor disputes in connection with the business and operations and there is not currently, and has not been in the five (5) years prior to the date of this Agreement, any labor strike, dispute, slow down or stoppage actually pending or, threatened against Seller; (iii) neither Seller nor any of its Affiliates have in the five (5) years prior to the date of this Agreement engaged in any unfair labor practices within the meaning of the National Labor Relations Act with respect to its employees or other individuals who provide services that support the business and operations; (iv) neither Seller nor any of its Affiliates have in the ninety (90) days preceding the date of this Agreement implemented any layoffs, plant closings or shutdowns as defined under the WARN Act; (v) there are no pending or, to the Knowledge of Seller, threatened employment discrimination, employee health and safety, unfair labor practice, wage and hour, unemployment compensation, worker's compensation, immigration, union grievance or other employment-related claims, citations, proceedings or, to the Knowledge of Seller, investigations or allegations against Seller involving any Business Employee; and (vi) with respect to the Business Employees, Seller and its Affiliates have complied in all material respects with all applicable legal requirements relating to employment and employment practices, including all legal requirements respecting terms and conditions of employment, wages, hours, classification of employees, including for minimum wage, overtime, and independent contractor purposes, discrimination in employment, immigration, occupational health and safety, disability rights or benefits, equal opportunity, plant closures and layoffs, affirmative action, workers' compensation, labor relations and collective bargaining and Seller and its Affiliates are not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing.

(m)    Schedule 3.12(m) sets forth a list of Business Employees, including the following information, to the extent permitted by applicable Law: (i) title or job/position, (ii) job designation (*i.e.*, salaried or hourly), (iii) location of employment, (iv) employment status (active or on leave or furlough), (v) date of hire, (vi) status as full- or part-time, (vii) rate of pay and most recent bonus amount, and (viii) accrued and unused paid time off.

Section 3.13    Title to Properties; Condition of Assets; Inventory.

(a)    Subject to requisite Bankruptcy Court approvals, Seller has or will have as of immediately prior to the Closing good, transferable, indefeasible, marketable and valid title to, or a valid leasehold interest in, all of the Purchased Assets. On the terms and subject to the conditions set forth in this Agreement, and subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, at the Closing Seller shall Transfer, or cause to be Transferred, to Purchaser (and which Transfer(s) shall be in accordance with the Sale Order) all right, title and interest of Seller as of the Closing Date in and to all Purchased Assets (for clarity, excluding in each case the Excluded Assets) in accordance with the Sale Order.

121645066v17

(b)      Except as set forth on Schedule 3.13(b), to the Knowledge of Seller: (i) the buildings, equipment and other tangible personal property comprising the Purchased Assets are, in all material respects, in good operating condition and repair, free of defects and in a state of good maintenance (ordinary wear and tear excepted in each case), and (ii) the Inventory, taken as a whole, consists of a quality and quantity salable in the Ordinary Course of Business in all material respects, except for obsolete, damaged or defective items that have been written off or written down to fair market value or for which adequate reserves have been established by Seller in the Ordinary Course of Business.

Section 3.14    Real Property.

(a)      The Leased Real Property constitutes all of the real property (whether leased, subleased, licensed or otherwise occupied) used by Seller in connection with the Business.  Subject to the disclosures set forth on Schedule 3.14(e), Seller has a valid and enforceable leasehold estate, or subleasehold estate, as applicable, in, and enjoys peaceful and undisturbed possession of, all Leased Real Property, free and clear of all Liens, other than Permitted Liens, subject to the application of any bankruptcy Laws, other similar Laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies.

(b)      Seller does not own, and, since January 1, 2018, has not owned, a fee interest in any real property.  To the Knowledge of Seller, at no time prior to January 1, 2018 did the Seller own any fee interest in any real property.

(c)      A true, correct and complete list of each Leased Real Property and security deposit delivered to the landlord with respect thereto is attached hereto as Schedule 3.14(c).  Seller has delivered (or otherwise made available) to Purchaser a true, correct and complete copy of each written or oral lease, sublease, license, concession or other occupancy agreement, including all amendments, modifications, assignments, extensions, renewals, supplements, written notices or memoranda, guaranties, terminations, surrenders, subordination, non-disturbance and attornment agreements and other agreements related thereto (it being understood that, with respect to any oral arrangements, Seller has delivered (or otherwise made available) a true, correct and complete summary thereof), to which Seller is a party, by which it is bound or pursuant to which Seller occupies any Leased Real Property (including the Distribution Center Lease and Headquarters Lease) (individually, a "Real Property Lease" and collectively, the "Real Property Leases").  Each Real Property Lease is unmodified and represents the entire agreement between Seller and the applicable landlord.

(d)      Except as set forth on Schedule 3.14(d), (i) there are no written or oral leases, subleases, licenses, concessions, occupancy agreements or other Contracts to which Seller is a party granting to any other Person (other than Seller) the right of use or occupancy of any of the Leased Real Property, (ii) there is no Person (other than Seller) in possession of any of the Leased Real Property, and (iii) there are no outstanding options or rights of first refusal granted by Seller (or, to the Knowledge of Seller, any predecessor-in-interest of Seller pursuant to a Contract to which Seller is a party) granting any other Person the right to purchase or lease any Leased Real Property or any portion thereof or interest

121645066v17

therein.  With respect to each Real Property Lease that is a sublease, to the Knowledge of Seller, the representations and warranties in this Section 3.14(d) are true and correct with respect to the underlying lease.

(e)    Except as set forth on Schedule 3.14(e), with respect to each Real Property Lease: (i) such Real Property Lease is valid, binding, enforceable and in full force and effect (except (A) as enforcement may be limited by the Enforceability Exceptions and (B) insofar as the availability of equitable remedies may be limited by applicable Law); (ii) upon payment of the Cure Costs and the entry of the Sale Order, as of the Closing, Seller will not be in material breach or default thereunder; (iii) to the Knowledge of Seller, all work required to be performed under such Real Property Lease by Seller has been performed and, to the extent that Seller is responsible for the payment of such work, has been fully paid for, whether directly to the contractor performing such work or to the landlord as reimbursement therefor; (iv) Seller has not assigned, subleased, mortgaged, deeded in trust or otherwise transferred or encumbered any Real Property Lease or Leased Real Property or any interest therein (or entered into any outstanding contracts for any of the foregoing); and (v) Seller has not received or delivered any written notice terminating any Real Property Lease.

(f)    There is no real property (or ownership interests therein) that Seller is obligated to buy, sell, lease or sublease (other than the Real Property Leases) on or after the date hereof.

(g)    None of Seller nor any of its Affiliates has received any written notice of any pending or threatened condemnation proceedings in connection with any parcel of Leased Real Property.  To the Knowledge of Seller, Seller's and the Business' current use of the Leased Real Property does not violate, in any material respect, any restrictive covenant of record that affects any of the Leased Real Property.  Seller has not received (and to the Knowledge of Seller there does not exist) any written notice issued with respect to any pending or contemplated changes in any applicable legal requirements (or other Law) which might adversely affect the use, operation or maintenance of the Leased Real Property.

(h)    Each Leased Real Property is supplied with utilities and other services necessary for the operation of such Leased Real Property as the same is currently operated or currently contemplated to be operated, to the Knowledge of Seller.  As of the date hereof, each Leased Real Property is in good operating condition and repair, ordinary wear and tear excepted, in all material respects.  The Improvements constructed at each Leased Real Property, including all leasehold Improvements owned or leased by Seller or otherwise operated in connection with the Business, are sufficient, when considered as a whole, for the operation of the Business as presently conducted.

(i)    Seller is not a party to any agency or brokerage agreements, and there are no brokerage or other leasing commissions due or payable by Seller on an absolute or contingent basis to any Person in connection with any real property, including the Real Property Leases (and amendments, extensions or renewals of existing Real Property Leases or exercise of any rights or options thereunder).

40

Section 3.15    Contracts.    Except as set forth on Schedule 3.15 with respect to each Assumed Contract, and except as would not reasonably be expected to have a material and adverse effect on the Business, the Assumed Liabilities or the Purchased Assets (and subject, in each case, to requisite Bankruptcy Court approvals and except as a result of the commencement of the Bankruptcy Case): (a) upon payment of the Cure Costs and the entry of the Sale Order, as of the Closing, Seller will not be in material default or breach with respect to any obligation to be performed under any such Contract; (b) to the Knowledge of Seller, as of the date hereof, no third party is in material default or breach with respect to any obligations to be performed under any such Contract; (c) as of the date hereof, such Contract is valid, binding and in full force and effect, enforceable against Seller and, to the Knowledge of Seller, enforceable against the other party or parties thereto, in each case, in accordance with the terms thereof (except (i) as enforcement may be limited by the Enforceability Exceptions and (ii) insofar as the availability of equitable remedies may be limited by applicable Law); and (d) as of the date hereof, other than in respect of or in connection with the commencement of the Bankruptcy Case, neither Seller nor, to the Knowledge of Seller, any third party has repudiated or waived any material provision of, or material rights under, any such Contract or in any way modified (in any material respect) any of the material terms thereof (including cancellation or termination of any such Contract).  Seller has made available to Purchaser or its Representatives true, complete and correct copies of all such Contracts (including any amendments thereto).  For clarity, notwithstanding any provision of this Section 3.15 to the contrary, Seller shall not be deemed to be making any representations or warranties in this Section 3.15 with respect to any Real Property Leases (including the Assumed Leases), it being understood and agreed that the sole representations and warranties made herein by Seller with respect to any Real Property Leases are set forth in Section 3.14 hereof.

Section 3.16    Insurance.    Schedule 3.16 sets forth a true and complete list of the insurance policies (collectively, the "Insurance Policies") maintained by Seller (or any of its Affiliates) on the Purchased Assets and/or the Assumed Liabilities as of the date hereof; provided that, for clarity, the term "insurance policy" shall not include any policies of insurance that fund or relate to any Employee Benefit Plan.  As of the date hereof, Seller (or one (1) or more of Seller's Affiliates) maintains all insurance required under the Real Property Leases, except for such failure to maintain insurance that would not reasonably be expected to be, individually or in the aggregate, material to the Real Property Leases. Each of the Insurance Policies is in full force and effect and all premiums due thereon as of the date hereof have been paid.  As of the date hereof, Seller has not received any written notice regarding (a) a termination or material reduction of coverage with respect to any Insurance Policy, (b) a refusal of any coverage or rejection of any claim under any Insurance Policy, (c) a change in coverage of any Insurance Policy, (d) a premium audit with respect to any Insurance Policy, or (e) an increase in the amount of the premiums payable with respect to any Insurance Policy.

Section 3.17    Financial Statements.

(a)    Seller has made available to Purchaser copies of the following financial information (collectively, the "Financial Statements"): (a) Seller's audited consolidated balance sheets as of February 1, 2020 and February 2, 2019 and audited consolidated statements of income and cash flows for the fiscal years ended February 1, 2020 (such date, the "Audited Financials Date") and February 2, 2019 (such balance sheets and statements of income and cash flows collectively, the "Audited Financial Statements"),

together with all related notes and schedules thereto, accompanied by the report thereon of the Parent's independent auditors, and (b) Seller's unaudited consolidated balance sheet as of January 2, 2021 (such date, the "Interim Balance Sheet Date") and unaudited consolidated statements of income and cash flows for the eleven (11) month period ending on January 2, 2021 (collectively, the "Interim Financial Statements"). Each of the Financial Statements (i) has been prepared in accordance with GAAP, consistently applied throughout the periods indicated (except as may be indicated in the notes thereto), (ii) fairly presents, in all material respects, the financial position, results of operations and cash flows of Seller for such periods except as otherwise noted therein and subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments and the absence of notes, (iii) is derived from and is consistent, in all material respects, with the books and records of Seller (which are correct and complete in all material respects) and (iv) is true, complete and correct in all material respects.

(b)     As of the date hereof, all Accounts Receivable (i) represent monies due for goods sold and delivered or services rendered, in each case, in the Ordinary Course of Business, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the Ordinary Course of Business that are not material in the aggregate, are valid and enforceable claims, are subject to no set-off or counterclaim and are current and fully collectible in the Ordinary Course of Business. Since January 1, 2020 to the date hereof, Seller has collected the Accounts Receivable in the Ordinary Course of Business and in a manner which is consistent with past practices of the Business and has not accelerated any such collections.

Section 3.18   [Reserved].

Section 3.19   Absence of Certain Developments.  Since December 31, 2020, and other than the commencement of the Bankruptcy Case, (a) the Business has been operated in the Ordinary Course of Business and (b) there has not been any event, occurrence, condition, development, change, circumstance or state of facts that has had or would reasonably be expected to have, a Material Adverse Effect.

Section 3.20   Material Suppliers.  Schedule 3.20 sets forth a list of the top twenty (20) suppliers of the Business by top open volume for the twelve (12) month period ended on December 31, 2020, as well as the corresponding dollar volume for such period (collectively, the "Material Suppliers").

Section 3.21   [Reserved].

Section 3.22   Affiliated Transactions.  Except as set forth on Schedule 3.22, to the Knowledge of Seller, no Related Party (a) is a party to any Contract or transaction involving the Business other than (i) loans and other extensions of credit to directors and officers of Seller (and/or the Business) for travel or business expenses or other employment-related purposes in the Ordinary Course of Business, none of which are material, individually or in the aggregate and (ii) employment arrangements, or (b) owns, directly or indirectly, any interest in, or is an officer, director, employee or consultant of, any Person which is, or is engaged in business as a material

42

supplier, lessor, lessee, competitor of the Business, or any other Person with a material commercial relationship with the Business.

Section 3.23    Product Warranty.    Each product or service manufactured, sold, leased or delivered by the Business has been in conformity in all material respects with all applicable Laws, contractual commitments and all express or implied warranties, and, to the Knowledge of Seller, neither Seller nor the Business has any material obligation or other material Liability for replacement or repair thereof or other damages or Liabilities in connection therewith.

Section 3.24    Product Liability.

(a)    Since January 1, 2018 to the date hereof, Seller has not received any written claim (or other written notice (or, to the Knowledge of Seller, oral notice)), or the Knowledge of Seller, been threatened with a claim or other Legal Proceeding (or other written notice (or, to the Knowledge of Seller, oral notice)), for which the Liability related thereto would be reasonably likely to be in excess of $50,000.00, individually or in the aggregate, arising out of any injury to individuals or property as a result of any products or services sold, performed or delivered by (or on behalf of) the Business, which claim remains unresolved.

(b)    Since January 1, 2018, Seller has not, either voluntarily or involuntarily, initiated, conducted or issued any recall, field notifications, field corrections, market withdrawal or replacement, investigator notice, safety alert or other notice or action, in each case, relating to a lack of safety, efficacy or regulatory compliance of any of its products.

Section 3.25    Occupational Safety and Health Matters.    Except as set forth on Schedule 3.25:

(a)    Seller is in all material respects in compliance with and is not in violation of, or liable under, any applicable Occupational Safety and Health Laws in respect of the Business.

(b)    Since January 1, 2018 to the date hereof, Seller has not received any written notice or other written communication from any Governmental Authority or any other Person regarding (i) any failure to comply in any material respect with any applicable Occupational Safety and Health Law in connection with the Business or (ii) any obligation to undertake or bear any material cost of any Occupational Safety and Health Liabilities in connection with the Business, including any Occupational Safety and Health Liabilities with respect to any of the Leased Real Property at, to or from which Hazardous Substances have been generated, manufactured, refined, transferred, used or processed, transported, treated, stored, handled, disposed of, recycled, or received by the Business.

(c)    Seller has made available to Purchaser copies of any occupational and safety assessment or audit reports or similar studies or analyses relating to the Business (including the Leased Real Property) that has been prepared on behalf of Seller (or its Affiliates) since January 1, 2018.

Section 3.26    <u>Taxes</u>.  Except as set forth on <u>Schedule 3.26</u>:

(a)    Seller has timely filed all Tax Returns in respect of the Business and/or the Purchased Assets required to be filed with the appropriate Governmental Authority.  All such Tax Returns are true, complete and correct in all respects and were prepared in compliance with all applicable Laws.  All Taxes relating to the Business and/or the Purchased Assets that are due and payable, whether or not shown to be payable on such Tax Returns, have been or will be timely paid before or at the Closing.  No examination of any such Tax Return is currently in progress by any Governmental Authority and, as of the date hereof, Seller has not received written notice of any contemplated examination of any such Tax Return and no adjustment has been proposed in writing with respect to any such Tax Returns by any Governmental Authority.

(b)    Seller has not agreed to any waiver or extension of any statute of limitations in respect of Taxes with respect to the Business and/or the Purchased Assets.  As of the date hereof, there are no pending (or, to the Knowledge of Seller, threatened in writing) audits, investigations, disputes, written notices of deficiency, claims or other Legal Proceedings for or relating to any liability for Taxes relating to the Business and/or the Purchased Assets.

(c)    Seller is not a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) or any other agreement with any Governmental Authority with respect to Taxes relating to the Business and/or the Purchased Assets.  Seller has no outstanding requests for a private letter ruling or technical advice memoranda or similar rulings with any Governmental Authority, and no such rulings are in effect, with respect to Taxes relating to the Business and/or the Purchased Assets.

(d)    As of the date hereof, Seller is not in default under, nor does there exist any condition which, with the giving of notice or passage of time, would constitute a default by Seller under any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to the Business and/or the Purchased Assets.

(e)    Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party (in each case, to the extent related to the Business and/or the Purchased Assets) and all IRS Forms W-2 and Forms 1099 (or any other applicable Tax forms) required with respect thereto have been properly and timely distributed.

(f)    Seller is not a party to any Tax allocation, Tax indemnification or Tax sharing agreement.  Seller (i) has not been a member of an affiliated group filing a consolidated federal income Tax Return (other than any group the common parent of which was Parent), and (ii) does not have liability for the Taxes of any Person under Treasury Regulation 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by Contract (other than a commercial contract entered into in the

44

Ordinary Course of Business the primary purpose of which is unrelated to Tax), or otherwise.

(g)     Seller is not and has never been a party to any "listed transaction," as defined in Section 6707A(c)(2) of the Code and Treasury Regulation 1.6011-4(b)(2).

(h)     No claim has been made in writing by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns that Seller is or may be subject to taxation by that jurisdiction with respect to the Business and/or Purchased Assets.

(i)     No power of attorney with respect to Taxes relating to the Business and/or the Purchased Assets has been executed or filed with any Governmental Authority by or on behalf of Seller that will remain in effect after the Closing Date.

(j)     Seller has, with respect to the Business and/or the Purchased Assets, properly (i) collected and remitted sales and similar Taxes with respect to sales made to its customers, and (ii) for all sales that are exempt from sales and similar Taxes that were made without charging or remitting sales or similar Taxes, received and retained any appropriate Tax exemption certificates and other documentation qualifying such sale as exempt.

Section 3.27    Certain Fees.  Except as set forth on Schedule 3.27, Seller has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

Section 3.28    No Other Representations and Warranties.  Except as provided in this Article III and the Transaction Documents, neither Seller nor any of Seller's Affiliates (including, for clarity, Parent) has made, or is making, any representation or warranty whatsoever to Purchaser or any of its Affiliates or Representatives and no such party shall be liable in respect of the accuracy or completeness of any information provided to Purchaser or its Affiliates or Representatives in connection with the negotiation and execution of this Agreement.  Seller disclaims any and all liability for any other representation, warranty, statement or information made, communicated, or furnished (orally or in writing) to Purchaser, its Affiliates or its Representatives.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Subject to the terms, conditions and limitations set forth in this Agreement, Purchaser hereby represents and warrants to Seller as of the date of this Agreement and as of the Closing as follows:

Section 4.1    Organization.  Purchaser is a limited liability company validly existing under the Laws of Delaware and has the power and authority to carry on in all material respects its business as now being conducted.  Purchaser is duly licensed or qualified to transact business and is in good standing in each jurisdiction in which the operation of its business as currently conducted makes such licensing or qualification necessary, except to the extent that the

failure to be so licensed, qualified or in good standing would not prevent or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.2    <u>Due Authorization</u>.  Subject to the entry of the Sale Order, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions are within the limited liability company powers of Purchaser and have been duly and validly authorized by all necessary actions on the part of Purchaser.  Subject to the entry of the Sale Order, this Agreement and each Transaction Document to which Purchaser is a party constitutes a legal, valid and binding agreement of Purchaser that is enforceable in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

Section 4.3    <u>Governmental Authorization</u>.  Subject to entry of the Sale Order and (if applicable) approval under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions by Purchaser require no action by or in respect of, notification to, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, (b) such actions and filings required by the HSR Act or otherwise required pursuant to <u>Section 7.4</u>, and (c) any such action or filing as to which the failure to make or obtain would not prevent or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.4    <u>Noncontravention</u>.  Subject to the entry of the Sale Order and (if applicable) approval under the HSR Act, the execution, delivery and performance by Purchaser of this Agreement and each Transaction Document to which it is a party and the consummation of the Transactions do not and will not (a) violate Purchaser's Organizational Documents; (b) assuming compliance with the matters referred to in <u>Section 4.3</u>, constitute or result in a default under or violate any applicable Law; or (c) constitute a breach or a default under (or event which, with the giving of notice or lapse of time, or both, would become a default) or give rise to any right of termination, amendment, revocation, suspension, payment, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound, except in the cases of <u>clauses (b)</u> and <u>(c)</u>, as would not reasonably be expected to prevent or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.5    <u>Adequate Assurances</u>.  As of the Closing, Purchaser shall have all requisite power and authority to effectuate the Credit Bid of the Pre-Petition First Lien Obligations and DIP Obligations in an aggregate amount equal to the Credit Bid Amount set forth in <u>Section 2.7(a)</u>.  In addition to the Credit Bid, Purchaser shall be capable, as of the Closing, of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Purchased Contracts and the Assumed Liabilities.  Purchaser (or its permitted assignee(s) in accordance with <u>Section 13.5</u> herein) will have at the Closing sufficient funds in an aggregate amount necessary to pay the Cure Costs.

121645066v17

Section 4.6    Litigation.  There are no Legal Proceedings pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which would, or would reasonably be likely to prevent, enjoin, alter or materially delay, or otherwise have a material adverse effect, individually or in the aggregate, on Purchaser's ability to consummate the Transactions.

Section 4.7    Certain Fees.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

Section 4.8    No Other Representations and Warranties.  Except as provided in this Article IV and the Transaction Documents, neither Purchaser nor any of Purchaser's Affiliates has made, or is making, any representation or warranty whatsoever to Seller or any of its Affiliates or Representatives and no such party shall be liable in respect of the accuracy or completeness of any information provided to Seller or its Affiliates or Representatives in connection with the negotiation and execution of this Agreement.  Purchaser disclaims any and all liability for any other representation, warranty, projection, forecast, statement or information made, communicated, or furnished (orally or in writing) to Seller, its Affiliates or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any Representative of Purchaser or any of its Affiliates).

Section 4.9    No Outside Reliance.  Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that the representations and warranties made by Seller to Purchaser in Article III (as qualified by the Disclosure Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties and statements of any kind made to Purchaser or any member of the Purchaser Group and on which Purchaser and the Purchaser Group may rely in connection with the transactions contemplated by this Agreement. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that (other than solely to the extent expressly set forth in the Express Representations) all other representations, warranties and statements of any kind or nature expressed or implied, whether in written, electronic or oral form, including (a) with respect to the completeness or accuracy of, or any omission to state or to disclose, any information, including in the confidential information memorandum prepared by Lincoln International LLC or in any meetings, calls or correspondence with management of Seller or with any other Person (including Affiliates and advisors of Seller) on behalf of Seller or the Business and (b) the historical, current or future business, financial condition, results of operations, assets, liabilities, properties, contracts, or prospects of Seller or the Business, or the quality, quantity or condition of Seller's assets, in each case, are specifically disclaimed by Sellers, and that neither Purchaser nor any member of the Purchaser Group has relied on any such representations, warranties or statements. Purchaser acknowledges and agrees, on its own behalf and on behalf of the Purchaser Group, that it has conducted to its full satisfaction an independent investigation and verification of the Business and the Purchased Assets, and all such other matters relating to or affecting the Purchased Assets as Purchaser deemed necessary or appropriate, and, in making its determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of the Purchaser Group's own independent investigation and verification.

ARTICLE V
COVENANTS OF SELLER

Seller agrees that:

Section 5.1    Conduct of the Business.

(a)    From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, except (i) as disclosed on Schedule 5.1(b), (ii) as explicitly required by applicable Law, (iii) as explicitly required by the Bankruptcy Court, (iv) as provided in the DIP Facility, (v) subject to Section 5.1(b)(xx), actions taken in good faith business judgment of Seller's officers in response to COVID-19 (including actions taken in relation to or in connection with COVID-19 Measures), or (vi) as explicitly required by this Agreement, Seller agrees to conduct the Business and the operation thereof (including the E-Commerce Platform and wholesale network) in the Ordinary Course of Business and, subject to the availability of funds pursuant to the DIP Facility, to pay all applicable Taxes as such Taxes become due and payable, and to the extent related to a capital expenditure of Seller under the applicable Real Property Lease, ensure that each Leased Real Property is maintained in good operating condition and repair, ordinary wear and tear excepted, in all material respects.

(b)    From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, except (i) as disclosed on Schedule 5.1(b), (ii) as explicitly required by applicable Law, (iii) as explicitly required by the Bankruptcy Court, (iv) as provided in the DIP Facility, or (v) as explicitly required by this Agreement, Seller will not:

(i)    acquire (by merger, consolidation, acquisition of stock or assets, or otherwise) any corporation, partnership, joint venture, association or other business organization or division thereof, or substantially all of the assets of any of the foregoing;

(ii)    sell, lease, license, Transfer, encumber or otherwise dispose of any Purchased Assets (including any Assumed Leases), except for Inventory sold, leased, licensed, Transferred, encumbered or otherwise disposed of in the Ordinary Course of Business, in each case, for clarity for purposes of compliance with Section 5.1(b)(xxi), other than in connection with or relating to an Alternative Transaction;

(iii)    modify or amend (other than by automatic extension or renewal), supplement or terminate (other than by expiration) in any respect the terms of any Purchased Contract (other than any purchase orders), except in the Ordinary Course of Business or in a manner that would not have an adverse effect on such Purchased Contract (provided, that Purchaser shall not unreasonably withhold its consent to any such modification, amendment or supplement pursuant to this Section 5.1(b)(iii));

(iv)    subject any portion of the Purchased Assets, taken as a whole, to any Liens, other than Permitted Liens;

(v)    fail to maintain and keep in full force and effect all existing Insurance Policies, other than (A) expiration of insurance policies that expire by their terms (in which event Seller shall use commercially reasonable best efforts to renew or replace such insurance policies with insurance policies offering commensurate levels of coverage) or (B) changes to such insurance policies made in the Ordinary Course of Business;

(vi)    except to the extent required by applicable Law or the terms of the applicable Employee Benefit Plan: (A) increase the salary, bonus or severance arrangements of any Business Employee, other than in the Ordinary Course of Business; (B) adopt, enter into, amend or terminate any Employee Benefit Plan (including any employee benefit plan or arrangement which would be an Employee Benefit Plan if entered into as of the date hereof); (C) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Employee Benefit Plan; (D) grant any loan to, increase the compensation or benefits of or pay any bonus to any Business Employee; (E) grant any severance, change of control, retention, termination or similar compensation or benefits to any Business Employee; (F) pay to any Business Employee any benefit or amount not required under the terms of any Employee Benefit Plan as in effect on the date of this Agreement; or (G) take any action to fund the payment of compensation or benefits under any Employee Benefit Plan;

(vii)    hire or terminate the employment of (A) any executive officer of Seller who performs services for the Business or (B) any employee with a base salary of more than $100,000 per year;

(viii)    make, revoke or change any Tax election, file any amended Tax Return, revoke or change any Tax accounting method, enter into any closing agreement within the meaning of Section 7121 of the Code, request any Tax ruling with or from a Governmental Authority, surrender any right to claim a Tax refund, offset or other reduction in a Tax liability, consent to any extension or waiver of limitations period applicable to any Tax claim or assessment, or settle any Tax proceeding, in each case, with respect to the Business and/or Purchased Assets;

(ix)    sell, transfer, license, dispose of, or permit to lapse any Intellectual Property Rights except in the Ordinary Course of Business;

(x)    change any financial accounting policies or procedures or any methods of reporting income, deductions or other material items for financial accounting purposes, except as required by GAAP or applicable Law;

(xi)    (A) delay or postpone the repair or maintenance of the Purchased Assets (including any of the Assumed Leases) (provided, that Purchaser shall not unreasonably withhold its consent pursuant to this Section 5.1(b)(xi)(A));

or (B) modify Inventory purchase practices in any material respect from Inventory purchase practices in the Ordinary Course of Business;

(xii)    adopt any amendments to the articles of incorporation, bylaws, certificate of formation, limited liability company agreement or similar Organizational Documents of Seller;

(xiii)    form any Subsidiary of Seller;

(xiv)    waive, release, assign, settle or compromise any pending or threatened Legal Proceeding that would reasonably be expected to give rise to Liabilities that are not Excluded Liabilities;

(xv)    demolish or remove any Improvement on the real property associated with any Assumed Lease or erect material Improvements on the real property associated with any Assumed Lease (or any portion thereof);

(xvi)    enter into any Contract with any Related Party;

(xvii)    sell or issue (or commit to sell or issue) any gift cards, gift certificates or other similar products for the purchase of Inventory or services related to the Business except in the Ordinary Course of Business (provided, that Purchaser shall not unreasonably withhold its consent pursuant to this Section 5.1(b)(xvii));

(xviii)    move or otherwise transfer any Inventory from any Acquired Store or the Distribution Center to any Excluded Store;

(xix)    initiate any closings of Acquired Stores or other similarly themed sales, "GOB" or "Going Out of Business" sales, or use of any other phrases of similar import with respect to any Acquired Stores, or advertise any closings of Acquired Stores;

(xx)    adopt any COVID-19 Measures or take any action with respect to the Purchased Assets, the Assumed Liabilities or the Business relating to, as a result of, or on the basis of, COVID-19, except to the extent required by applicable Law (provided, that Purchaser shall not unreasonably withhold its consent pursuant to this Section 5.1(b)(xx)); provided, however, that, notwithstanding the foregoing, the Seller shall not require the prior consent of Purchaser pursuant to this Section 5.1(b)(xx) in order to adopt any COVID-19 Measures, or to take any action with respect to the Purchased Assets, the Assumed Liabilities or the Business relating to, as a result of, or on the basis of, COVID-19, if and to the extent (A) adopted or taken in the good faith business judgment of Seller's officers, and (B) (I) related to the ordinary course day-to-day operations of the Stores, and (II) not material to the Purchased Assets, the Assumed Liabilities or the Business, taken as a whole, individually or in the aggregate; or

(xxi)    agree or commit to do any of the foregoing.

Section 5.2      Access to Information.

(a)      From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, Seller shall reasonably afford, and shall cause its Representatives to reasonably afford, to Purchaser and its Representatives, reasonable access (at reasonable times during regular business hours and upon reasonable advance written notice) to all books records, personnel, officers and other facilities of Seller relating to the Business; provided that any such access shall be conducted at Purchaser's expense, in accordance with applicable Law (including the Bankruptcy Code), under the supervision of the Seller's personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of Seller or the Business; provided, further, that such access may be limited by Seller to the extent reasonably necessary (i) for Seller to take actions in its good faith business judgment in response to COVID-19 (including actions taken in relation to or in connection with COVID-19 Measures) or (ii) for such access, in light of COVID-19 or any COVID-19 Measures, not to jeopardize the health and safety of Seller or any of its personnel.

(b)      Notwithstanding anything to the contrary contained in this Agreement, Seller shall have no obligation to make available to Purchaser or its Representatives, or to provide Purchaser or its Representatives with access or copies to information to the extent that Seller determines, in its reasonable judgment, that making such information available would (i) jeopardize any attorney-client privilege, the work product immunity or any other legal privilege or similar doctrine or (ii) contravene any applicable Law, Governmental Order applicable to Seller or any fiduciary duty owed by Seller, it being understood that Seller shall use reasonable best efforts in cooperating with any requests for, and use reasonable best efforts to obtain any, waivers that would enable any otherwise required disclosure to Purchaser to occur without so jeopardizing any such privilege or immunity or contravening such applicable Law, Governmental Order or fiduciary duty.

Section 5.3      Cooperation with Purchaser.  From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 and the Closing Date, Seller and Purchaser shall each use commercially reasonable efforts, and shall reasonably and in good faith cooperate, assist and consult with each other, to secure the entry of the Sale Order (a) approving this Agreement, (b) authorizing the sale of the Purchased Assets pursuant to Sections 363, 365, 1123 and 1129, (c) authorizing the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code, and (d) authorizing the Transactions. In connection with the assumption and assignment of the Purchased Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions reasonably requested by Seller to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of "adequate assurance of future performance" by Purchaser under the Purchased Contracts after the Closing. Seller and Purchaser shall consult with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Sale Order.

121645066v17

Section 5.4    Bankruptcy Action.

(a)    As soon as reasonably practicable, but not later than three (3) Business Days following the date hereof, Seller shall file a Petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. On the Petition Date, Seller shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court. The Sale Motion shall seek, among other things, the entry of the Bid Procedures Order, the Bankruptcy Court's approval of this Agreement, Seller's performance under this Agreement and the assignment and assumption of the Purchased Contracts.

(b)    Seller shall: (i) obtain entry of the Bid Procedures Order by the Bid Procedures Order Deadline Date, (ii) ensure that the Auction (if any), during which Seller will solicit Qualified Bids from other prospective purchasers for the sale of all or substantially all of the Purchased Assets, is held in accordance with the procedures set forth in the Bid Procedures Order, (iii) obtain entry of the Sale Order by no later than the Sale Order Deadline Date, and (iv) consummate the Closing on or before the End Date.

(c)    Seller shall comply in all material respects with all of the obligations of Seller under the Bid Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Order (after the entry of such Order by the Bankruptcy Court). The Bid Procedures Order and Sale Order shall each be in form and substance reasonably satisfactory to Purchaser.

(d)    Seller shall use reasonable efforts to comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code in connection with obtaining approval of the Transactions. Seller shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim against or interest in any of the Purchased Assets, (ii) the Internal Revenue Service, (iii) all applicable Governmental Authorities (including all applicable state, local and non-U.S. Governmental Authorities with taxing authority), (iv) all other Persons required by any Order of the Bankruptcy Court, (v) all counterparties to Contracts and Real Property Leases, and (vi) any other Persons that Purchaser reasonably may request in writing that Seller serve such notice (and Seller shall use commercially reasonable efforts to serve such Persons who are the subject of this clause (vi)), in each case, any notice of the Sale Motion, the Sale Hearing, the Bid Procedures Order, the Sale Order, and all objection deadlines in accordance with the Bankruptcy Code, the Bid Procedures Order, and any applicable local or other rules of the Bankruptcy Court.

Section 5.5    Other Bids. This Agreement is subject to the approval by the Bankruptcy Court and the consideration by Seller and the Bankruptcy Court of higher or otherwise better competing bids and offers as set forth in the Bid Procedures and, for the avoidance of doubt, Purchaser shall have the right to bid against any such competing bids and offers.

Section 5.6    Sale Order. The Sale Order shall, among other things: (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Seller of this Agreement and the Transaction Documents, (ii) the sale of the Purchased Assets to Purchaser on the terms set forth herein and free and clear of all Liens, Claims

and interests to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities), and (iii) the performance by Seller of its obligations under this Agreement and the Transaction Documents; (b) authorize and empower Seller to assume and assign to Purchaser the Purchased Contracts; (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code; (d) find that Purchaser has not violated Section 363(n) of the Bankruptcy Code by any action or inaction and (e) provide for the transfer of the Estate Causes of Action to Purchaser and Purchaser's agreement to release and not to prosecute such claims under the Estate Causes of Action.  Seller and Purchaser agrees that such Party will promptly take such actions as are reasonably requested by the other Party to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of: (A) demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (B) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

Section 5.7    Other Bankruptcy Matters.    Seller acknowledges that this Agreement and the sale of the Purchased Assets and the assumption and assignment of the Purchased Contracts are subject to Bankruptcy Court approval. Seller and Purchaser acknowledges that (a) to obtain such approval, Seller must demonstrate that it has taken commercially reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the Transactions to interested parties as ordered by the Bankruptcy Court, and (b) Purchaser must provide adequate assurance of future performance under the to-be-assigned Purchased Contracts.

Section 5.8    Stalking Horse Bidder Matters.    If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder"), but Purchaser has the next-highest or otherwise second-best qualified bid at the Auction, as determined by Seller in the exercise of its reasonable business judgment, Purchaser shall be required to serve as a backup bidder (the "Backup Bid" and "Backup Bidder").  If the Successful Bidder fails to consummate the approved transactions contemplated by its bid, the Backup Bidder may be selected as the Successful Bidder, and the Backup Bidder shall be deemed a Successful Bidder for all purposes.  Seller shall be authorized, but not required, to consummate all transactions contemplated by the Backup Bid in accordance with this Agreement without further order of the Bankruptcy Court or notice to any party.  For the avoidance of doubt, this Section 5.8, including Purchaser's role as Backup Bidder, if applicable, shall not modify, limit or in any way affect Purchaser's ability to terminate this Agreement pursuant to Article XII (including Section 12.1(b)) in any respect, except solely in respect of the language in Section 12.1(c) that excludes the requirement that the condition in Section 10.1(c) be satisfied in the event the Purchaser is selected as the Backup Bidder.

Section 5.9    Rejected Contracts.    Subject to the final proviso of Section 2.5, Seller shall not reject any Real Property Lease or other Contract in any bankruptcy proceeding following the date hereof without the prior written consent of Purchaser.

Section 5.10    Receipt of Property Relating to Assets.    If, following the Closing, Seller (or its Affiliates (but excluding Investcorp) or Representatives) receives any money, check,

121645066v17

note, draft, instrument, payment or other property as proceeds of the Purchased Assets or any part thereof, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, up on receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner specified by Purchaser.

Section 5.11   <u>Confidentiality Obligations of Seller</u>.  In further consideration for the payment of the consideration contemplated by this Agreement and in order to protect the value of the Business and Purchased Assets purchased by Purchaser, upon the Closing, Seller agrees as follows:

(a)      As an owner of the Business, Seller has had access to and contributed to information and materials of a highly sensitive nature (including Confidential Information) of the Business.  Seller agrees that unless it first secures the written consent of an authorized representative of Purchaser, Seller shall not use for itself or anyone else, and shall not disclose to others, any Confidential Information, except to the extent such use or disclosure is required by applicable Law or any Order (in which event Seller shall, to the extent practicable, inform Purchaser in advance of any such required disclosure, shall cooperate with Purchaser (at Purchaser's sole expense) in all reasonable ways in obtaining a protective Order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements).  Seller shall use the same standard of care to maintain the confidentiality of Confidential Information following the Closing as Seller uses to maintain its other confidential, non-public information.

(b)      Seller (on behalf of itself and its Affiliates (but excluding Investcorp)) further agrees that promptly after the Closing, Seller (and its Affiliates (but excluding Investcorp)) shall deliver to Purchaser or destroy all Confidential Information of, or relating to, the Business in Seller's or such Affiliate's possession and control, in whatever form or medium.  If Purchaser requests, Seller (on behalf of itself and its Affiliates (but excluding Investcorp)) shall promptly provide written confirmation and certification that Seller (and its Affiliates (but excluding Investcorp)) has returned or destroyed all such materials.

Section 5.12   <u>Acknowledgement</u>.  Seller acknowledges and represents that: (a) sufficient consideration has been given by each Party to the other Parties as it relates hereto and the covenants, obligations and agreements under this <u>Article V</u> were taken into account in determining the amount of such consideration; (b) Seller has consulted with independent legal counsel regarding its, his or her rights and obligations under this <u>Article V</u>; (c) Seller fully understands the terms and conditions contained herein; (d) the restrictions and agreements in this <u>Article V</u> are reasonable in all respects and, as applicable, necessary for the protection of the Business and the Purchased Assets and that, without such protection, the customer and client relationships and competitive advantage relating to the Business would be materially adversely affected; and (e) the agreements in this <u>Article V</u> are an essential inducement to Purchaser to enter

into this Agreement and they are in addition to, rather than in lieu of, any similar or related covenants to which Seller is party or by which it is bound.

## ARTICLE VI
## COVENANTS OF PURCHASER

Purchaser agrees that:

Section 6.1    Insurance.  To the extent that any insurance policies of Purchaser or Seller or any of its Affiliates (including the Insurance Policies) cover any loss, Liability, claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser and Seller (as applicable) shall cooperate with the other, as applicable, in good faith in submitting and pursuing such claims for the benefit of the party bringing such claim.

## ARTICLE VII
## COVENANTS OF PURCHASER AND SELLER

Purchaser and Seller agree that:

Section 7.1    Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, the Bankruptcy Code and any Orders of the Bankruptcy Court, Purchaser and Seller will each use commercially reasonable efforts to take, or cause to be taken, all reasonable actions and to do, or cause to be done, and cooperate with each other with respect to all things necessary or desirable under applicable Laws to consummate the Transactions.  Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements, instruments, and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

Section 7.2    Certain Filings.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Purchased Contracts or any Intellectual Property Rights included in the Purchased Assets, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.  Each Party shall, as promptly as possible, (i) make, or cause to be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement.

Section 7.3    Public Announcements.  Except as required by Law or in connection with the Bankruptcy Case (based upon the reasonable advice of counsel), neither Seller nor Purchaser shall issue any press release or public announcement or statement concerning this Agreement or the Transactions without obtaining the prior written consent of the other party (not

to be unreasonably withheld, delayed or conditioned) and the parties shall cooperate as to the timing and contents of any such announcement.

Section 7.4    Antitrust Filings.

(a)    To the extent applicable to the Transactions, in connection with and without limiting Section 7.2, the Parties shall (i) promptly (and in no event later than thirty (30) days after the date hereof, unless otherwise agreed to by the Parties in writing) file with the Federal Trade Commission (the "FTC") and the Antitrust Division of the United States Department of Justice (the "Antitrust Division") the notification and report form (the "HSR Filing"), if, and solely to the extent, required under the HSR Act, (ii) promptly provide all information requested by any Governmental Authority in connection with this Agreement or any of the Transactions, (iii) promptly take, and cause each of their respective Affiliates to take, all actions and steps reasonably necessary to obtain any antitrust clearance required to be obtained from the FTC, the Antitrust Division, any state attorney general, or any other Governmental Authority in connection with this Agreement or any of the Transactions, and (iv) duly make all notifications and other filings (together with the HSR Filing, the "Antitrust Filings"), if and to the extent required under any other applicable competition, merger control, antitrust or similar Law that the Parties deem advisable or appropriate, in each case with respect to the Transactions and as promptly as practicable.  The Antitrust Filings shall be in substantial compliance with the requirements of the HSR Act or other Laws, as applicable.  Each Party shall bear its own costs and expenses for obtaining its respective Antitrust Filings; provided, however, that Purchaser shall have responsibility for one hundred percent (100%) of the filing fees in connection with the HSR Act.

(b)    Each Party shall, subject to applicable Law and except as prohibited by any applicable Representative of any applicable Governmental Authority, (i) promptly notify the other Party of any written communication to such Party from the FTC, the Antitrust Division, the Attorney General of any state or any other Governmental Authority relating to this Agreement and permit the other Party to review in advance any proposed written communication to any of the foregoing; (ii) not agree to participate in any substantive meeting or discussion with any Governmental Authority in respect of any filings, investigation or inquiry concerning this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to attend and participate in such meeting or discussion; and (iii) furnish the other Party with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives, on the one hand, and any Governmental Authority or members or their respective staffs, on the other hand, with respect to this Agreement.  Each Party shall (A) respond as promptly as practicable under the circumstances to any inquiries received from the FTC or the Antitrust Division for additional information or documentation and to all inquiries and requests received from the Attorney General of any state or other Governmental Authority in connection with antitrust matters relating to this Agreement, and (B) not extend any waiting period under the HSR Act or enter into any agreement with the FTC or the Antitrust Division not to consummate the Transactions without the prior written consent of the other Party. Purchaser and Seller

56

shall undertake promptly any and all commercially reasonable actions required to complete lawfully the Transactions as soon as practicable (but in any event prior to the End Date) and any and all commercially reasonable action necessary to avoid, prevent, eliminate or remove the actual or threatened commencement of any Legal Proceeding in any forum by or on behalf of any Governmental Authority or the issuance of any Order that would (or to obtain the agreement or consent of any Governmental Authority to the Transactions the absence of which would) delay, enjoin, prevent, restrain or otherwise prohibit the consummation of the Transactions.

Section 7.5   <u>Notice of Certain Matters</u>.  Prior to the Closing:

(a)   If at any time (i) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant, obligation or agreement contained herein that would reasonably be expected to cause either of the conditions set forth in <u>Section 10.2(a)</u> or <u>10.2(b)</u> not to be satisfied, or (ii) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant, obligation or agreement contained herein that would reasonably be expected to cause either of the conditions set forth in <u>Section 10.3(a)</u> or <u>10.3(b)</u> not to be satisfied, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 13.2</u>, in writing of such breach.

(b)   Each Party shall promptly notify the other of any Legal Proceeding that shall be instituted or threatened against such Party to restrain, prohibit or otherwise challenge the legality of the Transactions. Seller shall promptly notify Purchaser, and Purchaser shall promptly notify Seller, of any Legal Proceeding or investigation that may be threatened, brought, asserted or commenced against the other which would have been listed in <u>Schedule 3.7</u> or would be an exception to <u>Section 3.7</u> if such Legal Proceeding or investigation had arisen prior to the date hereof; <u>provided</u> however, that, for clarity, failure to provide such notice, in and of itself, shall not be deemed to cause or result in a breach of <u>Section 10.2(a)</u>.

Section 7.6   <u>Access</u>.  On and after the Closing Date, upon reasonable advance notice, Purchaser and Seller will afford promptly to such other requesting Party and its Representatives reasonable access during normal business hours to their respective properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of Claims in the Bankruptcy Case or otherwise to enable Purchaser or Seller, as applicable, to address issues arising in connection with or relating to the Bankruptcy Case or to permit Purchaser or Seller, as applicable, to determine any matter relating to their rights and obligations under this Agreement or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, that any such access by Seller or Purchaser, as applicable, shall not unreasonably interfere with the conduct of the business of Seller or Purchaser (including the Business), as applicable. Seller or Purchaser, as applicable, will hold, and will use commercially reasonable efforts to cause their respective officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence (in accordance with the terms of <u>Section 5.11</u>, as applicable), unless compelled to disclose by judicial or administrative process or

121645066v17

by other requirements of Law, all confidential documents and information concerning Seller, Purchaser or the Business, as applicable, provided to them pursuant to this <u>Section 7.6</u>.

Section 7.7      <u>280G Matters</u>.  To the extent necessary to avoid the application of Section 280G of the Code and the applicable rulings and final regulations thereunder ("<u>Section 280G</u>"), not later than three (3) Business Days prior to the Closing Date, Seller shall use commercially reasonable efforts to obtain a written waiver from each "disqualified individual" (within the meaning of Section 280G(c)) of his or her right to any and all payments that could be deemed to be "parachute payments" under Section 280G(b), <u>provided</u> that in no event shall Seller be deemed in breach hereof if any such "disqualified individual" refuses to execute such written waiver.  Prior to the Closing Date, Seller shall use commercially reasonable efforts to take such action as may be reasonably necessary to seek approval of any and all such payments or benefits in a manner that would satisfy, or be deemed under applicable rulings and final regulations to satisfy, the requirements for exemption under Section 280G(b)(5)(A)(ii), including adequate disclosure of all such payments or benefits.  Purchaser shall be afforded a reasonable opportunity to review and comment on the form of waiver, solicitation and approval documents and disclosure materials before the waivers and approval are sought.  In connection with the foregoing, following the date of this Agreement, Purchaser and Seller shall cooperate to ensure that Seller receives all information reasonably necessary to allow Seller to determine whether any payments or benefits made or to be made pursuant to any arrangement between a "disqualified individual" and Purchaser could be deemed to be "parachute payments" under Section 280G(b), and in no event shall Seller be deemed in breach hereof to the extent Purchaser has provided materially inaccurate information, or omitted material information, in respect thereof.

Section 7.8      <u>Negotiation and Execution of Restrictive Covenant Agreements</u>.  Seller shall, and shall cause its Affiliates to, use reasonable best efforts to cooperate with Purchaser in its efforts to negotiate in good faith to agree, and to cause the Restricted Parties to execute restrictive covenant agreements with Purchaser or its Affiliate that contain customary non-solicitation, no-hire and confidentiality provisions consistent with transactions of the size and nature as contemplated by this Agreement, which restrictive covenant agreements shall, in any event, be effective as of the Closing and in form and substance reasonably acceptable to Purchaser, and, upon, and subject to, the execution and delivery to Purchaser of such restrictive covenant agreements at or prior to the Closing, Purchaser and its Affiliates shall provide the Restricted Parties and their Affiliates with a customary release, in form and substance reasonably acceptable to the Restricted Parties and the Purchaser, by Purchaser and its Affiliates of any claims, causes of action, defenses and counterclaims related to or based upon any facts, circumstances, and transactions related to the Seller, the Business or assets held by Purchaser or its Affiliates (including any such claims that are avoidance or recovery actions under Chapter 5 of the Bankruptcy Code) against Restricted Parties and their Affiliates on account of their status as direct or indirect equityholders of the Seller, whether such claims arose directly or as a result of the claims, causes of action, defenses and counterclaims acquired pursuant to this Agreement.  For the avoidance of doubt, the failure of Purchaser and the Restricted Parties to enter into any such restrictive covenant agreements shall not constitute a basis for (a) Seller to terminate this Agreement pursuant to <u>Article XII</u> or (b) <u>Section 10.3(a)</u> to not have been satisfied, and, furthermore, such failure shall not subject Purchaser to any Liability under this Agreement.

58

ARTICLE VIII
TAX MATTERS.

Section 8.1    Tax Cooperation.  Each of Seller and Purchaser agrees to furnish or cause to be furnished to the other Party, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax returns (including any claim for a Tax refund) by Seller or Purchaser, the making of any election relating to Taxes by Seller or Purchaser, the determination of liability for Taxes, the preparation for any audit by any Governmental Authority, and the prosecution or defense of any Claim, suit or other Legal Proceeding relating to any Tax.  Seller and its Affiliates shall (a) abide by all record retention agreements entered into with any Governmental Authority and (b) give Purchaser thirty (30) days' written notice prior to transferring, destroying or discarding any Tax records and, if Purchaser so requests, shall allow Purchaser to take possession of such Tax records.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other Legal Proceeding relating to Taxes involving the Purchased Assets or the Business.  Notwithstanding anything to the contrary in this Agreement, Seller shall have the exclusive right to control in all respects at its sole cost and expense, and neither Purchaser nor any of its Affiliates shall be entitled to participate in, any Tax proceeding with respect to any Tax Return of Seller of any Affiliate thereof to the extent such Tax proceeding relates to Taxes paid or borne by Seller.

Section 8.2    Transfer Taxes.  Any and all sales, use, transfer, recording or other similar taxes or charges assessed at Closing or at any time thereafter on the Transfer of any Purchased Assets (collectively, the "Transfer Taxes"), as well as any related Tax Return preparation and filing costs, shall be paid by Purchaser.  Each Tax Return with respect to such Transfer Taxes will be prepared and filed by the Party that customarily has primary responsibility for filing such Tax Return pursuant to applicable Law.  The Parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or otherwise reduce) with respect to any such Taxes or fees.  The Parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

Section 8.3    Asset Taxes.  Seller shall be allocated and bear all property Taxes and similar ad valorem obligations (excluding, for the avoidance of doubt, income Taxes and Transfer Taxes) levied based upon or measured by the ownership or operation of the Purchased Assets and/or Business (collectively, the "Asset Taxes") for any period or portion thereof ending on or prior to the Closing Date and Purchaser shall be allocated and bear all Asset Taxes for any period or portion thereof that begins after the Closing Date.  For purposes of this Section 8.3, Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending on the Closing Date and the portion of such Straddle Period beginning after the Closing Date by prorating each such Asset Tax based on the number of days in the applicable Straddle Period ending on and including the Closing Date, on the one hand, and the number of days in such Straddle Period that occur after the Closing Date, on the other hand, and all other Asset Taxes (if any) shall be allocated upon a hypothetical closing of the taxable year on the Closing Date.

121645066v17

ARTICLE IX
EMPLOYEE MATTERS

Section 9.1    <u>Employees and Offers of Employment</u>.    As of the Closing, Purchaser shall offer employment to such number of Business Employees who are actively employed and not on furlough or other leave of absence at the Acquired Stores, the Distribution Center and the Headquarters as Purchaser determines in its reasonable discretion prior to the Closing Date to be necessary to conduct operations at the Acquired Stores, the Distribution Center and the Headquarters from and following the Closing (collectively, the "<u>Offered Employees</u>"). The offer of employment to each Offered Employee who is not a Key Employee shall provide for (a) a rate of base pay that is not less than the Offered Employee's rate of base pay in effect on the Closing Date and (b) substantially comparable medical, prescription drug, dental, vision and defined contribution retirement benefits in the aggregate as in effect on the Closing Date for each Offered Employee.  The offer of Employment for each Offered Employee who is a Key Employee shall be on such terms and conditions, including position/title, rate of base pay and benefits described in <u>clause (b)</u> of the preceding sentence, as Purchaser may determine in its sole discretion. Those Offered Employees who accept Purchaser's offer of employment and commence working for Purchaser on the Closing Date shall hereafter be referred to as "<u>Transferred Employees</u>."  To the extent not prohibited by applicable Law, Seller shall terminate the employment of all of such Transferred Employees effective as of the Closing Date and will be responsible for all Liabilities associated with such termination, including all Liabilities under the WARN Act; <u>provided</u>, <u>however</u>, that Purchaser shall be responsible for all Liabilities for severance payments in accordance with Seller's severance guidelines described on <u>Schedule 3.12(j)</u> for Business Employees as of the Closing who are not Offered Employees, to the extent such severance amounts are allowed, undisputed, accrued and unpaid, constitute an administrative expense under Section 503 of the Bankruptcy Code and are not assumed by Purchaser in accordance with the terms of <u>Section 2.3</u> of this Agreement.  In addition, Purchaser shall be responsible for all Liabilities for payment of accrued and unused paid time off at Closing in the amounts set forth on <u>Schedule 3.12(m)</u> (i) for Business Employees who are not Offered Employees and (ii) for Offered Employees who are employed in a jurisdiction where applicable Law requires payment of accrued and unused vacation upon termination of employment with Seller; <u>provided</u>, that payments of such accrued and unused paid time off are allowed, undisputed, accrued and unpaid, constitute an administrative expense under Section 503 of the Bankruptcy Code and are not assumed by Purchaser in accordance with the terms of <u>Section 2.3</u> of this Agreement.

Section 9.2    <u>Service Credit</u>. For purposes of eligibility, vesting, and participation (but not benefit accruals under defined benefit pensions plans, equity or equity-based compensation plans, post-retirement welfare plans, plans or arrangements that are no longer open to new participants, or for purposes of early retirement eligibility or early retirement subsidies) under any Purchaser Plans (as defined below) and programs providing employee benefits to Transferred Employees after the Closing Date, each Transferred Employee shall be credited with his or her years of service with Seller before the Closing Date to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service under substantially similar Employee Benefit Plans in which such Transferred Employee participated before the Closing Date except to the extent such credit would result in a duplication of benefits. In addition, and without limiting the generality of the foregoing, for purposes of each employee benefit plan of Purchaser and its Affiliates providing medical, dental, pharmaceutical and/or vision

60

benefits to any Transferred Employee at any time after the Closing (each such plan, a "Purchaser Plan"), Purchaser shall use commercially reasonable efforts to cause all pre-existing condition exclusions and actively-at-work requirements of such Purchaser Plan to be waived for such Transferred Employee and his or her covered dependents, to the extent such exclusions or requirements were waived under the corresponding Employee Benefit Plan (and would have been waived if the credited service had been performed for Purchaser or its Affiliates) and, to the extent all necessary information has been received from Seller, Purchaser shall use commercially reasonable efforts to cause any eligible expenses incurred by such Transferred Employee and his or her covered dependents during the portion of the plan year of the applicable Employee Benefit Plan in which the Closing Date occurs to be taken into account under such Purchaser Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee.

Section 9.3    Employment Tax Reporting Responsibility.    Seller and Purchaser hereby agree to follow the standard procedure for employment tax withholding as provided in Section 4 of Rev. Proc. 2004-53, I.R.B. 2004-35. Accordingly, Seller shall have employment tax reporting responsibilities for the wages and other compensation it pays to Business Employees and Purchaser shall have employment tax reporting responsibilities for the wages and other compensation it pays to Business Employees.

Section 9.4    No Third Party Beneficiaries; No Guarantee of Employment.    The Parties acknowledge and agree that all provisions contained in Sections 9.1, 9.2 and 9.3 are included for the sole benefit of the Parties, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (a) in any other Person, including any employee or former employee of Seller or its Affiliates (including the Business Employees), any participant in any employee benefit plan maintained by any of the Parties or any of their respective Affiliates, or any dependent or beneficiary thereof, or (b) to continued employment with any of the Parties or any of their respective Affiliates. Nothing in this Agreement shall affect the right of the Parties or any of their respective Affiliates to terminate the employment of its employees. Nothing contained in Sections 9.1, 9.2 or 9.3 is intended to be or shall be considered to be an amendment or adoption of any Employee Benefit Plan or any other plan, program, Contract, arrangement or policy of the Parties or any of their respective Affiliates. In addition, nothing contained in Sections 9.1, 9.2 or 9.3 shall interfere with the Parties' or any of their respective Affiliates' right to amend, modify or terminate any Employee Benefit Plan in accordance with its provisions or to terminate the employment of any Business Employee for any reason.

Section 9.5    WARN Act.    Seller shall be solely responsible for any obligations and other liabilities arising solely with respect to time periods on or prior to the Closing with respect to the Business Employees under the WARN Act, or under any similar provision of any applicable legal requirement that might arise on or prior to the Closing, including providing any notice of layoff or plant closing, or maintaining the Business Employees on Seller's payroll for any period of notice required by the WARN Act. On the Closing Date, Seller shall provide Purchaser with a written schedule of each "employment loss" (as defined in WARN) experienced by any employee of Seller during the ninety (90) day period prior to the Closing Date (including the location of employment of such employee, and the reason for the employment loss). Purchaser shall be responsible for all obligations and other liabilities under the WARN Act arising solely

with respect to time periods following the Closing with respect to Transferred Employees under the WARN Act, or under any similar provisions of any applicable Law that arises following the Closing.

Section 9.6    Workers' Compensation.    Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Seller's employees on or prior to the Closing, including injuries sustained by a Transferred Employee after the Closing that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Closing. Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by Transferred Employees after the Closing. Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's facilities and which are alleged to have been sustained or contracted on or prior to the Closing Date.

ARTICLE X
CLOSING CONDITIONS

Section 10.1    Conditions to Obligations of Purchaser and Seller.    The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a)    the Bid Procedures Order shall have been entered on the docket of the Bankruptcy Court no later than the Bid Procedures Order Deadline Date;

(b)    the Sale Order shall have been entered on the docket of the Bankruptcy Court no later than the Sale Order Deadline Date;

(c)    Purchaser shall be the successful bidder at the Auction in accordance with the Bid Procedures Order;

(d)    the Sale Order shall have been entered by the Bankruptcy Court and shall have become a Final Order;

(e)    all terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority, and any other Governmental Approvals, in each case necessary for consummation of the Transactions (including, if applicable, those under the HSR Act), if any, shall have occurred and/or been received; and

(f)    no injunction, stay or similar Order issued by any Governmental Authority, or other legal restraint or prohibition, shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

121645066v17

Section 10.2    <u>Conditions to Obligations of Purchaser</u>. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver (to the extent waivable) by Purchaser) of the following further conditions:

(a)    Seller shall have performed and complied in all material respects with all of the covenants, obligations and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date;

(b)    (i) the representations and warranties of Seller contained in <u>Sections 3.1</u> (Organization), <u>3.2</u> (Due Authorization), <u>3.4(a)</u> and <u>3.4(b)</u> (Noncontravention), <u>3.6</u> (No Subsidiaries), <u>3.13(a)</u> (Title to Properties, Condition of Assets; Inventory), and <u>3.27</u> (Certain Fees) shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date); and (ii) all other representations and warranties of Seller contained in this Agreement or in any certificate or other instrument or writing delivered in connection herewith (but disregarding all qualifications or limitations as to "materiality" or "Material Adverse Effect" and words of similar import set forth therein) shall be true and correct at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date) except, with respect to this clause (ii), for such failure to be so true and correct that, individually or in the aggregate, has not had, or would not reasonably be expected to have, a Material Adverse Effect;

(c)    since the date of this Agreement, there shall not have occurred any Material Adverse Effect;

(d)    the Sale Order shall be in form and substance acceptable to Purchaser in its sole discretion;

(e)    the Commercial Lease Cure Costs shall not be in excess of the Commercial Lease Cure Costs Cap;

(f)    the Other Contracts Cure Costs shall not be in excess of the Other Contracts Cure Costs Cap;

(g)    the Post-Petition Payables shall not be in excess of the Post-Petition Assumed Liabilities Cap;

(h)    the Transfer Taxes shall not be in excess of the Transfer Taxes Cap; and

(i)    Seller shall have delivered all items and satisfied all obligations pursuant to <u>Section 2.10</u>.

121645066v17

Section 10.3    <u>Conditions to Obligations of Seller</u>.  The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver (to the extent waivable) by Seller) of the following further conditions:

(a)    Purchaser shall have performed and complied in all material respects with all of the covenants, obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date;

(b)    the representations and warranties of Purchaser contained in <u>Sections 4.1</u> (Organization), <u>4.2</u> (Due Authorization) and <u>4.4(a)</u> (Noncontravention) shall be true and correct in all respects at and as of the date hereof and at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all respects as of such earlier date), and all other representations and warranties of Purchaser contained in this Agreement or in any certificate or other writing delivered in connection herewith (but disregarding all qualifications or limitations as to "materiality" or "material adverse effect" and words of similar import set forth therein) shall be true and correct at and as of the date hereof and as of the Closing Date as though made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date), in each case, except for such failure to be so true and correct that, individually or in the aggregate, has not had, or would not reasonably be expected to have, a material adverse effect on the ability of Purchaser to consummate, or would not otherwise materially impair or prevent Purchaser from consummating, the Transactions;

(c)    Purchaser shall have delivered all items and satisfied all obligations pursuant to <u>Section 2.11</u>;

(d)    Seller shall have received the Excluded Cash; and

(e)    the Bankruptcy Court shall have entered an Order (which may be the Sale Order) approving the execution of this Agreement by Seller and the consummation by Seller of the Transactions that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

ARTICLE XI
SURVIVAL; INDEMNIFICATION

Section 11.1    <u>Survival</u>.  None of the representations, warranties, covenants and agreements in this Agreement (nor the representations and warranties set forth in any instrument delivered by the Parties pursuant to this Agreement which do not survive the Closing pursuant to the terms of such instrument), including any rights arising out of any breach or violation (or inaccuracy) of such representations, warranties, covenants and agreements contained herein, shall survive the Closing; provided, however, that those covenants and agreements contained herein that, by their terms, apply to or are to be performed in whole (or in part) after the Closing, which covenants and agreements herein shall survive for the period specified following the Closing or, if no such period is specified, for the applicable statute of limitations.

64

Section 11.2    <u>Indemnification</u>. There shall be no post-Closing indemnification of the Parties. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall preclude or impair any claim or other Legal Proceeding based upon fraud or willful or criminal misconduct by any Party.

ARTICLE XII
TERMINATION

Section 12.1    <u>Grounds for Termination</u>. This Agreement may be terminated at any time prior to the Closing:

(a)        by mutual written agreement of Seller and Purchaser;

(b)        by Seller or Purchaser, if the Closing shall not have been consummated on or before May 26, 2021 (the "<u>End Date</u>"), unless the Party seeking termination is in material breach any of its representations, warranties, covenants or agreements contained herein or in the Bid Procedures Order;

(c)        by Seller or Purchaser, if any condition set forth in <u>Section 10.1</u> is not satisfied (excluding the condition in <u>Section 10.1(c)</u> that Purchaser be the successful bidder in the Auction in the event that Purchaser is selected as the Backup Bidder), and such condition is incapable of being satisfied by the End Date; <u>provided</u> <u>however</u>, that, for the avoidance of doubt, the foregoing shall not modify, limit or in any way affect Purchaser's ability to terminate this Agreement pursuant to this <u>Article XII</u> (including <u>Section 12.1(b)</u>), even if Purchaser is selected as the Backup Bidder;

(d)        by Seller, if a breach or failure to perform any of the covenants, obligations or agreements of Purchaser contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of Purchaser contained in this Agreement, and such breach, failure to perform or inaccuracy either individually or in the aggregate would, if occurring or continuing on the Closing Date, give rise to a failure of a condition set forth in <u>Section 10.3</u> and such breach, violation or default has not been cured or waived within thirty (30) days following receipt of written notice from Seller specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction; <u>provided</u>, <u>however</u> that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 12.1(d)</u> if Seller is then in breach of any of its covenants, obligations or agreements contained in this Agreement or any of the representations or warranties of Seller contained in this Agreement shall be inaccurate, and such breach or inaccuracy would give rise to the failure of a condition set forth in <u>Section 10.2</u>;

(e)        by Seller, if such termination is pursuant to the requirements of the Bid Procedures Order;

(f)        by Purchaser, if a breach or failure to perform any of the covenants, obligations or agreements of Seller contained in this Agreement shall have occurred, or there shall be any inaccuracy of any of the representations or warranties of Seller contained in this Agreement, and such breach, failure to perform or inaccuracy either individually or

65

in the aggregate would, if occurring or continuing on the Closing Date, give rise to a failure of a condition set forth in <u>Section 10.2</u> and such breach, violation or default has not been cured or waived within thirty (30) days following receipt of written notice from Purchaser specifying, in reasonable detail, such claimed breach, violation or default and demanding its cure or satisfaction; <u>provided</u>, <u>however</u> that Purchaser shall not have the right to terminate this Agreement pursuant to this <u>Section 12.1(f)</u> if Purchaser is then in breach of any of its covenants, obligations or agreements contained in this Agreement or any of the representations or warranties of Purchaser contained in this Agreement shall be inaccurate, and such breach or inaccuracy would give rise to the failure of a condition set forth in <u>Section 10.3</u>;

(g)      by Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the Parties shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(h)      automatically, if Seller closes or consummates an Alternative Transaction;

(i)      by Purchaser, if, as a result of an Order of the Bankruptcy Court, the Bankruptcy Case are converted to chapter 7 and a chapter 7 trustee is appointed with respect to Seller;

(j)      by Purchaser if the Bankruptcy Court has not entered the Bid Procedures Order on or before Bid Procedures Order Deadline Date; <u>provided</u>, <u>however</u>, that Purchaser is not then in material breach of any of its representations, warranties, covenants, obligations or agreements contained herein or in the Bid Procedures Order;

(k)      the Sale Order has not been entered by the Bankruptcy Court on or before the Sale Order Deadline Date; <u>provided</u>, <u>however</u>, that Purchaser is not then in material breach of any of its representations, warranties, covenants, obligations or agreements contained herein or in the Bid Procedures Order;

(l)      automatically, if Seller (i) withdraws, or seeks to withdraw, the Sale Motion, or (ii) announces or files a plan or other transaction, or seeks to file a plan or other transaction, contemplating reorganization or sale of all or any part of Seller under the Bankruptcy Code that does not comply with the terms and conditions of this Agreement; or

(m)      by Purchaser if, there is an "Event of Default" (or comparable concept) as defined in the DIP Facility.

The Party desiring to terminate this Agreement pursuant to this <u>Section 12.1</u> (other than pursuant to <u>Section 12.1(a)</u> or <u>12.1(j)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 13.2</u>.

121645066v17

Section 12.2    <u>Effect of Termination</u>.

        (a)    If this Agreement is terminated as permitted by <u>Section 12.1</u>, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or Representative of such Party) to the other Party to this Agreement except any liability of a Party for any intentional and willful breach of this Agreement by such Person occurring prior to such termination.  In determining losses or damages recoverable upon termination prior to the Closing by a Party for the other Party's intentional and willful breach, the Parties acknowledge and agree that such losses and damages shall not be limited to reimbursement of expenses or out-of-pocket costs, and shall include the benefit of the bargain lost by such Party. The provisions of <u>Sections</u> <u>11.2</u>, <u>12.2</u>, <u>13.2</u>, <u>13.3</u>, <u>13.5</u>, <u>13.6</u>, <u>13.7</u>, <u>13.8</u>, <u>13.10</u>, <u>13.11</u> and <u>13.12</u> shall survive any termination hereof pursuant to <u>Section 12.1</u>.

        (b)    Notwithstanding anything contained in this Agreement to the contrary, in all cases, Purchaser's Liability to Seller (including for intentional and willful breach) under or arising from this Agreement is and shall be limited to a forfeiture and waiver of a portion of the Pre-Petition First Lien Obligations up to an amount of $1,000,000.00, which shall be deemed liquidated damages.

ARTICLE XIII
MISCELLANEOUS

Section 13.1    <u>Sale of Assets Subject to Bankruptcy Court Approval</u>.    This Agreement, the sale of the Purchased Assets hereunder, and Seller's obligations and ability to perform under this Agreement is conditioned and contingent upon the Bankruptcy Court's entry of the Bid Procedures Order and of the Sale Order.

Section 13.2    <u>Notices</u>.    All notices, requests, demands, claims and other communications hereunder (each, a "<u>Notice</u>") given pursuant to this Agreement will be in writing. Any Notice shall be sent (a) by personal delivery to the recipient, (b) to the recipient by reputable overnight courier services (charges prepaid), or (c) by facsimile transmission or electronic mail (which, in the case of this <u>clause (c)</u>, also shall be sent contemporaneously by another method specified above in this <u>Section 13.2</u>), in each case addressed to the intended recipient as set forth below:

        if to Purchaser, to:

           MidCap Funding Investment XI LLC
           c/o MidCap Financial Trust
           c/o MidCap Financial Services, LLC, as servicer
           7255 Woodmont Avenue, Suite 300
           Bethesda, MD 20814
           Attention:  General Counsel
           Fax:  (301) 941-1450
           Email: legalnotices@midcapfinancial.com

121645066v17

with copies to (which shall not constitute notice):

> Proskauer Rose LLP
> Eleven Times Square
> New York, NY 10036
> Telephone:  (212) 969-3000
> Facsimile:  (212) 969-2900
> Attention: Charles A. Dale; James P. Gerkis; Kristian M. Herrmann
> Email: cdale@proskauer.com; jgerkis@proskauer.com;
> kherrmann@proskauer.com

if to Seller, to:

> Paper Source, Inc.
> 125 Clark St.
> Chicago, IL 60603
> Attention:  Ronald Kruczynski
> Email: rkruczynski@papersource.com

with copies to (which shall not constitute notice):

> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, NY 10019
> Attention: John Longmire; Matthew Feldman; James Burbage
> Email: jlongmire@willkie.com; mfeldman@willkie.com;
> jburbage@willkie.com

A Party may change its address for receipt of Notices by Notice given to the other Parties in accordance with this Section 13.2. Each Notice sent in accordance with this Section 13.2 shall be deemed given and effective upon receipt or refusal of receipt.

Section 13.3   Expenses.

(a)      Except as otherwise provided under this Agreement, Seller shall be responsible for all costs, fees, expenses, obligations and other liabilities arising out of or relating to the Purchased Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing on or prior to the Closing. Each Party shall be responsible for all such Party's costs, fees, expenses, obligations and other liabilities, if any, relating to any Antitrust Filings; provided, however, that Purchaser shall be responsible for one hundred percent (100%) of all fees and expenses relating to the HSR Filing and the HSR Act. Purchaser shall be responsible for all expenses, obligations and other liabilities arising out of or relating to the Purchased Assets and the Assumed Liabilities or the use, possession, ownership or operation thereof accruing after the Closing.

(b)    Except as otherwise provided in this Agreement, each Party shall be responsible for the payment of its own attorneys', brokers' and other costs, fees and expenses incurred in connection with the Transactions.

Section 13.4    <u>Waivers</u>.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative.

Section 13.5    <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; <u>provided</u>, <u>however</u>, that no Party may assign, delegate or otherwise Transfer any of its rights or obligations under this Agreement without the written consent of the other Party.  Notwithstanding the foregoing or anything in this Agreement to the contrary, Purchaser may assign this Agreement and/or any of its rights, interests, or obligations hereunder (in whole or in part) to an Affiliate of the Purchaser without the prior written consent of the other Party; <u>provided</u>, that such assignment shall not relieve the Purchaser of its obligations hereunder.  In furtherance of the foregoing, Purchaser may, without the consent of Seller, designate, in accordance with the terms of this paragraph and effective as of the Closing, one (1) or more Persons to acquire all, or any portion of, the Purchased Assets and assume all or any portion of the Assumed Liabilities or pay all or any portion of the Purchase Price; <u>provided</u>, that such assignment shall not relieve the Purchaser of its obligations hereunder.  The above designation may be made by Purchaser by written notice to Seller at any time prior to the Closing Date.  The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

Section 13.6    <u>Governing Law</u>.  This Agreement and all claims or causes of action (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement as an inducement to enter this Agreement) shall be governed by and construed in accordance with the internal Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code, without giving effect to any choice or conflict of Law (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware and any applicable provisions of the Bankruptcy Code.

Section 13.7    <u>Jurisdiction</u>.

(a)    Prior to the closing of the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code, the Parties agree that any Legal Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such Legal Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Legal Proceeding in the Bankruptcy Court or that any such Legal Proceeding which is brought in the Bankruptcy Court has

69

been brought in an inconvenient forum.  Process in any such Legal Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.2</u> shall be deemed effective service of process on such Party.

(b)    After the closing of the Bankruptcy Case pursuant to Section 350 of the Bankruptcy Code, except as otherwise expressly provided in this Agreement, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Delaware Court of Chancery and any state appellate court therefrom within the State of Delaware (or if (but only if) that such court does not have subject matter jurisdiction over such Legal Proceeding, in the United States District Court for the District of Delaware) and any appellate court from any thereof, for the resolution of any Legal Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions.  The Parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection that they may now or hereafter have to the laying of the venue of any such Legal Proceeding in any such court or that any such Legal Proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such Legal Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.  Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.2</u> shall be deemed effective service of process on such Party.

Section 13.8    <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

Section 13.9    <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur if any provision of this Agreement was not performed in accordance with its specific terms or was otherwise breached or the Closing was not consummated, and that money damages would not be an adequate remedy, even if available. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions, or any other appropriate form of specific performance or equitable relief, to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof (including the parties' obligations to consummate the Closing) in any court of competent jurisdiction, this being in addition to any other remedy to which they are entitled at law, or in equity, or otherwise. Each of the Parties agrees that it will not oppose the granting of an injunction, specific performance and other equitable relief on the basis that any other party has an adequate remedy at law or that any award of specific performance is not an appropriate remedy for any reason at law or in equity. Any Party seeking an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement shall not be required to post any bond or other security in connection with any such Order.

Section 13.10  <u>No Third Party Beneficiaries</u>.  No provision of this Agreement is intended to confer upon any Person other than the Parties any rights or remedies hereunder.

121645066v17

Section 13.11  <u>Entire Agreement; Amendments; Counterparts</u>.  This Agreement (including the Disclosure Schedules, Schedules and Exhibits hereto), together with the other Transaction Documents, set forth the entire agreement among the Parties with respect to the subject matter hereof, merge all prior negotiations, agreements and understandings, if any, and state in full all representations, warranties, covenants, obligations and agreements which have induced this Agreement.  This Agreement can be amended, supplemented or changed only by a written instrument making specific reference to this Agreement executed by Purchaser and Seller.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signed facsimile copies of this Agreement shall legally bind the Parties to the same extent as original documents.  This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party.

Section 13.12  <u>Headings</u>.   The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 13.13  <u>Severability</u>.  If any one (1) or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

Section 13.14  <u>Negotiated Agreement</u>.  Each of Seller and Purchaser acknowledges that it has been advised and represented by counsel in the negotiation, execution and delivery of this Agreement and accordingly agrees that, if an ambiguity exists with respect to any provision of this Agreement, such provision shall not be construed against any party because such party or its Representatives drafted such provision.

Section 13.15  <u>Interpretation</u>.  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)    All references in this Agreement to Articles, Sections, Disclosure Schedules, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Disclosure Schedules, Schedules and Exhibits to this Agreement.

(b)    The Disclosure Schedules and all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(c)    The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(d)    The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless of whether such words or similar words actually appear).

71

(e) When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action will be extended to the next succeeding Business Day.

(f) Any reference in this Agreement to $ shall mean U.S. dollars.

(g) Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(h) The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(i) An item shall be considered "made available" (or words of similar import) to Purchaser only if such item has been made available for viewing by Purchaser and its Representatives in the electronic data room established by Seller, which is hosted by Box, in connection with the Transactions at least five (5) calendar days prior to the date of this Agreement.

[<em>signature page follows</em>]

121645066v17

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLER**:

**PAPER SOURCE, INC.**

By: _Ron Kruczynski_
FA04758C45E24E2
Name: Ron Kruczynski
Title:   Secretary, Treasurer and Chief Financial Officer

**PARENT**:

**PINE HOLDINGS, INC.**

By: _Ron Kruczynski_
FA04758C45E24E2
Name: Ron Kruczynski
Title:   Secretary, Treasurer and Chief Financial Officer

*[Signature Page to Asset Purchase Agreement]*

       IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**<u>PURCHASER</u>:**

MIDCAP FUNDING INVESTMENT XI LLC,
a Delaware limited liability company

By:   Apollo Capital Management, L.P.,
      its Investment Manager

By:   Apollo Capital Management GP, LLC,
      its General Partner

By:  _____
Name:    Maurice Amsellem
Title:     Authorized Signatory

[Signature Page to Asset Purchase Agreement]