John C. Longmire (admitted *pro hac vice*)   Christopher A. Jones (VSB# 40064)
Matthew A. Feldman (admitted *pro hac vice*)   David W. Gaffey (VSB# 85088)
James H. Burbage (admitted *pro hac vice*)   Jae Won Ha (VSB# 94781)
**WILLKIE FARR & GALLAGHER LLP**   **WHITEFORD TAYLOR & PRESTON LLP**
787 Seventh Avenue   Two James Center
New York, NY 10019   1021 E. Cary Street, Suite 1700
   Richmond, VA 23219
Telephone:   (212) 728-8000   Telephone:   (804) 977-3300
Facsimile:   (212) 728-8111   Facsimile:   (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al.*,[1] | ) | Case No. 21-30660 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER
## (A) AUTHORIZING AND APPROVING THE DEBTORS' KEY
## EMPLOYEE INCENTIVE PLAN AND (B) GRANTING RELATED RELIEF

Paper Source, Inc. and its debtor affiliate, as debtors and debtors-in-possession (together, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), move (this "Motion") for entry of an order (the "Proposed Order") substantially in the form attached hereto as **Exhibit A**, pursuant to sections 363(b), 363(c), and 503(c) of title 11 of the United States Code (the "Bankruptcy Code"), rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 6004–2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules"): (a) authorizing and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

approving the Debtors' proposed key employee incentive plan (the "KEIP"), (b) authorizing the Debtors to make payments to certain management employees under the KEIP, if payments are earned, (c) granting administrative expense priority status to all payment obligations of the Debtors under the KEIP, and (d) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of Colin M. Adams in Support of Debtors' Motion for Entry of an Order (A) Authorizing and Approving the Debtors' Key Employee Incentive Plan and (B) Granting Related Relief* (the "Adams Declaration"), attached hereto as **Exhibit B**, and respectfully represent as follows:

### Background

1.     On March 2, 2021 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On March 4, 2021, the Court entered an order [Docket No. 89] authorizing the joint administration and procedural consolidation of these cases pursuant to Bankruptcy Rule 1015(b).  On March 11, 2021, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "UCC") [Docket No. 130]. As of the date hereof, no trustee or examiner has been appointed in any of the Debtors' cases.

2.     The Debtors operate a leading lifestyle brand and retailer of premium paper products, crafting supplies and related gifts, including custom invitations, greeting cards and personalized stationery and stamps.  Through their 149 domestic stores and e-commerce website, the Debtors are an omnichannel provider of fine and artisanal papers, wedding paper goods,

books and gift wrap.  The Debtors also provide wedding consultation, crafting supplies and instructions, and subscription services.  The Debtors' administrative headquarters is in Chicago, Illinois.

3.    The Debtors commenced these cases on the Petition Date by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code in order to facilitate a timely and efficient sale process for all or substantially all of their business.  As set forth in the *Declaration of Ronald Kruczynski, Chief Financial Officer of Paper Source, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), the Debtors believe the sale process will maximize the value of the Debtors' estates for the benefit of all stakeholders [Docket No. 4].

## Jurisdiction and Venue

4.    The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.    Venue of the cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

6.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.     The predicates for the relief requested herein are sections 363(b), 363(c), and 503(c) of the Bankruptcy Code, Bankruptcy Rule 6004, and Local Bankruptcy Rule 6004-2.

## Relief Requested

8.     By this Motion, the Debtors seek entry of the Proposed Order: (a) authorizing and approving the KEIP, (b) authorizing the Debtors to make payments to certain management employees under the KEIP, if payments are earned, (c) granting administrative expense priority status to all payment obligations of the Debtors under the KEIP, and (d) granting related relief.

## Development of the Compensation Plans

9.     The unprecedented global COVID-19 pandemic has imposed extraordinary challenges on the Debtors' business over the past year.  Before the COVID-19 pandemic began, the Debtors' business had been strong.  On March 2, 2020, the Debtors acquired 27 leases out of the chapter 11 proceedings of SFP Franchise Corporation (Papyrus), historically one of the Debtors' biggest competitors in the high-quality paper product space.  Yet less than three weeks later, on March 16, 2020, the Debtors were required to shut down all of their retail locations for over one month.  At the time of this decision, approximately 83% of the Debtors' sales were generated through in-store sales and the significant drop in in-store retail sales immediately began straining the Debtors' liquidity profile.

10.     As a result of the challenges brought on by the pandemic, the Debtors' management team was called on to undertake responsibilities that significantly expanded the scope of their employment.  For example, in the months leading up to the Petition Date, in addition to addressing their standard daily operational responsibilities, management spent significant amounts of time (i) negotiating with the Debtors' equity holders and secured lenders

for additional capital infusions, (ii) negotiating multiple credit agreement amendments and forbearance agreements with the Debtors' secured lenders, (iii) developing a holistic lease rationalization strategy, (iv) engaging in a comprehensive marketing process for the Debtors' entire business, (v) negotiating an asset purchase agreement and debtor in possession loan with the Debtors' prepetition first lien lenders, and (vi) preparing the Debtors for the filing of these Chapter 11 Cases.  Without the continued and enhanced efforts of the management team during this time, the Debtors likely would not have been able to negotiate a capital infusion transaction in the fall of 2020, remain outside of bankruptcy until after the 2020 holiday season, or facilitate a smooth transition into these Chapter 11 Cases with a blueprint for the Debtors to continue operating as a going concern.

11.     The Debtors' dual path of conducting a sale process and operating their business simultaneously has continued to place significant challenges on the Debtors' management team, who are already facing challenges operating the Debtors' businesses during the COVID-19 pandemic.  Recognizing the importance of incentivizing their managers in this challenging environment, the Debtors, at the direction of the disinterested members of the Board of Directors (the "Disinterested Directors"), with the assistance of M-III Advisory Partners LP ("M3") and Willkie Farr & Gallagher LLP ("Willkie" and, together with M3, the "Restructuring Advisors"), and with the input of MidCap Financial Trust, as administrative and collateral agent under the Debtors' senior secured postpetition financing (in such capacity, the "DIP Agent"), approved, and now seek to implement, an incentive-based compensation plan that is focused on maximizing the value of these estates for the benefit of all stakeholders.  Specifically, the KEIP provides management with compensation rewards if the Debtors generate positive net cash

flows, in excess of predetermined targets, between the Petition Date and the anticipated time for closing a sale of substantially all of the Debtors' assets.

12.     The Debtors and their advisors, at the direction of the Disinterested Directors, have determined that implementing the KEIP is critical under the circumstances, to align the interests of the Debtors' management employees with stakeholders and to maximize the value of the Debtors' estates.  The Debtors believe that the total investment in the KEIP—the full amount of which is already included in the Debtors' approved DIP budget—is appropriate under the circumstances.  Further, the total compensation opportunities for the KEIP Participants are reasonable compared to relevant benchmarks in other recent chapter 11 cases.  The Debtors believe that not providing this incentive to the KEIP Participants would have a greater negative impact on the Debtors than the potential cash cost of the KEIP.  Notably, both the DIP Agent and the UCC are supportive of the relief the Debtors seek in this Motion.

13.     For the reasons set forth herein, the Debtors respectfully request that the Court approve the KEIP.

## Key Employee Incentive Plan Participants

14.     The proposed KEIP provides opportunities for seven members of the Debtor's management team (each a "KEIP Participant" and collectively, the "KEIP Participants"), several of whom may be considered "insiders" under the Bankruptcy Code, to earn incentive payments if the Debtors achieve certain performance targets.  The KEIP Participants are responsible for the overall strategy and direction of the Debtors' business enterprise and have played, and will continue to play, a central role in the Debtors' restructuring.  In addition to their substantial day-to-day responsibilities running a highly complex enterprise, the KEIP Participants have seen

their workloads expand significantly as the Debtors have transitioned their operations into chapter 11 while also focusing on the comprehensive marketing process, and cost rationalization process, for their business.

15.     Incentive opportunities are always a key part of the compensation package for senior management teams at companies like the Debtors.  But now—as the Debtors continue to transition into chapter 11 and the sales process continues in earnest—it is critical that the senior management team remain properly motivated and incentivized to handle the myriad responsibilities required to maintain strong operational performance of the Debtors' business throughout the chapter 11 process.  Critically, if the KEIP were not in place, the KEIP Participants' overall compensation would be lower than the historical total compensation paid to the KEIP Participants despite the unprecedented demands that each has been asked to take on in connection with these cases.  Moreover, no KEIP Participant will receive any other bonus or incentive cash compensation during the intended duration of these Chapter 11 Cases.

## Overview of the KEIP

16.     Since February 2021, the Debtors have evaluated the need for a KEIP with the benefit of independent oversight and guidance from their Disinterested Directors and Restructuring Advisors.  The proposed award opportunities reflect the Restructuring Advisors' benchmarking analysis of incentive-based compensation plans approved in other chapter 11 cases.  The Debtors' proposed award opportunities (and performance targets) were also formulated and vetted by the Disinterested Directors to ensure that the opportunities (if achieved) reflect the Debtors' business needs and goals.

17.    The KEIP is designed to incentivize the KEIP Participants' performance by linking compensation awards to the Debtors' generation of net cash flows from operations ("NCFO"). For example, if NCFO—as measured between the Petition Date and the earlier of the sale closing and the week ended May 29, 2021—is at least approximately 80% of the NCFO originally projected in the Initial DIP Budget, then KEIP Participants will be entitled to an incentive pool of $579,350. If measured NCFO is above the approximately 80% threshold, the incentive pool increases up to a maximum amount of $1,000,000.[2] That is to say, for every additional $1.00 of NCFO generated between the approximately 80% threshold and target threshold, and the target threshold and the maximum payout, the incentive pool for the KEIP Participants increases by approximately $0.19 and $0.23 respectively. If NCFO does not reach the approximately 80% threshold, no incentive pool will be created and the KEIP Participants will not receive an incentive bonus. The incentive pool created under the KEIP will be distributed to KEIP Participants in accordance with the respective allocations for each KEIP Participant.

18.    The KEIP contains the following primary design features:

- ***Eligible Participants.***  The KEIP is limited to the aforementioned KEIP Participants, who are critical to the Debtors' day-to-day operations, financial performance, and the ongoing sale and marketing process.

- ***KEIP Awards.***  Each KEIP Participant will be eligible for certain cash awards upon achieving specified performance metrics up to a set maximum amount, and subject to continued employment of the participant.

- ***Performance Metrics.***  The KEIP Participants shall be eligible for certain cash awards based on the Debtors' achieving specified levels of NCFO.

---

[2]    The maximum incentive pool is reached at NCFO performance of approximately 120% of the Initial DIP Budget target (or approximately $6.044 million)

- ***KEIP Payment Timing.***   Any payments owed to KEIP Participants will be calculated shortly following the conclusion of the KEIP's measurement period (the earlier of May 29, 2021 and the closing of a sale of the Debtors' assets), and earned as of the conclusion of the measurement period.[3]  Payments under the KEIP will made as soon as reasonably practicable following the date they are earned and calculated.

- ***Eligibility for Payment***.   If a KEIP Participant terminates employment with the Debtors without good reason prior to the date the KEIP award is earned, the KEIP Participant will not receive any amounts pursuant to the KEIP.

- ***KEIP Payout Ranges.***   If the threshold NCFO level is met, the KEIP incentive pool will be created consistent with the performance achieved; the table below illustrates incentive pool and individual payouts at the threshold, target, and maximum levels:

---

[3]   For the avoidance of doubt, any payment earned by a KEIP Participant shall be earned prior to any technical termination of the KEIP Participants' employment made in connection with the sale closing.

| Postpetition Cash Management Performance | | | | |
|---|---|---|---|---|
| **Title** | **Target Net Cash from Operations** | | | **Maximum Total Compensation** |
| | **Threshold NCFO: $4,043.5** | **Target NCFO: $5,043.5** | **Maximum NCFO: $6,043.5** | |
| Chief Executive Officer | $202,781.25 | $270,375.00 | $350,000.00 | $350,000.00 |
| Chief Financial Officer | $115,875.00 | $154,500.00 | $200,000.00 | $200,000.00 |
| Chief of Operations | $86,906.25 | $115,875.00 | $150,000.00 | $150,000.00 |
| Chief Marketing & Digital Commerce Officer | $57,937.50 | $77,250.00 | $100,000.00 | $100,000.00 |
| Chief Merchant Officer | $57,937.50 | $77,250.00 | $100,000.00 | $100,000.00 |
| Vice President of Merchandising and General Manager of Wholesale | $28,968.75 | $38,625.00 | $50,000.00 | $50,000.00 |
| Vice President of Marketing | $28,968.75 | $38,625.00 | $50,000.00 | $50,000.00 |
| *TOTAL* | *$579,375.00* | *$772,500.00* | *$1,000,000.00* | *$1,000,000.00* |

19.     The KEIP thresholds were designed to align the financial performance of the Debtors and the KEIP Participants, thereby creating incentives which will help maximize recoveries for the Debtors' stakeholders.  The Restructuring Advisors carefully developed the performance thresholds to ensure that they are appropriate "reaches" to drive performance, but will not present unrealistic or unattainable goals, which would frustrate the incentivizing nature of the plan.  The Debtors believe that the proposed KEIP—which provides a sliding scale of potential KEIP payouts, capped maximum payout, and no guaranteed minimum level of payouts—strikes this balance.  In order to reach these performance targets—including the

approximately 80% threshold level—the Debtors will need to regain a significant portion of the in-store sales that were lost due to the COVID-19 pandemic, while also maintaining the Debtors' fast-growing online sales.  For example, achieving the threshold NCFO level of approximately $4.044 million for the postpetition period of March through May requires the KEIP Participants to grow operating cash flows at a compounded rate of approximately 122% from the same period, pre-pandemic, in 2019.

20.    The KEIP and its structure represent a reasonable, market-based approach to incentivize the KEIP Participants in accordance with their performance and is justified under the circumstances of these Chapter 11 Cases.  As set forth in the Adams Declaration, the KEIP awards will result in KEIP Participants receiving compensation commensurate to, or below, the market.  However, in order to receive the KEIP awards, KEIP Participants will need to substantially outperform relative to the Debtors' historical outcomes.  As further set forth in the Adams Declaration, the KEIP's maximum potential cost of $1,000,000 is reasonable in light of the aggregate cost of key employee incentive programs approved in similarly-sized chapter 11 cases.  The cost of the KEIP is comparable to similar incentive programs approved in recent comparably-sized cases, most of which involved a wind down of operations and/or a proposed sale process.  Finally, the KEIP payouts have been sanctioned by the Debtors' DIP lenders and are included in the Court-approved DIP budget

### The Need for a KEIP

21.    The Debtors' success is directly linked to the ability of their key employees to effectively manage the Debtors' day-to-day operations during the pendency of the going-concern sale of the Debtors' business.  In light of the chapter 11 filing, it is critical that the Debtors

implement the KEIP as soon as practicable to ensure that the key employees remain incentivized during these Chapter 11 Cases. In recent months, the KEIP Participants have seen a substantial increase in their workloads. While preparing a company to file for chapter 11 and operating in bankruptcy is ordinarily no easy task, these challenges have been compounded by the COVID-19 pandemic, as well as the demands that an ongoing marketing and sale process place on these key employees.

22. The KEIP Participants have met these challenges and have directly engaged with vendors, customers, and employees to maintain stability and seamless performance across the Debtors' business. KEIP Participants will continue to play a vital role in negotiations concerning a potential sale transaction as these Chapter 11 Cases progress. While the Debtors believe they can continue to meet the challenges that lay ahead, providing incentive opportunities, such as those contemplated by the KEIP, will enable the Debtors to not only achieve, but possibly exceed, their goal to maximize recoveries.

23. The continued successful management of the Debtors' day-to-day operations and net cash position will be key factors in demonstrating the value that the Debtors' business offers to potential purchasers through the sale process. The performance targets were carefully developed based on the best available information to require management to "reach," without presenting unrealistic or unattainable goals in these uncertain times—which would thwart the incentivizing nature of the program. The KEIP Participants are being asked to attain net cash goals above the Debtors' historical levels during these cases, while also grappling with the numerous challenges brought about by the pandemic, including the threat of additional government mandated lockdowns and unprecedented delays in shipping and extended wait times

for imported goods at ports of entry.[4]   Against this backdrop, the Debtors do not believe that

KEIP Participants can achieve the plan's targets simply by "showing up."

24.     Properly incentivizing and compensating the Debtors' key employees at this

critical juncture is in the best interests of the Debtors, the Debtors' estates, and all parties in

interest.  As outlined in the Adams Declaration, achieving even a minimum award opportunity

will mean that KEIP Participants have outperformed against these challenges for the benefit of

all stakeholders in these chapter 11 estates.

## Basis for Relief

### I.     The KEIP Is an Ordinary Course Transaction Under Section 363(c) of the Bankruptcy Code.

25.     Under section 363(c)(1) of the Bankruptcy Code, a debtor in possession may

"enter into transactions . . . in the ordinary course of business, without notice or a hearing, and

may use property of the estate in the ordinary course of business without notice or a hearing." 11

U.S.C. § 363(c)(1).  The Bankruptcy Code does not define "ordinary course of business." *In re

Cowin*, 2014 WL 1168714, at *40 (Bankr. S.D. Tex. Mar. 21, 2014).  Courts apply a two-part

test to determine whether a transaction is in the ordinary course of a debtor's business. *See In re

Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  Courts in the Fourth Circuit

and elsewhere have analyzed transactions to determine whether a transaction is common to the

debtor's industry and whether the proposed transaction is consistent with the debtor's prepetition

practices. *See e.g.*, *In re Fairmont Gen. Hosp., Inc.*, 510 B.R. 783, 787 (Bankr. N.D.W. Va.

2014); *In re Ohio Valley Amusement Co.*, 2008 WL 5062464, at *3–4 (Bankr. N.D.W. Va. Dec.

---

[4]     Costa Paris, *Port Delays Leave Cargo Ships Stranded off U.S. Pacific Gateways*, https://www.wsj.com/articles/port-delays-leave-cargo-ships-stranded-off-u-s-pacific-gateways-11610574485 (Jan. 13, 2021, 4:48 PM)

1, 2008); *Cowin*, 2014 WL 1168714, at *40 n.55 (noting that the "horizontal dimension test" is also known as the "comparable businesses" test and the "vertical dimension test" is also known as the "creditor expectation test"); *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (applying the "horizontal" and "vertical" tests); *In re Dana Corp.*, 358 B.R. 567. 576-77 (Bankr. S.D.N.Y. 2006).

26.     Under the horizontal dimension test, the court analyzes whether the transaction is one that other businesses in the same industry "would engage in as ordinary business." *Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700, 704 (9th Cir. 1988).   Under the vertical dimension test, the court analyzes whether a hypothetical creditor would view the transaction as an ordinary or unusual business practice. *Cowin*, 2014 WL 1168714, at *41.   If the transaction was ordinary, such hypothetical creditor would not expect notice and a hearing with the opportunity to object. *Id.*

27.     ***First***, the KEIP meets the horizontal dimension test because it is consistent to incentive-based compensation plans in retail bankruptcy cases involving companies that are similarly-situated with the Debtors. *See e.g.*, *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012) (approving incentive bonus plans under section 363(c)(1) of the Bankruptcy Code where the debtor sought to continue prepetition plans and incentive-based bonus plans that were common in the industry). [5]   To measure the reasonableness of the total cost of the KEIP, the Restructuring Advisors analyzed incentive plans approved in chapter 11 cases involving 14 comparable retailers and food services companies.   The total direct compensation available under

---

[5]     KEIPs are routinely approved in this and other districts in chapter 11 cases involving debtors in the retail industry. *See, e.g.*, *In re Le Tote, Inc.*, No. 20-33332 (KLP) (Bankr. E.D. Va. Sept. 29, 2020); *In re Neiman Marcus Group Ltd LLC*, No. 20-32519 (DRJ) (Bankr. S.D. Tex. July 30, 2020); *In re Gymboree Group Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 15, 2019); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Dec. 8, 2017).

the KEIP is consistent with the direct compensation in incentive plans approved in comparable chapter 11 cases.  Further, the proposed performance metrics are similar to those used in other chapter 11 cases as well.

28.      *Second*, the KEIP meets the vertical dimension test because it is a continuation of the Debtors' prepetition compensation practices.  *See Dana Corp.*, 358 B.R. at 580 (finding that a debtor's postpetition incentive program was a "refinement" of historical practices and therefore within the ordinary course of the debtor's business).  The Debtors have historically offered incentive-based cash awards to their leadership team based on the achievement of certain performance targets.  The targets for the KEIP represent a continuation of certain prepetition incentive opportunities adjusted for the current situation in which managing the Debtors' cash position is of paramount importance to the Debtors' success.

29.      The KEIP is consistent with both the Debtors' prepetition practice and industry practice for companies in chapter 11.  Thus, out of an abundance of caution, the Debtors request that the Court approve the KEIP as an ordinary course transaction pursuant to section 363(c) of the Bankruptcy Code.

## II.    Implementing the KEIP Is a Proper Exercise of the Debtors' Sound Business Judgment Under Section 363(b) of the Bankruptcy Code.

30.      Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   Under this section, a court may authorize a debtor to use property of the estate when such use has a "sound business purpose" and when the use of the property is proposed in good faith. *See In re W.A. Mallory Co.,* 214 B.R. 834, 836 (Bankr. E. D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995).

31.     Courts generally require a debtor to demonstrate that a valid business purpose exists for the use of estate property outside the ordinary course of business.  *See In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983).  Once the debtor has articulated a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief the action was in the best interest of the company. *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992).  Furthermore, once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Johns-Manville*, 60 B.R. at 616.  The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Integrated Res.*, 147 B.R. at 656; *Johns-Manville*, 60 B.R. at 615-616 ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1).

32.     The KEIP was carefully designed to balance the Debtors' need to properly motivate the KEIP Participants through appropriate, market-competitive compensation with the need to ensure that the Debtors' estates receive enhanced value in exchange.  Payments under the KEIP are directly linked to value achieved through management of the Debtors' operations and financial performance, which will in turn have an impact on the marketing and sale process and recovery to stakeholders.

33.     Courts have found that a debtor's use of reasonable performance-based payments and other incentives for employees is a valid exercise of a debtor's business judgment. *See, e.g.,*

*In re Alpha Nat. Res., Inc.*, 546 B.R. 348, 358-363 (E.D. Va. 2016) (approving the KEIP where a "significant part of the bonus pool" was contingent on confirmation of a chapter 11 plan as a valid exercise of business judgement); *In re Am. W. Airlines, Inc.,* 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) (noting that it is the proper use of a debtor's business judgment to propose payments for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.,* 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991) (stating that a debtor's business judgment was controlling in the approval of a "performance/retention program").

34.     Courts have approved employee payment programs to insiders as valid exercises of business judgment. *See, e.g., In re Velo Holdings, Inc.,* 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012) (noting that Bankruptcy Code section 503(c) does not "foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization"). While predominantly or purely retentive payments to insiders are expressly prohibited by the terms of section 503(c)(1), incentive payments that may have some retentive effect are permissible so long as they motivate senior management "to produce and increase the value of the estate." *Dana Corp.,* 358 B.R. at 571.

35.     The implementation of the KEIP is a proper exercise of the Debtors' sound business judgment and in the best interests of the Debtors' estates and all stakeholders in these Chapter 11 Cases. The KEIP results from an independent analysis undertaken by the Debtors, with the assistance of the Debtors' Restructuring Advisors. The KEIP was further subject to review and approval by the Disinterested Directors and the DIP Agent, none of who are current or prospective KEIP Participants or employees of the Debtors. The KEIP properly incentivizes the KEIP Participants who possess the skills, knowledge, and experience critical to the Debtors'

ability to operate in the ordinary course during these Chapter 11 Cases in such a way as to generate value for the Debtors' creditors through a potential sale transaction, all while managing through a global pandemic. The KEIP Participants hold positions that are integral to the Debtors' restructuring process and will face additional stress and demands throughout the chapter 11 process.

36.     As discussed above, the KEIP creates a sliding scale that rewards all KEIP Participants as the Debtors' NCFO increases. Thus, the Debtors' proposed metrics will drive performance at all levels where all parties will benefit if achieved. Absent the KEIP, the KEIP Participants may be undercompensated and under-incentivized at a critical juncture for the Debtors' business. For these reasons, the Debtors' decision to implement the KEIP is a valid exercise of the Debtors' sound business judgment and should be approved.

**III.    The KEIP is Justified by the Facts and Circumstances of These Chapter 11 Cases.**

37.     Section 503(c)(3) of the Bankruptcy Code prohibits certain transfers made to managers, consultants, and others that are not justified by the facts and circumstances of a bankruptcy case. *See* 11 U.S.C. § 503(c)(3). A majority of courts agree that the requirement of section 503(c)(3) of the Bankruptcy Code that a transaction be "justified by the facts and circumstances of the case" is the same as the business judgment standard under section 363(b) of the Bankruptcy Code. *See, e.g., Alpha Nat.*, 546 B.R. at 356 (collecting cases applying the business judgment standard to approve an insider compensation program); *In re Patriot Coal Corp.*, 492 B.R. 518, 530–31 (Bankr. E.D. Mo. 2013) (using the business judgment test to analyze an incentive plan under section 503(c)(3)). In order to determine whether a compensation proposal meets the "sound business judgment test" courts consider the following

six factors: (a) whether the plan is calculated to achieve the desired performance; (b) whether the cost of the plan is reasonable in the context of a debtor's assets, liabilities, and earning potential; (c) whether the scope of the plan is fair and reasonable or discriminates unfairly among employees; (d) whether the plan is consistent with industry standards; (e) whether the debtor performed due diligence in investigating the need for the plan; and (f) whether the debtor received independent advice in performing due diligence, creating, and authorizing the plan. *See Dana Corp.*, 358 B.R. at 576-77.

38.     No single factor is dispositive, and a court has discretion to weigh each of these factors based on the specific facts and circumstances before it. *See In re FirstEnergy Sols. Corp.*, 591 B.R. 688, 697 (Bankr. N.D. Ohio 2018) (stating the *Dana Corp.* factors are "neither exhaustive nor of inherently equal weight").   Even the total absence of a factor may be permissible, so long as the interests of the Debtors are sufficiently protected. *See In re Borders Grp. Inc.*, 453 B.R. 459, 477 (Bankr. S.D.N.Y. 2011) (finding that the lack of independent counsel was "not fatal" where the presence of other factors ensured "that the [d]ebtors' interests were sufficiently protected"); *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 154 (Bankr. E.D.N.Y. 2012) (noting that "the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient").   The Debtors respectfully submit that the KEIP satisfies the standards set forth above, each as discussed more fully below.

39.     The KEIP is a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these Chapter 11 Cases.

      a.   ***The KEIP is Structured to Achieve the Desired Performance***.   The KEIP incentivizes the KEIP Participants to achieve value-driven financial targets.   Achieving the performance targets will require substantial over-

performance from the KEIP Participants based on the Debtors' NCFO for the same period in prior years.

b.  ***The Cost of the KEIP is Reasonable***.  Assuming the "threshold" NCFO target is met, the cost of the KEIP will range from $579,375.00 to $1,000,000.00.    As set forth in the Adams Declaration, given the challenging performance metrics set by the KEIP and the significant benefits to the estates if the performance metrics are achieved, the Debtors submit that the cost of the KEIP is reasonable and within market norms. Moreover, the DIP Agent supports the KEIP program and the KEIP awards contemplated in the Initial DIP Budget.

c.  ***The Scope of the KEIP is Reasonable***.  The scope of the KEIP is fair, reasonable, and does not discriminate unfairly among the KEIP Participants.  The KEIP Participants are a carefully selected, narrow group of seven individuals who drive company performance and are critical to ensuring a successful outcome in these cases.  The KEIP is reasonably limited to senior management whose efforts are critical to the Debtors' restructuring and maximizing the value of the Debtors' estates.

d.  ***The KEIP is Consistent with Industry Practices***.  To evaluate an appropriate compensation structure for the KEIP Participants, the Restructuring Advisors gathered external market compensation data from several data sources, encompassing a representative database of compensation information for comparable industries.  This process included evaluating the approved KEIPs provided to senior management in comparable chapter 11 cases.  With the potential KEIP payouts, the KEIP Participants' total compensation will be consistent with the Debtors' historical levels, which would be justified considering the additional duties and challenges faced by the KEIP Participants and the difficult goals necessary to achieve the KEIP awards.

e.  ***The Debtors Performed Due Diligence in Developing the KEIP***.  The Debtors actively sought the advice of the Restructuring Advisors in assessing and developing the KEIP.  The Debtors have evaluated the KEIP and its metrics based on the input of the Disinterested Directors and Restructuring Advisors.    As a result of these efforts, the Debtors concluded that it was critical to implement the KEIP to ensure the competitiveness of the Debtors' compensation practices.  The Debtors have set KEIP metrics that will be challenging for the Debtors' senior management team.  The performance targets set by the KEIP are similarly consistent with incentive plans approved in other similar cases and appropriately tailored to incentivize high levels of financial and operational performance by the Debtors' management team.

      f.     ***The Debtors Received Independent Counsel in Developing the KEIP***. The Debtors utilized the Disinterested Directors to evaluate a potential incentive plan. Further, the Debtors engaged their financial and legal advisors regarding the development and implementation of the KEIP. The active involvement of the Debtors' advisors and the selection of objective targets in developing the KEIP serves to ensure it appropriately and fairly incentivizes the KEIP Participants.

40. Because implementing the KEIP will motivate the Debtors' employees to the ultimate benefit of all parties in interest, the implementation of the KEIP reflects a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these Chapter 11 Cases, and therefore satisfies the requirements of Bankruptcy Code section 503(c)(3).

## IV.    Section 503(c)(1) of The Bankruptcy Code Is Inapplicable to the KEIP.

41. Section 503(c)(1) of the Bankruptcy Code generally prohibits payments to "insiders" made for the sole or primary purpose of inducing the "insider" to remain with a debtor's business—*i.e.*, those insider plans that are essentially "pay to stay" plans. *See, e.g.*, *Borders Grp.*, 453 B.R. at 471. Section 503(c)(1) of the Bankruptcy Code does not apply to performance-based incentive plans. *See, e.g.*, *Velo Holdings,* 472 B.R. at 209 (finding that an incentive-based plan alleviated the need for a section 503(c)(1) analysis); *Borders Grp.,* 453 B.R. at 471 (finding that "the Debtors [had] met their burden of establishing that the [compensation program was] incentivizing, thereby alleviating the need for a section 503(c)(1) analysis").

42. In determining whether an employee bonus plan is primarily incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.,* 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). This analysis further recognizes that all compensation, to some degree, has a retentive element. *Glob.*

*Home Prod.*, 369 B.R at 786 ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance."); *Dana Corp.*, 358 B.R. at 584 ("However, as noted, this Court also opined that incentivizing plans with some components that arguably have a retentive effect do not necessarily violate section 503(c)."). Rather, the focus remains on whether the plan is, on the whole, incentivizing in nature by demanding a "stretch" or a "reach" before an award opportunity is achieved. *Dana Corp.*, 358 B.R. at 581.

43.     The Debtors recognize that several KEIP Participants are likely "insiders" as defined under the Bankruptcy Code given their status as officers of the Debtors.  However, because the KEIP is *incentive-based*, section 503(c)(1) of the Bankruptcy Code does not apply. The KEIP Participants are not paid merely for maintaining their employment for a certain time period.  The KEIP provides award opportunities only if the KEIP Participants satisfy threshold levels of performance.  The KEIP Participants will not be eligible to obtain any award simply as a result of merely "showing up," as evidenced by the fact that there is no guaranteed minimum payout under the KEIP. *Cf. Hawker Beechcraft*, 479 B.R. at 315 (denying KEIP approval where lower threshold was attainable so long as debtor did not encounter "any 'whoopsies.'").  Instead, the KEIP Participants must over-perform in the face of a truly challenging economic environment in order to earn an award opportunity.

**V.     The KEIP is Consistent with Previously Approved Employee Incentive Plans.**

44.     The KEIP is consistent with other programs of its type that have been approved by courts in cases following the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  Courts regularly approve of incentive programs with graduated cash

rewards. *See, e.g., Velo Holdings*, 472 B.R. at 210-211 (approving an incentive program for insiders based on meeting the terms of a DIP loan and selling businesses to third parties); *In re Nobex Corp.,* 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006) (approving sale-related incentive pay for insiders); *In re Dewey & Leboeuf LLP,* 2012 Bankr. LEXIS 3484 at \*16–17 (approving an incentive plan linking payments to collection on receivables). The distinguishing characteristic of an appropriate KEIP is motivation: "when a plan is designed to motivate employees to achieve specified performance goals, it is primarily incentivizing, and thus not subject to section 503(c)(1)." *In re Residential Capital, LLC,* 478 B.R. 154, 172 (Bankr. S.D.N.Y. 2012).

45.     The importance of properly incentivizing key employees has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. *See, e.g., In re Le Tote, Inc.*, No. 20-33332 (KLP) (Bankr. E.D. Va. Sept. 29, 2020); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. June 30, 2020) (approving the debtors' key employee incentive plan with payments based on the achievement of performance targets); *In re Gymboree Group Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. Feb. 15, 2019) (approving a key employee incentive plan that involved an event-specific performance target); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Dec. 8, 2017) (approving the debtors' key employee incentive plan with payments based on the achievement of performance targets); *In re Alpha Nat. Res., Inc.,* No. 15-33896 (KRH) (Bankr. E.D. Va. Jan. 27, 2016) (same)*; In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. July 29, 2015) (same).

46.     In this case, the Debtors' proposed KEIP has no guaranteed payments to the KEIP Participants. The KEIP Participants are eligible only if the Debtors meet challenging cash

management and financial performance metrics.   The KEIP is entirely incentivizing and designed to motivate the Debtors' key employees.   Accordingly, the Debtors have a "sound business purpose" for, and have properly exercised their business judgment in developing, the KEIP.   In so doing, they have satisfied the standards of section 363(b) and the "facts and circumstances" test set forth in section 503(c)(3) of the Bankruptcy Code.

### Waiver of Bankruptcy Rule 6004(h)

47.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

48.     The Debtors will provide notice of this Motion via first class mail, facsimile or email (where available) to: (a) the United States Trustee for the Eastern District of Virginia; (b) proposed counsel of the official committee of unsecured creditors; (c) counsel to the DIP Agent; and (d) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

49.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Proposed

Order granting the relief requested herein and such further or other relief as the Court may

deem appropriate under the circumstances.

Richmond, Virginia
Dated: March 30, 2021

/s/ *David W. Gaffey*

| | |
|---|---|
| Christopher A. Jones (VSB# 40064) | John C. Longmire (admitted *pro hac vice*) |
| David W. Gaffey (VSB# 85088) | Matthew A. Feldman (admitted *pro hac vice*) |
| Jae Won Ha (VSB# 94781) | James H. Burbage (admitted *pro hac vice*) |
| **WHITEFORD TAYLOR & PRESTON LLP** | **WILLKIE FARR & GALLAGHER LLP** |
| Two James Center | 787 Seventh Avenue |
| 1021 E. Cary Street, Suite 1700 | New York, NY 10019 |
| Richmond, VA 23219 | |
| Telephone:     (804) 977-3300 | Telephone:     (212) 728-8000 |
| Facsimile:     (804) 977-3299 | Facsimile:     (212) 728-8111 |
| | |
| *Proposed Co-Counsel to the Debtors* | *Proposed Co-Counsel to the Debtors* |
| *and Debtors in Possession* | *and Debtors in Possession* |

**Exhibit A**

**Proposed Order**

John C. Longmire (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

Telephone:      (212) 728-8000
Facsimile:      (212) 728-8111

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:      (804) 977-3300
Facsimile:      (804) 977-3299

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PAPER SOURCE, INC., *et al*.,[1] | ) | Case No. 21-30660 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS'
## KEY EMPLOYEE INCENTIVE PLAN AND (B) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the debtors and debtors in possession in the above-captioned cases (together, the "Debtors") for entry of an order (this "Order"), pursuant to sections 363(b), 363(c), and 503(c)(3) of the Bankruptcy Code, Bankruptcy Rule 6004, and Local Bankruptcy Rule 6004-2, (a) authorizing and approving the Debtors' proposed KEIP, (b) authorizing the Debtors to make payments to certain management employees under the KEIP, (c) granting administrative expense priority status to all payment obligations of the Debtors under the KEIP, and (d) granting related relief, all as more fully set forth in the Motion; and upon

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]     Capitalized terms used in this Order but not immediately defined have the meanings given to them in the Motion.

the Adams Declaration; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief granted herein is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and due and proper notice of the Motion having been given and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules having been satisfied by such notice; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is

**HEREBY ORDERED THAT**:

1.     The Motion is granted as set forth herein.

2.     The KEIP is authorized and approved in its entirety.

3.     The Debtors are authorized, pursuant to sections 363(b), 363(c), and 503(c) of the Bankruptcy Code, to take all actions necessary to implement the KEIP on the terms and conditions set forth in the Motion, including making any payments that come due pursuant to the terms thereof during these chapter 11 cases and without the need for further Court approval.

4.     Upon receipt of a payment pursuant to the KEIP, the KEIP Participants agree to waive all rights to seek any other incentive or bonus payments from the Debtors' estates during the pendency of these chapter 11 cases.

5.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Bankruptcy Rules are satisfied by such notices.

6.     All amounts earned and payable under the KEIP shall have administrative expense priority under sections 503(a) and 507(a)(2) of the Bankruptcy Code.

7.     The requirement under Local Bankruptcy Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

8.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

9.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

10.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated:  _____
Richmond, Virginia                              THE HONORABLE KEITH L. PHILLIPS
                                                UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

/s/
Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:              (804) 977-3300
Facsimile:              (804) 977-3299

- and –

John C. Longmire (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019
Telephone:              (212) 728-8000
Facsimile:              (212) 728-8111

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order
has been endorsed by or served upon all necessary parties.

/s/

**Exhibit B**

**Adams Declaration**

John C. Longmire (admitted *pro hac vice*)
Matthew A. Feldman (admitted *pro hac vice*)
James H. Burbage (admitted *pro hac vice*)
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, NY 10019

Telephone:    (212) 728-8000
Facsimile:    (212) 728-8111

Christopher A. Jones (VSB# 40064)
David W. Gaffey (VSB# 85088)
Jae Won Ha (VSB# 94781)
**WHITEFORD TAYLOR & PRESTON LLP**
Two James Center
1021 E. Cary Street, Suite 1700
Richmond, VA 23219
Telephone:    (804) 977-3300
Facsimile:    (804) 977-3299

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| PAPER SOURCE, INC., *et al.*,[1] | Case No. 21-30660 (KLP) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF COLIN M. ADAMS
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY
OF AN ORDER (A) AUTHORIZING AND APPROVING THE DEBTORS'
KEY EMPLOYEE INCENTIVE PLAN AND (B) GRANTING RELATED RELIEF**

I, Colin M. Adams, hereby declare under penalty of perjury:

1. In January 2021, the Debtors[2] engaged M-III Advisory Partners LP ("M3") to provide financial advisory and consulting services to Paper Source, Inc. I am familiar with the pre- and postpetition structure of the Debtors' compensation plans and the proposed key employee incentive plan (the "KEIP"), which is set forth in the *Debtors' Motion for Entry of an*

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Pine Holdings, Inc. (4460) and Paper Source, Inc. (8035). The Debtors' service address is 125 South Clark St., Chicago, IL 60603.

[2]    Capitalized terms used in this Order but not immediately defined have the meanings given to them in the KEIP Motion (as defined herein).

*Order (A) Authorizing and Approving the Debtors' Key Employee Incentive Plan and (B) Granting Related Relief* (the "KEIP Motion").

2.      I submit this Declaration on behalf of M3 in support of the KEIP Motion.  Except as otherwise indicated, the statements set forth in this declaration are based upon: my personal knowledge; my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives; information obtained from members of the Debtors' management team and other advisors; my review of the Debtors' business and compensation practices; research conducted by myself and my team into compensation practices for companies in the retail industry; research conducted by myself and my team into the designs of retention and incentive-based plans approved in recent chapter 11 proceedings; my significant experience in developing such plans; and my experience with similarly situated companies that have sought relief under chapter 11.  For the reasons described below, it is my opinion that the KEIP is reasonable and generally consistent with market practice and my experience with similarly-situated companies that have sought relief under chapter 11.  I am over the age of eighteen, and, if called upon to testify, I could and would testify competently to the facts and opinions set forth in this declaration.

## Background and Qualifications

3.      I am a Senior Managing Director of M3, an independent corporate turnaround and advisory firm founded in 2015 that specializes in financial and operational restructurings, performance improvement and business management across a broad range of industries.  I have more than 20 years of experience in the restructuring sector, having been both an advisor and a principal in numerous U.S. and European restructurings and special situations.  Prior to

becoming a Managing Director at M3 in 2017, I served as a Managing Director at Morgan Stanley & Co., LLC in New York and London from 2010-2017 and as a Managing Director at Citadel Securities in New York from 2009-2010.  Prior to that, I was a partner at Kirkland & Ellis LLP in New York.  I hold a J.D. with a Certificate in Business Law from the University of California, Los Angeles School of Law and graduated with an A.B. in Economics and History from Duke University.

4.     Over the course of my career, I have served as an advisor, attorney, officer or investor in chapter 11 cases such as American Airlines, Belk, Bertucci's, Cengage Learning, Colt Defense, Cornerstone Propane, Craftworks, Energy Future Holdings, Extended Stay Hotels, General Motors, GST Auto Leather, Neiman Marcus, Relativity Media, Remington Outdoor, Sears, Solutia, Tailored Brands, Tronox, and WorldCom.

### M3's Involvement with the Debtors

5.     Since M3 began its most recent engagement with the Debtors in January 2021, I have re-familiarized myself with the Debtors' operations and business.  At the start of our engagement, M3 discussed with the Debtors and their advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs.  M3 reviewed the structure of the Debtors' primary incentive programs, paying specific attention to various incentive programs' performance metrics, participating employees, payout frequency, and target payout levels.

6.     The Debtors performed significant due diligence in developing the KEIP, and my team and I collaborated closely with the Debtors' management, disinterested members of the Debtors' board of directors, and other outside advisors in reviewing and advising on the KEIP.

Specifically, my team and I provided input and advice on the design, structure, total cost, and award opportunities of the KEIP for reasonableness. M3 provided analyses of the reasonableness of various derivations of the proposed KEIP to the Debtors' management and disinterested members of the Board of Directors. M3's primary goal was to provide an independent assessment of the Debtor's management compensation program that drew directly upon relevant market data for similarly situated companies.

### Overview of the KEIP

7.    The purpose of the KEIP is to provide competitive incentive opportunities to seven members of the Debtors' management team, some of whom I understand may be considered "insiders" under the Bankruptcy Code (each a "KEIP Participant" and collectively, the "KEIP Participants"). I understand that the KEIP Participants are responsible for the overall strategy and direction of the Debtors' business enterprise and have played, and will continue to play, a central role in the Debtors' restructuring. In addition to their substantial day-to-day responsibilities, these individuals saw their workloads expand significantly as a result of the chapter 11 cases as the Debtors transitioned their operations into chapter 11. While management responsibilities are inherent in the KEIP Participants' duties as leaders of a debtor-in-possession, I believe the additional challenge these responsibilities pose and will continue to pose, particularly during the COVID-19 pandemic and sale and marketing process, should be factored into consideration of the KEIP Participants' ability to achieve targeted business performance. In my experience, incentive programs are regularly used by similarly-situated companies to incentivize the performance of senior executives and create alignment with key economic stakeholders.

4

## KEIP Design and Structure

8.    As further described in the KEIP Motion, the KEIP is designed to incentivize the KEIP Participants' performance by linking compensation awards to the Debtors' generation of net cash flows from operations ("NCFO").  For example, if NCFO—as measured between the Petition Date and the earlier of the sale closing and the week ended May 29, 2021—is at least approximately 80% of the NCFO originally projected in the Initial DIP Budget, then KEIP Participants will be entitled to an incentive pool of $579,375.  If measured NCFO is above the approximately 80% threshold, the incentive pool increases up to a maximum amount of $1,000,000.[3]  That is to say, for every additional $1.00 of NCFO generated between the approximately 80% threshold and target threshold, and the target threshold and the maximum payout, the incentive pool for the KEIP Participants increases by approximately $0.19 and $0.23 respectively.  If NCFO does not reach the approximately 80% threshold, no incentive pool will be created and the KEIP Participants will not receive an incentive bonus.  The incentive pool created under the KEIP will be distributed to KEIP Participants in accordance with respective allocations for each KEIP Participant.

9.    In addition, the KEIP contains the following primary design features:

- ***Eligible Participants.***  The KEIP is limited to the aforementioned KEIP Participants, who are critical to the Debtors' day-to-day operations, financial performance, and the ongoing sale and marketing process.

- ***KEIP Awards.***  Each KEIP Participant will be eligible for certain cash awards upon achieving specified performance metrics up to a set maximum amount, and subject to continued employment of the participant.

---

[3]    The maximum incentive pool is reached at NCFO performance of approximately 120% of the Initial DIP Budget target (or approximately $6.044 million)

- ***Performance Metrics.***  The KEIP Participants shall be eligible for certain cash awards based on the Debtors' achieving specified levels of NCFO.

- ***KEIP Payment Timing.***  Any payments owed to KEIP Participants will be calculated shortly following the conclusion of the KEIP's measurement period (the earlier of May 29, 2021 and the closing of a sale of the Debtors' assets), and earned as of the conclusion of the measurement period.[4]  Payments under the KEIP will made as soon as reasonably practicable following the date they are earned and calculated.

- ***Eligibility for Payment***.  If a KEIP Participant terminates employment with the Debtors without good reason prior to the date the KEIP award is earned, the KEIP Participant will not receive any amounts pursuant to the KEIP.

- ***KEIP Payout Ranges.***  If the threshold NCFO level is met, the KEIP incentive pool will be created consistent with the performance achieved; the table below illustrates incentive pool and individual payouts at the threshold, target, and maximum levels:

---

[4]    For the avoidance of doubt, any payment earned by a KEIP Participant shall be earned prior to any technical termination of the KEIP Participants' employment made in connection with the sale closing.

| Postpetition Cash Management Performance | | | |
|---|---|---|---|
| **Title** | **Target Net Cash from Operations** | | **Maximum Total Compensation** |
| | **Threshold NCFO: $4,043.5** | **Target NCFO: $5,043.5** | **Maximum NCFO: $6,043.5** | |
| Chief Executive Officer | $202,781.25 | $270,375.00 | $350,000.00 | $350,000.00 |
| Chief Financial Officer | $115,875.00 | $154,500.00 | $200,000.00 | $200,000.00 |
| Chief of Operations | $86,906.25 | $115,875.00 | $150,000.00 | $150,000.00 |
| Chief Marketing & Digital Commerce Officer | $57,937.50 | $77,250.00 | $100,000.00 | $100,000.00 |
| Chief Merchant Officer | $57,937.50 | $77,250.00 | $100,000.00 | $100,000.00 |
| Vice President of Merchandising and General Manager of Wholesale | $28,968.75 | $38,625.00 | $50,000.00 | $50,000.00 |
| Vice President of Marketing | $28,968.75 | $38,625.00 | $50,000.00 | $50,000.00 |
| *TOTAL* | *$579,375.00* | *$772,500.00* | *$1,000,000.00* | *$1,000,000.00* |

### Analysis of KEIP Participants Potential Payouts

10.     In assessing the reasonableness of the KEIP, my team and I evaluated several factors.  First, we compared the threshold, target, and maximum NCFO metrics during the period of March through May against the Debtors' historical performance for the same time period.  We determined that, in order to reach even the minimum threshold amount of net cash from operations required to receive a payout under the KEIP, the KEIP Participants will need to grow NCFO 122% on a compound basis over the levels from the same period in 2019, before the

pandemic disrupted the Debtors' operations. Given that the Debtors would need to substantially over perform their historical financial performance—against the back drop of an unprecedented global pandemic—it is my professional opinion that even the threshold payout creates a difficult target for the KEIP Participants to strive for. In this regard, it is my opinion that the KEIP rewards outstanding performance and does not serve as a retention plan or provide KEIP Participants with an expectation of a bonus merely for continuing to remain employed by the Debtors.

11.     Another factor that my team and I analyzed to determine whether the KEIP was reasonable, was the sum of each KEIP Participant's base salary, target annual bonus awards and long-term incentive grants—sometimes referred to as total compensation. If the KEIP were not put in place, the KEIP Participants' total compensation would be lower than the historical total compensation paid to the KEIP Participants in 2019 and 2020. This would be despite the unprecedented demands that each KEIP Participant has been asked to take on in connection with these cases. Absent the KEIP, 2021 total compensation for the KEIP Participants will only reflect their present base salaries. It is my professional opinion that this outcome could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives, and that the KEIP is, in part, designed to reasonably address this shortfall. Moreover, based on my analysis of recent past compensation for the KEIP Participants, I do not view the KEIP, even at its maximum payout level, as providing the KEIP Participants with a windfall or excessive compensation in the context of their total compensation and reasonable expectations therefor.

8

### Analysis of Aggregate KEIP Costs

12.     As the primary reference point to evaluate the fairness and reasonableness of the KEIP, my team and I referenced companies in the Debtors' peer group (the "Peer Group").  The Peer Group consists of fourteen (14) peer companies operating in the retail and food services industries: (a) Barney's New York, Inc. (b) Brookstone Holdings Corp., (c) Charlotte Russe Holdings, Inc., (d) Charming Charlie Holdings Inc., (e) Fairway Group Holdings Corp., (f) FTD Companies, Inc., (g) Gymboree Group, Inc., (h) HRI Holding Corp. (Houlihan's Restaurants, Inc.), (i) Le Tote, Inc., (j) Perkins & Marie Callender's LLC, (k) RMH Franchise Holdings, Inc. (Applebees's), (l) Stage Stores, Inc., (m) True Religion Apparel, Inc., and (n) Z Gallerie, LLC.

13.     M3 selected companies for the Peer Group based on a number of factors, including the scope and complexity of operations, industry relevance, liabilities outstanding, and business model similarity.  I reviewed the Peer Group and found its composition to be reasonable.

14.     To assess the reasonableness of the total cost of the KEIP, my team and I analyzed incentive plans approved in the chapter 11 cases of the Peer Group.  My team and I calculated the cost of the KEIP on an absolute total dollar basis, and then compared this cost to both the historical cost of compensation for the KEIP Participants as well as the cost of court-approved incentive plans of the chapter 11 peers.  Based on this analysis, the cost of the KEIP awards is slightly below the median of similar incentive programs approved in the Peer Group cases.

15.     Based on the results of these benchmarking analyses, and my experience in other incentive compensation arrangements implemented in chapter 11 cases, I believe the KEIP and

projected 2021 direct compensation levels are reasonable in light of competitive market practice for companies, like the Debtors, that operate in the retail industry.  Critically, the absence of an incentive opportunity for the KEIP Participants would significantly undermine the current competitiveness of the Debtors' compensation structure, which in turn could negatively impact the Debtors' ability to capitalize on the chapter 11 process, including the sales process directed at benefitting all stakeholders.

### Conclusion

16.     Based on my education, experience, and the work I have done in this case and in similar cases, I believe that the design, structure, cost, and award opportunities available under the KEIP are reasonable given the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 30, 2021                    **M-III ADVISORY PARTNERS, LP**

                                         */s/ Colin M. Adams*
                                         Colin M. Adams
                                         Senior Managing Director